MARTIN J. BRILL (Calif. Bar No. 53220) mjb@lnbrb.com
DAVID B. GOLUBCHIK (Calif. Bar No. 185520) dbg@lnbrb.com
KRIKOR J. MESHEFEJIAN (Calif. Bar No. 255030) kjm@lnbrb.com
**LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.**
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244

*Proposed Reorganization Counsel for Chapter 11 Debtor and Debtor-in-Possession*

Bruce T. Beesley (NV Bar No. 1164) bbeesley@lrlaw.com
LEWIS AND ROCA LLP
Bank of America Plaza
50 West Liberty Street, Suite 410
Reno, Nevada 89501
Telephone: (775) 823-2900

*Proposed Co-Counsel for Chapter 11 Debtor and Debtor-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>WESTERN UTAH COPPER COMPANY,<br><br>    Debtor and Debtor-in-Possession. | Case No. 10-51913-GWZ<br>Chapter 11<br><br>**DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364 AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**<br><br>[Request for hearing on shortened notice filed concurrently herewith] |

Copper King Mining Corporation and Western Utah Copper Company, debtors and debtors in possession in their respective Chapter 11 bankruptcy cases (collectively, "Debtors"), hereby move on an emergency basis (the "Financing Motion"), for entry of an order authorizing Debtors to borrow up to $15,000,000 (up to $1,100,000 following entry of an interim order and the balance following entry of a final order) on a senior secured lien, junior secured lien, and superpriority administrative claim basis from Altus Metals, LLC ("Altus") to enable Debtors to commence operations of their business during the pendency of these cases.   A copy of the proposed interim financing order granting the relief requested in the Financing Motion (the "Financing Order") is attached as Exhibit "F" to the Declaration of A. John A. Bryan, Jr. ("Bryan Declaration") filed concurrently herewith.

Pursuant to the Financing Motion, Debtors seek a facility of up to $15 million, which will be secured by a superpriority and senior secured priming liens on Debtors' assets, excluding pre-petition equipment, which will serve as collateral on a junior secured basis.   At this time, Altus has committed, subject to Bankruptcy Court approval and certain closing contingencies, to fund up to $5 million of the foregoing facility.   Notwithstanding the foregoing, based on the fact that Debtors continue to discuss additional financing with Altus and other third parties, and for administrative and judicial efficiencies, Debtors respectfully request that a full $15 million facility be approved provided that additional financing comes in on the identical terms proposed herein.

The proposed financing is crucial to Debtors' business operations to address the following immediate concerns:

a.      Debtors' reclamation bond must be renewed or it will expire.  The cost of renewal is approximately $18,000, but Debtors lack the funds necessary to make such payment.  Without a reclamation bond in place, it is possible and likely that Debtors' mining permits will be pulled, resulting in irreparable harm to Debtors and their estates.

b.      Based on lack of funds, Debtors' utilities have been shut off.  Debtors cannot carry out the most basic of operations without utilities.

c.      Based on lack of funds, inadequate security exists at the properties.  Without security, a serious risk exists that Debtors' valuable equipment will be stolen or damaged, or that an unsupervised injury will occur on the properties.

d.     Debtors have received default notices from real property lessors.  If Debtors are not able to remain current with lease obligations, the leases will likely be deemed rejected and the time and effort that has gone into operating such properties will have been lost.

e.     Debtors are on the verge of proving certain reserves, but cannot complete the necessary drilling, inspection and investigation process without additional funding.

Unless the foregoing issues are immediately addressed, the estates and all creditors will be irreparably harmed.   The financing will stabilize and preserve operations, and substantially increase the value of Debtors' assets, thereby enhancing the positions of secured creditors herein.

Absent an immediate infusion of cash, Debtors have no ability to secure or operate their business.   The existing lenders would likely seek relief from stay to foreclose upon their collateral.   The propose financing would create value for the estates, protect the interests of all creditors, and create the foundation for a successful Chapter 11 reorganization.

Following an extensive and very active search of potential lenders/buyers/investors, the optimal entity that Debtors were able to negotiate an acceptable deal with is Altus, which is not an insider of Debtors, and which is willing to fund significant sums of cash to Debtors, but only on a senior secured, superpriority basis.   Debtors submit that, given the circumstances, the Court should approve the proposed financing.

