MARTIN J. BRILL (Calif. Bar No. 53220) mjb@lnbyb.com   **Filed Electronically**
DAVID B. GOLUBCHIK (Calif. Bar No. 185520) dbg@lnbyb.com
KRIKOR J. MESHEFEJIAN (Calif. Bar No. 255030) kjm@lnbyb.com
**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244

*Proposed Reorganization Counsel for Chapter 11 Debtor and Debtor-in-Possession*

STEVEN R. SKIRVIN (Utah Bar No. 7626)
**DION-KINDEM & CROCKETT**
10808 S. River Front Parkway, Suite 334
South Jordan, UT  84095
Telephone: (801) 984-8045
Facsimile: (801) 984-4315
Email: srs@dkclaw.com

*Proposed Local Counsel for Chapter 11 Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH

| | |
|---|---|
| In re: | Case No. 10-29159-WTT |
| Western Utah Copper Company, | Chief Judge William T. Thurman |
| Debtor and Debtor-in-Possession. | Chapter 11 |

**MEMORANDUM OF LAW IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364 AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

1

WESTERN UTAH COPPER COMPANY, the above-named Chapter 11 debtor and debtor in possession ("WUCC") hereby files its Memorandum of Law in support of the motion for entry of an order authorizing the Debtors to borrow up to $10,000,000 (up to $650,000 following entry of an interim order and the balance following entry of a final order) on a senior secured lien, junior secured lien, and superpriority administrative claim basis from Altus Metals, LLC ("Altus") to enable the Debtors to commence operations of their business during the pendency of this and the related Copper King Mining Corporation bankruptcy case ("CKMC" and collectively with WUCC, the "Debtors"). A similar pleading has been filed in the CKMC case.

## STATEMENT OF RELEVANT FACTS

### A.    Background Information.

1.    On May 18, 2010 (the "Petition Date"), the Debtors commenced their bankruptcy cases by filing Voluntary Petitions under Chapter 11 of the Bankruptcy Code (the "Petition Date"). The Debtors originally filed their bankruptcy cases in the United States District Court for the District of Nevada (the "Nevada Court").

2.    On July 8, 2010, pursuant to the Nevada Court's *sua sponte* ruling, WUCC's case was transferred to this Court (the "Utah Court"). Subsequent to that ruling, CKMC requested that the Nevada Court also transfer the CKMC case to the Utah Court. On July 26, 2010, the CKMC case was also transferred to this Court.

3.    WUCC engages in exploration, development, extraction, and processing of metals, including copper, silver, and gold, from its extensive mineral resources located in and around the Milford Mineral Belt in Beaver County Utah. Since 2003, WUCC had assembled an impressive mining property which consolidated a large region of the Milford Mineral Belt, a large mineral rich area in western Utah. WUCC now owns or controls approximately

100,000 acres of mineral rights, primarily in the Milford, Utah region. Many of these claims had been successfully mined previously, but no one was able to consolidate this region into one company and build an ore processing mill due to the fractured mining claims. WUCC succeeded in consolidating 635 Bureau of Land Management un-patented mining claims covering nearly 60,000 acres of land. WUCC had also built a "floatation" ore processing mill (the "Mill") which it ran and operated in 2009 and 2010 prior to filing for Chapter 11.

**B.**    **Events Leading To Bankruptcy.**

4.      WUCC was incorporated in mid-2002. Initially, WUCC had two shareholders which contributed to WUCC's mining property assets so that these assets could be exploited. In 2002-2004, WUCC completed a series of mineral leases in order to consolidate its position within its mining district. WUCC then directed its efforts at moving the project into production in late 2004. Plans for exploration, mining, and processing were developed and sized.

5.      In 2006, WUCC raised capital to pay property taxes due on mineral claims owned by the Debtor and other operating and capital expenditures. In January 2007, WUCC received additional financing in the form of secured loans with a group of individuals and entities (the "First Lien Lenders") with six month maturities in the aggregate face amount of $7.5 million (the "First Lien Loan"). Additional secured loans were made with several individuals and entities (the "Second Lien Lenders") through March 2007 in the amount of approximately $4 million (the "Second Lien Loan"). These short term loans were made with expectations that they would be repaid from a $100 million credit line to be provided by Credit Suisse First Boston ("CSFB"), whose indication of interest was in a form of a non-binding term sheet. However, the terms of the CSFB facility were rejected and WUCC turned to other lenders in May of 2007. Stillwater Capital, a hedge fund in New York, provided a term sheet. Loan documents were negotiated and agreed to for $55 million in

financing.  However, in late July 2007, just a few days before closing of this loan, Stillwater informed WUCC that it would not be able to close the transaction because of credit market problems that later developed into the now apparent "credit crunch."  In September of 2007, WUCC began selling its privately held stock.  Nearly $5 million of capital was raised in this manner.  Another loan was made to WUCC and secured with a third mortgage in the amount of $1 million in October of 2007 (the "Third Lien Loan").  The First, Second and Third Lien Loans were secured by substantially all real and personal property assets of WUCC.

6.      In February of 2008, WUCC merged with CPRK, a public company whose stock is traded on the "Pink Sheets" under the symbol of CPRK.  Shares in CPRK were sold and the proceeds invested in WUCC for: (1) completion of WUCC's concentrator/flotation mill; (2) mining; and (3) exploration.  During that same period of time, other loans were taken out by WUCC, secured with equipment and other assets which were not already encumbered by the First, Second and Third Lien Loans, in the aggregate amount of $17 million.[1]

7.      By December 2009, it had become nearly impossible to borrow any more money since most of WUCC's assets had been pledged as collateral and most of the 5.9 billion authorized shares of CPRK had been sold, and the lenders were unable and/or unwilling to accept reasonable proposed financing offers.

8.      The Debtors' management was involved in seeking alternative / supplemental financing for the Debtors.  Management contacted numerous lenders and investors to obtain

---

[1]    From September 2009 to May 2010, Empire Advisors, LLC and/or Altus Metals, LLC ("Empire") provided approximately $1.2 million of cash in purchasing certain unencumbered assets of the Debtors and certain third parties, which the Debtors were obligated to repurchase or purchase, and secured liens on certain other assets of the Debtors and third parties to secure the repurchase and purchase obligations.  During this time period, Empire made various offers to existing First Lien Lenders for reasonable financing of up to $7 million, but the First Lien Lenders were unwilling and/or unable to agree to terms.

such financing on a secured or unsecured basis.  Notwithstanding these efforts, the Debtors were unable to secure additional financing.

9.     The Debtors also sought to obtain financing which was *parri passu* with the First Lien Loans.  Specifically, additional financing of up to $6 million was offered to the Debtors, subject to existing lenders allowing those lenders to share, on a *parri passu* basis, a first priority position on substantially all assets of the Debtors.  It was believed at the time that these funds could bring operations to positive cash flow.  The existing lenders and the new money lenders were not able to agree on acceptable terms of an intercreditor agreement and, therefore, the financing transaction did not close.  As a result, the Debtors were not able to secure sufficient financing to complete their plan to reach positive cash flow.

10.    In early May 2010, the First Lien Lenders filed a notice of a foreclosure sale of WUCC's assets.  All utilities, including electrical power, were disconnected, and all personnel had been let go, including security.  Vandalism and theft were major problems and WUCC discovered generators and equipment were lost or stolen, the Mill had been shut down, huge machinery, such as loaders and ore hauling trucks (commonly called "Rolling Stock"), had been shut down without being adequately prepared for storage.  Over $8 million dollars worth of Rolling Stock, drilling equipment, generators, and other machinery was left outside in the field unprotected with no security and exposed to vandalism or theft.  The lack of security or supervision on the entire property meant that huge open pit mine sites had no security, endangering anyone on the property.  The Mill contains over $25,000,000 of equipment and, when it was shut down, it was done so improperly since there was no money to prepare the equipment for a long period of down time. For example, over $1,000,000 of heavy ball mills were left full of hardening wet ore, and bearings and motors were left with no lubrication or ongoing maintenance program in preparation for shut down. A major electrical power substation built to power the Mill was left completely unprotected.  The Mill

network control room, with over $1,500,000 of computer and network control equipment, was left unattended without power and completely unprotected from dust, dirt, and summer heat of over 100 degrees.  As a result of the foregoing, operational mining permits granted by Utah Department of Oil, Gas, and Mining were in jeopardy, resulting in a potential loss of $1,642,720.00 in prepaid bonding deposits.  Moreover, non-payment of maintenance fees on 635 Bureau of Land Management un-patented mining claims covering nearly 60,000 acres of land that had nearly lapsed, which would have then allowed any entrepreneurial miner to file new claims on the WUCC's un-patented holdings locations. This would have disrupted the consolidation of valuable proven and inferred resources currently held by the estate.  The loss of owned and leased patented mining claims covering many identified and proven ore resources would have wiped out WUCC's control over its consolidated mineral and land package.  WUCC's insurance was expiring, and the SEC and IRS were investigating alleged public company violations by CKMC among other things.  Essentially, all of the Debtors' resources and mineral properties were in question as leases, claims, mortgages, and other agreements were on the verge of lapsing, cancellation, or foreclosure.

