J. THOMAS BECKETT (5587)
DAVID P. BILLINGS (11510)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
Email: tbeckett@parsonsbehle.com
*Attorneys for Nevada Star Resource Corp.*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH

| | |
|---|---|
| *In re* **WESTERN UTAH COPPER COMPANY,**<br>Debtor, | Case No.  10-29159-wtt<br>Chief Judge William T. Thurman<br>Chapter 11 |

## NSRC'S OBJECTION TO DEBTORS' SECOND EMERGENCY MOTION FOR ORDER AUTHORIZING DIP FINANCING

Nevada Star Resource Corp. ("NSRC"), by and through its undersigned counsel, hereby

objects to the Debtor's Motion for Entry of an Order Authorizing Debtor to Obtain Interim Post-

Petition Financing Pursuant to 11 U.S.C. § 364 and Rule 4001 of the Federal Rules of Bankruptcy

Procedure (docket # 154)[1].

A.    **Introduction.**

Only one line-item in the Debtor's "emergency" DIP motion truly presents an

emergency: If the BLM fee is not timely paid on Wednesday next week, 644 unpatented mining

---

[1] All references to "docket" refer to the docket of the United States Bankruptcy Court for the District of Utah, case
no. 10-29159, unless designated "Nev. docket," in which case the document cannot be identified on the Utah docket
but does appear on the docket of the United States Bankruptcy Court for the District of Nevada, case no. 10-51913.

4839-4629-6327.1

claims will be instantaneously and irrevocably lost.[2]  That could completely destroy whatever value there is in the estate.  NSRC is shocked that this Debtor would (i) wait until the last possible minute to address such an important issue, and (ii) include a line-item of such great importance in a DIP proposal that will face such great opposition from NSRC and the Senior Secured Creditors.  By doing so, the Debtor seemingly required these parties to make a perverse choice: consent to the objectionable DIP or the estate will lose all its unpatented claims.  Wanting no part of that, NSRC today arranged to make timely payment on the BLM fees relating to the 187 unpatented claims in which NSRC has an interest.

**B.    The "Emergency."**

The last minute timing of the Debtor's *huge* "emergency" motion was entirely unnecessary.  Having to scramble to pay the BLM fee is an "emergency" only because the Debtor neglected to plan for a hard deadline that every single mining company in North America knows comes once a year on September 1.  That is the day these BLM fees are always due.  The "emergency" is not caused by the fact that September 1 is looming.  The "emergency" is caused by the fact that the Debtor and its advisors did not address this critical issue months ago.

Not only should this issue have been resolved before now, it should have and could have been addressed outside of a massive and highly objectionable DIP proposal.  The Debtor is so infatuated with borrowing gobs of hard money from Empire that it never explored, with the obvious parties, solving the BLM issue outside of that context.  If the BLM fee is not timely paid, someone will have some explaining to do.

---

[2] The deadline may be *noon* on Wednesday, so payment should be made Tuesday.  *Compare* 30 U.S.C. § 28(f)(a) and 28(f)(b) and related Federal Regulations.

Nor is the insurance policy an "emergency" that the Debtor could not have dealt with a long time ago and outside of the Empire DIP. Curiously, the proposed policy appears to have been designed for an operating mining company: it includes business income insurance on the mill and liability coverage on a fleet of vehicles. But neither that mill nor those vehicles are currently in use. The proposed policy should not be purchased. It is unnecessary and wasteful.

Nor is the Debtor necessarily the real party with an insurable interest. Whether and how the assets are insured should be up to the Senior Secured Creditors.

**C.    The Debtor Should Not Spend Any Money Preparing to Operate a Mill that is Inoperable.**

The Debtor's ore-bearing properties have little by way of "proven" reserves. Nevertheless, the Debtor proposes to use the proceeds of its DIP loan to recommence ore milling operations. But its mill has never operated properly, it has insufficient capacity, and it was not designed in the first place for the flavor of ore that the Debtor would be mining. The Debtor should not be spending *any* money on operations, or preparation for operations, until it can explain how it proposes to operate profitably.

**D.    The Debtor Cannot Mine or Encumber NSRC's Land Without NSRC's Permission.**

The Debtor will explain that it proposes to operate profitably by feeding its mill rich ore mined from the Bawana and similar deposits, which *do* have "proven" reserves. Never mind that that would constitute very poor and deceptive mining practices, most of those deposits *are on land that belongs to NSRC – and that land does not belong to the Debtor – and the Debtor cannot mine NSRC's land without NSRC's permission.* Nor can it, as it proposes to do, encumber NSRC's land without NSRC's permission. These issues were briefed more

- 3 -

completely in NSRC's objection to the Defendant's first emergency DIP motion. That objection, incorporated herein by this reference, is attached hereto as Exhibit "A."

**E.     The Debtor Should Not be Permitted to Borrow From Empire Until the Watley Group's Employment Has Been Considered by the Court.**

The Watley Group is the principal architect of the pending DIP motion. But its engagement has not yet been approved by this Court. Indeed, the Debtor's application to engage Watley has been objected to by NSRC (docket # 147), the Senior Secured Creditors (docket # 150), and the U.S. Trustee (docket # 153). (A copy of NSRC's objection, incorporated herein by this reference, is attached as Exhibit "B" hereto.) These objections raise *serious* issues regarding Watley's disinterestedness. Consequently, the Debtor should not be authorized to borrow *any* funds from Empire until after Watley's application has been considered by the Court.

**F.     The Secured Creditors, Not the Debtor, Should be Making Decisions About How Their Collateral is to be Protected or Used.**

The Senior Secured Creditors said it best:

Finally, and most importantly, the Debtor seeks to borrow DIP funds, at exorbitant interest rates, and with senior security interests in the assets, only to "protect" assets in which the Debtor *has no equity*! As shown by the Debtor's schedules all of its assets, including the Mill and other items of personal property, are severely over-encumbered. The Senior Secured Creditors and other secured creditors hold valid liens against these assets. *These secured creditors do not want the Debtor to borrow money to protect their collateral,* especially if doing so results in a subordination of their existing senior liens, and no adequate protection is offered or available to protect their interests. The Senior Secured Creditors would rather take the risk that their collateral further diminishes in value, than have senior debt, at usurious interest rates, place in front of their secured positions. In fact, it is the Senior Secured Creditors, and not the Debtor, that should decide when, if and how to protect this collateral, since there clearly is no equity in the assets for the benefit of unsecured creditors.

4839-4629-6327.1

*See* Senior Secured Lenders' Objection to Form of Order Shortening Time for Hearing on Second Interim DIP Motion (docket # 174), p. 3.  NSRC agrees.  It also does not want the Debtor to borrow money to disturb, encumber and mine real estate that in fact belongs to NSRC.[3]

### G.    Conclusion.

For all the reasons stated above, the Debtor's second emergency motion for an order authorizing DIP financing should be denied.

* * *

Respectfully submitted this 26th day of August, 2010.

