J. THOMAS BECKETT (UT 5587)
DAVID P. BILLINGS (UT 11510)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:    (801) 532-1234
Facsimile:    (801) 536-6111
Email: tbeckett@parsonsbehle.com

*Attorneys for Nevada Star Resource Corp.*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH

| | |
|---|---|
| *In re* **WESTERN UTAH COPPER COMPANY,**<br><br>Debtor, | Case No. 10-29159-WTT<br><br>(Jointly Administered with Case No. 10-30002 WTT)<br><br>Chief Judge William T. Thurman<br><br>Chapter 11 |

### NSRC'S OBJECTION TO DEBTOR'S MOTION FOR AUTHORIZATION OF INTERIM DIP FINANCING PURSUANT TO ITS "MEMORANDUM OF UNDERSTANDING" WITH ALTUS

Nevada Star Resource Corp. ("NSRC"), by and through its undersigned counsel, hereby objects to the motion of Western Utah Copper Company (the "Debtor") for authorization to borrow $7,000,000, on an "interim" basis, pursuant to its "Memorandum of Understanding" ("MOU") with Altus Metals, LLC ("Altus") (docket # 325), and it states as follows:

### I.
### INTRODUCTION

The Debtor proposes to further encumber its assets and borrow *$7 million more* from Altus. It proposes this because Altus gave it an ultimatum: "Altus . . . refuses to provide interim financing to the [Debtor] in an amount of less than $7 million. . . ." (MOU, docket # 325 at ¶ 7.)

And the Debtor simply capitulated. The result is an "interim" DIP proposal which is a veritable dog's breakfast of unnecessary and destructive expenditures. For example, the Debtor proposes to spend nearly half of what it borrows from Altus (about $3.3 million, including Altus' generous fee) to repurchase equipment from Altus, even though the Debtor does not need that equipment and does not have to repurchase it. The Debtor also proposes to borrow $1 million from Altus (and pay about 13.8% *per annum* interest on those funds) for "unsecured creditors." But it can do nothing with those funds to benefit unsecured creditors at this time, so those funds will just sit in a bank account, wasting away due to interest expense. The Debtor also proposes to borrow almost $400,000 to pay its CEO at least $70,000 more than he is entitled to. The Debtor also proposes to borrow $1 million to pay professional fees that have not yet been applied for and $250,000 to pay property taxes that are not yet due.

Smothering its assets with *$7 million more* of high-interest secured debt will surely kill whatever chance this Debtor has to reorganize and kill whatever value is left in the copper mines. The Debtor has scheduled the value of all its assets at $8,352,203. (Docket # 39.) If the current DIP request is approved, the post-petition super-priority DIP balance will balloon to $7,947,393. (Docket # 32, 200, 260, 325.) That will yield an unheard of 95% loan-to-value ratio.[1] Lacking any cash-flows from operations, this Debtor is predestined to default. And if that is insufficient to kill the reorganization and kill the value of the copper mines, the Debtor proposes another term in its DIP request that certainly will: the Debtor proposes that it should be obligated to

---

[1] Secured debt at reasonable loan-to-value ratios may be appropriate for a business entity that is operating cash-flow positive. It is inappropriate at such levels for a business operation that is not in operation because its prior attempts to operate have failed. Such an entity cannot generate the cash flow that is necessary to service the debt. There is also prepetition secured debt of $59,585,333 in this case, (*see* docket # 39) which if included would bring the secured loan total to $67,532,726. The loan to value ratio then reaches an utterly absurd 808%.

2

18185.001/4836-1529-4727.1

deliver to Altus 5% of the common stock of any third party that purchases substantially all the Debtor's assets. That will *guarantee* that no third party mining company of any substance will ever make a bid for this Debtor's assets. It will leave Altus as the only likely bidder. And Altus will credit bid, so no cash will result from the sale.

By allowing the loan-to-value ratio to go stratospheric, and by assisting its DIP lender to chill competitive bidding, this Debtor has unwittingly orchestrated the almost certain success of Altus' loan-to-own strategy, and the almost certain failure of this case.

Previously, this Debtor attempted to grant an "irrevocable license" to Massey Energy Company to mine magnetite from its copper mines for the next ten years. That would have given Massey total control of the debtor's assets, and it would have killed the reorganization and killed the value of the Debtor's copper mines. Now, this Debtor proposes to achieve the exact same result with Altus.

