MARTIN J. BRILL (Calif. Bar No. 53220) mjb@lnbyb.com
DAVID B. GOLUBCHIK (Calif. Bar No. 185520) dbg@lnbyb.com
KRIKOR J. MESHEFEJIAN (Calif. Bar No. 255030) kjm@lnbyb.com
**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
*Reorganization Counsel for Chapter 11 Debtors and Debtors-in-Possession*

STEVEN R. SKIRVIN (Utah Bar No. 7626)
**DION-KINDEM & CROCKETT**
10808 S. River Front Parkway, Suite 308
South Jordan, UT  84095
Telephone: (801) 984-8045
Facsimile: (801) 984-4315
Email: srs@dkclaw.com
*Local Counsel for Chapter 11 Debtors and Debtors-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>WESTERN UTAH COPPER COMPANY, et al.,<br><br>       Debtors and Debtors in Possession. | Bankruptcy No. 10-29159 WTT<br><br>Chapter 11<br><br>(Jointly Administered with<br>Case No. 10-30002 WTT)<br><br><br>Honorable William T. Thurman<br><br><br>**FILED ELECTRONICALLY** |

## DEBTORS' MOTION FOR ORDER APPROVING (1) SETTLEMENT AGREEMENT WITH SECURED CREDITORS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019; AND (2) SETTLEMENT BUYOUT TERM SHEET

Western Utah Copper Company ("**Western Utah**" or "**Debtor**") and Copper King Mining Corporation ("**Copper King**"), the jointly administered Chapter 11 debtors and debtors in possession (collectively the "**Debtors**") hereby file their Motion (1) for Order Approving Settlement Agreement With Secured Creditors Pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "Settlement Agreement"); and (2) approval of Term Sheet between the Debtors and Altus Metals, LLC.   True and correct copies of the Settlement Agreement and the Settlement Buyout Term Sheet ("Term Sheet") are attached hereto as Exhibits "A" and "B", respectively, and incorporated herein by reference.

The settling parties are the Debtors, and DDB Utah, LLC; The Raymond W. Schmelzer Marital Trust; Top- Notch Investments, LLC; Rodney Evan Schmelzer; Brent Thomas Bingham; Bridge Loan Capital Fund, LP; DPI College, LC; Milford Copper Investors II, LLC; Reynolds Brothers, Inc.; Milford Investors, LLC; Advanced Strategic Planning, LLC; Back Country Investments, LLC (collectively the "**First Lien Lenders**"); Bridge Loan Capital, LP; ME Dancy Consulting Services, Inc.; Jonathan B. Wells; Wendell Gile Trust; Josh Romney (collectively the "**Second Lien Lenders**"); and Devin Durrant (the "**Third Lien Lender**") (the First Lien Lenders, Second Lien Lenders and Third Lien Lender are collectively referred to herein as the "**Secured Creditors**").

The parties to the Term Sheet are the Debtors and Altus Metals, LLC ("Altus"). Specifically, Altus has the financial ability to purchase the claims pursuant to the Settlement Agreement and is in discussions to propose a plan of reorganization for the benefit of all creditors.  However, in order to do so, Altus requires a finding by the Court that the claims it is acquiring are valid claims.  The Debtors believe that the claims are valid.  Pursuant to the Term

Sheet, the Debtors are obligated to seek an order of this Court validating the amount of the secured claims in the amounts set forth in the Settlement Agreement, which total amount (among the three (3) traunches) is approximately $53,576,942.33, composed of the first lien in the amount of $36,624,942.33, second lien in the amount of $11,952,000, and third lien in the amount of $5,000,000.

## I.

## JURISDICTION

This Court has jurisdiction to entertain this Motion pursuant to 28 U.S.C. §§ 1334 and 157. This Motion represents a core proceeding pursuant to 28 U.S.C. § 157(b). Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.

## STATEMENT OF RELEVANT FACTS

### A. Background of Cases

1. On May 18, 2010 (the "Petition Date"), the Debtors commenced their respective bankruptcy cases ("Cases") by filing Voluntary Petitions under Chapter 11 of the Bankruptcy Code (the "Petition Date"). The Debtors originally filed their bankruptcy cases in the United States District Court for the District of Nevada (the "**Nevada Court**").

