MARTIN J. BRILL (Calif. Bar No. 53220) mjb@lnbyb.com
DAVID B. GOLUBCHIK (Calif. Bar No. 185520) dbg@lnbyb.com
KRIKOR J. MESHEFEJIAN (Calif. Bar No. 255030) kjm@lnbyb.com
**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
*Reorganization Counsel for Chapter 11 Debtors and Debtors-in-Possession*

STEVEN R. SKIRVIN (Utah Bar No. 7626)
**DION-KINDEM & CROCKETT**
10808 S. River Front Parkway, Suite 308
South Jordan, UT  84095
Telephone: (801) 984-8045
Facsimile: (801) 984-4315
Email: srs@dkclaw.com
*Local Counsel for Chapter 11 Debtors and Debtors-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>WESTERN UTAH COPPER COMPANY, et al.,<br><br>      Debtors and Debtors in Possession. | Bankruptcy No. 10-29159 WTT<br><br>Chapter 11<br><br>(Jointly Administered with Case No. 10-30002 WTT)<br><br>Honorable William T. Thurman<br><br>**Filed Electronically** |

**DEBTOR'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR AUTHORITY TO OBTAIN FINANCING ON A SENIOR SECURED BASIS PURSUANT TO 11 U.S.C. § 364 AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

1

Western Utah Copper Company (the "Debtor") hereby submits this Memorandum Of Points And Authorities in support of the Motion For Authority To Obtain Financing On A Senior Secured Basis Pursuant To 11 U.S.C. § 364 And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure (the "Motion").

## STATEMENT OF RELEVANT FACTS[1]

1.     On February 25, 2011, the Court entered an order (the "Settlement Order") approving the First Amended Settlement Agreement (the "Settlement Agreement") by and between the Debtors on the one hand, and the Secured Creditors[2] on the other hand.

2.     Under the Settlement Agreement, relief from the automatic stay was granted to the Secured Creditors with a foreclosure sale of nearly all of the Debtor's assets originally scheduled for May 2, 2011 subject to an extension pursuant to the terms of the Settlement Agreement.  The Debtor obtained an extension of the foreclosure sale, and a foreclosure sale of the Debtor's assets has not occurred.

3.     In June 2011, Skye Mineral Partners, LLC ("Skye") entered into an agreement with the Secured Creditors to purchase the Secured Creditors' claims.

4.     Paragraph 5 of the Settlement Order provides that "[i]n the event that the liens and claims of the First Lien Lenders, Second Lien Lenders, Third Lien Lenders, the Secured Creditors or any of their respective successors or assigns are acquired by or assigned to Altus Metals, LLC, Empire Advisors, LLC, their designee(s), successors or assigns, or any other party (the "Claim Purchaser"), the automatic stay imposed by section 362 of the Bankruptcy Code shall be immediately reinstated effective as of the date and time of any such assignment and/or purchase pursuant to the Settlement Agreement of the liens and claims of the Secured Creditors (and their respective successors and assigns)."

---

[1] The Debtors will not reiterate the basic facts and background information of this case, as such facts and information has been previously briefed on multiple occasions.
[2] Capitalized terms not otherwise defined herein shall have the same meaning as that ascribed to such terms in the Settlement Agreement.

5.     Pursuant to Paragraph 5, and as a result of the transfer of the Secured Creditors' claims to Skye, the automatic stay imposed by section 362 of the Bankruptcy Code has been reinstated in the Debtor's bankruptcy case with respect to the liens and claims of the Secured Creditors.

6.     Since Skye's acquisition of the Secured Creditors' claims, the Debtor and Skye have engaged in negotiations aimed at developing an exit strategy in this case.

7.     Pending such negotiations, the Debtor continues to incur certain expenses which the Debtor is required to pay.  Additionally, the Debtor requires funding for cure payments for leases that the Debtor will seek to assume, bond/insurance replacement payments, and security expenses.  In order for the Debtor to preserve its assets, assume its real property leases which are vital components of the Debtor's asset base, and protect the estate, the Debtor will need the funding requested herein.

8.     Specifically, the Debtor requires approximately $2,422,750 (the "DIP Loan"), for the expenses enumerated in Exhibit "1" attached hereto.  Of that amount, the Debtor needs to borrow approximately $36,400 on an emergency basis (the "Interim Approval Amount"), on or before June 27, 2011, in order to pay the following expenses which are due to be paid immediately:

    a.   Utility expenses in the total amount of $11,500  which must be paid on or before June 27, 2011;

    b.   Payroll expenses in the total amount of $16,000, for June 2011; and

    c.   Security expenses in the total amount of $8,900 for which funding is needed immediately to ensure that security services for the Debtor are not discontinued.