The terms of the proposed financing from Altus are set forth in the agreements attached as Exhibits "E" and "F" to the concurrently filed Bryan Declaration.   As set forth therein, Altus has commited to lend to Debtors up to $5,000,000 of new money on a senior lien and superpriority adminstrative claim basis to enable Debtors to operate their business.   Up to $1,100,000 would be lent by Altus to Debtors on an emergency interim basis to enable Debtors to retain employees, maintain and/or establish crucial utility, security and other services, reestablish operations, address the existing impediments to successful operations, and sustain Debtors' Chapter 11 bankruptcy cases.   Given, the state of Debtors' operations, Altus is charging Debtors interest at the very reasonable rate of 12.99% per annum.   Debtors have concluded that the financing proposed by Altus is clearly in the best interests of Debtors' estates.

1    The relief sought in the Motion is based upon the Motion, the annexed Memorandum of

2    Points and Authorities, the Declarations of A. John A. Bryan, Jr., Marcus Southworth, David

3    Hartshorn, O. Jay Gatten and Michael G. Nelson, Ph.D., the statements, arguments and

4    representations of counsel to be made at the hearing on the Financing Motion, and any other

5    evidence properly presented to the Court at or prior to the hearing on the Motion.

6    **WHEREFORE**, Debtors respectfully request that this Court: (1) enter the proposed form

7    of Financing Order attached as Exhibit "F" to the Bryan Declaration; (2) authorize the Debtors to

8    borrow up to $1,100,000 from Altus on an interim basis in accordance with the terms set forth

9    above and in the Financing Order; (3) authorize the Debtors to execute all documents (including

10    all loan and security agreements, promissory notes and related documents) necessary to enable the

11    Debtors to implement the terms of the Financing Order; (4) schedule a final hearing on the

12    Motion to authorize the Debtors to borrow the remaining balance up to total borrowings of

13    $15,000,000; and (5) grant such other and further relief as the Court deems just and proper.

14    DATED this 2nd day of June, 2010.

15    By:    _/S/ David B. Golubchik_
       BRUCE T. BEESLEY, ESQ.
16       Nevada Bar No. 1164
       LEWIS AND ROCA LLP
17       50 W. Liberty Street, Ste. 410
       Reno, NV  89501
18

19       **Proposed Co-Counsel for Chapter 11
       Debtor and Debtor in Possession**
20

21       MARTIN J. BRILL, ESQ.
       California Bar No. 53220
22       DAVID B. GOLUBCHIK, ESQ.
       California Bar No. 185520
23       KRIKOR J. MESHEFEJIAN
       California Bar No. 255030
24       LEVENE, NEALE, BENDER, RANKIN
       & BRILL L.L.P.
25       10250 Constellation Blvd., Suite 1700
       Los Angeles, CA  90067
26

27       **Proposed Reorganization Counsel for
       Chapter 11 Debtor and Debtor in
28       Possession**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (D). Venue of the Debtor's Chapter 11 case is proper pursuant to 28 U.S.C §§ 1408 and 1409. The statutory basis for the relief sought herein is Sections 105, 364(c), 1107 and 1108.

## II.   STATEMENT OF FACTS AND BACKGROUND

**A.   Bankruptcy Filings.**

1.      Copper King Mining Corporation ("CKMC") and Western Utah Copper Company ("WUCC")(collectively, "Debtors") commenced their bankruptcy cases by filing Voluntary Petitions under Chapter 11 of the Bankruptcy Code on May 18, 2010 (the "Petition Date"). Debtors continue to manage their financial affairs and operate their bankruptcy estates as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

**B.   Debtors' Business Structure and a Summary of Debtors' Financial Problems.**

2.      WUCC was incorporated in mid-2002. Initially, WUCC had two shareholders which contributed to WUCC mining property assets they controlled so that these assets could be exploited. In 2002-2004, WUCC completed a series of mineral leases in order to consolidate their position within the district. WUCC then directed its efforts at moving the project into production in late 2004. Plans for exploration, mining, and processing were developed and sized.

3.      In November 2006, WUCC raised approximately $500,000 to pay property taxes due on mineral claims owned by WUCC. In January 2007, WUCC received additional financing in the form of secured loans with a group of individuals and entities with six month maturities in the aggregate face amount of $7.5 million (the "First Lien Loan"). Additional secured loans were made with several individuals and entities through March 2007 in the amount of approximately $4 million (the "Second Lien Loan"). These short term loans were made with expectations that they would be repaid from a $100 million credit line to be provided by Credit Suisse First Boston ("CSFB"), whose proposal was in the form of a term sheet. However, the terms of the CSFB

facility were rejected and WUCC turned to other lenders in May of 2007. Stillwater Capital, a hedge fund in New York, provided a term sheet. Loan documents were negotiated and agreed to for $55 million in financing. However, in late July 2007, just a few days before closing of this loan, Stillwater informed WUCC that it would not be able to close the transaction because of credit market problems that later developed into the now apparent "credit crunch" and their investors were pulling back their funding commitments. In September of 2007, WUCC began selling its privately held stock. Nearly $5 million of capital was raised in this manner. Another loan was made to WUCC and secured with a third mortgage in the amount of $1 million in October of 2007 (the "Third Lien Loan"). The First, Second and Third Lien Loans were secured by substantially all real and personal property assets of WUCC.