11.     In addition, numerous collection actions were nearing judgment, and litigation with Nevada Star could have resulted in a default summary judgment based on the fact that WUCC could not pay to defend the litigation.

12.     Further, certain federal agencies had threatened seizure of all of the Debtors' data relating to day to day financial operation.

13.     In summary, the Debtors were on the verge of falling apart.  The equipment in the Mill could not even be disassembled and sold because most buyers would require working equipment that they could test prior to purchase, which was impossible without utilities and proper maintenance and shut-down procedures.   Therefore, the Mill and

available Rolling Stock could only be valued as scrap or for breakdown into parts rather than as working equipment.

14.    In order to preserve the value of Debtors' business for the benefit of all creditors and parties in interest, the Debtors determined that the commencement of their bankruptcy cases under Chapter 11 of the Bankruptcy Code was necessary and proper.

**C.    Valuation of Assets on Petition Date.**

15.    On the Petition Date, the Debtors' holdings included substantial rolling stock equipment utilized for mining operations, the Mill, shop and office facilities, approximately 5,000 acres of raw land which is not suitable for mining, but may be sold for development of other projects, and ore which has not been extracted.  Based on lack of funds and an ore processing facility that needs technical improvements, all operations had ceased.

16.    Attached as Exhibit "A" to the accompanying Appendix of Exhibits ("Appendix") is a true and correct copy of the summary of assessments of the Debtors' assets upon case commencement.  Pursuant to the assessments, upon case commencement, the Debtors' assets were valued at $7,972,469.  Below the assessed values is a schedule of secured debt, which totals almost $60 million.

17.    The Watley Group ("Watley"), the Debtors' financial advisors, conducted extensive investigation into the Debtors' operations, including interviews with industry leaders and investment bankers.  Based on such efforts, Watley prepared a valuation model of the Debtors' assets as of case commencement, based on factors in existence at that time (e.g., no operations and no ability to extract and efficiently process ore).  Attached to the Appendix as Exhibit "B" is a true and correct copy of the model showing the methodology employed to value the Debtors' assets as of the Petition Date ("Petition Date Valuation Model"), which was created jointly by Watley and the Debtors.  Following is a narrative of certain assumptions utilized in the Petition Date Valuation Model:

a.      As set forth in the accompanying Declaration of David Hartshorn, attached to the RJN as Exhibit "3", it is unrealistic to place any value on "Inferred" and "Indicated" reserves since they have not been proven. Based on the foregoing, while the Hatch report indicates that there are "Inferred" and "Indicated" reserves, no value was placed on such unknowns.

b.      Debtors hold Measured reserves at the Bawana site, Hidden Treasure site and Copper Ranch site. However, Debtors lack the necessary infrastructure at this time to extract ore from Hidden Treasure and Copper Ranch. As a result, the only site which is currently capable of being mined by Debtors is the Bawana site.

c.      The Petition Date Valuation Model assumes that the ore at the Bawana site may be extracted over a period of eight (8) months. Even though the Debtors lacked sufficient funds to mine and process the Bawana deposit, it was assumed that a buyer would be willing to pay for the Net Present Value of the cash flows from the Bawana deposit after subtracting the amount of expenses that would need to be incurred. This set of assumptions was necessary to maximize the valuation of the Bawana deposit and the Debtors' operations. After subtracting the expenses, including capital expenditures, it is estimated the future value of such operations would result in approximately $4,225,000 in proceeds. The Net Present Value of the foregoing is $3,791,720.

d.      Because the ore mining facility did not have the equipment or technical capacity at that time to mine other deposits, it is assumed for this

valuation that once mining operations at Bawana were complete, that the Debtors sell their equipment, which would be expected to take six (6) months. It is estimated that the future value of such disposition of assets is approximately $8,000,000. The Net Present Value of the Foregoing is $6,467,130.

18.     Based on the foregoing, Watley has concluded that on the Petition Date the value of Debtors' estates in their condition at that time was approximately $10,258,850 ($3,791,720 plus $6,467,130). <u>With approximately $60 million in asserted secured claims, secured creditors are undersecured</u>.

**D.     <u>Initial DIP Financing in Reno, Nevada.</u>**

19.     Since being retained by the Debtors, Watley has gone out to the marketplace to obtain post-petition financing for the Debtors' operations. Watley has engaged institutional lenders and hedge funds, as well as individuals with financial wherewithal and interest in such entities.

20.     Watley was unable to obtain interests in financing on an unsecured basis. The best offer received by Watley was from Altus Metals, LLC ("Altus"), an affiliate of Empire Advisors, LLC ("Empire"), pursuant to which Altus agreed to lend to the Debtors up to $5 million on a senior secured basis, by priming existing secured creditors.

21.     On June 2, 2010, the Debtors filed, in the Nevada Court, a motion for an order authorizing the Debtors to obtain senior secured financing from Altus (the "Nevada Financing Motion"). On June 23, 2010, the Nevada Court held an initial hearing on the Nevada Financing Motion, and granted to WUCC the authority to borrow from Altus and from the First Lien Lenders, as provided in the "Amended Order Re: Motion For Entry Of An Interim Order Authorizing Debtor To Obtain Post-Petition Financing Pursuant To 11 U.S.C. § 364 and Rule 4001 Of The Federal Rules Of Bankruptcy Procedure" (the

"Interim Financing Order"), an amount not to exceed the principal amount of $300,000 ($250,000 to WUCC and $50,000 loan fee to Altus). (See Interim Financing Order, Docket No. 32.)   A true and correct copy of the Interim Financing Order is attached to the accompanying RJN as Exhibit "6".  WUCC has received, to date, that entire amount, to pay for bare minimum expenses to preserve the Debtors' assets, which include security expenses, facility and mill maintenance expenses, utilities, and insurance expenses.

**E.**      **Milestones Reached Since Petition Date With The Initial DIP Financing.**

22.     Since case commencement, and especially since obtaining the initial DIP financing, the Debtors have made substantial progress not only to protect existing secured positions, but to enhance the value of the estates for the benefit of all creditors.

23.     First, Watley and the management team met with lenders and developed a strategic plan (lenders were invited to participate and several elected to attend and help develop the plan). A five (5) phase business plan resulted:

    a.   Stabilization Phase – A three week period starting from the date of the initial approval of the DIP facility

    b.   Engineering and Development Phase - A 10 week period starting from the date of the initial approval of DIP facility.

    c.   Implementation Phase - A 24 week period starting from the date of the initial approval of the DIP facility.

    d.   Forensic and Litigation Phase - Starting immediately and continuing through the entire bankruptcy process.

    e.   Plan of Reorganization Phase - Starting immediately and continuing through the entire bankruptcy process. We will immediately initiate work to formulate a Plan to present to creditors within 45 days.

24.     After the planning session and approval of the initial emergency DIP, the stabilization Phase and engineering and development phases were implemented. The utilities have been reconnected and WUCC is now able to power the circuits in its mill.  This would render the ability for a buyer to see the components in motion and in a sale of the mill on a parted out basis, the buyer could see the components working.

25.     The utilities have been reconnected and WUCC is now able to power the circuits in its mill.  This would allow a potential buyer to see the components in motion and in a sale of the mill on a parted out basis, the buyer could see the components working.