PARSONS BEHLE & LATIMER

By:

J. Thomas Beckett
David P. Billings

*Attorneys for Nevada Star Resource Corp.*

---

[3] NSRC reserves all its objections to the non-emergency aspects of the proposed DIP including, without limitation, its objection to the proposed repurchase of assets from Empire.  That proposed transaction is not, the evidence will clearly show, in the best interests of the Debtor's estate and creditors.

4839-4629-6327.1

## CERTIFICATE OF SERVICE BY ECF / EMAIL

I hereby certify that on this 26th day of August, 2010, I caused true and correct copies of the foregoing **NRSC'S OBJECTION TO DEBTORS' SECOND EMERGENCY MOTION FOR ORDER AUTHORIZING DIP FINANCING** be filed via this Court's ECF system, and thus served electronically on those parties having registered to receive such service, and also sent via email to:

**MARTIN J. BRILL**
**DAVID B. GOLUBCHIK**
**KRIKOR J. MESHEFEJIAN**
Levene, Neale, Bender, Rankin & Brill
10250 Constellation Blvd.
Suite 1700
Los Angeles, CA 90067
Email: mjb@lnbrb.com
        kjm@lnbrb.com
        dbg@lnbrb.com

**MICHAEL J. ROESCHENTHALER**
**MARK FREEDLANDER**
**JASON P. ALTER**
**WILLIAM PRICE**
McGuire Woods LLP
635 Liberty Avenue, 23rd Fl.
Pittsburg, PA 15222
Email: jalter@mcguirewoods.com
        mfreedlander@mcguirewoods.com
        mroeschenthaler@mcguirewoods.com
        wprice@mcguirewoods.com

**STEVEN R. SKIRVIN**
Dion-Kindem & Crockett
21271 Burbank Blvd.
Suite 100
Woodland Hills, CA 91367
Email: srs@dkclaw.com

**STEVEN W. DOUGHTERTY**
Anderson & Karrenburg, P.C.
50 W. Broadway, Suite 700
Salt Lake City, UT 84101-2035
Email: sdougherty@aklawfirm.com

**DAVID E. LETA**
**ENGLES TEJEDA**
Snell & Wilmer, LLP
Gateway Tower West
15 West South Temple
Suite 1200
Salt Lake City, UT 84101-1531
Email: dlet@swlaw.com
        etejeda@swlaw.com

**LAURIE A. CAYTON**
US Trustees Office
Ken Garff Building
405 South Main Street
Suite 300
Salt Lake City, UT 84111
Email: laurie.cayton@usdoj.gov

- 6 -

# EXHIBIT A

REW R. GOODENOW (3722)
PARSONS BEHLE & LATIMER
50 West Liberty Street, Suite 750
Reno, Nevada 89501
Telephone:   (775) 323-1601
Facsimile:    (775) 348-7250
Email: RGoodenow@parsonsbehle.com

*Attorneys for Nevada Star Resource Corp.*

J. THOMAS BECKETT (UT 5587)
*Admitted Pro Hac Vice, Dkt.#17*
SCOTT S. BELL (9507)
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:   (801) 532-1234
Facsimile:    (801) 536-6111
Email: ECF@parsonsbehle.com

## IN THE UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

IN RE WESTERN UTAH COPPER
COMPANY,

           Debtor,

Case No.  10-51913-gwz

Judge Gregg W. Zive

Chapter 11

## NSRC'S OBJECTION TO DEBTOR'S
## MOTION FOR AN ORDER AUTHORIZING
## DIP FINANCING

Nevada Star Resource Corp. ("NSRC"), by and through its undersigned counsel, hereby objects to the June 1, 2010 motion (the "Motion") of Western Utah Copper Company ("WUCC" or the "Debtor") for an order authorizing DIP financing (docket #32) as follows:

### A.   **Introduction.**

The Debtor seeks authorization to encumber certain real properties in Utah with a priming lien to secure its DIP financing.  It proposes to use the proceeds of that loan to conduct copper mining and milling operations on those real properties.  The Debtor and its DIP lender assume that all those properties are property of the estate.  They are not.

Under Utah law, NSRC (*not* the Debtor) owns the real property interests in 5,360 acres of that real estate – holdings that are integral to the Debtor's operations – and those interests are *not* property of the Debtor's estate.  Consequently, this Court cannot authorize the Debtor to encumber those interests; it must not permit the Debtor's DIP lender to perfect any lien on those interests; and it should not authorize the Debtor to commit waste or trespass upon those interests.

PARSONS
BEHLE &
LATIMER

4842-1938-3302.1

Furthermore, the Debtor's proposed DIP financing is a wholly inappropriate response to its exigent circumstances, given its profound operational challenges. Because of those challenges, the Debtor's plan to enhance value with the proceeds of the DIP is unlikely to succeed. Instead, it is more likely to result in a forfeiture of the estate's assets to the DIP lender. And because the Debtor's most optimistic projections do not predict any recovery for unsecured creditors, the Debtor is not the proper party to be making decisions about how to maximize the value of those assets.

Finally, this Debtor has almost no ties to Nevada, but it does have substantial ties to Utah. As explained in detail below, NSRC's objection to the Debtor's proposed DIP financing raises substantial issues of Utah law that should be decided by the bankruptcy court in Utah. NSRC's motion to transfer venue of this case to Utah was filed on June 1, 2010 (docket # 19), before the Debtor's motion for an order authorizing DIP financing, and NSRC's motion remains pending. That motion should be considered before any decisions are made with respect to DIP financing.

The Debtor's motion should be denied.

**B.    NSRC has a Substantial Interest in WUCC's Real Estate.**

The history of how NSRC obtained its interest in WUCC's real estate is explained in detail in the Amended Complaint that NSRC filed against WUCC (the prepetition debtor) in a lawsuit that is pending in Utah (the "Utah Lawsuit").[1]  *See* Exhibit "A."

In short, in 2002 NSRC conveyed its mining claims and other properties in Utah (the "Properties") to WUCC with certain strings attached: (i) NSRC retained a royalty interest in the Properties, and (ii) NSRC retained an option to reacquire the Properties if they were not put "into production" by November 1, 2008.[2]  *See* Exhibit "B."  In November, 2008, WUCC declared that the Properties were "in production." Skeptical, NSRC requested documentation (to which it was

---

[1]  *Nevada Star v. Western Utah Copper Company*, District of Utah, Case No. 2:09-CV-00542 (Hon. Dale A. Kimball). This case has been stayed by the filing of the Debtor's bankruptcy petition. A copy of the Amended Complaint is attached as Exhibit "A."

[2]  A copy of the Agreement and NS Option (the "Agreement") is attached as Exhibit "B."

entitled) to verify production, but WUCC failed to provide it.  Consequently, in June, 2009,
NSRC filed the Utah Lawsuit seeking, among other things, a declaration that NSRC was entitled
to exercise its option.