This Debtor does not make good proposals. It makes very bad proposals. Its proposed DIP should be denied.

## II.
## ARGUMENT

A.  **The Debtor's Proposed "Interim" DIP Loan is Ill-Conceived and Ill-Advised.**

  1.  **The Debtor proposes to use half its "interim" DIP from Altus to finance its repurchase of unnecessary assets from Altus.**

The Debtor proposes to spend nearly half the proceeds of its proposed "interim" DIP to "repurchase" certain assets (the "Sold Assets") that it "sold" to Altus on the very eve of its

3

18185.001/4836-1529-4727.1

bankruptcy.[2] (MOU, docket # 325 at 5-6, ¶¶ 2-5.) It purports to have "sold" these assets for $2.2 million, and it proposes to "repurchase" them for just over $3 million. *Id.* That is, it proposes to allow Altus a 73% *per annum* rate of return on its prepetition claim.[3]

Nevertheless, the Debtor acknowledges that it does not even need to "repurchase" these assets. It admits that "none of the Sold Assets were removed from the [Debtors'] properties and [they] continue to be utilized by the [Debtors]." (MOU, docket # 325 at 5-6, ¶¶ 2-5.) Furthermore, the Debtor does not argue that it has any use for the Sold Assets. The only reason it gives for seeking to "repurchase" them at this time is that Altus "now require[s] that the Sold Assets are repurchase[d] . . . ." (*Id.* at ¶ 5.) Nor has the Debtor made any effort to establish that "repurchasing" the Sold Assets is in the best interest of its estate or creditors. The Debtor has provided no information addressing whether or not its prepetition "sale" of the Sold Assets to Altus was a fraudulent transfer that can and should be avoided, what the fair market value of the Sold Assets is, or whether it is in the best interest of creditors to repurchase them for the proposed price at this time.[4]

Solely with respect to the Sold Assets, the Debtor proposes to increase the super-priority administrative expense and secured debt burden on its estate and assets by more than $3.3

---

[2] The prepetition transaction between Altus and the Debtor was a thinly disguised secured financing. The Debtor's description of that transaction in the MOU is inaccurate. It is not in the nature of a sale-leaseback, and while minimal costs were deducted from the cash proceeds, more than $400,000 of costs were financed in the transaction.

[3] ($3,000,000 - $2,200,000)/2,200,000 = .3636. That would be the profit for the six months from April 15, 2010 to October 15, 2010. Double that is .7272 (73%), the *per annum* effective interest rate. The prepetition transaction generally contemplated a 38% effective interest rate and a 53% default interest rate. (See docket #160-2, ¶¶ 3.4 and 4.3.)

[4] The "Sold Assets" include (i) rolling stock and equipment that has been valued at $2.2 million (docket #160-3, pp 18-34 of 44), (ii) water rights, with respect to which a wholly inapt and inadequate "valuation" has been offered (docket #160-3, pp 5-15 of 44), and (iii) a pile of mined but unprocessed ore about which nothing is known or at least has been disclosed. The total asserted value of the "Sold Assets" is $2.2 million at most.

4

million, and to increase the interest expense cash-flow burden on its estate by more than $450,000 *per annum*. But it presently has possession of those assets, it does not need to use those assets, and it has no obligation to repurchase them. It only seeks to repurchase them now because Altus demands that. This is beyond wasteful. It is reckless.

    2.    **The Debtor's proposed repurchase of assets from Altus is a compromise, but the Debtor has not given proper notice of that compromise to its creditors.**