2. On July 8, 2010, pursuant to the Nevada Court's sua sponte ruling, Western Utah's case was transferred to this Court (the "**Utah Court**"). Subsequent to that ruling, Copper King requested that the Nevada Court also transfer its case to the Utah Court. On July 26, 2010,

the Copper King case was also transferred to this Court.  The Debtors' cases were thereafter ordered to be jointly administered by this Court.

3.      Western Utah was incorporated in mid-2002. Initially, Western Utah had two shareholders which contributed to Western Utah's mining property assets so that these assets could be exploited. In 2002-2004, Western Utah completed a series of mineral leases in order to consolidate its position within its mining district. Western Utah then directed its efforts at moving the project into production in late 2004. Plans for exploration, mining, and processing were developed and sized.  Western Utah engaged in exploration, development, extraction, and processing of metals, including copper, silver, and gold, from its extensive mineral resources located in and around the Milford Mineral Belt in Beaver County Utah. Since 2003, Western Utah had assembled an impressive mining property which consolidated a large region of the Milford Mineral Belt, a large mineral rich area in western Utah. Western Utah now owns or controls approximately 100,000 acres of mineral rights, primarily in the Milford, Utah region. Many of these claims had been successfully mined previously, but no one was able to consolidate this region into one company and build an ore processing mill due to the fractured mining claims. Western Utah succeeded in consolidating 635 Bureau of Land Management unpatented mining claims covering nearly 60,000 acres of land. Western Utah had also built a "floatation" ore processing mill which it ran and operated in 2009 and 2010 prior to filing for Chapter 11.

**B.      Background of Financing with Secured Creditors**

4.      In 2006, Western Utah raised capital to pay property taxes due on mineral claims owned by Western Utah and other operating and capital expenditures. In January 2007, Western

Utah received secured financing in the form of a secured loan from the First Lien Lenders in the aggregate amount of approximately $7.5 million (the "**First Lien Loan**"). The First Lien Loan was evidenced by a Secured Promissory Note (the "**First Note**") dated January 4, 2007, in the principal amount of $8,944,200.97, bearing interest at the nondefault rate of 24% per annum and maturing on July 4, 2007. In the event of any late payments, the First Note required Western Utah to pay a default fee equal to one percent (1%) of the delinquent payment for every three calendar days late, until fees and interest and principal were paid in full. The First Note was secured by a certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing ("**First Lien Deed of Trust**") on various real and related personal property assets owned by Western Utah. The First Lien Deed of Trust was recorded as Entry No. 229850 at Book 400, Page 356 on January 5, 2007, in the Office of the Beaver County Recorder.

5.     On February 3, 2009, Western Utah, Copper King and the First Lien Lenders entered into a Loan Modification Agreement which, among other provisions, acknowledged that, as of October 1, 2008, the indebtedness owed by Western Utah under the First Note, exclusive of obligations to Milford Investors, LLC, foreclosure costs and expenses, was $26,135,701.35. The Loan Modification Agreement reduced the non-default interest rate under the First Note to 16% per annum and fixed the default rate at 24% per annum. Copper King also guaranteed the First Note pursuant to the terms of the Loan Modification Agreement.

6.     In its Statement of Financial Affairs and Schedules [Nevada Doc. 39], Western Utah scheduled its obligations to the First Lien Lenders as an undisputed, first lien secured claim in the amount of $30,433,333.00, and has never amended this schedule.

7.     On September 7, 2010, the First Lien Lenders filed their Proof of Claim, Claim

No. 141-1, in the amount of $36,624,942.33.

8.      As of the Effective Date, the First Lien Lenders assert that the unpaid balance due on the First Note is at least $36,624,942.33.

9.      In March 2007, the Debtor borrowed approximately $4 million (the "**Second Lien Loan**") from the Second Lien Lenders. The Second Lien Loan also was purportedly secured by substantially all of the same assets securing the First Lien Loan. In its Schedules, the Debtor scheduled its obligations to the Second Lien Lenders as an undisputed, second lien secured claim in the amount of $11,952.000, and has never amended this schedule.