9.     Skye is willing to fund the DIP Loan on a senior secured basis, priming all of the Debtor's assets, except avoidance claims and causes of action (11 U.S.C. §§ 544-551), and except  any collateral in which Republic Bank has a lien.

10.     The Debtor's failure to pay the expenses discussed above and in Exhibit "1" within the timeframes set forth will cause an immediate and irreparable harm to the estate.

11.     If payroll payments are not made, the Debtor's employees may quit and the Debtor would be unable to continue with its minimal level of operations and with asset preservation without incurring significant expenses attempting to replace employees who have left due to nonpayment of payroll.

12.     If security expenses are not paid, the Debtor's assets will not be monitored and secured.

13.     If utility payments are not made to Rocky Mountain Power, utility services will be shut off and the Debtor will be forced to incur significant expenses in reinstituting utility services.

14.     If the Debtor does not have funds to cure monetary defaults upon leases that the Debtor intends to assume, the Debtor will be unable to preserve such leases for the benefit of the estate.

15.     If the Debtor does not pay its reclamation bond permit in the amount of $1,600,000, the Debtor will be in severe jeopardy of losing its mining permits, and the loss of its mining permits will be disastrous to the Debtor's reorganization efforts and business operations.

16.     Accordingly, the Debtor is in need of immediate approval of the Interim Approval Amount pending a final hearing on the DIP Loan, and ultimately, approval of the DIP Loan on a final basis.

17.     The Debtor believes that the DIP Loan is necessary and proper in light of the circumstances in this case.  No other financing has been made available to the Debtor, and the DIP Loan is needed to ensure that the value of the Debtor's estate is preserved and realized.

18.     As the Court is aware, the Debtor has obtained debtor-in-possession financing on multiple occasions during the pendency of its Chapter 11 case.  Such post-petition financing has been previously obtained in two forms.  Primarily, the Debtor has obtained such financing on a senior secured and super-priority basis, similar to the terms and conditions proposed herein.

19.     The Debtor has also obtained authority to borrow on a super-priority administrative claim basis, but such financing is not currently available to the Debtor.

20.     Accordingly, at this time, funding on terms and conditions better than those of the DIP Loan proposed herein are not available.  The Debtor does not believe that any party will object to the Motion, and that all existing lienholders whose liens are proposed to be primed pursuant to the DIP Loan will consent to the request being made by the Debtor in the Motion.  Indeed, for the most part, the existing lienholders on the assets to be primed are Skye, and Skye's affiliates that have loaned funds to the Debtor during this bankruptcy case. Skye is the proposed lender herein.

<u>**COMPLIANCE WITH RULE 4001**</u>

Pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure, the Debtor hereby provides the following disclosures with respect to the Loan:

| Material Provision | Brief Summary |
|---|---|
| Borrower | Debtor |
| Lender | Skye Mineral Partners, LLC |
| Regular Interest Rate | 12.99% per annum, compounded monthly, prior to default, and increased by 5% from and after default |
| Default Interest Rate | See above |

| Material Provision | Brief Summary |
|---|---|
| | |
| Fees And Expenses | N/A |
| Maturity | One year from the date of entry of a final order approving this Motion |
| Liens, Collateral, And Priority<br><br>Bankruptcy Rule 4001(c)(1)<br>(B)(i), (vii) & (xi)<br><br>Local Rule 4001-2 (a)(1)(D) and (G) | First and Senior, Priming Lien on all of the Debtor's assets, except on avoidance claims and causes of action (11 U.S.C. §§ 544-551), and except on any collateral in which Republic Bank has a lien |
| Events of Default | Failure to pay at maturity |
| Automatic Stay<br><br>Bankruptcy Rule 4001(c)(1)<br>(B)(iv) | N/A |
| Professional And Statutory Fee Carve-Out<br><br>Section 506(c) Waiver<br><br>Bankruptcy Rule 4001(c)(1)<br>(B)(x)<br><br>Local Rule 4001-2 (a)(1)(B) | N/A<br><br><br><br>N/A |
| Indemnification<br>Bankruptcy Rule 4001(c)(1)<br>(B)(ix) | N/A |

## ARGUMENT

## I.     THE DIP LOAN SHOULD BE APPROVED BY THE COURT

### A.     The Debtor Should Be Authorized To Obtain The DIP Loan For The Purpose Of Paying The Expenses Listed In Exhibit "1".