4.     In February of 2008, WUCC merged with CPRK, a Nevada corporation, a public company traded on the "Pink Sheets" under the symbol of CPRK. Shares in CPRK were sold and the proceeds invested in WUCC for completion of the concentrator/flotation mill, mining and exploration. During February 2007 to December of 2009, CPRK sold over four billion common shares of CPRK stock that provided aggregate proceeds to Debtors of $15 million. During that same period of time, other loans were taken out, secured with equipment and other assets which were not already encumbered by the First, Second and Third Lien Loans, in the aggregate amount of $17 million.[1]

5.     By December 2009, it had become nearly impossible to borrow any more money since most of Debtors' assets had been pledged as collateral and most of the 5.9 billion authorized shares of CPRK had been sold, and the existing creditors were unable and/or unwilling to accept reasonable proposed financing offers.

---

[1]   From September 2009 to May 2010, Empire Advisors, LLC and/or Altus Metals, LLC ("Empire") provided approximately $1.2 million of cash in purchasing certain unencumbered assets of Debtors and certain third parties, which Debtors were obligated to repurchase or purchase, and secured liens on certain other assets of Debtors and third parties to secure the repurchase and purchase obligations. During this time period, Empire made various offers to existing First Lien Loan lenders for reasonable financing of up to $7 million, but the First Lien Loan lenders were unwilling and/or unable to agree to terms.

6.      Debtors' management was involved in seeking alternative / supplemental financing for Debtors.  Management contacted numerous lenders and investors to obtain such financing on a secured or unsecured basis.  Notwithstanding, Debtors were unable to secure additional financing.

7.      Debtors also sought to obtain financing which was *parri passu* with the First Lien Loans.  Specifically, additional financing of up to $6 million was offered to Debtors, subject to existing lenders allowing those lenders to share, on a *parri passu* basis, a first priority position on substantially all assets of Debtors.  It was believed at the time that these funds could bring operations to positive cash flow.  The existing lenders and the new money lenders were not able to agree on acceptable terms of an intercreditor agreement and, therefore, the financing transaction did not close.  As a result, Debtors were not able to secure sufficient financing to complete their plan to reach positive cash flow.

8.      In early May 2010, the First Lien Loan lenders filed a notice of a foreclosure sale of Debtors' assets.  A foreclosure of Debtors' assets, without operations, would be detrimental to all creditors, including the foreclosing parties.  In order to preserve the value of Debtors' business for the benefit of all creditors and parties in interest, Debtors determined that the commencement of their bankruptcy cases under Chapter 11 of the Bankruptcy Code was necessary and proper.

**C.      Need For Immediate Funding**

9.      Debtors are at a critical juncture and, without funding, Debtors will lose value quickly due to the following important issues, which cannot be addressed without funding:

a.      Debtors' reclamation bond must be renewed or it will expire.  The cost of renewal is approximately $18,000, but Debtors lack the funds necessary to make such payment.  Without a reclamation bond in place, it is possible and likely that Debtors' mining permits will be pulled, resulting in irreparable harm to Debtors and their estates. It would take many months to try to replace this bond and it could well be impossible.

b.      Based on lack of funds, Debtors' utilities have been shut off.  Debtors cannot carry out the most basic of operations without utilities.

c.      Based on lack of funds, inadequate security exists at the properties. Without security, a serious risk exists that Debtors' valuable equipment will be stolen or damaged, vandalized, or that an unsupervised injury will occur on the properties.

     d.    Debtors have received default notices from real property lessors.  If Debtors are not able to remain current with lease obligations, the leases will likely be deemed rejected and the time and effort that has gone into operating such properties will have been lost. As a result,  Debtors could lose their valuable mineral reserves.

     e.    Debtors are on the verge of proving certain reserves, but cannot complete the necessary drilling, inspection and investigation process without additional funding.

Unless the foregoing issues are immediately addressed, the estates and all creditors will be irreparably harmed.  Immediate funding is necessary in order to remedy the foregoing issues.