26.     Power to the office has allowed for the security of company information and data.  Aggregation and organization efforts to get its "paper or hard copy data" into an electronic media have been instituted.  Tetra Tech, Inc. ("Tetra Tech"), WUCC's consulting engineer, has been transferred much of the data.  WUCC's computers are being evaluated for integrity and processes are being developed to secure the data on those computers.

27.     General full-time security of the site has been achieved.  WUCC has engaged and has on-site a professional security agency that is responsible for security of the site. There is now a 24/7 presence on the property.  All locks (e.g. doors, padlocks, gate locks and other barrier security) have been re-keyed or replaced.

28.     The retention of the Land Manager has allowed WUCC to validate and prepare documentation to file the annual maintenance fees on all 635 un-patented mining claims covering nearly 60,000 acres, which is due by August 31, 2010.  Prior to the Petition Date, this process was in question, however the loss of these claims would have completely devastating to the estate.  WUCC has also, with the assistance of its counsel, been able to review and detail all of its owned and leased private patented mineral properties.  Through

this lease review process, WUCC can then determine which, if any, of its leases on real property it would reject.  This process alone is the life of the company.  Specifically, if WUCC's estate loses the federal un-patented mining properties or any fee simple or patented properties, the estate will be significantly harmed.

29.     Retention of very critical employee Ron Wunderlich and Consulting Geologist David Hartshorn.  Mr. Hartshorn is the person most familiar with the mineral assets of WUCC.  By retaining the services of Mr. Hartshorn, WUCC's estate has improved its value. The same is true with respect to Mr. Wunderlich, who has the ability and experience to guide the company through its relationships with numerous governmental agencies, managing the processes of permitting, claims management, water rights maintenance and usage, mapping, and property documentation.  Mr. Wunderlich has been able to open dialogue with various governmental agencies for the purpose of preserving the Debtors' multiple permits and licenses.

30.     The Debtors were able to maintain insurance on their assets via the emergency funding that was granted by the Nevada Court on June 29, 2010.  The Debtors then searched out and were granted insurance for the following 12 months, protecting assets of the estates for the benefit of all creditors.

31.     Based on developments to date, the value of estate assets has increased tremendously from $10,258,850 on May 18, 2010, to a total of $21,129,105today, as set forth in the analysis attached to the Appendix as Exhibit "C".  The valuation as of today is as follows per the analysis below:

a.     Resources in the ground equal to $7,643,822.  Since the Petition Date, power has been restored to the Debtors' offices, geologic data has become accessible, and the Debtors' geologist has been formally retained.  This has enabled value to be attributed to the Debtors' mineral assets after a detailed review of the data.  Given the

lack of NI 43-101 (industry standards) compliance in WUCC's mineral data and the general level of uncertainty regarding the Debtors, a buyer today would be willing to pay 6 to 7.2 cents per pound of copper for the Debtors' Measured reserves and 1.2 cents per pound for the Indicated reserves. These prices were estimated by taking a 60% discount to the full value of these resources. This indicates a value of $7,192,368 for the Debtors' Measured reserves (excluding the Bawana deposit which is valued separately below) and $451,454for the Indicated reserves.

     b.   <u>Net Present Value of the mined and processed Bawana Deposit:</u> <u>$1,235,282,</u>.  Because the Bawana deposit is well-defined, is a known Measured reserve, and can be processed relatively efficiently on WUCC's existing Mill, a buyer today would pay the Net Present Value of the cash flows produced from mining and processing the Bawana ore.  Based on better information from the Debtors' geologist, the cash flows were modeled to take place over seven (7) months. Only minimal capital expenditures are assumed in this model, as the Debtors do not have sufficient funds to undertake their entire capital expenditure program without approval of the DIP facility and only the Bawana deposit can be assumed to be exploited economically. After expenses, including capital expenditures and bankruptcy-related expenses, it is estimated that the future value of this operation will be $1,575,710. The Net Present Value of the foregoing is $1,234,282.

     c.   <u>Rolling Stock and Mill: $12,250,000</u>. Since the Petition Date, necessary repairs and maintenance have been performed on WUCC's Rolling Stock and Mill.  Additionally, with power re-established to the equipment, Tetra Tech has investigated the status of the Mill and determined that it is in reasonably good condition and is operational.  Based on these actions and determinations, the Rolling Stock and Mill would not have to be scrapped if they were sold and could instead be

sold as is, in their current operating condition.  $25,000,000 was initially spent to construct the Debtors' Mill.  If liquidated, it is estimated that the Mill could be sold today for 25% of its original cost, or $6,250,000, and that the Rolling Stock could be sold today for $6,000,000. The total amount these assets could be sold for today is therefore approximately $12,250,000.

**F.    Use of Proposed DIP Funding.**

32.    Altus has offered a $18,000,000 DIP financing facility.  While substantial progress has been made by the Debtors to date in preserving and maintaining their assets with the limited available resources, the Debtors must now be able to commence operations to enhance the value of their business for the benefit of all creditors and parties in interest.  The Debtors' proposed budget for such expenditures is attached as Exhibit "D" to the accompanying Appendix.  In order to do so, the Debtors require funding.  While the specific terms of the proposed financing are discussed below, a discussion of the proposed use of funds and benefit to the estate and all creditors follow.

33.    The use of proceeds for the DIP funds will add substantial value to the estates in five (5) general categories:

a.    **Category 1** is capital spending on the floatation mill, which is projected to cost approximately $1,475,000. The specific items are as follows:

1.    An additional cone crusher for $380,000. By adding an additional crusher, (3rd stage) the Debtors will improve the efficiency of the crushing and grinding circuit.  The improved efficiency will manifest in lower power consumption per ton of ground ore and an improved flotation feed particle size distribution leading to better flotation performance.  The increased grinding efficiency will also reduce water consumption by lowering sump washing usage and decreasing recycle in the circuit.  This adds

considerable value to the Mill because the Mill can then use less power and water.

2.      A drying unit for $25,000. This adds value to the Mill because the tailings of the Mill have historically contained too much water. This caused the thickeners to operate inefficiently as well as created concentrate that was too wet, thereby adding substantial transport weight and reducing average revenue per ton from concentrate. A drying unit will also allow ore concentrate to be dried within hours instead of the days it has historically required. This will reduce the Debtors' working capital needs as the concentrate can only be delivered and sold once it has been dried.

3.      Additional $70,000 for Tetra Tech to conduct additional testing of Mill equipment, develop new protocols for Mill equipment maintenance, and for supervision of Mill employees. This adds value to the floatation mill because the Debtors' employees receive more training and are supervised by world class experts and engineers. Also, investors have less risk and more certainty that their investment dollars are being utilized with proper independent supervision.

4.      Engineering changes costing $1,000,000 to optimize the Mill based on testing conducted by Tetra Tech.  This will include many technical changes to the Mill, such as relocating the magnetic separators and improving the feed system into the ball mills. This category also includes the design and retrofit of the post-grinding classification system in the milling process.

b.      **Category 2** is capital spending on Tailings/Wastewater/Regulatory Compliance which is expected to total $2,480,000. The specific items are as follows:

1.      $650,000 for a large pond to hold water separated from the

tailings and concentrate, allowing recycling to occur. This investment saves money on water and, more importantly, allows the Debtors to become compliant with environmental rules. Together with the dewatering equipment below, this is expected to add over $10,000,000 of value to the Mill because, upon installation of the pond and the dewatering equipment, the Mill can be valued as an operating mill at close to replacement cost and not as scrap, parts, or haul-away equipment.

2.      $1,150,000 for dewatering equipment. Depending on WUCC's engineering tests, this item may possibly be delayed or cancelled entirely. The equipment removes water from the processed ore and makes concentrate much dryer, reducing weight, which increases average revenue per ton, as well as reducing water emissions from the mill, thereby improving water efficiency. Together with item the large pond above, this adds great value of approximately $10,000,000 to the Mill because it allows us to meet environmental standards and operate within the parameters of our permits.

3.      $130,000 for the Bawana mining bond. This adds over one million of value because the bond allows the Debtors to commence mining operations. Estimated gross profit from the Bawana deposit is over $9,800,000 in less than one year's worth of mining and processing time.