**C.**   **The Properties (Which are Subject to NSRC's Option) are Integral to the Debtor's Proposed Mining Operations.**

The Debtor proposes to use the proceeds of the DIP loan to attempt to conduct copper
mining and milling operations.  But those operations would be conducted on the Properties, and
the Properties are subject to NSRC's option.  The Properties include the patented mining claims
upon which the Debtor's mill is built and its tailings pond sits.[3]  The Properties also include the
patented claims that comprise "Bawana," the only site that the Debtor believes is currently
capable of being mined.[4]   The Properties also include the patented and unpatented claims
comprising the only other sites – "Copper Ranch"[5] and "Hidden Treasure"[6] – that the Debtor has
identified as holding "measured reserves" of mineral deposits.

**D.**   **Because the Properties Were Not "In Production" in 2008, NSRC Exercised its Option to Reacquire the Properties.**

Notwithstanding WUCC's repeated representations in the Utah Lawsuit that the Properties
were "in production" in 2008, the Debtor now admits (on the first page of its Statement of
Financial Affairs (docket #24)) that it had *no* income from business operations in 2008:

| | 1. Income from employment or operation of business | |
|---|---|---|
| None ☐ | State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.) | |
| AMOUNT | SOURCE | |
| $1,121,363.09 | 2009 to date - Income from business operations (gross revenues) | |
| $0.00 | 2008 - Income from business operations | |

---

[3] The Pronoun, Maud, Noun, Variah, Francis, Little Dick and May claims are among the Centurian Mines Claims
listed on Schedule A-1 to the Agreement.

[4] The Bawana No. 2 and Bawana No. 3 claims are among the McCulley Lease Claims listed on Schedule A-2 to the
Agreement.

[5] The Marguerite No. 15 and Jewel claims are among the Copper Ranch Lease Claims listed on Schedule A-6 to the
Agreement.

[6] The Carnathan, Marguerite, Rocky 26 – 32, Rocky 102 and Rocky 187 claims are among the McCulley Lease
Claims, listed on Schedule A-2 to the Agreement, and the Cortex Claims, listed on Schedule A-8 to the Agreement.

PARSONS
BEHLE &
LATIMER

4842-1938-3302.1

1     If the Debtor had no income from business operations in 2008, then the Properties were clearly

2     *not* "in production" at that time.[7] This is entirely consistent with everything NSRC learned in the

3     Utah Lawsuit. And that is why, on January 28, 2010, NSRC exercised its option to reacquire the

4     Properties.[8] *See* Exhibit "C."

5

6     **E.**      **Upon Exercising its Option, NSRC Reacquired the Real Property Interests in the Properties, Leaving the Debtor With No Real Property Interests to Encumber.**

7     "[T]he law of equitable conversion . . . is the law in Utah." *Cannefax v. Clement*, 786

8     P.2d 1377, 1379 (Utah 1990). "Under the law of equitable conversion, once parties have entered

9     into a binding and enforceable land sale contract, the buyer's interest in the contract is said to be

10     real property and the seller's retained interest is characterized as personal property." *Id.* "*The*

11     *rights of the parties are evaluated as if the conveyance had been made.*" *Id.* (emphasis added).

12     "The [transferee] is said to convert the monetary interest that he has in the property to an interest

13     in real estate so that he may invoke the powers of an equity court to compel specific performance

14     of the real estate contract." *Id.* at 1380 (quoting *Butler v. Wilkinson*, 740 P.2d 1244 (Utah 1987)).

15     Consequently, a lien against a transferor cannot attach to real property after equitable con-

16     version because the transferee "acquires the equitable interest in the property at the moment the

17     contract is created *and is thereafter treated as the owner of the land.*" *Lach v. Deseret Bank*, 746

18     P.2d 802, 805 (Utah Ct. App. 1988) (emphasis added). The transferor has "no real property inter-

19     est in the property to which the . . . lien could attach." *Id.*

20     Here, under Utah's doctrine of equitable conversion, when NSRC exercised its option

21     (thus creating a "binding and enforceable land sale contract," *Cannefax*, 786 P.2d at 1379), it ac-

22     quired the real property interest of equitable title to the Properties, leaving WUCC holding only

23     the personal property interest of bare legal title. That was the state of title to the Properties as of

24

25

26     _____

[7] *See also* the Debtor's Confidential Information Memorandum (Docket # 90) at p. 19: "due to permitting issues and

27     capital shortfalls, completion of the mill was repeatedly delayed *and it did not begin operation until April 2009.*" (Emphasis added.) *See also* Exhibit "3" thereto showing invoices and revenues from operations in 2009 only.

28     [8] A copy of NSRC's letter exercising its option is attached as Exhibit "C."

the day the Debtor filed its petition, and that is the state of title to the Properties today: The Debtor has no real property interest in the Properties to encumber.

**F.** **This Court Cannot Authorize the Debtor to Encumber NSRC's Real Property Interests; it Must Not Permit the Debtor's DIP Lender to Perfect any Lien in Respect of Such Interests; and it Should Not Permit the Debtor to Trespass or Waste.**

1. *The Properties are not Property of the Debtor's Estate.*

Section 364(d)(1)(B) of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") provides, in part, that "the Court . . . may authorize . . . the incurring of debt secured by a . . . lien on *property of the estate* . . . ." 11 U.S.C. § 364(d)(1)(B) (emphasis added). Section 541(a)(1) of the Bankruptcy Code provides, in part, that property of the estate "is comprised of . . . all legal or equitable interests *of the debtor* in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (emphasis added).

Under Utah law, as of the commencement of this case, the real property interest of equitable title to the Properties was held by NSRC, *not the Debtor*, so that interest is not property of the Debtor's estate, and this Court cannot authorize the Debtor to encumber it.[9] The Debtor's estate holds only a personal property interest in bare legal title. That interest is the only interest pertaining to the Properties that is available as collateral for the DIP.[10]

2. *The Debtor's DIP Motion Seeks an Order Allowing the DIP Lender to Perfect a Lien on NSRC's Real Property Interest in Violation of Utah's Wrongful Lien Statute.*

The Debtor's DIP motion seeks an order from this Court authorizing the DIP lender to record its deeds of trust against the Properties in the real property records of Beaver County,

---

[9] NSRC's interest in the Properties is equitable title. That interest is not a "charge against or interest in property to secure payment of a debtor or performance of an obligation." 11 U.S.C. § 101(37). Consequently, NSRC's interest is not a lien under section 101(37) of the Bankruptcy Code. So the Debtor's DIP lender cannot prime NSRC's interest by providing adequate protection under section 364(d)(1)(B) of the Bankruptcy Code.

[10] The DIP lender could perfect a security interest in the Debtor's personal property interest in bare legal title to the Properties by filing a financing statement with the Secretary of State in Salt Lake City, Utah. Upon a default, the DIP lender could then foreclose on that interest and step into the Debtor's shoes as the holder of bare legal title. Regardless, after NSRC prevails in the Utah Lawsuit, its real estate and bare title interests *will* relate back to the date of its exercise of the option.