Furthermore, pursuant to its prepetition contract with Altus, the Debtor is not required to "repurchase" the Sold Assets from Altus until April 15, 2011, six months from now. (Purchase and Sale Investment Agreement ("PSIP"), docket #160-2, ¶ 3.1.) Furthermore, according to that contract, it appears that the Debtor would be required to pay $3.37 million, not $4.2 million as the Debtor alleges in the MOU. (PSIP, docket # 160-2, ¶¶ 3.3 and 3.4.) Yet the Debtor proposes to pay $3.068 million *now*, and, in consideration, Altus has agreed that "any and all claims previously held by [Altus] against the Debtors (other than those granted postpetition) will be deemed satisfied and waived. . . ." (MOU, docket # 325 at 6.) Clearly, the Debtor is proposing a compromise of Altus' claims. Just as clearly, it has not disclosed the particulars of those claims. Yet the Debtor has not sought approval of the compromise as required under Rule 9019 of the Federal Rules of Bankruptcy Procedure. "[T]he permissive language of Rule 9019 refers, not to the trustee's discretion to seek approval, but to the court's discretion to approve, or disapprove, a particular settlement." *In re OPTINREALBIG.COM*, 345 B.R. 277, 291 (Bankr. D. Colo. 2006). The Debtor did not give notice of its proposed compromise to "all" creditors, nor did it give 20 days notice (*id.* at pp 15 – 18 of 18), both as required by Rule 9019. *See, e.g., Saccurato v. Masters, Inc. (In re Masters, Inc.)*, 149 B.R. 289, 293 (E.D.N.Y. 1992) ("The notice requirement

5

in Rule 9019(a) cannot be ignored"). Even though it is now a trustee, this Debtor does not welcome a public airing of its prepetition relationship with Altus. Instead, it kowtows to Altus.

    3.    **The Debtor proposes to give Altus a "loan commitment fee" equal to a 5% equity stake in the reorganized Debtor or the acquirer of the Debtor's assets and thereby hand over complete control of its bankruptcy case to Altus.**

The Debtor proposes, as a "loan commitment fee" for Altus, that it should commit to deliver to Altus 5% of the equity of either (i) the reorganized Debtor, or (ii) any entity that purchases substantially all the Debtor's assets. (*See* docket # 325 at 8.) This Debtor should be sophisticated enough to recognize that this proposed term is not a "loan commitment fee." It is a "Trojan Horse" that will destroy any dim chance that this Debtor has to reorganize, and it will put Altus in total control of this bankruptcy case. First, to the extent that any new equity funder might not want Altus participating as equity, with myriad state law shareholder rights, the proposed term reduces the quality and quantity of potential new equity funders. More important, no substantial copper mining company (Phelps Dodge, Minera Escondida or Codelco, for example) would *ever* propose acquiring the Debtor's copper mine assets if that meant it had to give Altus 5% of its equity. And if Phelps Dodge (for example) did make a proposal that was in the best interest of this Debtor's creditors, but refused to give Altus 5% of its common stock, then Altus would have an astronomical administrative claim against the estate for the Debtor's failure to deliver to it 5% of Phelps Dodge's equity.

In either event, the Debtor's proposal to give Altus a 5% equity stake will certainly chill, and most likely spoil, any interest by any legitimate third-party participant in the Debtor's reorganization effort. Altus will be the only bidder, and it will credit bid; there will be no cash proceeds for creditors. *See also In re Belk Properties, LLC*, 421 B.R. 221, 225 (Bankr.

6

N.D.Miss. 2009) (Postpetition financing granting lender equity in debtor with discretion to acquire additional interest effected change in control without protections of sale outside ordinary course and amounted to *sub rosa* plan.)

Finally, the Debtor's proposal to give Altus a 5% equity stake must be worth something. But the Debtor makes no effort to value that remuneration. If the Debtor pays Altus its principal and interest on the secured loan, then Altus will be adequately compensated, especially given its 13.8% *per annum* interest rate. If it is to be further compensated, then the extent of that remuneration must be disclosed. *See* 11 U.S.C. § 1129(a)(4).

4. **The terms of the proposed "interim" DIP loan are incomplete.**

It is nearly beyond belief – This Debtor has proposed to borrow $7 million from Altus but it did not even think to negotiate one absolutely necessary borrowing term: *When is the $7 million loan due?*[5] Is it to be amortized over five years? Ten years? Is it due, principal and interest, in three years? Is it due on November 1, 2010? The Debtor's borrowing proposal lacks specificity on numerous important terms (What are events of default? What are the notice and cure terms? What does the "interim" security agreement say?), but the fact that this Debtor has failed to specify *when a $7 million loan must be repaid* is simply incredible.

5. **The proposed "interim" DIP loan will not be binding on Altus, *even if* it is approved by this Court.**

The Debtor submits that some unknown entity, Winterfox, has a veto on this transaction.[6] It states in the MOU,

---

[5] The Debtor states in the MOU that the DIP loan documents are not to be approved until the hearing on December 1, 2010. (MOU, docket #325, p. 4, ¶ C.)