10.     As of the Effective Date, the Second Lien Lenders assert that the unpaid balance due on the Second Lien Loan is at least $11,952,000.

11.     In October of 2007, the Debtor borrowed approximately $1.2 million (the "**Third Lien Loan**") from the Third Lien Lender. In its Schedules, the Debtor scheduled its obligations to the Third Lien Lender as an undisputed, third lien secured claim in the amount of $4,000,000, and has never amended this schedule. As of the Petition Date, the Third Lien Lender claims and asserts that the unpaid balance on the Third Lien Loan is approximately $5,000,000. The Third Lien Loan also was purportedly secured by substantially all of the same assets securing the First Lien Loan and the Second Lien Loan.

12.     As of the Effective Date, the Third Lien Lender asserts that the unpaid balance due on the Third Lien Loan is at least $5,000,000.

13.     The First Lien Lenders, the Second Lien Lenders and the Third Lien Lender assert that the First, Second and Third Lien Loans are secured by valid, perfected and enforceable liens against certain real and personal property assets of Western Utah.

14.     These short term loans were made with expectations that they would be repaid from a $100 million credit line to be provided by Credit Suisse First Boston ("CSFB"), whose proposal was in the form of a term sheet. However, the terms of the CSFB facility were rejected and Western Utah turned to other lenders in May of 2007. Stillwater Capital, a hedge fund in New York, provided a term sheet. Loan documents were negotiated and agreed to for $55 million in financing. However, in late July 2007, just a few days before closing of this loan, Stillwater informed Western Utah that it would not be able to close the transaction because of credit market problems that later developed into the now apparent "credit crunch." In September of 2007, Western Utah began selling its privately held stock. Nearly $5 million of capital was raised in this manner.

15.     In February of 2008, Western Utah merged with Copper King, a Nevada corporation, a public company traded on the "Pink Sheets" under the symbol of CPRK. Shares in Copper King were sold and the proceeds invested in Western Utah for: (1) completion of Western Utah's concentrator/flotation mill; (2) mining; and (3) exploration. Through December of 2009, Copper King sold over four billion common shares of Copper King stock that provided aggregate proceeds to Copper King and the Debtor of $15 million. During that same period of time, other loans were taken out, secured with equipment and other assets which were not already encumbered by the First, Second and Third Lien Loans, in the aggregate amount of $17 million.[1]

---

[1]     From September 2009 to May 2010, Empire Advisors, LLC and/or Altus Metals, LLC ("Empire") provided approximately $1.2 million of cash in purchasing certain unencumbered assets of the Debtors and certain third parties, which the Debtors were obligated to repurchase or purchase, and secured liens on certain other assets of the Debtors and third parties to secure the repurchase and purchase obligations. During this time period, Empire made various offers to existing First Lien Lenders for financing of up to $7 million, but the First Lien Lenders and Empire were unable to agree to terms.

**C.      Events Leading to Bankruptcy**

16.      By December 2009, it had become nearly impossible to borrow any more money since most of Western Utah's assets had been pledged as collateral.  Most of the 5.9 billion authorized shares of Copper King had been sold, and the Debtors were unable to restructure or refinance their obligations with their existing creditors.

17.      Debtors' management was involved in seeking alternative/supplemental financing for Debtors. Management contacted numerous lenders and investors to obtain such financing on a secured or unsecured basis. Notwithstanding these efforts, the Debtors were unable to secure additional financing.

18.      Western Utah also sought to obtain financing which was *parri passu* with the First Lien Loans. Specifically, additional financing of up to $6 million was offered to the Debtors, subject to existing lenders allowing those lenders to share, on a *parri passu* basis, a first priority position on substantially all assets of the Debtor and Copper King. It was believed at the time that these funds could bring operations to positive cash flow. The existing lenders and the new money lenders were not able to agree on acceptable terms of an intercreditor agreement and, therefore, the financing transaction did not close. As a result, the Debtors were not able to secure sufficient financing to complete their plan to reach positive cash flow.

19.      In early May 2010, the First Lien Lenders filed a notice of a foreclosure sale of the Debtors' assets, alleging that in excess of $36 million was owing. In order to preserve the value of Debtors' business for the benefit of all creditors and parties in interest, the Debtors determined that the commencement of their Cases under Chapter 11 of the Bankruptcy Code was necessary and proper.