Pursuant to Bankruptcy Code § 364(c) and (d), the Debtor requests authority to incur up to $2,422,750 of post-petition financing.  The Debtor needs such funding to

meet its obligations necessary to minimally operate its business, administer its Chapter 11 estate and preserve the going concern value of the Debtor's business.

Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate. See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-9 (D. Colo.1985) (authorizing interim financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) ("Ames") (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"). Section 364(c) provides, in pertinent part, that:

(c)  If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)  with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title:

(2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)  secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

11 U.S.C. § 364(c); In re Utah 7000, LLC; 2008 WL 2654919 (Bkrtcy. D.Utah 2008)

Section 364(d)(1) of the Bankruptcy Code governs the incurrence of senior secured debt or "priming" loans. Pursuant to Section 364(d)(1), the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by

a senior or equal lien only if –

> (1)    the trustee is unable to obtain such credit otherwise; and
>
> (2)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364 (d)(1).

Section 364 of the Bankruptcy Code is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the post-petition period.   In re Photo Promotion Associates, Inc., 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989).   Where a trustee or debtor in possession cannot otherwise obtain unsecured post-petition credit, such credit may be obtained under certain carefully proscribed conditions.   In re T.M. Sweeney & Sons LTL Services, Inc., 131 B.R. 984, 989 (Bankr.N.D.Ill.1991).   For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including, without limitation, liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364(d).   In re Photo Promotion Associates, Inc., 87 B.R. at 839.

Section 364(c) of the Bankruptcy Code also enumerates certain incentives that a court may grant to post-petition lenders.   The Section 364(c) list, however, is not exhaustive.   Courts frequently have authorized the use of inducements not specified in the statute.   See, *e.g.*, In re Ellingsen MacLean Oil Co., 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); In re Defender Drug Stores, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), aff'd 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial

arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364").

Subject to the approval of the Court the Debtor has agreed to grant a first and senior, priming lien on all of the Debtor's assets, except on avoidance claims and causes of action (11 U.S.C. §§ 544-551), and except on any collateral upon which Republic has a lien. The priming lien proposed herein shall be senior to any prior post-petition liens. The DIP Loan (A) shall accrue interest at 12.99% per annum, compounded monthly, prior to default, and increased by 5% from and after default, and (B) shall be due and payable in full, with all principal and accrued interest, one year from the date of entry of a final order approving this Motion.

Two factors courts consider in determining whether to authorize post-petition financing which contemplates the granting of a security interest in favor of the lender are (1) whether the debtor is unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 364(b)(1)(A); and (2) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); see also In re Aqua Assoc., 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

In addition to the foregoing, a debtor in possession seeking subordination of liens to new financing must establish adequate protection of the liens to be subordinated to the new financing. In re C.B.G. Ltd., 150 B.R. 570, 571 (Bankr. M.D.Pa. 1992).

The Debtor submits that all of these standards have been satisfied in this case.

1.      The Debtor Is Unable To Obtain Unsecured Credit. In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under § 364(a)

and (b).  See, e.g., In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); Ames, supra, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lending institutions).

The accompanying Declaration of David McMullin discusses the financing currently available to the Debtor.  While the Debtor has previously obtained approval to borrow funds on an unsecured super-priority basis, such funding is not available to the Debtor at this time, as no other party from which the Debtor has previously obtained financing has offered to advance to the Debtor either the Interim Approval Amount or the DIP Loan as a whole.  The Debtor has primarily been able to obtain financing during its case on a senior secured basis, and this Court has granted similar financing requests on prior occasions.  Prior requests similar to the request being made herein have been opposed by various constituencies.  However, the Debtors do not believe that any party will object to the request being made herein, including those parties whose liens will be primed by the funding request being made herein.

2. The Terms Of The Proposed Financing Are Fair, Reasonable and Adequate. The Debtor submits that terms of the DIP Loan are fair, reasonable and adequate.  The proceeds of the DIP Loan will be used solely to preserve the value of the Debtor's estate.  Without the DIP Loan, valuable leases which belong to the estate, which the estate intends to assume, will potentially be lost.  If the leases are lost, the value of the Debtor's business will decrease.  Skye which is not an insider of the Debtor, and which has agreed to fund the Debtor's maintenance operations, is taking on economic risk by

loaning cash to the Debtor whose current operations are minimal. The financing terms contemplated herein are the best financing terms which have been offered to the Debtor.