**D.    Current Valuation**

10.    Debtors' holdings include substantial equipment utilized for mining operations, a floatation mill, shop and office facilities, approximately 5,000 acres of raw land which is not suitable for mining, but may be sold for development of other projects, and ore which has not been extracted.   Based on lack of funds and an ore processing facility that needs technical improvements, all operations have ceased.

11.    Attached as Exhibit "A" to the accompanying Declaration of A. John A. Bryan, Jr. ("Bryan Declaration") is a true and correct copy of the summary of assessments of Debtors' assets.   Pursuant to the assessments, Debtors' assets are valued at $7,972,469.   Below the assessed values is a schedule of secured debt, which totals almost $60 million.

12.    The Watley Group ("Watley"), Debtors' financial advisors, conducted extensive investigation into Debtors' operations, including interviews with industry leaders and investment bankers.  Based on such efforts, Watley prepared a valuation model of Debtors' assets today, based on current factors (e.g., no operations and no ability to extract and efficiently process ore).  Attached to the Bryan Declaration as Exhibit "B" is a true and correct model showing the methodology employed to value Debtors' assets today ("Current Valuation Model"), which was created jointly by Watley and Debtors.  Following is a narrative of certain assumptions utilized in the Current Valuation Model:

     a.    As set forth in the accompanying Declaration of David Hartshorn, it is unrealistic to place any value on "Inferred" and "Indicated" reserves since they have not been proven.  Based on the foregoing, while the Hatch report indicates that there are "Inferred" and "Indicated" reserves, no value was placed on such unknowns.

b.    Debtors hold Measured reserves at the Bawana site, Hidden Treasure site and Copper Ranch site.  However, Debtors lack the necessary infrastructure at this time to extract ore from Hidden Treasure and Copper Ranch.  As a result, the only site which is currently capable of being mined by Debtors is the Bawana site.

c.    The Current Valuation Model assumes that the ore at the Bawana site may be extracted over a period of eight (8) months.  After expenses, including capital expenditures, it is estimated the future value of such operations will result in approximately $4,225,000 in proceeds.  The Net Present Value of the foregoing is $3,791,720.

d.    Because the ore  mining facility does not have the equipment or technical capacity at this time, one has to assume that once mining operations at Bawana are complete, it is assumed that Debtors will sell their equipment, which is expected to take six (6) months.  It is estimated that the future value of such disposition of assets will be approximately $8,000,000.  The Net Present Value of the Foregoing is $6,467,130.

13.    Based on the foregoing, Watley has concluded that the current value of Debtors' estates, in their current condition, is approximately $10,258,850 ($3,791,720 plus $6,467,130). With approximately $60 million in asserted secured claims, secured creditors are undersecured.

**E.    Future Valuation**

14.    Debtors, with the aid of Watley, continued to determine whether an infusion of funds would increase the value of the estates for the benefit of all creditors, including secured creditors.  Based on interviews with industry experts and review of the Hatch report, copies of relevant pages of which are attached as Exhibit "A" to the Declaration of Marcus Southworth, the most efficient way of creating value is to transfer "Inferred" and "Indicated" reserves into "Measured" reserves categories.  This can only be accomplished with additional drilling and verification, to comply with the NI 43-101 requirements.  Once Debtors' reserves achieve "Measured" status, they will be recognized reserves in the industry and will substantially add to the value of these estates.  This can only be effectuated with additional funding.

15.    Attached to the Bryan Declaration as Exhibit "C" is a true and correct copy of a model Watley and Debtors created to determine the difference in values if Debtors had access to funding of up to $15 million (the "$15 Million Model").  With such funding, Debtors would have the ability to commence operations.  This would include additional

drilling and investigation to comply with NI 43-101 requirements, resulting in adding to Debtors' "Measured" reserves holdings.  Funds would also be used to upgrade the floatation mill and build leaching facilities.

16.    Based on the $15 Million Model, Watley has concluded that, if Debtors were allowed to spend up to $15 million (the $15 Million Model actually includes projected expenditures of less than $14 million), the Net Present Value of the estates will increase to $56,573,590.

17.    The actual valuations are not as critical at this time as much as the change in value from today to the future based on access to funds.  Watley has concluded that with up to $15 million in financing, the value of Debtors' holdings will increase from $10,258,850 to $56,573,590, an increase of $46,314,740.  After deducting the $15 million in financing from the foregoing figure, the net increase in value of the estates is $31,314,740.