4.      $250,000 for the Sunrise mining bond. This adds over one million of value because the bond allows the Debtors to commence mining operations. Estimated gross profit from the Sunrise deposit is over $35,000,000 in less than one year's worth of mining and processing time.

5.      $300,000 for the Re-approval of the Debtors' Large Mining Permit/Hidden Treasure. This adds over one million of value because the

permitting allows the Debtors to commence mining and milling operations.

c.  **Category 3** is capital spending on leach testing ($295,000).  Positive leach testing results will add substantial value.  The Debtors hold many valuable ore deposits that include significant amounts of low-grade oxide ore. The leachability of the low-grade halo within these deposits enables the mining and processing of the higher grade portions of the deposits.  This is a typical approach to deposits of this type.

d.  **Category 4** is composed of $6,030,000 of capital spending on drilling to prove additional reserves. This adds substantial value to the estates because the Debtors will take existing inferred deposits that have been drilled extensively, but have not been proven, and convert them to "proven" status.This adds tremendous value because proven or "Measured" deposits have the least amount of uncertainty associated with them and therefore are valued more highly by potential acquirers.

e.  **Category 5** of the plan is the capital spending required after WUCC reaches positive cash flow.  This relates to, and depends on, the actual sequencing of ore deposits that will be mined to maximize cash flow over the short term (1 to 5 years) and long term (5 to 20 years).  Several factors affect short-term sequencing at deposits such as Candy B and Copper Ranch.  At current mill capacity (2,000 tons per day), WUCC can operate for the next five (5) years even if WUCC only mines the currently known proven, indicated, and inferred resources.  Future ore (5 to 20+ years) will come from extensions of the known deposits, underground operations, and development of numerous untested large targets. As future reserves are explored, drilled, and proven, a larger mill capacity may be economic.  If heap leaching proves economical ahead of schedule during the testing phase, the Mill capacity will be increased to over 5,000 tons per day and annual copper production will increase several times.  However, to optimize the current milling operation, WUCC will need gravity and tailings vat leach circuits in order to optimize the copper recovery to above 85%.

**G.**   **DIP Financing's Benefit To Estates.**

34.   The estates are benefited greatly after spending the DIP funds. The value of the estate increases from $21,129,105 today [Exhibit "C" to the Appendix] to between $74,468,490 and $83,285,848 [Exhibit "M" to the Appendix]. Two methods were used to value the Debtors' estates after the DIP financing has been approved:

a.   Method 1 –

VALUE OF ESTATES =

NET PRESENT VALUE ("NPV") OF PROVING THE CANDY B
DEPOSIT

+ VALUE OF RESOURCES IN THE GROUND

+ NPV OF MINED AND PROCESSED BAWANA AND SUNRISE
DEPOSITS

+ VALUE OF ROLLING STOCK AND FLOTATIONTHE MILLi.

Net Present Value of proving the Candy B deposit and bringing it from "Inferred" to "Measured" status: $21,560,394. $6,030,000 will be used to drill out and prove the Candy B deposit (and Sunrise deposit) under N1 43-101 standards. This deposit will therefore be fully valued by potential acquirers at the full value price of 18 cents per pound.  Upon completion of this drilling program, the Candy B deposit will be moved from the "Inferred" to the "Measured" category and will be therefore valued at approximately $34,567,200. After subtracting the drilling costs and taking into account the 11 month period before drilling is complete, the Net Present Value of this project is $21,560,394.

ii.     <u>Other resources in the ground equal to $18,509,556 (excluding
the Candy B deposit)</u>. With approval of the DIP facility drastically
reducing or eliminating the uncertainty regarding the Debtors and
enabling complete access to Debtors' digital geologic data, the
Debtors' other Measured and Indicated deposits can be valued at their
full value prices of 15 to 18 cents per pound (Measured) and 3 cents
per pound (Indicated). This indicates a value of $17,980,920 for the
Debtors' Measured reserves (excluding the Bawana deposit which is
valued separately below) and $528,636 for the Indicated reserves
(excluding the Sunrise deposit which is also valued separately below).

iii.    <u>Net Present Value of the mined and processed Bawana and
Sunrise Deposits: $13,648,540</u>.  Once the Debtors are able to use the
DIP facility to fund the necessary capital expenditures described
above (e.g. improvements to the Mill, the large pond, dewatering
equipment, mining bonds/permits, etc), both the Bawana and Sunrise
deposits can be mined and processed through the Mill. The deposits
are relatively rich in ore and already can be processed reasonably
efficiently on the Mill without any improvements being made.  These
cash flows are expected to take place over sixteen (16) months based
on the Mill's current processing capacity of 2,000 tons per day. After
all expenses, including capital expenditures and bankruptcy-related
expenses, it is estimated that the future value of this operation will be
$20,512,847. The Net Present Value of the foregoing is <u>$13,648,540</u>.

iv.     <u>Rolling stock and Mill: $12,250,000</u>. See above for valuation
summary of these assets.

v.     <u>Repurchased assets from Empire and Strategic Capital:</u> <u>$8,500,000.</u> See below for the valuation summary of these assets.

b.     <u>Method 2 –</u>

<u>VALUE OF ESTATES =</u>

VALUE OF ALL RESOURCES IN THE GROUND

+ (2.5) X (ANNUAL OPERATING CASH FLOW OF

FLOTATION MILL)

i.     <u>Value of all mineral resources in the ground (including the</u> <u>Bawana, Sunrise, and Candy B deposits) equals $57,594,756.</u> With the Sunrise and Candy B deposits moved into the Measured category, they will be fully valued by potential acquirers at the full value price of 18 cents per pound. Additionally, with approval of the DIP facility drastically reducing or eliminating the uncertainty regarding the Debtors and enabling complete access to Debtors' digital geologic data, the Debtors' other Measured and Indicated deposits can be valued at their full value prices of 15 to 18 cents per pound (Measured) and 3 cents per pound (Indicated). This indicates a total value of $57,066,120 for the Debtors' Measured reserves and $528,636 for the Indicated reserves.

ii.     <u>Value of the Mill is equal to $25,691,092.</u>  In addition to the above method of valuing the Debtors' flotation Mill, the Mill was also valued based on a multiple of its annual cash flows. At its current capacity of 2,000 tons per day, the Mill can produce $10,276,437 of pre-tax cash flow per year if it is fed ore containing 1% copper (which is significantly lower than the copper percentage of most of the Debtors' ore deposits) and copper prices are at $3.08 per pound. This number does not

take into account the gold, silver, or magnetite that the Mill can produce, the sale of which dramatically increases the amount of cash the Mill can generate. By multiplying the Mill's annual cash flow number by a very conservative 2.5, the mill's indicated value is $25,691,092.

35.    In the unlikely event that the Debtors do not receiving DIP financing up to $18,000,000, which the Debtors believe will not be the case, the Debtors can still be valued based on the Percent-of-Completion method. The Debtors require $9,328,697 to fund their capital expenditures before their operations are self-sustaining.   If the Debtors receive $10,000,000 in financing, the Debtors will be able to spend 44.37% of the total amount required for capital expenditures. This 44.37% of the spending includes $380,000 for an additional cone crusher, $60,000 for Tetra Tech's investigations, $150,000 for mill optimization work, $216,667 towards constructing the large pond, $621,506 towards dewatering equipment, (if necessary), $300,000 for the re-approval of the large mining permit, $85,000 for leach testing, $233,333 towards drilling redundant water sources, 122,000 towards completion of the new metallurgical laboratory, $10,000 for electrical work on the mill, $130,684 for mine and mill maintenance, and $498,768 as a contingency. The value created by a $10,000,000 DIP facility is therefore equal to 44.37% of the value created by completion of all the capital expenditures plus the $8,500,000 value of the assets repurchased from Empire and Strategic Capital. Based on Methods 1 and 2 above, respectively, the indicated values using the Percent-of-Completion method are $37,769,333 and $41,682,481.

**H.    Terms of Proposed DIP Funding.**

36.    Altus has offered a $10 million DIP facility as set forth in the Loan documents, although Altus has advised the Debtors and will confirm to the Court that it has agreed to extend the facility to $18 million upon the same terms and conditions.