- 5 -

Utah. The Debtor's DIP lender cannot do that because the county recorder's office is where liens on real property are perfected by recording. But the Debtor does not own any real property interest in the Properties that is of record in the county recorder's office. NSRC owns that interest. Thus, if the DIP lender records any lien in the Beaver County recorder's office, it will be recording a "wrongful lien" upon NSRC's interests in violation of Utah law.[11] The DIP lender will be liable to NSRC for treble damages and attorneys fees, and the lien will eventually be nullified.[12] Because the Debtor proposes to indemnify the lender under the DIP facility, those (post-petition) damages will ultimately be borne by the Debtor's estate. That is not in the best interest of the Debtor, its estate or its creditors.

> 3.    *The Debtor's DIP Motion Seeks Authorization to Commit Waste or Trespass Upon the Land to Which NSRC Holds Equitable Title.*

The Debtor proposes to use the proceeds of the DIP loan to conduct copper mining and milling operations. But "Bawana," the site the Debtor proposes to mine, is on NSRC's land. So too is the mill that the Debtor seeks to operate. The Debtor's proposal to use that land without NSRC's permission could constitute a trespass under Utah law. *See Walker Drug Company, Inc. v. La Sal Oil Company*, 972 P.2d 1238, 1243 (Utah 1998) ("The essential element of trespass is physical invasion of the land; '[t]respass is a possessory action.'" (quoting *John Price Assoc., Inc. v. Utah State Conf. Bricklayers Locals Nos. 1, 2, & 6*, 615 P.2d 1210, 1214 (Utah 1980)). In the alternative, disturbing that land could expose the Debtor to an administrative claim for waste. *See*

---

[11] The Debtor also seeks permission on behalf of its DIP lender to forego having to perfect by recording. If the Debtor and its DIP lender propose that the Nevada Bankruptcy Court's entry of an order approving the DIP is sufficient to perfect an interest in real property in Utah, then, in NSRC's view, that order would violate Utah's Wrongful Lien Statute.

[12] Utah's "wrongful lien" statute provides that a person who knowingly records a "wrongful lien" is liable to a "record owner" for treble damages and attorneys fees. Utah Code Ann. § 38-9-4. Any such "wrongful" lien," if recorded, may be nullified by a Utah District Court. *Id.* at § 38-9-7. Under Utah's "wrongful" lien" statute, an "owner" is defined as "a person who has a vested ownership interest in certain real property." *Id.* at § 38-9-1(3). NSRC is an "owner" because its equitable title to the Properties vested in it when it exercised its option. A "record owner" is an "owner" whose name and ownership interest ... is recorded ... in the county recorder's records." *Id.* at § 38-9-1(5). NSRC is a "record owner" because it is an "owner" and its interest – its option – is of record in Beaver County, Utah. Finally, a "wrongful lien" is defined as "any document that purports to create a lien ... on an owner's interest ... and ... is not ... signed by ... the owner ...." *Id.* at 38-9-1(6).

Parsons
Behle &
Latimer

4842-1938-3302.1

*Reading Co. v. Brown*, 391 U.S. 471, 485, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) (post-petition

tort claims are "actual and necessary costs" of administration.)

**G.    The Proposed DIP is Inappropriate and Unlikely to Succeed.**

    1.    *The Proposed DIP is an Inappropriate Response to the Debtor's Exigent Circumstances, Given its Profound Operational Challenges.*

Surely, the Debtor faces some exigent circumstances in relation to its security,

reclamation bonds and insurance coverage. But the DIP it proposes is an entirely inappropriate

response to those issues. While it appears that the Debtor has unencumbered assets that are suf-

ficient in value to collateralize a *modest* loan that would adequately address these exigencies, the

Debtor has instead proposed a "Delaware DIP" to fund an expensive wish-list of mining

adventures. In addition, the Debtor's proposed DIP would

- Provide for the payment of at least *seven* professional firms, projected to cost $250,000 per month, although not one of them (excepting the UCC's proposed counsel) has yet – one month into this case – applied for this Court's authorization of its employment;
- Pay $41,000 to the Debtor's CFO in consideration of his past services on behalf of an individual officer and director of WUCC for numerous ongoing state and federal investigations;
- Expend $1,500 per month for "Stockholder Relations" (evidencing a rather curious disregard for the absolute priority rule);
- Pay $10,000 per month to a member of the Official Committee of Unsecured Creditors; and
- Pay $100,000 of the DIP lender's expenses, and commit to giving the DIP lender 5% of the reorganized company.

Such an enormous commitment to spend money is entirely inappropriate when the

Debtor's immediate needs can most certainly be addressed much more cost-efficiently, especially

when (given the Debtor's operational challenges) the Debtor's proposed DIP is so unlikely to

succeed.

    2.    *The Debtor's Proposed DIP is Unlikely to Succeed.*

The Debtor proposes to use the DIP to finance its road to recovery. It proposes to do

something it has never done before – it proposes to achieve and sustain the profitable production

of copper. However, every step along that road remains fraught with serious risks. The Debtor's

PARSONS
BEHLE &
LATIMER

4842-1938-3302.1

DIP motion, and its recently-disclosed Confidential Information Memorandum, reveal that the

Debtor faces *profound* operational challenges:

- The Debtor cannot prove its own mineral reserves and must engage experts and drill 500 holes in order to determine what those reserves actually are;

- Many of its mineral reserves are on properties that are subject to NSRC's real property interests (described above), and on other properties that may imminently be lost to other parties;

- Even if the Debtor has reserves that can be mined, the availability of its mining equipment is uncertain and its disgruntled former employees cannot be relied on;

- Even if the Debtor has reserves and can mine them, it must solve a production bottleneck that currently limits (by a factor of two) its ability to crush ore for delivery into its mill;

- Even if the Debtor solves that bottleneck, its mill is presently shut down and on the verge of falling into "an irreversible state of disrepair;"

- Even if the mill can be repaired, it was last operating at only 30% efficiency;

- The Debtor needs to engage more experts to assist it increase the mill's efficiency up to 70% or more, and it is uncertain whether that objective can be achieved;

- The Debtor also needs to engage more experts to assist it with its ore leaching process, which will require a new tailings pond and more water;

- But the Debtor is unsure that it has enough water, so it will have to design and drill new wells and qualify for a new regulatory permit;

- But the Debtor is not currently in compliance with its existing regulatory permits; it needs to "amend" at least one of those permits, and it needs to obtain further permits;

- The Debtor's books and records are evidently in total disarray, and it proposes to rebuild them from the very beginning of its corporate existence in 2001; and

- The Debtor is on the verge of losing its knowledge base, its insurance, its bonding and many of its leased properties to a whole panoply of payment defaults.

The only entity in this case that has had an opportunity to investigate if all these obstacles can be overcome – within the price tags proposed in the DIP – is the DIP lender. No other party in this case has *any informed idea* whether the DIP is more likely to result in an increase in the value of the Debtor's estate or a forfeiture of all the properties of its estate to the DIP lender. Given the Debtor's track record to date, the latter appears substantially more likely.