[6] The Debtor incorrectly identifies Winterfox as a party to its prepetition agreement with Altus. (MOU, docket #325, p. 2, ¶ 2.) It is not. It is party to the related "Intercreditor Agreement." (Docket #160-2, pp 45 – 74 of 74.)

7

> While Winterfox has consented in principal to the transactions proposed herein, its written consent must be obtained to formally complete these transactions. Empire, based on statements and representations received, believes that Winterfox will provide its written consent to this agreement, if approved.

(Docket # 325 at 10.) It is disrespectful for this Debtor to require its creditors and this Court to expend time and energy on a proposal that some stranger has a right to veto, even after a hearing on the Debtor's motion. Winterfox must give its consent immediately or Altus should indemnify the estate and its creditors against Winterfox not giving its consent. Otherwise, the Debtor should bring the matter before the Court at a later time when Winterfox (whoever that may be) has agreed in writing to the terms of the Debtor's proposal.

**B.    The Available Proceeds of the Debtor's Proposed "Interim" Loan are not Necessary to Address any Impending Emergencies.**

    **1.    Only *half* the proceeds of the proposed "interim" DIP loan will be made available to the Debtor, but the Debtor will still have to pay interest on the entire $7,000,000.**

The Debtor proposes to pay interest at 12.99% (accrued monthly, which is 13.79% *per annum*) on $7 million although it will receive only about half that amount ($3,697,000) as loan proceeds. The balance ($3,303,000) will be kept by Altus to pay for the Debtor's unnecessary "repurchase" of the "Sold Assets" and to pay Altus' jaw-dropping fees of $235,000. Because the Debtor has witlessly proposed a term loan (which will be drawn down immediately in its entirety), rather than a credit facility (which could be drawn down only if and when funds are needed), the entire $7 million will begin to accrue interest as soon as the loan closes. The Debtor's estate and assets will be smothered as of that moment under an additional $7 million in principal, and $965,300 *per annum* in interest expense, whether or not the Debtor urgently needs to spend the balance of the $7 million loan.

8

18185.001/4836-1529-4727.1

Obviously, there is no exigency in the Debtor's purchase of the Sold Assets. And little if any of the balance of available proceeds is proposed to be wisely-spent to address any impending emergencies.

2. **A. John A. Bryan, Jr. will receive more than 11% of the available proceeds of the Debtor's proposed "interim" loan (nearly $400,000), at least $70,000 more than he is entitled to.**

The Debtor proposes to pay A. John A. Bryan, Jr. $390,967.74 (nearly 5.6% of the entire $7 million loan) under two line-items in its budget: First, it proposes to pay him $370,967.74 for his service as "contract CEO." But Mr. Bryan's engagement as such has not yet been approved by an order of this Court.[7] Even if it is approved, the *most* Mr. Bryan will be paid is $50,000 per month. He has not yet submitted any fee applications, and some parties are increasingly and seriously concerned that his services may not be worth $600,000 *per annum*. In any event, $370,967.74 divided by $50,000 per month equals 7.42 months. As the case was filed on May 18, 2010, $370,967.74 would pay Mr. Bryan's fee for 7.42 months; that is, through the end of December, 2010. But the Debtor's budget proposes to expend funds only to December 1, 2010. In other words, the Debtor is proposing to over-compensate Mr. Bryan as CEO by at least $50,000.

In addition, the Debtor proposes to compensate Mr. Bryan in the amount of $20,000 for "board observation fees." This line-item has its genesis in the Watley Group's proposed employment agreement with the Debtors. (Docket # 90, Exhibit 2.) That agreement provided that "Watley will be granted observation rights for any and all meetings of the Board of Directors

---

[7] NSRC does not believe that Mr. Bryan is entitled to compensation as CEO, *nunc pro tunc*, to the petition date. Moreover, it believes that any compensation he receives must be shown to have benefitted the estate. It should not be paid, without scrutiny, pursuant to a DIP budget. *See In re Energy Partners, Ltd.*, 409 B.R. 211, 216 (S.D. Tex. 2009) ("The estate is not a cash cow to be milked to death by professionals seeking compensation for services rendered to the estate which have not produced a benefit commensurate with the fees sought.").