**D. Unresolved Contested Matters with the Secured Creditors**

20.     On August 23, 2010, the Debtors filed their *Motion for Entry of an Order Authorizing Debtor to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364 and Rule 4001 of the Federal Rules of Bankruptcy Procedure* [Doc. No. 154] (the "**DIP Motion**").

21.     On August 24, 2010, the First Lien Lenders filed their *Initial Objection of Senior Secured Creditors to Debtor's Ex Parte Motion for Hearing on Shortened Notice on Debtor's Motion for Entry of an Order Authorizing Debtor to Obtain Interim Post-Petition Financing* [Doc. No. 170].

22.     On November 19, 2010, the Debtors withdrew their DIP Motion [Doc. No. 435] in partial performance of the terms and conditions of the Settlement Agreement.

23.     On September 7, 2010, the First Lien Lenders filed their *Motion and Memorandum in Support of Senior Secured Creditors' Motion for Termination of the Stay, or, in the Alternative, for Appointment of a Chapter 11 Trustee, or, in the Alternative, for Conversion of the Case to a Case Under Chapter 7* [Doc. No. 230] (the "**Relief Motion**").

24.     On September 24, 2010, the Debtors filed their *Opposition to Senior Secured Creditors' Motion for Termination of the Stay, or, in the Alternative, for Appointment of a Chapter 11 Trustee, or, in the Alternative, for Conversion of the Case to a Case Under Chapter 7* [Doc. No. 284]. Other oppositions were filed by other parties in interest in the Debtors' cases.

25.     On November 22, 2010, the First Lien Lenders filed their Withdrawal of the Relief Motion [Doc. No. 440] in partial performance of the terms and conditions of the Settlement Agreement.

26.     On August 12, 2010, the Debtors filed their *Motion for an Order Substantively*

*Consolidating Chapter 11 Bankruptcy Cases* [Doc. No. 131] (the "**Consolidation Motion**").

27.     On August 30, 2010, the First Lien Lenders filed their *Limited Objection to Debtor's Motion for an Order Substantively Consolidating Chapter 11 Bankruptcy Cases* [Doc. No. 199].

28.     On November 19, 2010, the Debtors withdrew their Consolidation Motion [Doc. No. 437] in partial performance of the terms of the Settlement Agreement.

29.     On August 20, 2010, the Debtors filed their *Motion for an Order Extending Debtor's Exclusivity Periods to File a Plan of Reorganization and Obtain Acceptance Thereof* [Doc. No. 145] (the "**Exclusivity Motion**").

30.     On October 7, 2010, the Bankruptcy Court entered its *Order Extending Debtors' Exclusivity Periods to File a Plan of Reorganization and Obtain Acceptance Thereof* [Doc. No. 339], extending the Debtors' exclusivity periods through and including December 15, 2010.

31.     On August 12, 2010, the Debtors filed their *Motion for an Order Extending Deadline to Assume or Reject Leases* [Doc. 127] (the "**Extension Motion**").

32.     On October 7, 2010, the Bankruptcy Court entered its *Order Extending Deadline to Assume or Reject Leases* [Doc. No. 338], which extended the Debtors' deadlines under Section 365 of the Code for assumption or rejection of non-residential real property leases through and including December 15, 2010.[2]

33.     Through the Settlement Agreement, the Debtors and Secured Creditors intend to resolve their differences respecting the DIP Motion, the Relief Motion, the Consolidation

---

[2]     With the consent of the affected real property lessors, this deadline was further extended to December 28, 2010, and, subject to receipt by the lessors or a 25% partial payment of their respective annual lease obligations, the lessors agreed to further extend this deadline to March 15, 2011.  On or before December 28, 2010, the partial payment was made by the Debtors to the lessors.  To make these payments, the Debtors borrowed money from certain equity security holders pursuant to a DIP Financing Motion that was approved by the Court.

Motion, the Exclusivity Motion and the Extension Motion, as well as address other items related thereto, for the purpose of furthering the resolution of disputes in the Cases, avoiding the uncertainty, risk and cost of litigation, and providing the Debtors with an opportunity to make arrangements for satisfaction of the First, Second and Third Lien Loans and progress towards confirmation of a plan of reorganization.