      3.    The Liens Being "Subordinated" Are Adequately Protected. The proposed priming lien is authorized by the Bankruptcy Code, even absent consent of other existing lien holders. However, the Debtor believes that existing lien holders will consent to the DIP Loan (indeed, most if not all of the liens that are being primed are Skye's liens, and the liens of Skye's affiliates). Bankruptcy Code § 364(d)(1)(B) requires the furnishing of adequate protection in favor of lien holders which assert an interest in collateral. Neither this nor any other Bankruptcy Code provision specifically defines the term "adequate protection." However, Bankruptcy Code § 361 provides that adequate protection is furnished to the extent the Debtor's "use, sale, lease or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3) (emphasis added). Stated succinctly, adequate protection protects a secured creditor against a decrease in the value of its collateral. See e.g., In re Planned System, Inc., 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987). This standard applies equally with respect to a proposed "priming" financing under section 364(d)(1)(B). See, e.g., In re Hubbard Power & Light, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests."); In re Aqua Assoc., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); In re Beker Ind. Corp., 58 B.R. 725, 741-42 (Bankr. S.D.N.Y. 1986).

      The Court has broad discretion to determine whether adequate protection is furnished. See e.g., In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Whether the party entitled to such protection is over or undersecured is not dispositive of whether adequate protection is furnished. As the court in Aqua Assoc., 123

11

B.R. 192, noted:

> Therefore, we believe that, while the presence of an equity cushion should be a relevant factor, it should not be a determinative factor in any 'adequate protection' analysis, and particularly one relating to § 364(d)(1)(B). The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.

Id. at 196 (emphasis added; approving priming financing where interest rate was 5% over prime and loan likely would enhance value of estate).

The preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex. 1988). See also In re Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982). In Stein, the Court found that, as a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though the secured party had no equity cushion for protection. The Stein Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. See also In re McCombs Properties VI, Ltd., 88 B.R. 261 (C.D. Cal. 1988), where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

Such adequate protection of any existing liens is present in the Debtor's case

12

because without the DIP Loan, the Debtor would be unable to cure monetary defaults upon real property leases which the Debtor intends to assume, the Debtor would be placed in severe jeopardy of losing its mining permits and claims if the Debtor was unable to renew its reclamation bond, and the Debtor would lose security services, employees, utility services, and as a result, would lose the ability to continue maintaining and preserving the Debtor's assets for the benefit of creditors such as existing lien holders.  If the Debtor is unable to make the payments contemplated in the Debtor's proposed budget, the value of the Debtor's assets would decline and all of Debtor's going concern value would be immediately and permanently lost.  In contrast, the DIP Loan enables Debtor to pay critical expenses, continue maintenance activities, and create value for all parties, particularly the secured lenders in this case.

Finally, the Debtor has reduced and will continue with its efforts to reduce further its operating expenses as much as possible in order to maximize the Debtor's profitability.  In a similar situation, the Court in the <u>Matter of Pursuit Athletic Footwear, Inc.,</u> 193 B.R. 713 (Bankr. D. Del. 1996), considered this issue and allowed the use of cash collateral, accepting the debtor's argument that no additional adequate protection payments need be made:

> if there is no actual diminution in the value of [the] collateral through the date of the hearing, and [Debtor] can operate profitably post-petition, [creditor] is adequately protected for the use of its cash collateral. 11 U.S.C. Section 361; <u>In re Newark Airport/Hotel Ltd. Partnership</u>, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); <u>In re Dynaco</u>, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); <u>In re Immenhausen Corp.</u>, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

13

4.    <u>The DIP Loan Is Necessary And Proper</u>.  While in determining whether to approve such a transaction, a court is authorized to act in its informed discretion, <u>In re Ames Department Stores, Inc.</u>, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990), the court should give broad deference to the business decision of a Chapter 11 debtor, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds. <u>Richmond Leasing Co. v. Capital Bank N.A.</u>, 762 F.2d 1303, 1311 (5th Cir. 1985).  As the court noted in <u>In re Ames Dept. Stores Inc.</u>, supra, "the court's discretion under section 364 is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to be exercised . . . ." <u>In re Ames Department Stores, Inc.</u>, 115 B.R. at 40.