18.    While Altus has advised Debtors that it is willing to go up to $15 million, pursuant to the DIP Loan Documents attached to the Bryan Declaration as Exhibits "E" and "F", Altus has formally committed to only $5 million.  Attached to the Bryan Declaration as Exhibit "D" is a model Watley and Debtors created to determine the difference in values if Debtors had access to funding of up to $5 million (the "$5 Million Model").

19.    Based on the $5 Million Model, Watley has concluded that, if Debtors were allowed to spend up to $5 million, the Net Present Value of the estates will increase to $34,559,020.  Based on the foregoing, Watley has concluded that with up to $5 million in financing, the value of Debtors' holdings will increase from $10,258,850 to $34,559,020, an increase of $24,300,170.  After deducting the $5 million in financing from the foregoing figure, the net increase in value of the estates is $19,300,170.

20.    Debtors submit that this is a huge windfall for all secured creditors of Debtors. However, once Debtors commence operations and prove the existence of additional "Measured" reserves, Debtors are certain that the value will further increase, which will benefit the unsecured creditors of the estates as well.

**D.      DIP Financing**

21.      Since being retained by Debtors, Mr. Bryan has gone out to the marketplace to obtain post-petition financing for Debtors.   Mr. Bryan spoke with representatives of institutional lenders hedge funds, as well as individuals with financial wherewithal and interest in such entities.   To date, the only commitment received by Debtors is from Altus, which is an affiliate of Empire Advisors, LLC, Debtors' pre-petition equipment lender.

22.      Negotiations with Altus were extensive, with numerous drafts of proposed loan documents exchanged and modified.   At the conclusion of such negotiations, the parties agreed to the terms of the DIP financing.   True and correct copies of the proposed promissory note and security agreement (collectively, the "DIP Loan Documents") are attached to the Bryan Declaration as Exhibits "E" and "F", respectively. A proposed form of order is part of Exhibit "F".

23.      The material terms of the proposed financing include:

a.      Debtors seek a $15 million financing facility.  Pursuant to the DIP Loan Documents, Altus has committed to fund up to $5 million.  However, Mr. Bryan has been advised by Altus that Altus has examined Debtors' preliminary business plan and, given the integrity of the business plan and anticipated increase in the value of the collateral, Altus expects to increase the commitment to $10 million, then to $15 million based on further funding submissions to be provided.

b.      Interest on the outstanding amount will accrue at the rate of 12.99% per annum.

c.      Altus will be entitled to reimbursement of expenses, up to $100,000, plus third party costs related to negotiation and documentation of the DIP Loan Documents.

d.      In the event that the DIP Loan Documents are not approved but financing is approved through a different entity, Altus will be entitled to a fee of $100,000.

e.      The loan will be due and payable in one (1) year.

f.      In the event that the loan is repaid prior to the one (1) year period, a prepayment penalty of 10% will apply.

g.      As further consideration for financing, Altus will be entitled to receive 5% equity interest in the reorganized entity.

h.     The financing will be secured by a first priority priming lien on all assets of the Debtors, excluding pre-petition equipment.  With respect to pre-petition equipment, the financing will be secured by a junior lien on such assets.

24.     In light of the circumstances of these cases, Debtor submits that the proposed financing is fair and reasonable and, to date, the only commitment received by Debtors. Immediate financing is necessary to preserve and enhance the value of Debtors' holdings.

### III.     COMPLIANCE WITH RULE 4001

Pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure, Debtors hereby provide the following disclosures with respect to the DIP Loan:

| | | |
|---|---|---|
| A grant of priority or a lien on property of the estate under § 364(c) or (d) | Does apply | The DIP Loan will be secured by liens which will be (1) senior to perfected, valid and enforceable liens existing on the petition date on all of the Debtors' assets with the exception of any equipment owned by the Debtors as of the petition Date and (2) junior in priority to perfected, valid and enforceable liens existing on the petition date on any equipment owned by the Debtors. |
| The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim | Does not apply | |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | Does not apply | |
| A waiver or modification of Code provisions or applicable rulings relating to the automatic stay | Does not apply | |
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request to obtain authority to obtain credit under § 364 | Does not apply | |

11

| | | |
|---|---|---|
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | Does not apply | |
| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | Does apply | The Final DIP Order will waive the requirement of the perfection of the post-petition liens being granted to Altus to secure the Debtor's post-petition obligations to Altus, which the Debtors submit is a routine right granted to a post-petition lender. |
| A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or deadline to commence an action | Does not apply | |
| The indemnity of an entity | Does apply | Section 30 provides for indemnity of Altus with respect to any challenges to its liens and rights herein |
| A release, waiver, or limitation of any right under Section 506(c) | Does not apply | |
| The granting of a lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | Does not apply | |

## IV.  **DISCUSSION**

A.  The Debtors Should Be Authorized To Obtain Debtor In Possession Financing From Altus To Operate, Maintain And Preserve Their Business.