Since being retained by the Debtors, Watley has gone out to the marketplace to obtain post-petition financing for the Debtors.  Mr. Bryan of Watley spoke with representatives of institutional lenders, hedge funds, as well as individuals with financial wherewithal and interest in such entities.  The Debtors were unable to obtain financing on an unsecured basis.  To date, the only commitment received by the Debtors is from Altus, which is an affiliate of Empire.

37.    Negotiations with Altus were extensive, with numerous drafts of proposed loan documents exchanged and modified.  At the conclusion of such negotiations, the parties agreed to the terms of the DIP financing.  True and correct copies of the proposed promissory note and security agreement (collectively, the "DIP Loan Documents") are attached to the Appendix as Exhibits "E" and "F", respectively.

38.    The material terms of the proposed financing include:

a.    Debtors seek a $18 million financing facility.  Pursuant to the DIP Loan Documents, Altus has committed to fund up to $10 million, but it is expected to increase the commitment to $13 million.  $3 million of the financing commitment will be utilized to repurchase certain assets from Empire as discussed below, which have a value of over $9 million.  The balance of the financing, less fees and costs, will be available for operations.

b.    Interest on the outstanding amount will accrue at the rate of 12.99% per annum.

c.    Altus will be entitled to reimbursement of internal and external expenses related to negotiation and documentation of the DIP Loan Documents.

d.    In the event that the DIP Loan Documents are not approved but financing is approved through a different entity, Altus will be entitled to a fee of $100,000.

e.    The loan will be due and payable on September 8, 2011.

f.    In the event that the loan is repaid prior to the foregoing deadline, a prepayment penalty of 10% will apply.

h.     The financing will be secured by a first priority priming lien on all assets of the Debtors, excluding pre-petition equipment but including the "Sold Assets" (defined hereinbelow).  With respect to pre-petition equipment, except for the "Sold Assets", the financing will be secured by a junior lien on such assets.

I.     **Repurchase Transaction.**

39.     Pre-petition, in connection with the Debtor's efforts to raise funds for operations, the Debtors entered into a sale-leaseback type transaction with Empire and Strategic Capital (collectively, the "Pre-Petition Buyers") pursuant to which the Debtors transferred to the Pre-Petition Buyers certain rolling stock and equipment, certain water rights and certain mined, but unprocessed, ore (collectively, the "Sold Assets").  A copy of the Purchase and Sale Investment Agreement ("Sale Agreement") is attached to the Appendix as Exhibit "G".  In exchange for the foregoing, and as set forth in accounting attached to the Appendix as Exhibit "H", the Debtor received approximately $2.2 million from the Pre-petition Buyers.

40.     The intent of the parties was for the Debtors to repurchase the Sold Assets in accordance with the terms and conditions of the Sale Agreement, which would require, at this time, a payment of over $4.2 million.  None of the Sold Assets were removed from the Debtors' properties and continue to be utilized by the Debtors.

41.     Pursuant to the DIP Loan Documents, the Debtors will repurchase the Sold Assets for $3 million, which will be financed by Altus.  Once the purchase is complete, any and all claims previously held by the Pre-Petition Buyers against the Debtors will be deemed satisfied and waived.

42.     Since the foregoing sale, the Debtors have made substantial progress with respect to developing the water rights (consisting of 546.23 acre-feet of water, including obtaining a 14-year extension from the state to prove the water rights. Attached to the

Appendix as Exhibit "I" is documentation from a water rights expert valuing such rights at $10,000 per acre-foot of water, which totals over $5.4 million for the rights.

43.     The mined, but unprocessed, ore portion of the Sold Assets consists of 4,509,000 pounds of copper, 1,336 ounces of gold and 13,360 ounces of Silver. As set forth in Exhibit "J" to the Appendix, while the gross market value of the foregoing ore is approximately $16.9 million, based on the fact that it is unprocessed, market value is reduced to 7% of the gross amount, resulting in a current value of approximately $1,186,207.68.

44.     Finally, as set forth in Exhibits "K" and "L" to the Appendix, the Rolling Stock and equipment have been valued at approximately $1,942,000 at liquidation value.

45.     Based on the foregoing, the Debtors will receive assets with a value of over $8.5 million. Moreover, Altus has agreed that, in the event of a default and subsequent foreclosure, it will proceed first as against the Sold Assets before any other collateral. Moreover, in order to provide further adequate protection to existing secured creditors, the Debtors propose to grant to all secured creditors junior liens (junior to Altus) in and to the Sold Assets with the same extent, validity and priority as the creditors were entitled to on the Petition Date.

46.     The Debtors have discussed with the Official Committee of Unsecured Creditors (the "Committee") the foregoing transaction and the possibility that such transaction may be avoided as a fraudulent conveyance. However, if the transaction is avoided as a fraudulent conveyance, the Pre-Petition Buyers would still be entitled to a claim for the consideration advanced. More importantly, Altus refused to provide the financing contemplated by the Financing Motion without the repurchase being part and parcel of such transaction. To avoid the time, expense and uncertainty of litigation, as well as the estates' immediate need for financing, the Debtors have concluded, in the exercise of their business judgment, that consummating the transaction contemplated herein is fair, reasonable and in

the best interest of the estates and all creditors.  To the extent necessary, the Debtors view

this transaction as a compromise of a potential controversy.

## **COMPLIANCE WITH RULE 4001**

Pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure, Debtors hereby

provide the following disclosures with respect to the DIP Loan:

| Material Provision | Brief Summary | Document/ Provision |
|---|---|---|
| Borrowers | The Debtors. | Note and Security Agreement |
| DIP Lender | Altus Metals, LLC, an Ohio limited liability company | Note and Security Agreement |
| Regular Interest Rate | 12.99%, compounded monthly | Note |
| Default Interest Rate | 5% per annum above the Regular Interest Rate | Note |
| Fees And Expenses | <u>Closing/Accommodation Fee</u>.  Debtors shall jointly and severally pay to Altus, from financing proceeds, a closing fee in cash, in an amount equal to two percent (2%) of the Capital Availability Amount, and upon any increase in the Capital Availability Amount the increased closing fee shall become due, and (2) Altus (or its nominee) shall be entitled to receive, and the Companies agree to issue or cause to be issued, no later than the effective date of any plan of reorganization of either Company or the Companies (or the date of sale of all or substantially all of the assets of one or both of the Companies to any entity (the "Purchasing Entity")), a loan accommodation fee equal to a stock warrant for that amount of fully paid and nonassessable common stock (or any other securities or equity interests into which or for which any of the common stock or equity interests may be converted or exchanged pursuant to a plan of recapitalization, reorganization, merger, sale of assets or otherwise) (such common stock or other equity interests | Security Agreement, Section 5(b) |

| Material Provision | Brief Summary | Document/ Provision |
|---|---|---|
| | referred to herein as, the "Equity") totaling Five Percent (5%) of the total Equity of reorganized Copper King and/or reorganized WUCC and/or the Purchasing Entity, as the case may be, for the initial Loan of Seven Million Dollars ($7,000,000), and an additional one percent (1%) of the total Equity of reorganized Copper King and/or reorganized WUCC and/or the Purchasing Entity, as the case may be, for each One Million Dollars ($1,000,000) borrowed in addition to the initial Loan.<br><br>Expenses.  The Debtors shall jointly and severally reimburse Altus, from proceeds of the financing, for its expenses (including reasonable legal fees and expenses) incurred in connection with the preparation and negotiation of the DIP Documents, and expenses incurred in connection with Altus' due diligence review of the Debtors and all related matters.  Debtors shall pay any fee due Empire Advisors in connection with any Loans. Amounts due on the Closing Date will be paid on the Closing Date and shall be equal to (x) Altus's actual costs and expenses, inclusive of anticipated reasonable internal and outside legal fees, plus (y) the cost of all third-party appraisals and extraordinary diligence deemed advisable or prudent by Altus less (z) a credit for the Fifty Thousand Dollar ($50,000) expense reimbursement granted to Altus by the Nevada Court in connection with the Emergency Advance (the "Closing Reimbursements").  In addition, during the term hereof, Altus may pay all legal and other professional fees incurred by Altus upon submission by such professionals of a written invoice to Altus, whether or not reflected in or in excess of the amount set forth in any Budget, and without the need of fee applications or other submissions to the Bankruptcy Court or otherwise, and all such payments shall constitute Loans. Altus shall deliver to the Debtors copies of all invoices by professionals submitted to Altus with respect to which proceeds of Loans have been applied, which invoices may be redacted to protect privileged information.<br><br>Unused Facility Fee.  If Debtors do not utilize the entire Capital Availability Amount within six (6) months of the Closing Date and provided that Altus has not denied to the Debtors access to such Capital Availability Amount when Debtors have satisfied closing conditions, then Debtors shall be charged an unused facility fee equal to two percent (2%) of the unused portion of the Capital Availability | |