This Debtor has nearly $60 million of undisputed secured debt, over $14 million of un-disputed unsecured claims, and it has raised and expended untold additional sums in equity investments. At best, it has produced just over $1 million in revenues. And currently, the

Debtor's operations are shuttered. Its mineral reserves are unknown. Those reserves are on lands embroiled in ownership disputes. Its mining capacity is iffy. Its former employees are disgruntled. Its woefully inefficient mill is falling into "an irreversible state of disrepair." Its leaching process is subpar. It is out of compliance under some of its regulatory permits, and yet it expects to qualify for new permits that will need to operate. It proposes to hire an army of experts and lawyers just to probe the feasibility of its business plan.

This Debtor is in no position to provide adequate protection to its secured lenders, and its unsecured creditors are presently slated to receive nothing, not even under the rosiest available analysis.

This Debtor presents a profile of a debtor whose bankruptcy case is on the verge of a conversion. If its best-case projection predicts nothing for unsecured creditors, then it is the secured lenders who should be making decisions about how to maximize the value of their collateral. If the Utah Lawsuit results in a judgment that NSRC is the rightful owner of the Properties, then it is NSRC who should be making those decisions. In either event, this Debtor does *not* present a profile that recommends another $15 million of secured debt, especially when the substantial financial risk of forfeiture is being borne entirely by others.

**H.    NSRC's Pending Motion for an Order Transferring Venue Should be Decided Before the Debtor's Pending DIP Financing Proposal is Considered.**

This Debtor has virtually no ties to Nevada, but it does have substantial ties to Utah. NSRC's objection to the Debtor's proposed DIP raises significant issues of Utah law that should be decided by the bankruptcy court in Utah. NSRC's motion for an order transferring venue remains pending. The Debtor's DIP proposal should not be considered until this Court has considered and ruled upon that motion.

**I.    Conclusion.**

The Debtor's DIP motion presupposes that the Debtor has a real property interest in the Properties. It does not. Under Utah's doctrine of equitable conversion, NSRC acquired that interest prepetition when it exercised its option. The Debtor cannot be authorized to encumber

that interest.  The DIP lender must not be permitted to perfect any lien on that interest.  The Debtor should not be authorized to commit waste or trespass upon that interest.  The Debtor's proposed DIP facility is inappropriate to address the Debtor's immediate financing needs.  In light of the Debtor's profound operational challenges, that facility is unlikely to succeed, it is more likely to result in a forfeiture of the Debtor's assets to the DIP lender.  The Debtor's rosiest analysis predicts no recoveries for unsecured creditors, so the Debtor should not be making the decisions about how to maximize the value of assets that ultimately belong to others.  This case should be transferred to Utah before any decisions are made with respect to DIP financing.

For all the reasons stated above, the Debtor's motion for an order authorizing DIP financing should be denied.

* * *

Respectfully submitted this 21st day of June, 2010.

PARSONS BEHLE & LATIMER

By: *J. Thomas Beckett*

Rew R. Goodenow
J. Thomas Beckett
Scott S. Bell
Attorneys for Nevada Star Resource Corp.

- 10 -

# EXHIBIT B

J. THOMAS BECKETT (5587)
DAVID P. BILLINGS (11510)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
Email: tbeckett@parsonsbehle.com
*Attorneys for Nevada Star Resource Corp.*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH

| | |
|---|---|
| *In re* **WESTERN UTAH COPPER COMPANY,** Debtor, | Case No. 10-29159-wtt Chief Judge William T. Thurman Chapter 11 |

## NRSC'S OBJECTION TO DEBTOR'S APPLICATION TO EMPLOY THE WATLEY GROUP, LLC AS CONSULTANT AND INVESTMENT BANKER TO THE DEBTOR

Nevada Star Resource Corp. ("NSRC"), by and through its undersigned counsel, hereby

objects to the Debtor's Application (docket # 89)[1] (the "Application") to Employ the Watley

Group, LLC ("Watley") as Consultant and Investment Banker to the Debtor.

### I.
### INTRODUCTION

The Application to employ Watley was signed by John Bryan as acting CEO of the

Debtor. John Bryan is CEO of Watley. In the Application, Mr. Bryan proposes to hire Watley's

Steve Durbin as investment banker to raise up to $100,000,000 in financing for the Debtor. As

the Debtor's investment banker, Durbin will negotiate the terms of the financing package and, if

---

[1] All references to "docket" refer to the docket of the United States Bankruptcy Court for the District of Utah, case no. 10-29159, unless designated "Nev. docket," in which case the document cannot be identified on the Utah docket but does appear on the docket of the United States Bankruptcy Court for the District of Nevada, case no. 10-51913.

it closes, Watley will be paid a substantial contingent fee. As the Debtor's CEO, Mr. Bryan will advise the Debtor's board of directors – a member of which personally paid Watley's retainer – whether or not Mr. Durbin's proposed financing is in the best interest of the Debtor's estate and creditors. In other words, *Watley seeks authorization to engage Watley to raise the financing that will pay Watley's fee, and Watley will advise the Debtor's Board whether that financing is in the Debtor's best interest.* This arrangement may be in Watley's best interest; it is certainly *not* in the estate's best interest.

The Application fails because it presupposes that John Bryan can, as CEO of the Debtor, hire his own firm as investment banker. He cannot. His and Watley's potential conflicts would be hopelessly irreconcilable. Watley cannot possibly provide disinterested financial advisory services to the Debtor in these circumstances. That is why Watley's proposed arrangement is expressly prohibited by subsections 327(a) and 327(d) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code" or the "Code").[2]

If this Debtor expects to remain in chapter 11, it will require the sound advice of a disinterested financial advisor. But if this Application is approved, this Debtor will pay dearly for the services of a financial advisor that is certainly *not* disinterested.

The Application should be denied.

---

[2] An investment banker for the Debtor must be a disinterested person. 11 U.S.C. § 327(a). An officer of the Debtor is not a disinterested person. 11 U.S.C. § 101(14)(B). An insider of the Debtor is also not a disinterested person. 11 U.S.C. § 101(14)(B). John Bryan is the Debtor's chief executive officer. As such, he is an insider. 11 U.S.C. § 101(31)(B)(ii). Bryan is also CEO of Watley. So Watley is disqualified from serving as the Debtor's investment banker. It is of no legal consequence that Watley has tapped Steve Durbin as "the investment banker." Durbin is a Senior Managing Director of Watley, he is an agent of Watley, and presumably he reports to Watley's CEO, John Bryan. *See also* 11 U.S.C. § 327(d) (the trustee may not employ his own firm as investment banker).

4850-4775-2967.2

## II.
## BACKGROUND

1.  On May 18, 2010 (the "Petition Date"), Western Utah Copper Company ("WUCC" or the "Debtor") filed its petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada (the "Nevada Bankruptcy Court").