9

of the Company." (*Id.*, ¶ 14.) That agreement, which was *not* approved by this Court, did not contemplate that the Watley Group would receive any compensation for observing board meetings. *And Mr. Bryan has never proposed compensation including "board observation fees," and this Court has never approved compensation for Mr. Bryan including "board observation fees."* Yet the Debtor, under Mr. Bryan's supervision, now proposes to pay Mr. Bryan, who is not a board member, $20,000 for "observing" board meetings. That is simply outrageous.

3. **The Debtor proposes to borrow $1 million (and pay interest on those borrowed funds), to purchase the support of the Unsecured Creditors Committee for its DIP, even though those funds cannot at this time be used for that purpose.**

The Debtor's budget includes the line-item "Unsecured Creditors - $1,000,000." It is inconceivable that the Debtor can lawfully make a payment to unsecured creditors in the near term of $1 million. *See, e.g., Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002) (describing absolute priority rule). Obviously, this is just pandering to the Unsecured Creditors Committee. But this line-item will increase the administrative expense and secured debt burden on the estate and its assets by $1 million, and it will increase the Debtor's cash-flow burden by $137,800 *per annum*; clearly, it will ultimately *hurt* the creditors, secured and unsecured alike. Frankly, the Unsecured Creditors Committee should be offended.

4. **The Debtor has not submitted sufficient evidence with respect to most of the line-items in its proposed Budget.**

On October 8, 2010, the secured creditors advised the Debtor's counsel that

> we [have not received] any evidence or explanation for the individual line items in the budget. To the extent the Debtor has evidence to support any of these line items, or it intends to present evidence on this subject at the October 20 hearing, please provide the same to us and to counsel for the other parties not later than noon Mountain Time on Monday, October 11, 2010.

10

(E-mail from Engles Tejada to Martin Brill.) On October 10, 2010, the Debtor responded as follows, "The October 20, 2010 hearing is a continued hearing. Evidence in support of financing has been previously filed." (E-mail response from David Golubchik.) Consequently, to the extent current budget line-items differ from prior budget line-items, the Debtor has provided no evidence to support them. Most of the line-items, furthermore, appear unnecessary on an "interim" basis. Among them are,

- Contract Geologist - $39,516.13. This is a member of the Unsecured Creditors Committee who is working for the Debtor as a consultant/expert witness. His engagement by the Debtor has not been submitted by the Debtor to the Court for approval. The Debtor has not defined exactly what his mission is.

- Geology Software - $27,000. The Debtor's software provider is evidently interfering with the Debtor's use of its geology data. The Debtor proposes no action against the provider, nor has it proposed to assume whatever contract it has with the provider.

- Tetra Tech - $60,000. Tetra Tech is working for the Debtor as a professional consultant and expert witness. Its engagement by the Debtor has not been submitted to the Court for approval. The Debtor has not defined exactly what its mission is.

- Compressor Service Contract - $21,000. No explanation.

- Management Payroll - $166,833.33. The Debtor offers no explanation as to whom this line item pertains, or why this is necessary on an "interim" basis.

- Large Mine Permit compliance, tailings, regulatory compliance -- $300,000. The note says that this request is "a jump start on the necessary items that will be required by the debtor by the UTAH DOGM." The request is nonsensical.

- Utilities – $13,000 for 16 days, then $13,000 for the following 27 days. "based on actual from the past 2 months." The request is nonsensical. The amount also seems excessive for a mill that has never operated successfully and should be mothballed.

- Expense Reimbursements – $18,000. There is no backup for this request.

- Professional Fees – $1,000,000. The Debtor does not discuss why it should pay 13.8% interest to borrow funds (when that puts the Debtor's

11

case at serious risk) to pay professional fees that have not been submitted in fee applications.

- <u>Property taxes</u> – $250,000. The Debtor does not discuss why it should pay 13.8% interest to borrow money to pay property taxes that are not yet due.

- <u>Load claims</u> -- $150,000. The Debtor does not explain why it needs to stake mineral claims on its property while others are precluded from doing so by the automatic stay.