**E. Summary of Terms of the Settlement Agreement[3]**

34.    The terms of the Settlement Agreement are summarized as follows:

a.    The Settlement Agreement is subject to the approval of this Court.

b.    The DIP and Consolidation Motions shall be withdrawn without prejudice, and shall not be renewed on less than 30 days' notice.  This term is without prejudice to the Debtors seeking post-petition financing on terms that do not prime the First, Second and Third Lien Loans.  These Motions have been withdrawn by the Debtors.

c.    The Relief Motion of the First Lien Lenders is to be withdrawn, without prejudice, and not renewed on less than 30 days' notice.  The Relief Motion has been withdrawn by the First Lien Lenders.

d.    Debtors are to file an accounting.

e.    The Debtors are to seek an extension of time to assume nonresidential real property leases.  The Debtors' motion to extend such deadline has been granted.

f.    The Debtors consent to an order granting the Secured Creditors immediate relief from the automatic stay under 11 U.S.C. § 362 so the Secured Creditors can

---

[3]       The following is only a summary.  The attached Settlement Agreement should be consulted for a more detailed description of the terms and conditions.

comply with state law foreclosure requirements, provided, however, that no foreclosure sale may be conducted prior to March 1, 2011, subject to further conditions in the Settlement Agreement.

g. Any foreclosure sale scheduled on or after March 1, 2011 shall be postponed to a date on or after April 4, 2011 if, on or before March 1, 2011, either of the following events occurs:

    i. The claims of the Secured Creditors are purchased by a third party under detailed terms set forth in the Settlement Agreement for $14,500,000 cash plus legal fees, a new indemnity agreement and replacement reclamation bond (or no mining until such is obtained), dismissal of the *Western Utah Copper Co. v. Bridge Loan Capital Fund, LP* adversary proceeding and 5% voting equity interests in any new entity that becomes owner of the Western Utah assets through a confirmed plan of reorganization or otherwise; or

    ii. This Court enters an order confirming a plan of reorganization in the Cases or approves a sale of the Debtors' assets that provides for payment of the claims of the Secured Creditors in the same manner as the prior paragraph, and closing and payment occurs no later than April 1, 2011.

h. The foreclosure deadline may be extended for 30 days for the payment of $150,000, as long as this payment does not come from a lien that primes the liens of the Secured Creditors.  The parties agree to a maximum of two such extensions.  These payments will not reduce the Secured Creditors' claims.

i. Debtors are to seek an order approving a modified cash collateral budget ("**Budget**") from certain of the Secured Creditors and allowing a "**Secured DIP Loan**" on detailed terms set forth in the Settlement Agreement, up to $200,000 to pay for certain "**Preservation Expenses**" as defined therein at page 6, ¶ 12.  Mr. Robert Reynolds of First Lien Lender Reynolds Brothers, Inc. is appointed representative of the Secured Creditors as to the **Budget** and of those Secured Creditors funding the Secured DIP Loan.

j. The Debtors agree to treat the claims of the Secured Creditors in a manner consistent with the Settlement Agreement, and not to seek to alter, modify or contradict the same.  In any proposed plan, the Secured Creditors shall be classified in a single impaired class of secured claims.  So long as the proposed plan provides for treatment of the Secured Creditors as set forth in the Settlement Agreement, the Secured Creditors agree to vote to accept the proposed plan, and to affirmatively support confirmation of the plan.  However, if another plan is proposed by another party that provides for better treatment of the Secured Creditors, the Secured Creditors may also vote for that plan.

**F.      Term Sheet With Altus**

35.      Altus has been involved with the Debtors since before the Petition Date, based on certain pre-petition financing transactions entered into by the Debtors and Altus, as well as its affiliate, Empire Advisors, LLC.  Post-petition, Altus provided DIP funding to the Debtor, in an amount of approximately $1 million.  As a result, Altus is very familiar with the Debtors' finances and business operations.