Without additional financing, the Debtor will be unable to preserve the existing value of its estate.  This would result in irreparable harm for the Debtor and all creditors of the estate.  The Debtor has therefore concluded that obtaining post-petition financing on the proposed terms herein is in the best interests of the Debtor's estate.

///

///

///

///

///

///

///

///

///

///

///

///

14

## CONCLUSION

The Debtor respectfully requests that this Court: (1) approve the Motion in its entirety; (2) authorize the Debtor to borrow the Interim Loan Amount on an interim basis; (3) authorize the Debtor to borrow the DIP Loan from Skye; and (4) grant such other and further relief as the Court deems just and proper.

Dated: June 22, 2011

**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**

By:_____*/s/ Krikor J. Meshefejian*_____
       Martin J. Brill
       David B. Golubchik
       Krikor J. Meshefejian
       Reorganization Counsel for
       Chapter 11 Debtors and Debtors in Possession

**DION-KINDEM & CROCKETT**

By:_____*/s/ Steven Skirvin*_____
       Steven Skirvin
       Local Counsel for
       Chapter 11 Debtors and Debtors in Possession

**EXHIBIT "1"**

## Budget for financing SSC though sept 1

### Emergency Notice--

|  | | months | | Catch up | | |
|---|---|---|---|---|---|---|
| Utility | | - | | $ 11,500.00 | $ 11,500.00 | |
| Labor mill/maint +payroll tax | $ 16,000.00 | 1 | $ 16,000.00 | | $ 16,000.00 | |
| Security + burden | $ 8,900.00 | 1 | $ 8,900.00 | | $ 8,900.00 | |
| | | | | subtotal- | $ 36,400.00 | |

### Regular Notice--

| | Monthly | # of months | total * months | Catch up | TOTALS | |
|---|---|---|---|---|---|---|
| Geologic | $ 10,000.00 | 3 | $ 30,000.00 | $ 20,000.00 | $ 50,000.00 | Hartshorn |
| WUCC Trustee fees | $ 2,000.00 | 3 | $ 6,000.00 | $ 1,900.00 | $ 7,900.00 | estimated |
| Insurance | $ 160,000.00 | 1 | $ 160,000.00 | | $ 160,000.00 | Annual Policy lapses on july 31 |
| Fuel | $ 2,500.00 | 3 | $ 7,500.00 | | $ 7,500.00 | Road service and OTR |
| Security + burden | $ 8,900.00 | 2 | $ 17,800.00 | | $ 17,800.00 | 2 more months |
| Lease payments (Monthly) | $ 6,000.00 | 3 | $ 18,000.00 | | $ 18,000.00 | Other Leases july and aug |
| Lease Payments (annuals) | $ 100,000.00 | 1 | $ 100,000.00 | | $ 100,000.00 | **McCulley Due JULY 20** |
| Utility | $12,000 | 3 | $ 36,000.00 | | $ 36,000.00 | |
| Expenses | $ 5,000.00 | 3 | $ 15,000.00 | | $ 15,000.00 | Travel |
| Bond Replacement state of Utah | $ 1,600,000.00 | 1 | $ 1,600,000.00 | | $ 1,600,000.00 | Need to verify amount |
| Labor mill/maint +payroll tax | $ 16,000.00 | 2 | $ 32,000.00 | | $ 32,000.00 | 2 more months |
| Payments to BLM (CLAIM FEES) | $ 190,000.00 | 1 | $ 190,000.00 | | $ 190,000.00 | DUE AUGUST |
| Office and admin | $ 800.00 | 3 | $ 2,400.00 | | $ 2,400.00 | |
| | | | | | $ 2,236,600.00 | |

### CURES--

| | | | | | | |
|---|---|---|---|---|---|---|
| McCulley | | | | | $ 37,500.00 | |
| KING BIRD KLONDIKE CLAIMS | | | | | $ 3,750.00 | |
| HORN SILVER 1 | | | | | $ 82,500.00 | |
| BEALER | | | | | $ 5,000.00 | |
| Bogdanich (AJL) | | | | | $ 16,500.00 | |
| | | | | Subtotal Cure | $ 145,250.00 | Due By July 18 per the stipulation |
| Contingency | $ 1,500.00 | 3 | $ 4,500.00 | | $ 4,500.00 | |

| | | |
|---|---|---|
| TOTAL | $ | 2,422,750.00 |