Pursuant to Bankruptcy Code §§ 364(c) and (d), the Debtors request authority to incur up to $15,000,000 of post-petition financing from Altus (with $1,100,000 to be advanced pursuant to an interim Court order and the balance to be advanced pursuant to a final Court order) allowable as an administrative expense, having priority over all other administrative expenses and secured by a senior lien on all assets of the Debtors' estates, except the Debtors' equipment (upon which only a junior lien shall inure).  The Debtors need additional funding to meet their obligations necessary to operate their businesses, administer their Chapter 11 estates and increase the going concern value of the Debtors' businesses.  However, at this time, the Debtors have the following critical issues which must be immediately addressed: (1)  Debtors' reclamation bond must be

renewed or it will expire.  The cost of renewal is approximately $18,000, but Debtors lack the funds necessary to make such payment.  Without a reclamation bond in place, it is possible and likely that the Debtors' mining permits will be pulled, resulting in irreparable harm to the Debtors and their estates.  It would take many months to try to replace this bond and it could well be impossible; (2) based on lack of funds, Debtors' utilities have been shut off.  Debtors cannot carry out the most basic of operations without utilities; (3) based on lack of funds, inadequate security exists at the properties.  Without security, a serious risk exists that Debtors' valuable equipment will be stolen or damaged, vandalized, or that an unsupervised injury will occur on the properties; (4) Debtors have received default notices from real property lessors.  If Debtors are not able to remain current with lease obligations, the leases will likely be deemed rejected and the time and effort that has gone into operating such properties will have been lost. As a result, Debtors could lose their valuable mineral reserves; and (5)  Debtors are on the verge of proving certain reserves, but cannot complete the necessary drilling, inspection and investigation process without additional funding.

Unless the foregoing issues are immediately addressed, the estates and all creditors will be irreparably harmed.  Immediate funding is necessary in order to remedy the foregoing issues.

Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate.  See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-9 (D. Colo.1985) (authorizing interim financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ("Ames") (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").  Section 364(c) provides, in pertinent part, that:

(c)  If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the

incurring of debt –

    (1)   with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title:

    (2)   secured by a lien on property of the estate that is not otherwise subject to a lien; or

    (3)   secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

Section 364(d)(1) of the Bankruptcy Code governs the incurrence of senior secured debt or "priming" loans.  Pursuant to Section 364(d)(1), the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if –

    (1)   the trustee is unable to obtain such credit otherwise; and

    (2)   there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.  11 U.S.C. § 364 (d)(1).

Section 364 of the Bankruptcy Code is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the post-petition period.  In re Photo Promotion Associates, Inc., 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d. Cir. 1989).  Where a trustee or debtor in possession cannot otherwise obtain unsecured post-petition credit, such credit may be obtained under certain carefully proscribed conditions.  In re T.M. Sweeney & Sons LTL Services, Inc., 131 B.R. 984, 989 (Bankr.N.D.Ill.1991).   For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including, without limitation, liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364(d).  In re Photo Promotion Associates, Inc., 87 B.R. at 839.

Section 364(c) of the Bankruptcy Code also enumerates certain incentives that a court may grant to post-petition lenders.   The Section 364(c) list, however, is not exhaustive.   Courts frequently have authorized the use of inducements not specified in the statute.  See, e.g., In re

Ellingsen MacLean Oil Co., 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); In re Defender Drug Stores, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), aff'd 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364").

Subject to the approval of the Court, Debtors have agreed to grant to Altus liens against all of Debtors' assets senior to any and all existing liens (except for Debtors' pre-petition equipment, upon which Altus will receive a junior lien) and have agreed that any administrative claim in favor of Altus will have priority over all other administrative claims.  For all of the reasons explained herein, Debtors believe that granting these protections to Altus are warranted, appropriate and necessary given the circumstances of these cases where Altus has agreed to provide the Debtors with critically necessary emergency and future financing.