| Material Provision | Brief Summary | Document/ Provision |
|---|---|---|
| | Amount. | |
| Maturity | September 8, 2011. | |
| Liens, Collateral, And Priority<br><br>Bankruptcy Rule 4001(c)(1)(B)(i), (vii) & (xi)<br><br>Local Rule 4001-2 (a)(1)(D) and (G) | (a)     The priority of the Liens granted to Altus on the Collateral of each Debtor shall be senior and prior to all of each Debtor's Prepetition Indebtedness and Postpetition Indebtedness (subject to the Carve Out and the Marshalling Agreement, see "Repurchase and Marshalling" below).<br><br>(b)     The priority of the Liens granted to Altus on the Prepetition Equipment of each Debtor shall be junior to all of each Debtor s Prepetition Indebtedness.<br><br>(c)     All Obligations shall constitute allowed superpriority administrative expense claims of each Debtor in the Chapter 11 Cases pursuant to Section 364(c)(1) of the Bankruptcy Code (as to the Collateral) having priority over any and all administrative expenses of the kind specified in or incurred pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c) or 726 of the Bankruptcy Code ("**Superpriority Claims**") and shall at all times be senior to the rights of each Debtor, its estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code, in any case subject only to Permitted Exceptions, provided that such Obligations shall be junior to existing security interests in and to the Prepetition Equipment. | Security Agreement, Sections   6 and 7 |
| Events of Default | See Section 25 of Security Agreement for extensive list of Events of Default.<br><br>See Section 26 of Security Agreement for discussion of remedies upon the occurrence of Events of Default.<br><br>See Section 27 of Security Agreement for discussion of opportunity to cure Events of Default. | Security Agreement, Section 25 |
| Automatic Stay<br><br>Bankruptcy Rule 4001(c)(1) | Except as set forth in the Financing Orders, no rights or remedies available to Altus shall require any application or motion to, or order of, the Bankruptcy Court; provided, however, that enforcement of rights or remedies against the | Security Agreement, Section 26(b) |

| Material Provision | Brief Summary | Document/ Provision |
|---|---|---|
| (B)(iv) | Collateral or Prepetition Equipment shall require five (5) Business Days' notice to the Company Agent, to the United States Trustee, to counsel for any statutory committee, with a copy of such notice to be filed with the Bankruptcy Court, and, if any hearing shall be requested after delivery of such notice (which request shall be made within three (3) Business Days' after the date of such notice, by way of objection), the sole issue to be determined at such hearing shall be whether an Event of Default has occurred. Except as otherwise provided in the Financing Orders, subject to the calendar of the Bankruptcy Court, any such hearing requested shall be permitted on shortened time, on the earliest available date. | |
| Profession-al And Statutory Fee Carve-Out  Section 506(c) Waiver  Bankruptcy Rule 4001(c)(1) (B)(x)  Local Rule 4001-2 (a)(1)(B) | Altus consents to the application by either Debtor for entry of an administrative procedures order that will allow all professionals to be paid their customary percentage of their reasonable professional fees on a monthly basis, so long as aggregate payments do not exceed the availability for such professionals under the Carve Out ($1,000,000), and Altus reserves all of its rights to object to the reasonableness of such professional fees pursuant to, *inter alia*, Section 330 of the Bankruptcy Code and does not waive any rights, requirements or procedures with respect to approval of such fees.  The Debtors waive all rights to seek to surcharge Altus' Prepetition Collateral and Collateral pursuant to Section 506(c) of the Bankruptcy Code. | Security Agreement, Section 6(d)   Security Agreement, Section 6(e) |
| Indemnific ation  Bankruptcy Rule 4001(c)(1) (B)(ix) | Each Company hereby jointly and severally indemnifies and holds Altus, and its respective affiliates, employees, attorneys and agents (each, an "**Indemnified Person**"), harmless from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses of any kind or nature whatsoever (including attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) which may be instituted or asserted against or incurred by any such Indemnified Person as the result of | Security Agreement, Section 33 |

| Material Provision | Brief Summary | Document/ Provision |
|---|---|---|
| | credit having been extended, suspended or terminated under this Agreement or any of the DIP Documents or with respect to the execution, delivery, enforcement, performance and administration of, or in any other way arising out of or relating to, this Agreement, the DIP Documents or any other documents or transactions contemplated by or referred to herein or therein and any actions or failures to act with respect to any of the foregoing, except to the extent that any such indemnified liability is finally determined by a court of competent jurisdiction to have resulted solely from such Indemnified Person's willful misconduct. NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY COMPANY OR TO ANY OTHER PARTY OR TO ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER THIS AGREEMENT OR ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.<br><br>Each Company hereby jointly and severally indemnifies and holds each Indemnified Person harmless from and against the increased cost of capital resulting from reserve requirements or otherwise imposed, in each case subject to customary increased costs, capital adequacy and similar provisions. | |
| Repurchase and Marshalling | Debtors shall purchase or repurchase from Altus and/or its affiliates and co-owners, in accordance with the terms hereof ("**Repurchase**"), those assets purchased from Debtors and certain third parties in connection with the Prepetition Agreements that are utilized in connection with Companies' operations, including but not limited to certain water rights and equipment ("**Assets**"). The combined purchase price for such Assets shall be Three Million and No/100 Dollars ($3,000,000.00), representing a discount | Security Agreement, Section 16 |

| Material Provision | Brief Summary | Document/ Provision |
|---|---|---|
| | from the repurchase option and other Prepetition obligations to Altus and its affiliates in the amount of over One Million Two Hundred Thousand and No/100 Dollars ($1,200,000.00). In connection with the Repurchase, Altus and its affiliates and co-owners shall release all other Liens they hold on any other properties or assets of Companies ("**Repurchase Collateral**"), and any and all Prepetition obligations, claims and agreements with Altus and its relevant affiliates and co-owners, including but not limited to those held by Strategic Capital Partners, LLC and Winterfox, L.L.C., shall be terminated and released. The priming super priority Liens granted to Altus shall apply to all Assets and Repurchase Collateral.<br><br>If Altus exercises or enforces the Liens granted under the DIP Documents or by the Bankruptcy Court, Altus must first enforce its Liens with respect to the Assets and Repurchase Collateral to the fullest extent practicable prior to enforcing its Liens with respect to any other Collateral, Prepetition Equipment or property ("Marshalling Agreement"). | |

## ARGUMENT

### I.     POST-PETITION FINANCING

**A.     The Debtors Should Be Authorized To Obtain Debtor In Possession Financing From Altus To Preserve, Maintain And Operate Their Business.**

Pursuant to Bankruptcy Code § 364(c) and (d), the Debtors request authority to incur up to $18,000,000 of post-petition financing, $10,000,000 of which has been committed by Altus (with $650,000 to be advanced pursuant to an interim Court order and the balance to be advanced pursuant to a final Court order) allowable as an administrative expense, having priority over all other administrative expenses and secured by a senior lien on all assets of the Debtors' estates (including the Sold Assets), except the Debtors' equipment owned by them on the Petition Date (upon which only a junior lien

shall inure).  The Debtors need additional funding to meet their obligations necessary to operate their businesses, administer their Chapter 11 estates and increase the going concern value of the Debtors' businesses.

Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate.  See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-9 (D. Colo.1985) (authorizing interim financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ("Ames") (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").  Section 364(c) provides, in pertinent part, that:

> (c)  If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> > (1)  with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title:
> >
> > (2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3)  secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

11 U.S.C. § 364(c); In re Utah 7000, LLC; 2008 WL 2654919 (Bkrtcy. D.Utah 2008)

Section 364(d)(1) of the Bankruptcy Code governs the incurrence of senior secured debt or "priming" loans.  Pursuant to Section 364(d)(1), the Court may, after

notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if –

> (1)     the trustee is unable to obtain such credit otherwise;
>
> and
>
> (2)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364 (d)(1).