2.  On the Petition Date, the Debtor's board of directors resolved to retain the Watley Group, LLC ("Watley") "on such terms and conditions as [Marcus] Southworth shall approve, to provide CEO, financial and investment banking services to, and represent, the [Debtor] in connection with such chapter 11 proceeding and other related matters in connection therewith." *See* Docket # 1 at 5.

3.  On or about May 19, 2010, Southworth, a member of the Debtor's board of directors, caused $70,000 to be delivered to the Debtors' proposed counsel, $25,000 of which was forwarded by them to Watley as a retainer for its CEO and investment banking services. *See* Docket # 90 at 5.

4.  On June 1, 2010, the Debtor filed its statements and schedules. *See* docket # 39. They show the Debtor having $8,352,203.08 in assets, $59,585,333 in secured debt, $184,629.12 in priority unsecured debt, and $14,274,724.98 in non-priority unsecured debt. *Id.*

5.  The Debtor's affiliate, Copper King Mining Corp., also sold over four billion shares of its stock, raising an additional $15,000,000. *See* Nev. docket # 34 (Declaration of Marcus Southworth), p. 3, ¶ 6.

6.    The Debtor's statements show it had no income from operations in 2008, and only $1,121,363 in income from operations in all of 2009. *See* docket # 39, p. 101, Statement of Financial Affairs, p. 1.

7.    On June 18, 2010, proposed counsel to the Official Committee of Unsecured Creditors published Watley's "Confidential Information Memorandum" (the "CIM"). *See* docket # 16, Part 2. (The "CIM" is attached as Exhibit "B" hereto.) The CIM describes the Debtor's current challenges:[3]

    a.    The Debtor was not operating its business when it filed bankruptcy, and it has not operated its business since then, *see id.* pp. 6 - 9.[4]

    b.    The Debtor cannot prove its own mineral reserves and must engage experts and drill 500 holes in order to determine what those reserves actually are, *see id.* p. 8;

    c.    Many of its mineral reserves are on properties that are subject to NSRC's real property interests, and on other properties that may imminently be lost to other parties, *see id.* pp. 7, 12, and 19 ;

    d.    Even if the Debtor has reserves that can be mined, the availability of its mining equipment is uncertain and its disgruntled former employees cannot be relied on, *see id.* pp. 6, 7 and 12;

    e.    Even if the Debtor has reserves and can mine them, it must solve a production bottleneck that currently limits (by a factor of two) its ability to crush ore for delivery into its ore processing mill (the "Mill"), *see id.* p. 20,;

---

[3] *See* Transcript of June 23, 2010 hearing on Debtor's Motion for Entry of an Order Authorizing Debtor to Obtain Post-Petition Financing Pursuant to 11 U.S.C. Section 364 and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Transcript") at 52:9-12, 54:21-24 (Mr. Leta: "[O]n behalf of the Watley Group [you] prepared a document entitled Confidential Information Memorandum. Did you not?" Mr. Bryan: "Yes, that's correct." Mr. Leta: "You ma[de] those representations in the document, correct?" Mr. Bryan: "The — yes." Mr. Leta: "And that's now a matter of record in this case, correct?" Mr. Bryan: "Yes, it is."). A copy of the relevant portions of the Transcript is attached hereto as Exhibit "A".    A copy of the CIM is attached as Exhibit "B."

[4] *See* Transcript at 19:9-12; 34:24-25; 37:3-7 (Mr. Freelander: "This is -- this case starts out as a mess but it actually starts out not all that different than the majority of non-operating mining operations with which we've been involved."); (The Court: "Well doesn't that contemplate you're in operation?"); (The Court: "When you say miscellaneous operating costs, and I just learned from counsel for the Secured Creditors that you're not operating." Mr. Golbchick: "It's -- your Honor, then maybe it shouldn't have been termed operating costs.")

4850-4775-2967.2

    f.    Even if the Debtor solves that bottleneck, its Mill is presently inoperative and on the verge of falling into "an irreversible state of disrepair," *see id.* pp. 8 and 13;

    g.    Even if the Mill can be repaired, it was last operating at only 30% efficiency, *see id.* p. 20;

    h.    The Debtor needs to engage more experts to assist it increase the Mill's efficiency up to 70% or more, and it is uncertain whether that objective can be achieved, *see id.* p. 7;

    i.    The Debtor also needs to engage more experts to assist it with its ore leaching process, which will require a new tailings pond and more water, *see id.* p. 20;

    j.    But the Debtor is unsure that it has enough water, so it will have to design and drill new wells and qualify for a new regulatory permit, *see id.* p. 20;

    k.    The Debtor is not currently in compliance with its existing regulatory permits; it needs to "amend" at least one of those permits, and it needs to obtain further permits, *see id.* p. 20;

    l.    The Debtor's books and records are evidently in total disarray, and it proposes to rebuild them from the very beginning of its corporate existence in 2001, *see id.* pp. 9 – 10, 23;

    m.    The Debtor is under criminal investigation by the SEC, the IRS, and the United States Department of Labor, *see id.* pp. 9 – 10;[5]

    n.    The Debtor is on the verge of losing its knowledge base, its insurance, its bonding and many of its leased properties and heavy mining equipment to a whole panoply of payment defaults, *see id.* pp. 10 – 11;

    o.    The Debtor has no unencumbered properties, and no income from operations, to give its secured lenders as adequate protection against further priming liens.[6]

8.    On July 8, 2010, the Nevada Bankruptcy Court transferred the Debtor's bankruptcy case to the United States Bankruptcy Court for the District of Utah.

9.    The Application to employ Watley proposes, among other things, that:

    a.    John Bryan, CEO of Watley, will serve as the Debtor's CEO;

---

[5] *See also* Transcript at 39:12-17 (Mr. Golubchik: "Yes. That is correct, your Honor. We have three -- . . . there are three governmental agencies that are conducting criminal investigations, SEC, IRS and Department of Labor.").

[6] *See* Transcript at 55:21-24, 56:1-25, 57:1-25, 58:1-25, 59:1-16 (Mr. Leta's questioning of Mr. Bryan regarding adequate protection for his clients and other secured creditors)

-5-

b.   Steve Durbin, Senior Managing Director of Watley, will serve as the Debtor's investment banker;

c.   Watley will receive five and one quarter percent (5.25%) of the aggregate gross proceeds from DIP loans and permanent financing received by the Debtor, projected to approach $100,000,000;

d.   Watley will receive $100,000 as post-petition retainer from any DIP loans;

e.   Watley will receive $50,000 fee per month as a consulting fee (without having to file any application or fee statement);

f.   Watley's employment will last at least until May 18, 2011, with an automatic renewal every 90 days thereafter.