C. **The Debtor's Proposed "Interim" Loan Provides no Adequate Protection.**

1. **The Debtor proposes to provide the Secured Creditors with worthless junior liens on the very properties that Altus is required to foreclose upon first.**

Section 363(p) provides that "the trustee has the burden of proof on the issue of adequate protection . . . ." 11 U.S.C. § 363(p). *See, e.g., In re Martin*, 761 F.2d 472 (8th Cir. 1985). The only adequate protection that the Debtor has proposed, with respect to this $7 million "interim" DIP request, is a junior lien on the Sold Assets and the Additional Assets.[8] The MOU says,

> In order to provide adequate protection to other secured creditors of the [Debtors], Altus consents to existing secured liens to attach to Altus' collateral hereunder, including the Sold Assets and the Additional Assets, provided that such security interests are junior to those of Altus.

(MOU, docket # 325 at 10) But the MOU also says,

> If Altus exercises or enforces its liens and right to foreclosure on its collateral, Altus must first enforce its liens with respect to the Sold Assets and the Additional Assets to the fullest extent practicable prior to enforcing its liens with respect to any other collateral or property.

(*Id.*) In other words, the Debtor has arranged for Altus to recover first from the very same assets it has offered a subordinated lien on to secured creditors as adequate protection. That is not adequate protection, it is no protection whatsoever.

---

[8] In connection with its prepetition contract with Altus, the Debtor granted Altus a security interest in the "Additional Assets." The Debtor has never provided a valuation with respect to any of the Additional Assets. As noted above, the value of the "Sold Assets" is less than $2.5 million.

12

18185.001/4836-1529-4727.1

1. **The Debtor acknowledges, but does not account for, the fact that a substantial component of its copper mines belongs in fact to NSRC.**

In the MOU, the Debtor seems to acknowledge for the first time that it cannot encumber or mine the real properties in which NSRC asserts an interest. As NSRC has repeatedly stated, equitable title to those properties are not property of the Debtor's estate. The Debtor now acknowledges that "the liens provided for in this Order [sic] shall not attach to property which is not property of the [Debtors'] estates pursuant to 11 U.S.C. § 541." (MOU, docket # 325 at 8) But this means that the liens that Altus seeks to impress on property of the estate will only encumber property that is *not* subject to NSRC's interest. And that changes the Debtor's burden with respect to adequate protection. The Debtor must now show that there is sufficient value in property of the Debtor's estate (*not including the property in which NSRC asserts its interest*) to sustain Altus' DIP *and* the existing secured claims as well. If the Debtor's pending DIP request is granted, that debt will exceed $67 million. There is no evidence in this case that the Debtor's uncontested properties can support that level of debt. The Debtor has done *nothing* to carry its burden in this regard.

D. **The Parties in this Bankruptcy Case Are Entitled to Conduct Discovery before the Court Conducts a Final Hearing on the Debtor's DIP Proposal, and any Consideration of this Pending $7 million "Interim" DIP Proposal would Prevent that.**

At the hearing on September 9, 2010, this Court agreed that the parties in interest needed 90 days to conduct discovery with regard to the Debtor's "final" DIP proposal, although it did allow for a further "interim" DIP request in the meantime. The creditors understood that the further DIP hearing would be limited to "interim" (i.e., emergency) relief. Nevertheless, the Debtor now seeks $7 million in "interim" funds. This is an amateurish ploy by this Debtor or Altus or both to cast the die before the creditors can conduct the discovery that is necessary.

13

18185.001/4836-1529-4727.1

E.   **By Seeking this "Interim" DIP Loan of $7 million, this Debtor has *Again* Proven its Incompetence as Trustee.**

This Debtor chose to venue its case in Reno, Nevada. It cost other parties in interest much time and money to get the case transferred to Utah, where it should have been filed in the first place. This Debtor also chose to hire a CEO who thought he could lawfully hire himself as the Debtor's investment banker. It cost other parties in interest much time and money to keep this from happening. This Debtor also attempted to grant Massey an "irrevocable license" to mine magnetite from the Debtor's copper mines for the next ten years. It cost other parties in interest much time and money to keep that from happening. Now, this Debtor proposes to encumber its estate with an "interim" DIP (i) to finance the purchase of assets it does not need, (ii) in connection with a compromise it has not explained, (iii) without even identifying when the $7 million will be due, (iv) that would over-compensate Mr. Bryan by at least $70,000, (v) that would require the payment of interest on $1 million for unsecured creditors, even though they cannot lawfully be paid those funds at this time, and (vi) without providing *any* adequate protection for secured creditors. If the smothering load of so much unnecessary high-interest secured debt does not kill this reorganization, and kill the copper mines, then the Debtor's proposal to give Altus a 5% equity stake in any acquirer certainly will.