36.     Altus has expressed interest in funding a plan of reorganization in these cases for the benefit of all creditors, which would include continuation of the Debtors' business.  Altus is also prepared to purchase and assume the Secured Creditors' claims, as well as extend the currently scheduled foreclosure to allow the parties time to formulate a plan of reorganization.  However, the only requirement from the Debtors, as set forth in the Term Sheet, is that the Debtors obtain an order of the Bankruptcy Court determining that the claims are valid and allowed claims.

37.     The Debtors have analyzed such claims and, based on such analysis, believe that the amounts of the claims are appropriate.  No objections have been filed to date.  Based on the foregoing, and the fact that, under the Term Sheet, the foreclosure will be delayed for 90 days, the Debtors believe that allowance of the claims is appropriate in this case.

38.     The Debtors are aware that the Official Committee of Unsecured Creditors and the Official Committee of Equity Holders (collectively, the "Committees") have advised the Debtors that they oppose the Settlement Agreement and the request set forth in the Term Sheet.  The Debtors and Altus continue to discuss the issues with the Committees.  In addition, Altus is negotiating with the Secured Creditors for an extension of the deadlines contained in the Settlement Agreement.  To date, however, no such extension has been obtained.  Accordingly, based on the current facts and dynamics of these cases, the Debtors believe that approval of the Settlement Agreement and the Term Sheet is appropriate as requested herein.

///

///

///

## III.

## THE SETTLEMENT AGREEMENT REPRESENTS A FAIR AND EQUITABLE

## COMPROMISE AND IS IN THE BEST INTERESTS OF THE ESTATE

This Motion is governed by Federal Rule of Bankruptcy Procedure 9019, which provides that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The Debtors respectfully submit that this Motion should be granted and the Settlement Agreement should be approved.

Settlements and compromises "are favored in bankruptcy." *Korngold v. Loyd (In re Southern Med. Arts Cos.)*, 343 B.R. 250, 255 (B.A.P. 10th Cir. 2006) ("*Southern Med. Arts*") (*quoting* 10 *Collier On Bankruptcy* ¶ 9019.01, at 9019-2 (Alan N. Resnick & Henry J. Sommer eds., 15th rev. ed. 2006)). "The purpose behind compromises 'is to allow the trustee and creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims.'" *Southern Med. Arts,* 343 B.R. at 255 (*quoting Martin v. Kane (In re A&C Props*.), 784 F.2d 1377, 1380-81 (9th Cir. 1986)).

The decision to approve a settlement under Bankruptcy Rule 9019(a) is within the Court's discretion, but it is well established that the decision "must be an informed one based upon an objective evaluation of the developed facts." *Reiss v. Hagmann*, 881 F.2d 890, 891-92 (10th Cir. 1989) (citations omitted) (*quoted in Southern Med. Arts*, 343 B.R. at 256); *see also Bank One v. Kallstrom (In re Kallstrom)*, 298 B.R. 753, 757 (B.A.P. 10th Cir. 2003); *C.K. Williams, Inc. v. All Am. Life Ins. Co. (In re Kopexa Realty Venture Co.)*, 213 B.R. 1020, 1022 (B.A.P. 10th Cir. 1997); *accord Am. Employers' Ins. Co. v. King Resources Co*., 556 F.2d 471, 478-79 (10th Cir. 1977) (citations omitted). In determining whether to approve a proposed

settlement, the court is not required to conduct a "mini-trial" to decide the questions of law or

fact raised by the settlement. *Comm. of Unsecured Creditors v. Interstate Cigar Dist., Inc. (In re*

*Interstate Cigar Co.),* 240 B.R. 816, 822 (Bankr. E.D.N.Y. 1999) (also noting that Rule 9019(a)

does not require the court conduct an evidentiary hearing) *(quoted with approval in Armstrong v.*

*Rushton (In re Armstrong)*, 2002 WL 471332 at *3, Case No. UT-10-039 (B.A.P. 10th Cir., Mar.

28, 2002)). Rather, the Court must determine whether the Settlement Agreement is fair,

equitable, and in the best interests of the Debtors' estates. *See Protective Comm. for Indep.*

*Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1967); *Southern Med.*

*Arts*, 343 B.R. at 255-56) (discussing adopting *Trailer* standard under Bankruptcy Code). The

Court should approve the Amended Agreement unless it "falls below the lowest point in the

range of reasonableness." *In re Carson*, 82 B.R. 847, 853 (Bankr. S.D. Ohio 1987) (*quoting*

*Cosoff v. Rodman (In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464

U.S. 822 (1983)).