Two factors courts consider in determining whether to authorize post-petition financing which contemplates the granting of a security interest in favor of the lender are (1) whether the debtor is unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 364(b)(1)(A); and (2) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.  In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); see also In re Aqua Assoc., 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

In addition to the foregoing, a debtor in possession seeking subordination of liens to new financing must establish adequate protection of the liens to be subordinated to the new financing. In re C.B.G. Ltd., 150 B.R. 570, 571 (Bankr. M.D.Pa. 1992).

Debtors submit that all of these standards have been satisfied in these cases.

1.      Debtors Were Unable To Obtain Unsecured Credit.  In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under § 364(a) and (b).  See, e.g., In re

1  Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith

2  effort that credit was not available without senior lien by unsuccessfully contacting other financial

3  institutions in immediate geographic area; "the statute imposes no duty to seek credit from every

4  possible lender before concluding that such credit is unavailable"); Ames, supra, 115 B.R. at 40

5  (finding that debtors demonstrated the unavailability of unsecured financing where debtors

6  approached four lending institutions).

7      The accompanying Declaration of Marcus Southworth discusses Debtors' extensive

8  efforts prior to the bankruptcy filing to obtain financing, which efforts were not successful.  The

9  accompanying Declaration of A. John A. Bryan, Jr. discusses his extensive efforts on and after the

10  Petition Date in seeking financing.  To date, the best (and only) commitment was provided by

11  Altus.  Based on the testimony provided in the foregoing declarations, Debtors submit that this

12  element has been satisfied.

13      2.    The Terms Of The Proposed Financing Are Fair, Reasonable and Adequate.

14  Debtors submit that terms of the proposed post-petition financing from Altus are fair, reasonable

15  and adequate.  Altus is not an insider of Debtors and has been asked to commit to providing

16  Debtors with up to $15,000,000 of post-petition financing (although only $5 million has been

17  committed to date).  Altus is taking on a substantial economic risk by loaning cash to companies

18  that currently have suspended operation, which Debtors believe justify the protections and

19  security requested by Altus.  The Altus loan offers Debtors their best opportunities to jump start

20  Debtors' business from its current suspension, and increase the going concern value of their

21  business.  The terms of the Altus post-petition financing were extensively negotiated by and

22  between Debtors and Altus in an arms length transaction.  The financing terms offered by Altus

23  are the best financing terms which have been offered to Debtors.

24      3.    The Liens Being "Subordinated" Are Adequately Protected.  The proposed priming

25  liens are authorized by the Bankruptcy Code, even absent consent of other existing lien holders.

26  Bankruptcy Code § 364(d)(1)(B) requires the furnishing of adequate protection in favor of lien

27  holders which assert an interest in collateral.  Neither this nor any other Bankruptcy Code

28

provision specifically defined the term "adequate protection". However, Bankruptcy Code §361 provides that adequate protection is furnished to the extent Debtors' "use, sale, lease or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3) (emphasis added). Stated succinctly, adequate protection protects a secured creditor against a decrease in the value of its collateral. See e.g., In re Planned System, Inc., 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987). This standard applies equally with respect to a proposed "priming" financing under section 364(d)(1)(B). See, e.g., In re Hubbard Power & Light, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests."); In re Aqua Assoc., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); In re Beker Ind. Corp., 58 B.R. 725, 741-42 (Bankr. S.D.N.Y. 1986).

The Court has broad discretion to determine whether adequate protection is furnished. See e.g., In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Whether the party entitled to such protection is over or undersecured is not dispositive of whether adequate protection is furnished. As the court in Aqua Assoc., 123 B.R. 192, noted:

> Therefore, we believe that, while the presence of an equity cushion should be a relevant factor, it should not be a determinative factor in any 'adequate protection' analysis, and particularly one relating to § 364(d)(1)(B). The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.

Id. at 196 (emphasis added; approving priming financing where interest rate was 5% over prime and loan likely would enhance value of estate).

The preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex. 1988). See also In re Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982). In Stein, the Court found that, as a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though the secured party had no equity cushion for protection. The Stein Court

determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business.  See also In re McCombs, supra, where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

Such adequate protection of any existing liens is present in the Debtors' cases because without the proposed financing from Altus, Debtors would be required to permanently shut down and all of Debtors' going concern value would be immediately and permanently lost.  In contrast, the Altus financing enables Debtors to pay critical expenses, resume operations, perform exploratory drilling, and create value for all parties, particularly the secured lenders in these cases, and realize the full potential of Debtors' business.  Detailed analyses of the effect of a $15 million and $5 million in funding are set forth in Exhibits "C" and "D" to the Bryan Declaration, respectively.  Both scenarios clearly conclude that the return on investment greatly exceeds the investment.  As a result, not only is every existing lien holder not harmed by the granting of the priming liens in favor of Altus, any and all such lien holders are benefited (and positions improved) from the granting of such priming liens in favor of Altus.  Indeed, the proposed financing will allow Debtors to increase the productivity of Debtor's copper mill two-fold, prove additional copper and other mineral deposits, obtain requisite permitting, and drill.