Section 364 of the Bankruptcy Code is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the post-petition period. In re Photo Promotion Associates, Inc., 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d. Cir. 1989). Where a trustee or debtor in possession cannot otherwise obtain unsecured post-petition credit, such credit may be obtained under certain carefully proscribed conditions. In re T.M. Sweeney & Sons LTL Services, Inc., 131 B.R. 984, 989 (Bankr.N.D.Ill.1991). For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including, without limitation, liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364(d). In re Photo Promotion Associates, Inc., 87 B.R. at 839.

Section 364(c) of the Bankruptcy Code also enumerates certain incentives that a court may grant to post-petition lenders. The Section 364(c) list, however, is not exhaustive. Courts frequently have authorized the use of inducements not specified in the statute. See, e.g., In re Ellingsen MacLean Oil Co., 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); In re Defender Drug Stores, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), aff'd 145 B.R. 312, 316 (Bankr. 9th

Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364").

Subject to the approval of the Court, Debtors have agreed to grant to Altus liens against all of Debtors' assets senior to any and all existing liens (except for Debtors' pre-petition equipment, upon which Altus will receive a junior lien) and have agreed that any administrative claim in favor of Altus will have priority over all other administrative claims.  For all of the reasons explained herein, Debtors believe that granting these protections to Altus are warranted, appropriate and necessary given the circumstances of these cases where Altus has agreed to provide the Debtors with critically necessary emergency and future financing.

Two factors courts consider in determining whether to authorize post-petition financing which contemplates the granting of a security interest in favor of the lender are (1) whether the debtor is unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 364(b)(1)(A); and (2) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.  In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); see also In re Aqua Assoc., 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

In addition to the foregoing, a debtor in possession seeking subordination of liens to new financing must establish adequate protection of the liens to be subordinated to the new financing.  In re C.B.G. Ltd., 150 B.R. 570, 571 (Bankr. M.D.Pa. 1992).

Debtors submit that all of these standards have been satisfied in these cases.

1.      Debtors Were Unable To Obtain Unsecured Credit.  In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but

should make a reasonable effort to seek other sources of credit available under § 364(a) and (b).  See, e.g., In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); Ames, supra, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lending institutions).

The accompanying Declaration of Marcus Southworth, which is attached as Exhibit "5" to the Request for Judicial Notice ("RJN") filed concurrently herewith, discusses Debtors' extensive efforts prior to the bankruptcy filing to obtain financing, which efforts were not successful.  The accompanying Declaration of A. John A. Bryan, Jr. discusses his extensive efforts on and after the Petition Date in seeking financing.  To date, the best (and only) commitment was provided by Altus.  Based on the testimony provided in the foregoing declarations, Debtors submit that this element has been satisfied.

2.    The Terms Of The Proposed Financing Are Fair, Reasonable and Adequate.  Debtors submit that terms of the proposed post-petition financing from Altus are fair, reasonable and adequate.  Altus is not an insider of Debtors and has been asked to commit to providing Debtors with up to $18,000,000 of post-petition financing (although only $10 million has been committed to date).  Altus is taking on a substantial economic risk by loaning cash to companies that currently have suspended operations, which Debtors believe justify the protections and security requested by Altus.  The Altus loan offers Debtors their best opportunities to jump start Debtors' business from its current suspension, and increase the going concern value of their business.  The terms of the

Altus post-petition financing were extensively negotiated by and between Debtors and Altus in an arms length transaction. The financing terms offered by Altus are the best financing terms which have been offered to Debtors.

3.    <u>The Liens Being "Subordinated" Are Adequately Protected</u>. The proposed priming liens are authorized by the Bankruptcy Code, even absent consent of other existing lien holders. Bankruptcy Code § 364(d)(1)(B) requires the furnishing of adequate protection in favor of lien holders which assert an interest in collateral. Neither this nor any other Bankruptcy Code provision specifically defined the term "adequate protection". However, Bankruptcy Code §361 provides that adequate protection is furnished to the extent Debtors' "use, sale, lease or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3) (emphasis added). Stated succinctly, adequate protection protects a secured creditor against a decrease in the value of its collateral. <u>See</u> <u>e.g.</u>, <u>In re Planned System, Inc.</u>, 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987). This standard applies equally with respect to a proposed "priming" financing under section 364(d)(1)(B). <u>See</u>, <u>e.g.</u>, <u>In re Hubbard Power & Light</u>, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests."); <u>In re Aqua Assoc.</u>, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); <u>In re Beker Ind. Corp.</u>, 58 B.R. 725, 741-42 (Bankr. S.D.N.Y. 1986).

The Court has broad discretion to determine whether adequate protection is furnished. <u>See</u> <u>e.g.</u>, <u>In re 495 Cent. Park Ave. Corp.</u>, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Whether the party entitled to such protection is over or undersecured is not dispositive of whether adequate protection is furnished. As the court in <u>Aqua Assoc.</u>, 123 B.R. 192, noted:

> Therefore, we believe that, while the presence of an equity cushion should be a relevant factor, it should not be a determinative factor in any 'adequate protection' analysis, and particularly one relating to § 364(d)(1)(B). The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.

Id. at 196 (emphasis added; approving priming financing where interest rate was 5% over prime and loan likely would enhance value of estate).

The preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex. 1988). See also In re Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982). In Stein, the Court found that, as a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though the secured party had no equity cushion for protection. The Stein Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. See also In re McCombs Properties VI, Ltd., 88 B.R. 261 (C.D. Cal. 1988), where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

Such adequate protection of any existing liens is present in the Debtors' cases because without the proposed financing from Altus, the Debtors would lose their mining

claims with the BLM, lose insurance coverage and would have no choice but to permanently shut down. If the foregoing occurs, the value of the Debtors' assets would decline and all of Debtors' going concern value would be immediately and permanently lost. In contrast, the Altus financing enables Debtors to pay critical expenses, resume operations, perform exploratory drilling, and create value for all parties, particularly the secured lenders in these cases, and realize the full potential of Debtors' business. Detailed analyses of the effect of a $10 million funding are set forth in Exhibit "M" to the Appendix. This analysis clearly concludes that the return on investment greatly exceeds the investment. As a result, not only is every existing lien holder not harmed by the granting of the priming liens in favor of Altus, any and all such lien holders are benefited (and positions improved) from the granting of such priming liens in favor of Altus. Indeed, the proposed financing will allow Debtors to increase the productivity of Debtor's copper mill two-fold, prove additional copper and other mineral deposits, obtain requisite permitting, and drill.

Secured creditors are further adequately protected based on Altus agreement to marshal the Sold Assets. In other words, in the event of foreclosure, Altus will first look to the Sold Assets before seeking to enforce its liens on the remaining estate assets herein. Based on a valuation of the Sold Assets at over $8.5 million, the exposure to existing secured creditors is minimal, even if the increase in value of estate property is not taken into consideration herein.

Moreover, the Debtors propose to provide further adequate protection to secured creditors by granting to them liens in the Sold Assets to be repurchased by the Debtors, which liens will be junior to those of Altus. Since the value of such assets is over $8.5 million, the Debtors submit that providing liens to existing secured creditors, with the same validity, extent and priority as they were entitled to on the Petition Date, provides

additional adequate protection.

Finally, Debtors have reduced and will continue with their efforts to reduce further their operating expenses as much as possible in order to maximize Debtors' profitability. In a similar situation, the Court in the Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713 (Bankr. D. Del. 1996), considered this issue and allowed the use of cash collateral, accepting the debtor's argument that no additional adequate protection payments need be made:

> if there is no actual diminution in the value of [the] collateral through the date of the hearing, and [Debtor] can operate profitably post-petition, [creditor] is adequately protected for the use of its cash collateral. 11 U.S.C. Section 361; In re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); In re Dynaco, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); In re Immenhausen Corp., 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

4.    The Financing From Altus Is Necessary And Proper.    While in determining whether to approve such a transaction, a Court is authorized to act in its informed discretion, In re Ames Department Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990), the Court should give broad deference to the business decision of a Chapter 11 debtor, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds.  Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).  As the Court noted in In re Ames Dept. Stores Inc., supra, "the court's discretion under section 364 is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to be exercised . . . ." In re Ames Department Stores, Inc., 115 B.R. at 40.