10.   John Bryan has been acting as the Debtor's CEO since May 18, 2010. *See* Docket # 90 at 22. *See also* Docket # 37, May 31, 2010 Declaration of John Bryan Supporting DIP Financing, p. 2, ¶ 1 ("In connection with the Chapter 11 bankruptcy filings . . . , the Debtors retained Watley, subject to Court approval, to provide restructuring services for the Debtor, including, without limitation, to appoint me as the Chief Executive Officer ("CEO") of the Debtor. Based upon the foregoing, upon the bankruptcy filings, Marcus Southworth resigned his position as CEO and I filled such position.")

### III.
### ARGUMENT

A.   <u>Overview.</u>

Watley is disqualified from employment under section 327(a) of the Bankruptcy Code because, among other things, it is not a "disinterested person" under section 101(14) of the Code. As well, Watley's employment is unauthorized under section 327(d) of the Code. If the Debtor needs a financial advisor, it needs a disinterested one. Granting Watley's Application will not provide that. The Application should be denied.

4850-4775-2967.2

**B.**    <u>**Watley is Disqualified from Employment Under Section 327(a).**</u>

The Debtor seeks to engage Watley as its investment banker under section 327(a) of the Bankruptcy Code. Section 327(a) provides that "the trustee, with the Court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons . . . ." 11 U.S.C. § 327(a). "An applicant under § 327(a) has the burden of establishing by application and accompanying affidavit that its chosen professional is qualified." *In re Interwest Bus. Equip., Inc.*, 23 F.3d 311, 318 (10th Cir. 1994); *In re Roberts*, 46 B.R. 815, 822 (Bankr. D.Utah 1985) *aff'd in part and rev'd in part on other grounds*, 75 B.R. 402 (D.Utah 1987) *(en banc)*.

The Debtor cannot sustain its burden to show that Watley is qualified under section 327(a). First, it has not presented any evidence (other than the declaration of its acting CEO, John Bryan) that the engagement of Watley is in the Debtor's best interest. John Bryan should not be heard to testify as to what is in the Debtor's best interest unless his employment as CEO of the Debtor has been approved. Moreover, inasmuch as he is CEO of Watley, his declaration is irrelevant. The opinions of Watley's CEO do not make it more probable that Watley's employ-ment is *in fact* in the Debtor's best interest. *See* Rule 401, Federal Rules of Evidence. His declaration should be disregarded. Second, and more important, Watley is clearly *dis*qualified under section 327(a) because it "holds an interest adverse to the estate," and it is not a "disinterested person."

"To 'hold an interest adverse to the estate' means (1) to possess or assert any *economic interest that would tend to lessen the value of the bankruptcy estate* or that would *create either an actual or potential dispute* in which the estate is a rival claimant; or (2) to possess a *predispo-*

-7-

sition under circumstances that render such a bias against the estate." *In re Roberts*, 46 B.R. at 827 (emphasis added). A "disinterested person" is one who "*is not . . . [an] insider, . . . [or an] officer . . . of the debtor; and . . . does not have an interest materially adverse to the interest of the estate* or of any class of creditors . . . , by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14) (emphasis added).

The Application fails every qualification test under section 327(a). As a threshold matter, since John Bryan is an officer (and thus an insider) of the Debtor, Watley is by definition not a "disinterested person." 11 U.S.C. §§ 101(31)(B)(ii) and 101(14)(A)&(B). Consequently, Watley cannot be engaged as the Debtor's investment banker. 11 U.S.C. § 327(a). In addition, if the Application is approved, John Bryan and Watley will have the most severely divided loyalties imaginable because of Watley's economic interest in the Debtor's financing.

As CEO of the Debtor, Watley's John Bryan will owe fiduciary duties to the Debtor and its estate. *See Hansen, Jones & Leta, P.C. v. Segal*, 220 B.R. 434, 451 (D.Utah 1998) (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355-56 (1985); *In re Williams*, 152 B.R. 123, 127 (Bankr. N.D. Tex. 1992); *In re Baldwin-United Corp.*, 43 B.R. 443, 459 n. 22 (S.D. Ohio 1984)). Of course, as a fiduciary to the Debtor, his duty of loyalty to the Debtor will preclude John Bryan from allowing any duty he may have to Watley to interfere with his duties to the Debtor or its estate. *See id.* (citing Utah Code Ann. § 16-10a-480; *Nicholson v. Evans*, 642 P.2d 727, 730 (Utah 1982)) (The company's "principals owed a fiduciary duty to the corporation and its shareholders, which, among other things, required them to *exercise*

- 8 -

*reasonable care in making informed business decisions, and prohibited them from any form of self-dealing,* fraud or other illegality" (emphasis added)).

On the other hand, as CEO of Watley, John Bryan will owe fiduciary duties to Watley. *See Bingham Consol. Co. v. Groesbeck,* 2004 UT App 434, ¶ 22, 105 P. 3d 365 (quoting *Nicholson,* 642 P.2d at 730-31) ("'Directors and officers have a fiduciary duty of loyalty to their corporation and its stockholders' and are 'obliged to . . . preserve and enhance the property and *earning power of the corporation,* even if the interests of the corporation are in conflict with their own personal interests'" (emphasis added)). Of course, as a fiduciary to Watley, John Bryan's duty of loyalty to Watley will preclude him from allowing any duty he may have to the Debtor to interfere with his duties to Watley. *See Hansen, Jones & Leta, P.C.,* 220 B.R. at 451 (citing Utah Code Ann. § 16-10a-480; *Nicholson,* 642 P.2d at 730).

The circumstances described above present an ethical problem, but one that can be managed. That problem, however, becomes *impossible to manage* when Watley proposes an additional business relationship with the Debtor in which Watley has an economic interest. And that is precisely what Watley proposes to do – it proposes to become the Debtor's investment banker. And that presupposes that Watley's John Bryan, as an officer of the Debtor, can independently evaluate for the Debtor a financing proposal brought by Watley's Steve Durbin. He cannot. He cannot because Watley will have become both advis*or* and advis*ee* in a financial transaction in which it has an economic interest.[7]

---

[7] The entity that will pay Watley's contingent financing fee is a trust. The beneficiaries of that trust are the creditors of the Debtor's estate. Under Watley's proposed engagement, those creditors will be paying that fee either without the benefit of independent financial advice or upon the advice of a self-interested and hopelessly conflicted financial advisor. In either event, the result will be exactly what section 327(a) of the Bankruptcy Code is intended to avoid.

4850-4775-2967.2

The opportunities for conflicts and self-serving mischief are readily apparent. For example, it may be in the Debtor's best interest to borrow $100,000 or less; but it is certainly in Watley's best interest for the Debtor to borrow $100,000,000 or more. And it may be in Watley's best interest to close a financing transaction on any terms; but it is certainly in the Debtor's best interest to obtain the very best terms or refuse to close. With Watley and its divided loyalties involved, any financing proposal will be clouded in potential conflicts of interest and the appearance of impropriety. The only certainty will be that this Debtor will be making enormously important financial decisions for its estate without the benefit of disinterested, objective financial advice. Nevertheless, the estate will pay dearly for Watley's "advice."