What is truly disturbing is that committing all these *blunders* really is all this Debtor has in fact accomplished so far in this case.

### III.
### CONCLUSION

This Debtor is not competent to manage and develop its copper mine assets in this bankruptcy case. It has a proven track record of trying to kill the value of those assets and kill

18185.001/4836-1529-4727.1

the prospects of success in this case. Its request for $7 million in "interim" DIP financing pursuant to the MOU is just more of the same.

Its request should be denied.

Dated: October 13, 2010
      Salt Lake City, Utah

                              PARSONS BEHLE & LATIMER

                              By: _____
                                 J. Thomas Beckett
                                 David P. Billings
                                 Attorneys for Nevada Star Resource Corp.

18185.001/4836-1529-4727.1

## CERTIFICATE OF SERVICE BY ECF / EMAIL

I hereby certify that on this 13th day of October, 2010, I caused true and correct copies of the foregoing **NSRC's Objection to Debtor's Motion for Authorization of Interim DIP Financing Pursuant to its "Memorandum of Understanding" with Altus** to be filed via this Court's ECF system, and thus served electronically on those parties having registered to receive such service, and also sent via email to:

Martin J. Brill
Levene, Neale, Bender, Yoo & Brill, L.L.P.
Email: mjb@lnbyb.com

Glenn R. Bronson
Prince Yeates & Geldzahler
Email: grb@pyglaw.com

Laurie A. Cayton
US Trustees Office
Email: laurie.cayton@usdoj.gov

Joseph M.R. Covey
jcovey@parrbrown.com

Steven W. Dougherty
Anderson & Karrenberg
Email: sdougherty@aklawfirm.com

Mark E. Freedlander
mfreedlander@mcguirewoods.com

Christopher Grivakes
Affeld Grivakes Zucker, LLP
Email: cg@agzlaw.com

David B. Golubchik
Levene, Neale, Bender, Yoo & Brill L.L.P
Email: dbg@lnbrb.com

Mark H. Howard
Internal Revenue Service
Email: mark.h.howard@irscounsel.treas.gov

Mary Margaret Hunt
Dorsey & Whitney
hunt.peggy@dorsey.com

David W. Hunter
Dixon Truman Fisher & Clifford, PC
Email: davidh@dixontruman.com

Annette W. Jarvis
Dorsey & Whitney
jarvis.annette@dorsey.com

Michael R. Johnson
Ray Quinney & Nebeker, P.C.
Email: mjohnson@rqn.com

Derek Langton
Parsons Behle & Latimer
Email: dlangton@parsonsbehle.com

Adelaide Maudsley
Chapman and Cutler LLP
Email: maudsley@chapman.com

Krikor J. Meshefejian
Levene, Neale, Bender, Yoo & Brill L.L.P
Email: kjm@lnbyb.com

Edmond "Buddy" Miller
Email: bmiller@buddymillerlaw.com

Carolyn Montgomery
Callister Nebeker & McCullough
Email: cmontgomery@cnmlaw.com

M. Eric Olmstead
Barney McKenna & Olmstead, PC
Email: eolmstead@barney-mckenna.com

Mitchel H. Perkiel
Troutman Sanders
Email: mitchel.perkiel@troutmansanders.com

16

18185.001/4836-1529-4727.1

William C. Price
McGuire Woods, LLP
Email: wprice@mcguirewoods.com

Michael J. Roeschenthaler
McGuireWoods, LLP
Email: mroeschenthaler@mcguirewoods.com

R. Craig Schneider
Internal Revenue Service
Email: randall.c.schneider@irscounsel.treas.gov

Justin E. Scott
Babcock Scott & Babcock
Email: justin@babcockscott.com

Nathan Seim
Dorsey & Whitney
seim.nathan@dorsey.com

Steven R. Skirvin
Dion-Kindem & Crockett
Email: srs@dkclaw.com

Jennifer A. Smith
Lionel Sawyer & Collins
Email: jsmith@lionelsawyer.com

Quinn A. Sperry
Email: qsperry@mbt-law.com

Gerald H. Suniville
Van Cott Bagley Cornwall & McCarthy
Email: gsuniville@vancott.com

United States Trustee Email:
USTPRegion19.sk.ecf@usdoj.gov

2