The Bankruptcy Appellate Panel for the Tenth Circuit established the following four

factors (commonly known as the "*Kopexa* Factors") that bankruptcy courts should consider in

determining the propriety of a settlement for purposes of approval under Rule 9019:

(1)     the probable success of the underlying litigation on the merits;

(2)     the possible difficulty in collection of a judgment;

(3)     the complexity and expense of the litigation; and

(4)     the interest of creditors in deference to their reasonable views.

*Kopexa Realty Venture*, 213 B.R. at 1022; *see also King Res.,* 556 F.2d at 478-79 (applying 10-

factor test for approval of settlement), *Southern Med. Arts*, 343 B.R. at 257 n.5 (recognizing that

the *Kopexa* Factors collapse and take into consideration the 10-point test established in *King Resources*).

As discussed below, an evaluation of the *Kopexa* Factors demonstrates that the Settlement Agreement is fair, equitable, and in the best interests of the creditors of these bankruptcy estates. The Debtors therefore respectfully request that this Court grant this Motion and enter an Order approving the Settlement Agreement.

In connection with this Motion, the Debtors also request the Court take judicial notice of the records and files in this matter. *See Valley View Angus Ranch, Inc. v. Duke Energy Field Services, Inc.,* 497 F.3d 1096, 1108, n.18 (10th Cir. 2007), *quoting CA 79-3511 St. Louis Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) (the court may "take judicial notice, whether requested or not…of its own records and files, and facts which are part of its public records") (citations omitted).

## A.    Probability of Success on the Merits

As the Court is well aware and as reflected in the Court's files in these Cases, while there is no separate "litigation" between the Debtors and the Secured Creditors, this has been a contentious and litigious case, particularly with a select group of Secured Creditors.  This compromise represents a significant amount of effort and negotiations by the Debtors and the Secured Creditors.  While the Debtors have been successful in obtaining financing, even priming liens, in the face of significant opposition, the success on the merits of future contested matters is uncertain, especially given the Debtors' lack of funds, and the interference of the contested matters with the Debtors' reorganization efforts.  Certain of the Secured Creditors believe that the Debtors' mining, milling and processing operations should be "mothballed" until the quality

and quantity of the Debtors' mineral resources can be appropriately determined, until the economic feasibility of those operations can be properly assessed, and until adequate financing is available to resume mining operations as a viable business that can propose and confirm a viable plan of reorganization.  These Secured Creditors also oppose any further priming of their liens until the feasibility of the Debtors' operations has been established, and until there is sufficient adequate protection for any proposed subordination.  The Debtors believe that it would be best to pursue a different course of action.  Absent an agreement, expensive and protracted litigation on these factual, legal and operational issues is inevitable, and the outcome of such litigation is uncertain.   This Settlement Agreement resolves these disputes and allows the Debtors to focus their efforts on reorganization, not litigation.   More importantly, the Settlement Agreement provides that upon meeting certain deadlines, the Debtors will be able to reduce the claims of the Secured Creditors from more than $53,000,000 to approximately $15,000,000.   This is a significant benefit to the Debtors' estates.  The Debtors do not see any potential for a greater reduction in the claims of the Secured Creditors.

**B.     Difficulty in Collection of a Judgment**

This factor is not applicable to this matter, except to the extent it may resolve the *Western Utah Copper Co. v. Bridge Loan Capital Fund, LP* adversary proceeding ("**Bridge Loan Adversary**"), in which the reference has just been withdrawn to the District Court.  The Debtor believes its claims against the Defendants in the Bridge Loan Adversary are meritorious, and would be successful at the end of the day.  However, to get to judgment in what will no doubt be a contentious and expensive case that involves complex issues of securities law, would be cost prohibitive.   The ability to collect a judgment against the Defendants in the Bridge Loan

Adversary is uncertain. The Debtors believe that settlement of the Bridge Loan Adversary in connection with satisfaction of other conditions set forth in paragraph 10(a) of the Settlement Agreement necessary to achieve resolution of the Secured Creditors' claims is in the best interests of the estates of the Debtors, and all creditors.