Further, Debtors have reduced and will continue with their efforts to reduce further their operating expenses as much as possible in order to maximize Debtors' profitability.  In a similar situation, the Court in the Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713 (Bankr. D. Del. 1996), considered this issue and allowed the use of cash collateral, accepting the debtor's argument that no additional adequate protection payments need be made:

> if there is no actual diminution in the value of [the] collateral through the date of the hearing, and [Debtor] can operate profitably post-petition, [creditor] is adequately protected for the use of its cash collateral. 11 U.S.C. Section 361; In re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); In re

<u>Dynaco</u>, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); <u>In re</u>
<u>Immenhausen Corp.</u>, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

4.     <u>The Financing From Altus Is Necessary And Proper</u>.   While in determining whether to approve such a transaction, a Court is authorized to act in its informed discretion, <u>In re</u> <u>Ames Department Stores, Inc.</u>, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990), the Court should give broad deference to the business decision of a Chapter 11 debtor, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds.   Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).   As the Court noted in In re Ames Dept. Stores Inc., supra, "the court's discretion under section 364 is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to be exercised . . ."   In re Ames Department Stores, Inc., 115 B.R. at 40.

Without additional financing, Debtors will be required to permanently shut down their business operations as Debtors would not be able to pay any operating expenses.   This would result in irreparable harm for Debtors and all creditors of the estates.   In contrast, the potential value of the business, if Debtors are able to operate and initiate the changes management envisions, would increase exponentially based on the analysis prepared by Watley.   Debtors have therefore concluded that obtaining post-petition financing on the proposed terms herein is in the best interests of the Debtors' estates.

B.     <u>Debtors Have Satisfied The Procedural Requirements Regarding Approval Of The</u>
<u>Proposed Financing</u>.

Bankruptcy Rules 4001(c) and (d) sets forth procedural requirements for obtaining post-petition credit.   There are three general provisions of these Bankruptcy Rules.   First, the Motion must contain a copy of the proposed form of financing order, which has been done by attaching the proposed form of financing order as Exhibit "F" to the concurrently filed Bryan Declaration (the "Financing Order").   Second, the Motion must provide a concise statement of the relief requested, which was done above.   Third, the Motion is required to be served on a creditors committee or on the twenty largest unsecured creditors if there is no committee and on such other parties as the Court directs.   Here, Debtors served the Motion on the twenty largest unsecured

creditors (as no committee yet exists), the Office of the United States Trustee, all known lien holders, and those parties who have requested special notice via overnight mail (or email when email addresses were known).    Accordingly, the Motion complies with the requirements of Bankruptcy Rules 4001(c) and (d).  Also, Debtors have addressed the issues raised in Bankruptcy Rule 4001(c) regarding a motion for obtaining post-petition credit.

## V.    CONCLUSION

WHEREFORE, Debtors respectfully request that this Court: (1) enter the proposed form of Financing Order attached as Exhibit "F" to the Bryan Declaration; (2) authorize Debtors to borrow up to $1,100,000 from Altus on an interim basis in accordance with the terms set forth above and in the Financing Order; (3) authorize Debtors to execute all documents (including all loan and security agreements, promissory notes and related documents) necessary to enable Debtors to implement the terms of the Financing Order; (4) schedule a final hearing on the Motion to authorize Debtors to borrow the remaining balance up to total borrowings of $15,000,000; and (5) grant such other and further relief as the Court deems just and proper.

DATED this 2nd day of June, 2010.

By:    /S/ David B. Golubchik
BRUCE T. BEESLEY, ESQ.
Nevada Bar No. 1164
LEWIS AND ROCA LLP
50 W. Liberty Street, Ste. 410
Reno, NV  89501
**Proposed Co-Counsel for Chapter 11
Debtor and Debtor in Possession**

MARTIN J. BRILL, ESQ.
California Bar No. 53220
DAVID B. GOLUBCHIK, ESQ.
California Bar No. 185520
KRIKOR J. MESHEFEJIAN
California Bar No. 255030
LEVENE, NEALE, BENDER, RANKIN
& BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA  90067
**Proposed Reorganization Counsel for
Chapter 11 Debtor and Debtor in
Possession**