Without additional financing, Debtors will be required to permanently shut down their business operations as Debtors would not be able to pay any operating expenses, insurance, or BLM fees for mining claims. This would result in irreparable harm for Debtors and all creditors of the estates. In contrast, the potential value of the business, if Debtors are able to operate and initiate the changes management envisions, would increase exponentially based on the analysis prepared by Watley. Debtors have therefore concluded that obtaining post-petition financing on the proposed terms herein is in the best interests of the Debtors' estates.

## II.    SETTLEMENT AGREEMENT RELATING TO REPURCHASE TRANSACTION

### A.    The Debtor's Settlement Of Its Potential Claims Against Altus Should Be Approved By The Court.

Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, the Debtors submit that the terms of the financing arrangement with Altus, wherein the Debtors will repurchase the Sold Assets for $3 million, which will be financed by Altus, should be authorized and approved by the Court because such repurchase of the Sold Assets is in the best interest of the Debtors, their estates and creditors, represents the sound business judgment of the Debtor, and is fair and reasonable under the circumstances. Once the repurchase is complete, any and all claims previously held by the Pre-Petition Buyers against the Debtors will be deemed satisfied and waived.

The Debtors have discussed with the Committee the foregoing transaction and the possibility that such transaction may be avoided as a fraudulent conveyance. However, if the transaction is avoided as a fraudulent conveyance, the Pre-Petition Buyers would still be entitled to a claim for the consideration advanced. More importantly, Altus declined to

provide the financing contemplated by the Financing Motion without the repurchase being part and parcel of such transaction.  To avoid the time, expense and uncertainty of litigation, as well as the estates' immediate need for financing, the Debtors have concluded, in the exercise of their business judgment, that consummating the transaction contemplated herein is fair, reasonable and in the best interest of the estates and all creditors.

Rule 9019 provides, in pertinent part, that: "[o]n motion by [the debtor] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  It is well established that compromises are favored in bankruptcy. Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3rd Cir. 1996); Korngold v. Loyd, (In re Southern Medical Arts Companies), 343 B.R. 250, 255 (10th Cir. B.A.P. 2006).  The "purpose behind compromises is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." Id., citing Martin v. Kane (In re A&C Properties), 784 F.2d 1377, 1380-1381 (9th Cir. 1986).  In approving a settlement agreement, the Court need not conduct an exhaustive investigation into the validity of the merits of the claims sought to be compromised. United States v. Alaska National Bank (In re Walsh Constr., Inc.), 669 F.2d 1325, 1328 (9th Cir. 1982).  Rather, it is sufficient that the Court find that the settlement is fair and equitable and in the best interests of the estate. In re Kaiser Steel Corp., 105 B.R. 971, 976-977 (D. Colo. 1989).

In the Tenth Circuit, Courts have identified the following factors for consideration in determining whether a proposed settlement agreement is fair, reasonable, and equitable:

(1)     The probable success of the underlying litigation on the merits;

(2)     The possible difficulty in collection of a judgment;

(3)     The complexity and expense of the litigation; and

(4)     The interest of creditors in deference to their reasonable views.

Kopp v. All American Life Ins. Co. (In re Kopexa Realty Venture Co.), 213 B.R. 1020,

1022-1023 (10 Cir. B.A.P. 1997); <u>Shaw v. Anderson</u> (<u>In re Anderson</u>), 2006 WL 4846387, at *7 (Bankr. D. Utah Aug. 14, 2006).

When considering these factors, the Court "is not required to hold a 'mini-trial' on the litigation . . . the Court's obligation is to 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" <u>Id.</u>, citing <u>In re Drexel Burnham Lanbert Group, Inc.</u>, 134 B.R. 493, 495-497 (Bankr. S.D.N.Y. 1991).

Consideration of the <u>Kopexa</u> factors leads to the conclusion that the Court should approve the Financing Agreement and allow the Debtor to repurchase the Sold Assets. Any alternative attempt to obtain ownership of the Sold Assets would be problematic and expensive for the estate, and jeopardize the Debtor's ability to obtain post-petition financing from Altus. While the Debtors recognize that Sale Agreement transaction could potentially be avoided as a fraudulent conveyance, if the transaction is avoided as a fraudulent conveyance, the Pre-Petition Buyers would still be entitled to a claim for the consideration advanced. More importantly, Altus declined to provide the financing contemplated by the Financing Motion without the repurchase of the Sold Assets being part and parcel of such transaction.

### III.   REPURCHASE OF SOLD ASSETS

Pursuant to Section 363(b), the Debtor requests authority to enter into a transaction with Altus pursuant to which the Debtor will repurchase the Sold Assets pursuant to the terms of the Financing Agreement.

Section 363(b)(1) of the Bankruptcy Code provides that a trustee (or debtor in possession in this case) "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 102(1) of the Bankruptcy Code defines "after notice and a hearing" as after such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is

appropriate in the particular circumstances.

In In re Medical Software Solutions, the Bankruptcy Court considered the Second Circuit's analysis for approval of transactions outside the ordinary course of business:

> In *Lionel*, the court enumerated several factors a judge may wish to consider . . . .  These factors include: (1) the proportionate value of the asset to the estate as a whole; (2) the amount of elapsed time since the filing; (3) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (4) the effect of the proposed disposition on the future plans of reorganization; (5) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property; (6) which of the alternatives of use, sale or lease the proposal envisions; and (7) most importantly perhaps, whether the asset is increased or decreasing.

In re Medical Software Solutions, 286 B.R. 431, 441 (Bankr. D. Utah 2002), citing In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir.1983); see also In re Burke Mountain Recreation, Inc., 56 B.R. 72 (Bankr. D. Vt. 1985); In re Naron & Wagner, Chartered, 88 B.R. 85 (Bankr. D. Md. 1988); In re Continental Air Lines, Inc., 780 F.2d 1223 (5th Cir. 1986).

The vast majority of reported decisions, as well as the foregoing factors, relate to sale of property outside the ordinary course of business, which the Debtors do not seek in these cases.  But the Debtors do seek to *use* property of the estates outside of the ordinary course of business.  Specifically, the Debtors seek to repurchase the Sold Assets from the Pre-Petition Buyers, and the Debtor seeks to utilize proceeds from post-petition financing from Altus, in the amount of $3 million, to do so.

As discussed above, the Sold Assets have a value of over $8.5 million. More importantly, the Sold Assets are critical for the Debtors' continuing operations. For example, the Debtors require the constant use of, and access to, water for their mining operations. Moreover, the Rolling Stock is necessary for the Debtors to continue mining and exploring. Finally, while the ore is currently valued at approximately $1 million based on the fact that it has not been processed, once processed, the value increases to almost $17 million. The Debtors submit that repurchasing the foregoing Sold Assets for $3 million is fair, reasonable and in the best interest of the estates and all creditors.

## CONCLUSION

**WHEREFORE**, Debtors respectfully request that this Court: (1) approve the Financing Motion in its entirety; (2) authorize the Debtors to borrow up to $650,000 from Altus on an interim basis in accordance with the terms set forth above and in the Financing Documents; (3) authorize the Debtors to execute all documents (including all loan and security agreements, promissory notes and related documents) necessary to enable the Debtors to implement the terms of the financing; (4) schedule a final hearing on the Financing Motion to authorize the Debtors to borrow the remaining balance, up to total borrowings of $18,000,000, $10,000,000 of which has been committed by Altus; (5) authorize the Debtors to repurchase the Sold Assets pursuant to the terms and conditions set forth in the Financing Documents; and (6) grant such other and further relief as the Court deems just and proper.

Dated:  August 23, 2010

**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**

By:___*/s/ Martin J. Brill*_____
       Martin J. Brill
       Proposed Reorganization Counsel for

Chapter 11 Debtor and Debtor in Possession

**DION-KINDEM & CROCKETT**

By:  */s/ Steven Skirvin*  
       Steven Skirvin  
       Proposed Local Counsel for  
       Chapter 11 Debtor and Debtor in Possession