Watley's Application fails every test under section 327(a) of the Bankruptcy Code: First, because Watley's John Bryan is the Debtor's CEO and an insider, Watley is not a "disinterested person" under section 101(14) of the Code, and so it cannot be approved as the Debtor's investment banker. Second, by virtue of its contingent financing fee, Watley has *both* (i) an "economic interest that would tend to lessen the value of the bankruptcy estate [or] create either an actual or potential dispute" *and* (ii) a "predisposition under circumstances that render such a bias against the estate." *See In re Roberts*, 46 B.R. at 827. Finally, Watley's economic interest in the Debtor's financing, by virtue of its contingent fee, gives it "an interest materially adverse to the interest of the estate. . . ." 11 U.S.C. § 327(a). Consequently, Watley is disqualified from employment by the Debtor as its investment banker.

**C.    <u>Watley's Employment is Unauthorized Under Section 327(d).</u>**

Section 327(a) allows the trustee to employ unrelated "attorneys, accountants, appraisers, auctioneers, or other professional persons . . . ." 11 U.S.C. § 327(a). In contrast, section 327(d)

- 10 -

allows the trustee to employ *his own firm* as a professional person, but *only* as "attorney or accountant."[8] *Id.* at § 327(d) (emphasis added). Here, the Debtor's CEO is Watley's CEO. And he is proposing to employ his own firm as investment banker. But that is unauthorized under section 327(d) because an investment banker is neither an attorney nor an accountant.

"By its express language, section 327(d) permits the trustee to serve only as 'attorney or accountant.' It does not authorize the trustee to serve in any other professional capacity." *In re Palm Coast, Matanza Shores Ltd. P'ship*, 101 F.3d 253, 258 (2d Cir. 1996) (citing *In re John Galt, Ltd.*, 130 B.R. 464, 465-66 (S.D. W.Va. 1989); *In re Blue*, 146 B.R. 856, 858 (Bankr. W.D. Okla. 1992); *In re Alexander*, 129 B.R. 183, 185 (Bankr. D.Minn. 1991); *In re Cont'l Nut Co.*, 44 B.R. 48, 49 (Bankr. E.D. Cal. 1984)).

> Because '[e]quity tolerates in bankruptcy trustees no interest adverse to the trust,' we hold that a trustee is not permitted to hire his own firm in a non-lawyer or non-accountant capacity. In certain situations, a bankruptcy trustee can hire his own law or accounting firm, but only because those two occupations are specifically exempted by subsection 327(d) of the Bankruptcy Code.

*Id.* (quoting *Mosser v. Darrow*, 341 U.S. 267, 271 (1951)). *See In re Blue*, 146 B.R. 856, 858 (Bankr. W.D. Okla. 1992) ("self employment by a trustee is limited to only two of these roles, attorney or accountant.").

**D.     This Debtor Needs a Disinterested Financial Advisor, Not More Watley.**

This much is known: The Debtor owns land in Beaver County, Utah. It built an on-site ore processing mill, and it conducted mining operations on that land in 2009, but those operations ceased before it filed bankruptcy. It reported revenue from mining operations in 2009

---

[8] NSRC recognizes that John Bryan is not a chapter 11 trustee. So section 327(d) may not expressly apply. But Bryan *is* CEO of a debtor in possession that has the rights, powers and duties of a trustee, *see* 11 U.S.C. § 1107(a), and this debtor has no other visible management. So section 327(d) should be applied.

4850-4775-2967.2

of only $1,121,363. It owes its creditors almost $75,000,000. Its assets are currently worth less than $9,000,000. And that is about all that is known.

Substantial uncertainties remain: The Debtor may or may not own a substantial portion of the land that comprises its mine. Its land may or may not be mineralized in sufficient concentration to justify mining. When it was in commission, its mill was running well below capacity. Even if it ran full-bore, it would be inadequate. The Debtor is the subject of criminal investigations by the SEC, IRS and DOL. But it has not complied with all their subpoenas, apparently because its books and records are in shambles. It proposes to heap more debt on its properties, but it has nothing to offer its under-secured lenders by way of adequate protection.

In NSRC's view, this case is an easy candidate for conversion or dismissal. But if it were to remain in chapter 11, then this Debtor would need the assistance of a disinterested financial advisor to recommend the steps to take next. Those steps may or may not include borrowing up to $100,000,000. (NSRC thinks not – the Debtor's $9,000,000 of assets is unlikely to support secured debt of up to $160,000,000.) But if Watley controls, then borrowing another $100,000,000 *will* be the unquestioned goal. That is because Watley is not disinterested.

## IV.
## CONCLUSION

Watley is not a "disinterested person" under section 101(14) of the Bankruptcy Code. It is disqualified from employment under section 327(a). Its employment is unauthorized under section 327(d). The Debtor may need a disinterested financial advisor, but granting Watley's Application will not provide that.

The Application should be denied.

\* \* \*

- 12 -

Respectfully submitted this 23rd day of August, 2010.

                          **PARSONS BEHLE & LATIMER**


                          By: _/s/ J. Thomas Beckett_
                          J. Thomas Beckett
                          David P. Billings

                          *Counsel to Nevada Star Resource Corp.*

## CERTIFICATE OF SERVICE BY ECF / EMAIL

I hereby certify that on this 23rd day of August, 2010, I caused true and correct copies of the foregoing **NSRC's Objection to the Debtor's Application to Employ the Watley Group, LLC as Consultant and Investment Banker to the Debtor** to be filed via this Court's ECF system, and thus served electronically on those parties having registered to receive such service, and also sent via email to:

**MARTIN J. BRILL**
**DAVID B. GOLUBCHIK**
**KRIKOR J. MESHEFEJIAN**
Levene, Neale, Bender, Rankin & Brill
10250 Constellation Blvd.
Suite 1700
Los Angeles, CA 90067
Email: mjb@lnbrb.com
         kjm@lnbrb.com
         dbg@lnbrb.com

**STEVEN R. SKIRVIN**
Dion-Kindem & Crockett
21271 Burbank Blvd.
Suite 100
Woodland Hills, CA 91367
Email: srs@dkclaw.com

**MICHAEL J. ROESCHENTHALER**
**MARK FREEDLANDER**
**JASON P. ALTER**
**WILLIAM PRICE**
McGuire Woods LLP
635 Liberty Avenue, 23rd Fl.
Pittsburg, PA 15222
Email: jalter@mcguirewoods.com
         mfreedlander@mcguirewoods.com
         mroeschenthaler@mcguirewoods.com
         wprice@mcguirewoods.com

**STEVEN W. DOUGHTERTY**
Anderson & Karrenburg, P.C.
50 W. Broadway, Suite 700
Salt Lake City, UT 84101-2035
Email: sdougherty@aklawfirm.com

**LAURIE A. CAYTON**
US Trustee's Office
Ken Garff Building
405 South Main Street
Suite 300
Salt Lake City, UT 84111
Email: laurie.cayton@usdoj.gov

_/s/ J. Thomas Beckett_

4850-4775-2967.2