C.      **The Complexity and Expense of Litigation**

The litigation of contested matters in these cases was out of hand. Every move the Debtors made was opposed by certain parties, including certain of the Secured Creditors. The Debtors lack the funds for continued expensive litigation. The Debtors were at risk of being consumed by the administrative expenses they were forced to incur to defend themselves and move towards reorganization. The Debtors sought to minimize these expenses by entering into settlement discussions with all interested parties, which resulted in this Settlement Agreement. The issues in this case have been complex, and have taken a significant amount of this Court's time. The Debtors submit it is in everyone's best interests to resolve the claims of the Secured Creditors in this manner.

D.      **The Interests of Creditors**

The Secured Creditors, which represent all secured creditors in this case, have all executed the Settlement Agreement. As to unsecured creditors, the Debtors are unaware whether they will support this Motion. However, the Debtors believe that the Settlement Agreement is in the best interests of all creditors, because it provides the Debtors with opportunity, upon meeting certain deadlines, to reduce the claims of the Secured Creditors from more than $53,000,000 to approximately $15,000,000. Further, continued litigation will only result in increased administrative expenses, and a resulting reduced return to unsecured creditors in any plan of

reorganization.

## IV.

## APPROVAL OF THE TERM SHEET IS APPROPRIATE

Section 105(a) of the Bankruptcy Code provides that the bankruptcy court "may issue any order, process, or a judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) of the Bankruptcy Code thus empowers the Court to grant injunctive relief to prevent harm to the debtor, its estate, and its creditors. See In re Chateaugay Corp., 109 B.R. 613, 622 (S.D.N.Y. 1990). Courts have repeatedly held that a bankruptcy court "has authority under section 105 broader than the automatic stay provisions of Section 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings." See In re Baldwin-United Corp. Lit., 765 F.2d 343, 348 (2nd Cir. 1985) (emphasis added); In re Chateaugay Corp., 93 B.R. 26, 29 (S.D.N.Y. 1988).

In this case, the Settlement Agreement provides for a foreclosure sale to take place after March 1, 2011. Altus, however, intends to purchase the secured debt and has agreed to extend any foreclosure sale for a period of 90 days after its acquisition of such secured debt, which will occur after March 1, 2011. The purpose for the foregoing is to allow the parties to negotiate a plan of reorganization for the benefit of all creditors. Not surprisingly, however, Altus is willing to move forward with the transaction on the condition that the claims it is purchasing are valid claims. Based on the foregoing, Altus requires an order of the Bankruptcy Court finding that the secured claims are valid and that the allowed amount of such secured claims totals $53,576,942.33, composed of the first lien in the amount of $36,624,942.33, second lien in the amount of $11,952,000, and third lien in the amount of $5,000,000.

The Debtors are aware that the Committees have advised the Debtors that they oppose the Settlement Agreement and the request set forth in the Term Sheet.  The Debtors and Altus continue to discuss the issues with the Committees.  However, based on the current facts and dynamics of these cases, including the extension of the foreclosure sale, the Debtors believe that approval of the Settlement Agreement and the Term Sheet is appropriate herein.

## V.

## CONCLUSION

The Debtors believe the Settlement Agreement represents a fair and equitable compromise.  It benefits the estate through significant reductions in the claims of the Secured Creditors, and ends contentious contested matters, allowing the Debtors to progress quickly towards reorganization with an agreement with all Secured Creditors in place.  The Debtors also believe the Term Sheet, which seeks a determination as to the allowance and validity of the secured claims, is appropriate in light of the circumstances of these cases.  The Debtors therefore respectfully request this Court enter an order approving the Settlement Agreement and the Term Sheet.

Dated:  January 18, 2011        **LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**


By:___*/s/ David B. Golubchik*_____
           David B. Golubchik
           Reorganization Counsel for
           Chapter 11 Debtors and Debtors in Possession

**DION-KINDEM & CROCKETT**


By:___*/s/ Steven Skirvin*_____
           Steven Skirvin
           Local Counsel for
           Chapter 11 Debtors and Debtors in Possession

-21-