MARTIN J. BRILL (Calif. Bar No. 53220) mjb@lnbyb.com
DAVID B. GOLUBCHIK (Calif. Bar No. 185520) dbg@lnbyb.com
KRIKOR J. MESHEFEJIAN (Calif. Bar No. 255030) kjm@lnbyb.com
**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
*Reorganization Counsel for Chapter 11 Debtors and Debtors-in-Possession*

STEVEN R. SKIRVIN (Utah Bar No. 7626)
**DION-KINDEM & CROCKETT**
10808 S. River Front Parkway, Suite 308
South Jordan, UT  84095
Telephone: (801) 984-8045
Facsimile: (801) 984-4315
Email: srs@dkclaw.com
*Local Counsel for Chapter 11 Debtors and Debtors-in-Possession*

### IN THE UNITED STATES BANKRUPTCY COURT
### DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>WESTERN UTAH COPPER COMPANY, et al.,<br><br>     Debtors and Debtors in Possession. | Bankruptcy No. 10-29159 WTT<br><br>Chapter 11<br><br>(Jointly Administered with Case No. 10-30002 WTT)<br><br>Honorable William T. Thurman<br><br>**Filed Electronically** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER: (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING AND APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES AND DETERMINING CURE AMOUNTS; (C) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (D) GRANTING RELATED RELIEF**

4671

# TABLE OF CONTENTS

JURISDICTION AND VENUE ................................................................... 3

STATEMENT OF RELEVANT FACTS ..................................................... 3

A.  Background Information .................................................................... 3

B.  Commencement of Bankruptcy Cases ............................................ 5

C.  Post-Petition Events. ........................................................................ 5

D.  The Efforts To Market The Debtors' Assets For
    Sale/Financing/Investment. .............................................................. 7

E.  Brief Description Of The Terms Of The Agreement And Term Sheet. ......... 13

F.  Executory Contracts and Leases. .................................................. 17

G.  Necessity for the Sale. .................................................................... 17

THE SALE OF ASSETS SHOULD BE APPROVED ............................... 19

A.  The Court Should Authorize WUCC to Sell Its Assets Pursuant to
    the Terms of the Agreement and CKMC to Sell Its Assets Pursuant
    to the Terms of the Term Sheet. ................................................... 19

B.  Section 363(f) of the Bankruptcy Code Permits A Debtor's Sale of
    Assets to Be Free and Clear of Any Liens, Claims or Interests. ................. 26

C.  The Court Should Authorize WUCC to Assume and Assign to the
    Winning Bidder Its Executory Contracts and Unexpired Leases. ............... 30

D.  The Debtors Request the Court Waive the 14-Day Waiting Period
    Set Forth in Bankruptcy Rule 6004(h) and 6006(d). .................... 32

CONCLUSION ........................................................................................... 33

4671

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

<u>Coastal Indus., Inc. v. U.S. Internal Revenue Service</u> (<u>In re Coastal Indus., Inc.</u>)
    63 B.R. 361 (Bankr. N.D. Ohio 1986) ...................................................................23

<u>Compak Companies, LLC v. Johnson</u>
    415 B.R. 334 (N.D.Ill. 2009) .............................................................................27

<u>In re Abbotts Dairies of Pennsylvania, Inc.</u>
    788 F.2d 143 (3d Cir. 1986).................................................................23, 24, 25

<u>In re AEG Acquisition Corp.</u>
    127 B.R. 34 (Bankr. C.D. Cal. 1991), *aff'd* 161 B.R. 50 (9th Cir. B.A.P. 1993) ...................31

<u>In re Alpha Industries, Inc.</u>
    84 B.R. 703 (Bankr. D. Mont. 1988) ...................................................................25

<u>In re Apex Oil Co.</u>
    92 B.R. 847 (Bankr. E.D. Mo. 1988)...................................................................25

<u>In re Atlanta Packaging Products, Inc.</u>
    99 B.R. 124 (Bankr. N.D. Ga. 1988) ...................................................................23

<u>In re Bowman</u>
    194 B.R. 227 (Bankr. D. Ariz. 1995)...................................................................31

<u>In re Central Fla. Metal Fabrication, Inc.</u>
    190 B.R. 119 (Bankr. N.D. Fla. 1995)...................................................................30

<u>In re Continental Country Club, Inc.</u>
    114 B.R. 763 (Bankr. M.D. Fla. 1990) ...................................................................30

<u>In re Delaware and Hudson Ry. Co.</u>
    124 B.R. 169 (D. Del. 1991)...................................................................21

<u>In re Embers 86th Street. Inc.</u>
    184 B.R. 892 (Bankr. S.D.N.Y. 1995)...................................................................31

<u>In re Filtercorp, Inc.</u>
    163 F.3d 570 (9th Cir. 1998) ...................................................................25

<u>In re Gucci</u>
    193 B.R. 411 (S.D.N.Y. 1996)...................................................................30

ii

4671

In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.
    77 B.R. 15 (Bankr. E.D. Pa. 1987) ................................................................24

In re Integrated Resources, Inc.
    135 B.R. 746 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650 (S.D.N.Y. 1992) .......................23

In re Jolan, Inc.
    2009 WL 1163928 (Bankr. W.D. Wash. 2009) ...................................................28

In re Karpe
    84 B.R. 926 (Bankr. M.D. Pa. 1988) ............................................................21, 23

In re Klein Sleep Products, Inc.
    78 F.3d 18 (2d. Cir. 1996) ...........................................................................30

In re Lionel Corp.
    722 F.2d (2d Cir. 1983) ............................................................................19, 20

In re Medical Software Solutions
    286 B.R. 431 (Bankr. D. Utah 2006) .............................................................19, 20

In re Prime Motors Inns
    124 B.R. 378 (Bankr. S.D. Fla. 1991) ............................................................31

In re Rock Indus. Mach. Corp.
    572 F.2d 1195 (7th Cir. 1978) ....................................................................25

In re The Seychelles, Partnership and Genius Corp. v. Banyan Corp.
    32 B.R. 708 (N.D. Tex. 1983) ....................................................................23

In re Snyder
    74 B.R. 872 (Bankr. E.D. Pa. 1987) ............................................................23

In re Whittemore
    37 B.R. 93 (Bankr. D. Or. 1984) ................................................................27

In re Wilde Horse Enterprises
    136 B.R. 830 (Bankr. C.D. Cal. 1991) .....................................................23, 24, 25

WBQ Partnership v. Virginia Dep't of Med. Assistance Serv. (In re WBQ
    Partnership)
    189 B.R. 97 (Bankr. E.D. Va. 1995) ............................................................19

Willemain v. Kivitz
    764 F.2d 1019 (4th Cir. 1985) ..................................................................23

4671

**OTHER STATE CASES**

Randall v. Valley Title
681 P.2d 219 (Utah 2000)...................................................................................28, 29

**FEDERAL STATUTES**

11 U.S.C. § 363....................................................................................................21, 30

11 U.S.C. § 363(b)...............................................................................................19, 23

11 U.S.C. § 363(b)(2)................................................................................................21

11 U.S.C. § 363(f).........................................................................................26, 27, 33

11 U.S.C. § 363(f)(2).................................................................................................27

11 U.S.C. § 363(f)(5)...........................................................................................27, 30

11 U.S.C. § 363(m)...............................................................................................26, 33

11 U.S.C. § 365..........................................................................................................31

11 U.S.C. § 365(b)........................................................................................................2

11 U.S.C. § 365(b)(1).................................................................................................31

11 U.S.C. § 365(f)(2).................................................................................................31

11 U.S.C. § 705..........................................................................................................22

11 U.S.C. § 1102........................................................................................................22

28 U.S.C. § 157............................................................................................................3

28 U.S.C. § 1334..........................................................................................................3

28 U.S.C. § 157(b)(2)(A), (G), (M) and (O)................................................................3

28 U.S.C. § 1409..........................................................................................................3

28 U.S.C. § 1408..........................................................................................................3

4671

**OTHER STATE STATUTES**

RCW 62A.9A-617 ...................................................................................................28

Utah Code Ann. § 57-1-29 .......................................................................................28

Utah Code Ann. § 70A-9a-615: ...............................................................................29

Utah Code Ann. § 70A-9a-617 ...........................................................................28, 29

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 2002(a)(2) ...............................................................................21, 22

Fed. R. Bankr. P. 2002(c)(1) ...............................................................................21, 22

Fed. R. Bankr. P. 2002(i) .....................................................................................21, 22

Fed. R. Bankr. P. 2002(k) ....................................................................................21, 22

Fed. R. Bankr. P. 6004 ................................................................................................3

Fed. R. Bankr. P. 6004(a) ...............................................................................21, 22, 23

Fed. R. Bankr. P. 6004(c) .....................................................................................22, 23

Fed. R. Bankr. P. 6004(h) .................................................................................2, 32, 34

Fed. R. Bankr. P. 6006 ................................................................................................3

Fed. R. Bankr. P. 6006(d) ......................................................................................32, 34

Fed. R. Bankr. P. 9014 ..............................................................................................22

Fed. R. Bankr. P. 9019 ................................................................................................5

Western Utah Copper Company ("**WUCC**") and Copper King Mining Corporation ("**CKMC**" and collectively with WUCC, the "**Debtors**") hereby submit this Memorandum Of Points And Authorities in support of the Motion For Entry Of An Order: (A) Authorizing The Sake Of Substantially All Of The Debtors' Assets Free And Clear Of Liens, Claims, Encumbrances And Interests; (B) Authorizing And Approving Assumption And Assignment Of Executory Contracts And Leases; And Determining Cure Amounts; (C) Waiving The 14-Day Stay Periods Set Forth In Bankruptcy Rules 6004(h) And 6006(d); And (D) Granting Related Relief" (the "**Motion**").  The terms of the proposed sale of the Debtors' respective assets are set forth in the Asset Purchase Agreement (the "**Agreement**") by and between WUCC and CS Mining, LLC ("CS") a copy of which is attached as **Exhibit "1"** to the Declaration of A. John A. Bryan, Jr. filed concurrently herewith (the "**Bryan Declaration**"), and the Asset Purchase Term Sheet (the "**Term Sheet**") by and between CKMC and CS a copy of which is attached as **Exhibit "2"** to the Bryan Declaration.

By the Motion, the Debtors seek approval of the sale of substantially all assets of the Debtors (the "**Sale**") pursuant to the Agreement and the Term Sheet, and the assumption and assignment of executory contracts and unexpired leases contingent upon closing of the Sale, as well as related relief as requested herein.  A list of all executory contracts and unexpired leases proposed to be assumed and assigned to the Buyer and the amount of money that the Debtors believe needs to be paid to other parties to the assumed contracts and assumed leases to satisfy the cure requirements of Section 365(b) of the Bankruptcy Code is attached as **Exhibit "3"** to the Bryan Declaration.

///

///

///

2

4671

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to the administration of WUCC's bankruptcy estate and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), (M) and (O). Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in this Sale Motion are Sections 105, 363 and 365 of the Title 11 of the United States Code (the "***Bankruptcy Code***"), and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.

## STATEMENT OF RELEVANT FACTS

**A.      Background Information.**

2.      WUCC engages in exploration, development, extraction, and processing of metals, including copper, silver, and gold, from mineral resources located in and around the Milford Mineral Belt in Beaver County, Utah (such business, the "***Business***").

3.      WUCC is a wholly-owned subsidiary of CKMC, a public corporation organized under the laws of the state of Nevada.

4.      In 2007, WUCC received secured financing in the form of a secured loan (the "***First Lien Loan***") from DDB Utah, LLC; The Raymond W. Schmelzer Marital Trust; Top-Notch Investments, LLC; Rodney Evan Schmelzer; Brent Thomas Bingham; Bridge Loan Capital Fund, LP; DPI College, LC; Milford Copper Investors II, LLC; Reynolds Brothers, Inc.; Milford Investors, LLC; Advanced Strategic Planning, LLC; and Back Country Investments, LLC (the "***First Lien Lenders***").  The First Lien Loan was evidenced by a Secured Promissory Note (the "***First Note***") dated January 4, 2007, in the principal amount of $8,944,200.97. The First Lien Loan was secured by substantially all assets of WUCC.

3

5.      In March 2007, WUCC borrowed approximately $4 million (the "*Second Lien Loan*") from Bridge Loan Capital Fund, LP; DPI College, LC; Milford Copper Investors II, LLC; Reynolds Brothers, Inc.; Milford Investors, LLC; Advanced Strategic Planning, LLC; Back Country Investments, LLC; Bridge Loan Capital, LP; ME Dancy Consulting Services, Inc.; Jonathan B. Wells; Wendell Gile Trust; and Josh Romney (the "*Second Lien Lenders*").  The Second Lien Loan was secured by substantially all assets of WUCC.

6.      In October of 2007, WUCC borrowed approximately $1.2 million (the "*Third Lien Loan*" and collectively with the First Lien Loan and the Second Lien Loan, the "*Loans*") from Devin Durrant (the "*Third Lien Lender*" and collectively with the First Lien Lenders and the Second Lien Lenders, the "*Lenders*").  The Third Lien Loan was secured by substantially all assets of WUCC.

7.      In February and March of 2007, WUCC entered into various equipment leases and loan transactions with Zions Credit Corporation, which leases and loan transactions were assigned to Republic Bank in February and March of 2007 (the "*Republic Transactions*").  The Republic Transactions were secured by, or involved the sale and leaseback of, certain assets of WUCC as set forth in the relevant documents.

8.      From September 2009 through April of 2010, WUCC and Copper King entered into various loan and sale/leaseback transactions with Empire Advisors, LLC, Altus Metals, LLC ("*Altus*"), Strategic Capital Partners, LLC, and Winterfox, L.L.C. (the "*Additional Transactions*").  The Additional Transactions were secured by, or involved the sale and leaseback of, certain assets of WUCC and CKMC as set forth in the relevant documents.

///

///

4

**B.**    **Commencement of Bankruptcy Cases.**

9.    On May 18, 2010 (the "*Petition Date*"), WUCC and CKMC (collectively the "*Debtors*") commenced separate bankruptcy cases ("*Cases*") by filing Voluntary Petitions under Chapter 11 of the Bankruptcy Code.  The Debtors originally filed their Cases in the United States Bankruptcy Court for the District of Nevada, but the Cases were subsequently transferred to the United States Bankruptcy Court for the District of Utah (the "*Bankruptcy Court*").  WUCC's bankruptcy case number is 10-29159-WTT (the "*Case*").  Copper King's bankruptcy case number is 10-30002-WTT (the "*CK Case*").

**C.**    **Post-Petition Events.**

10.    From July 2010 through July of 2011, Altus and the Lenders advanced various debtor-in-possession loans to WUCC (the "*DIP Loans*") pursuant to orders of the Bankruptcy Court.  Certain DIP Loans were secured by priming, super-priority liens on all or substantially all the assets of WUCC, as detailed in the relevant orders of the Bankruptcy Court.

11.    Pursuant to the Bankruptcy Court's Order Granting Debtors' Motion For Order Approving (1) Settlement Agreement With Secured Creditors Pursuant To Federal Rule Of Bankruptcy Procedure 9019; and (2) Settlement Buyout Term Sheet ("*Settlement Order*") [Docket No. 575], the Bankruptcy Court found that the aggregate amount of the claims of the Lenders pursuant to the Loans totaled at least $53,000,000 (the "*Minimum Loan Claims*") as of the time of such Order.

12.    Pursuant to notices filed with the Bankruptcy Court on June 9, 2011, the Loans, and all right, title and interest related thereto, have been purchased by, and transferred to, Skye Mineral Partners, LLC, a Delaware limited liability company

5

4671

("**SMP**"). SMP is owned and controlled by Clarity Copper, LLC and Skye Mineral Investors, LLC. Further, the Additional Transactions and DIP Loans, and all right, title and interest related thereto, have been purchased by, and transferred to, SMP. Further, WUCC has been advised and understands that SMP and Republic reached an agreement in principle pursuant to which all rights, title and interest in and to the Republic Transactions will be assigned and transferred to SMP.

13.     After the consummation of the transaction discussed above, the Debtors, and CS Mining, LLC ("**CS**") which is an affiliate of SMP, commenced negotiations for an exit strategy in these cases. Such negotiations included a possible plan of reorganization and a sale transaction. The negotiations have lasted weeks with all parties spending countless hours in meetings, on conference calls and corresponding in order to achieve a result in the best interest of the estate. The negotiations were initially stalled as a result of a recent change in the boards of directors of the Debtors. Nevertheless, despite the changes in the boards of the Debtors, the Debtors have ultimately, and successfully, negotiated the Agreement and Term Sheet which have been approved by the Debtors' respective boards. The Debtor understands and believes that the Agreement and Term Sheet are also supported by the Creditors' Committee and SMP.

14.     Pending the hearing on the Motion, WUCC required additional funds to address such issues as lease payments, insurance renewal payments and replacement of WUCC's reclamation bond, all of which are critical to maintain WUCC's as a going concern business. At a hearing held on July 14, 2011, the Bankruptcy Court authorized WUCC to borrow up to $2,434,250 from Skye on a priming senior secured basis. Such funding will allow WUCC to maintain basic operations pending the Sale hearing. This latest round of financing is also proposed to be assumed by CS in connection with the Agreement.

6

**D.**      **The Efforts To Market The Debtors' Assets For Sale/Financing/Investment.**

15.      WUCC's assets have been extensively marketed since the commencement of these cases.  WUCC is aware that such efforts were undertaken not only by WUCC, but also by the Equity Committee and the Creditors' Committee.

16.      The vast majority of WUCC's marketing efforts were carried out through Mr. Bryan, who is an investment banker and the CEO of The Watley Group ("*Watley*") - an investment banking and advisory firm.  Mr. Bryan also serves as the CEO to the Debtors.

17.      WUCC first contacted creditors, individuals, and investment firms that have a strong relationship with WUCC or a strong relationship with Watley or Mr. Bryan and who would have a high level of interest in investing in WUCC.  This list of potential investors includes:

  a.  Empire Advisors

  b.  Mr. Mark Arioto

  c.  Dyva Management Ltd.

  d.  Equity Investment Properties, Inc. ("EIPI")

  e.  Mr. Roderick Thomson

  f.  Mr. Guy DeSelliers

  g.  Mr. Johann Rupert

18.      Empire Advisors reacted quickly to the opportunity and conducted extensive diligence, including a review of available documents, discussions with management/consultants, and site visits.  Empire Advisors is the only investor to submit a committed term sheet.  Therefore, WUCC elected to accept this proposal and move forward with an agreement to effectuate an exit strategy for the estate and its creditors.

7

19.    All the other investors listed above also expressed significant interest in WUCC's business.  Mr. Arioto conducted significant diligence, visited the company and mines in Utah, and remains interested; however, he is concurrently raising funds for his investment vehicle, and has not tendered an offer.

20.    Dyva Management Ltd., EIPI, Mr. Johann Rupert, and Mr. Roderick Thomson all declined to move forward with a transaction because of a combination of lack of existing cash flow for WUCC, litigation risk and start-up risk.  However, Mr. Thomson continues to monitor the business.  Mr. Guy DeSelliers has not rejected the notion of investing in WUCC either.

21.    WUCC also explored potential investors in China, given the region's growth trajectory and their demand for base metals such as copper.  Although several Chinese investors were considered, two in particular demonstrated significant interest:

    a.    Global Mining Group (c/o Yianyi Zhu); and

    b.    Elite Epoch Investments Limited (c/o Jimmy Pang and Simon Ng).

22.    In August 2010, Marcus Southworth, as President of WUCC, visited China in order to meet with Elite Epoch.  Prior to the trip to China, Mr. Southworth had several discussions with Elite Epoch and they had expressed interest in WUCC, as well as Copper King as the public vehicle, and conducted significant diligence.  As a result of the meetings, a Memorandum of Understanding (MOU) was drafted that outlined the terms for a potential acquisition of the Debtors.   In October 2010, Simon Ng flew to Los Angeles specifically to meet with the Debtors to discuss a potential investment.  Mr. Ng also visited the mine in Utah and spent several hours with the management team.  After several discussions and negotiations with Elite Epoch, the Debtors ultimately determined that the terms did not reflect fair value.  Mr. Southworth also dealt with Mr. Lu Ming

(Huizhong Tongchan Investment Co. Ltd), but he was not able to proceed with a transaction due to personal cash flow issues.

23.    Mr. Bryan traveled to Hong Kong at the end of July 2010 to meet with several potential investors and known business contacts, including:

     a.  Cheever Asset Management

     b.  Fortune Fund

     c.  Galaxy Asset Management

     d.  Junefield (Holdings) Limited Hong Kong

     e.  UBS

     f.  Falcon Energy Group

     g.  Mr. Mohan Abraham

     h.  Mr. Jay Chen

     i.  Mr. Martin Euler

     j.  Mr. Anthony Harrison

     k.  Mr. Shawn Sanderson

24.    While initially expressing interest, these investors did not move forward with completion of due diligence or a transaction due to a combination of factors, including litigation risk, the lack of full NI 43-101 geology reports on the property (international standard for mining deposits) and the absence of a mining management team going forward.

25.    WUCC also worked with broker dealers with expertise in mining.  For example, Avro Capital ("Avro") was very interested in the deal on behalf of some of their clients.  WUCC was in discussions with Avro since July 2010.  Avro is based in Vancouver, Canada, and has extensive experience with mining operations.  Avro felt the opportunity was attractive, but the investors it contacted were either unable to commit the

4671

time for diligence, were unwilling to get involved with such a complex transaction, or expressed an interest in only investing in active mining operations. Based on information provided to WUCC, the list of investors approached by Avro includes:

    a.  Sandfire Securities, Northland Capital, Northland Capital Partners, Dr. Brian Bapty

    b.  Nevada Copper, Giulio Bonifacio, Eugene Toffolo

    c.  Peninsula Corp, Peninsula Merchant Syndications, Sam Magid

    d.  P.I. Financial Group

    e.  Haywood Securities

    f.  Canaccord Capital, Canaccord Adams, Canaccord Genuity

    g.  Creston Capital Corp, Robert Anderson

    h.  Dundee Wealth

    i.  Frank Anderson

26.    These accounts were contacted by telephone, email, and/or in person regarding the project. In the end, all accounts declined, citing one or more of the following reasons: insufficient data, valuation too high to mitigate risk, resource body too small to rationalize purchase, and/or ongoing litigation with Nevada Star.

27.    The last method which WUCC implemented to identify potential investors was referrals and various databases. Referrals were provided by (i) companies in the mining industry that were familiar with the Debtors; (ii) investors sourced by Mr. Bryan through previous relationships; and (iii) relationships of other members of the management team.

28.    In total, 36 of these firms and individuals were contacted, including:

    a.  Antarctica Capital

    b.  CBRE

4671

c.  ELAC

d.  Felix Investments

e.  Hatch Corporate Finance

f.  Jaker Investments Limited

g.  Kemper Capital Management

h.  Level 2 Acquisition Corporation (London, UK)

i.  Mercantile Consulting

j.  Mercatur

k.  Platinum Partners

l.  Rising Sun Holdings

m.  RW Wentworth

n.  Saint Cloud Capital

o.  SFA

p.  UBS

q.  Unique Fidelity Engineering

r.  Mr. Mohan Abraham

s.  Mr. Paul Abramowitz

t.  Mr. Paul Bagley

u.  Mr. Anthony Blumberg

v.  Mr. Peter Clinton

w.  Mr. Barry Couglan

x.  Mr. Charles Davidson

y.  Mr. Ken Garnett

z.  Mr. Jeff Green

aa.  Mr. Richard Groeneweg

11

    bb. Mr. Jason Heywood

    cc. Mr. Wayne Morrison

    dd. Mr. George McCaffrey

    ee. Mr. Alan Rude

    ff. Mr. Shawn Sanderson

    gg. Mr. Thomas Senefelder

    hh. Mr. Angie Teo

    ii. Mr. Marvin Tien

    jj. Mr. John Van Clief

29. The vast majority of the investors listed above conducted limited due diligence or elected to not proceed with due diligence after review of initial documents provided by WUCC, through Watley. Based on feedback from these investors, it appears believes the primary challenges include:

    a. The economic climate remains very uncertain and many investment funds stated that they were putting all investments on hold for the immediate future;

    b. Several investors shared a perception that the situation was highly complex and contained unknown risks;

    c. The Nevada Star litigation;

    d. The complex mineralogy;

    e. Previous failure of management to economically employ the flotation mill;

    f. The large amount of secured debt;

    g. The lack of management expert in mining going forward;

    h. The difficulty of doing due diligence; and

4671

i. Lack of NI 43-101 reports on the property.

30.    The foregoing discussion clearly demonstrates that WUCC has conducted extensive marketing efforts to maximize value for the estate and all creditors.  WUCC will serve a copy of the Motion and all supporting documents on such potential investors in order to ensure maximum exposure for the scheduled sale auction.

**E.**    **Brief Description Of The Terms Of The Agreement And Term Sheet.**

31.    The foregoing marketing efforts have produced an agreement to purchase WUCC's assets pursuant to the terms set forth in the Agreement between WUCC and CS, a copy of which is attached as **Exhibit "1"** to the Bryan Declaration, and an agreement to purchase CKMC's assets pursuant to the terms set forth in the Term Sheet between CKMC and CS, a copy of which is attached as **Exhibit "2"** to the Bryan Declaration.

32.    By way of summary (and subject to the specific terms of the Agreement, the defined terms in which are incorporated herein by reference), the principal terms of the Agreement for the sale of WUCC assets are as follows:

a. <u>Assets Sold</u>.    On the Closing Date, and on the terms and conditions of the Agreement, WUCC shall sell, assign, transfer, convey and deliver to CS, free and clear of all Encumbrances (excluding Assumed Liabilities), all of WUCC's right, title and interest in and to all Purchased Assets, including, but not limited to, the Purchased Real Property, the Purchased Furnishings and Equipment, the Purchased Inventory, the Deposits, the Purchased Contracts, the Receivables, the Purchased Business Permits, all Claims of WUCC which are not Excluded Assets, and all cash and cash equivalents. (<u>See</u> Agreement para. 1.1.)

13

b. <u>Assets Excluded From Sale</u>.    The Purchased Assets shall exclude, among other things, any right, title or interest in the Purchase Price, the Excluded Contracts, all Claims (A) for Avoidance Actions, or (B) arising under any Excluded Contract or relating exclusively to any Excluded Asset. (<u>See</u> Agreement para. 1.2.)

c. <u>Consideration</u>.    Consideration shall include the Assumed Liabilities, and the Purchase Price to be delivered to WUCC for the sale and transfer of the Purchased Assets which consists of: **(i)** the assumption of Assumed Liabilities (equal to approximately One Hundred Million Seven Hundred Thirty Five Thousand Eight Hundred Fifteen and 12/100 Dollars ($100,735,815.12); **(ii)** cash in an amount equal to Three Million Fifty Thousand and No/100 Dollars ($3,050,000.00) (together with the cash required pursuant to Section 2.1(a)(iv) of the Agreement and the Cure Costs provided in Section 2.2(c) of the Agreement); **(iii)** an unsecured promissory note executed by CS in favor of WUCC pursuant to which CS shall pay of WUCC (A) the sum of Two Hundred Thousand and No/100 Dollars ($200,000) on the first anniversary of the Closing Date, (B) the sum of Two Hundred Thousand and No/100 Dollars ($200,000) on the second anniversary of the Closing Date, (C) the sum of Three Million and No/100 Dollars ($3,000,000) on the third anniversary of the Closing Date, and (D) provided that the average COMEX Copper High Grade Comex Spot Settlement Daily Price exceeds $3.75/lb. for the 12- month period immediately preceding the fifth anniversary of the Closing Date, an additional One Million and No/100 Dollars ($1,000,000) payable on

14

the fifth anniversary of the Closing Date; **(iv)** cash required under proposed payment plans with the State of Utah and the Internal Revenue Service; and **(v)** a release of all claims of CS and SMP against WUCC and its affiliates. (See Agreement para. 2.1 – 2.2.)[1]

d.  Overbid Procedures.      The Motion does not seek to establish bid procedures in advance of the hearing on the Motion.  Instead, the Motion suggests procedures to be used for bidding as follows: A higher bid will not be considered by WUCC unless such bid includes the satisfaction of all secured, administrative, unsecured priority claims plus the Expense Reimbursement ($200,000) and the Break-Up Fee ($600,000) to CS, as the stalking horse bidder.  Additionally, any bids thereafter must be higher than the then existing highest or better bid, as determined in the reasonable discretion of WUCC, by at least $200,000.  Not later than seven (7) days prior to the hearing on the Sale Motion (in this case, August 15, 2011), each bidder shall submit to WUCC two marked copies of the Agreement marked to show changes and $500,000 deposit in cash or cash-equivalent which funds shall not be refundable to the bidder unless the bidder is not the successful bidder at the hearing on the Motion. (See Agreement para. 8.3.)

33.      By way of summary (and subject to the specific terms of the Term Sheet, the defined terms in which are incorporated herein by reference), the principal terms of the Term Sheet for the sale of CKMC assets are as follows:

---

[1] The Consideration is structured so that, upon consummation of the Sale, WUCC's estate is left with only administrative and general unsecured liabilities, with all other liabilities to be assumed or otherwise satisfied by CS.  The cash and promissory note portions of the Consideration will be used for distributions on account of administrative claims and general unsecured claims.

4671

a. <u>Assets Sold</u>.      All of CKMC's right, title, and interest in and to all of CKMC's assets and properties, real, personal, or mixed, tangible and intangible, of every kind, nature and description, wherever located, including all right, title and interest in those certain **unpatented mining claims** held in the name of CKMC and any rights, claims or interests in, under or to any assets owned by WUCC or conveyed to CD pursuant to the Agreement. (<u>See</u> Term Sheet page 3.)

b. <u>Consideration</u>.      In exchange for the Purchased Assets, CS shall provide the following to a liquidating trust or a similar trust for the benefit of CKMC's bankruptcy estate: (a) the assumption of Assumed Liabilities (as defined in the Term Sheet); (b) cash in an amount equal to One Hundred Thousand and No/100 Dollars ($100,000.00); (c) a release of all claims of CS, SCP and their affiliates against CKMC and its affiliates; (d) one percent (1%) of the voting equity interests in CS in the nature of one percent (1%) of the outstanding voting common LLC or membership interests; and (e) if the Equity Committee does not object to or oppose the Term Sheet and/or the Agreement, a warrant with a term of twelve (12) months to purchase an equity interest in CS in an amount equal to two percent (2%) of the outstanding common voting equity interests of CS, and with a strike price equal to two percent (2%) of One Hundred and Twenty Five Million Dollars ($125,000,000) or Two Million Five Hundred Thousand Dollars ($2,500,000), in CS' standard form satisfactory to CS will be issued to CKMC. **CKMC intends to transfer the**

16

**Warrant to the Equity Committee, subject to the approval of the Creditors' Committee**. (See Term Sheet pages 2-3.)

34.      The Agreement and Term Sheet contain other provisions, including provisions of the type normally contained in such agreements.    The descriptions contained herein are summaries only and are qualified in their entirety by the contents of the Agreement and the Term Sheet, which will control in the event of any conflict with these summaries.   All interested parties are urged to review the specific terms of the Agreement and the Term Sheet.

**F.      Executory Contracts and Leases.**

35.      Attached to the Bryan Declaration as **Exhibit "3"** is a copy of a chart identifying all executory contracts and leases to be assumed and assigned to CS under the Agreement and the Term Sheet, as well as the amount of any arrearage which will be cured by CS (subject to the non-debtor party establishing a different cure amount).   Based on the Debtors' books and records, the Debtors are current on the contracts and leases except to the extent of any cure amount set forth on **Exhibit "3."**   It is possible that, based on this Court's approval of financing on July 14, 2011, certain additional payments will have been made to certain lessors, which would decrease the cure amounts to be paid in connection with final assumption and assignment of leases.   The Debtors will submit an updated schedule in advance of the hearing on the Motion should the cure amounts change.

**G.      Necessity for the Sale.**

36.      The Debtors have administered their respective bankruptcy cases primarily through the incurrence of post-petition debtor in possession loans.   The Debtors cases

17

4671

have been fairly litigious, but the Sale of the Debtors' respective assets resolves the Debtors' cases. Additionally, perhaps the most contentious issue in these cases, involving Nevada Star's assertions that a significant portion of the Debtors' real property holdings belong to Nevada Star, has been resolved based upon a settlement agreement that the Debtors are informed has been reached between Nevada Star and CS.

37.    There does not appear to be any viable alternative exit option in these cases. The Debtors' exclusivity periods expired many months ago, yet no other party in interest has proposed, filed, or even indicated the intent and ability to file, a plan in these cases. No other sale proposals have been made to the Debtors. The alternative to the sales appears to be that the Debtors would have to cease operations, suffer foreclosure of their assets by secured creditors, and presumably, the liquidation sale of their assets. Indeed, the Creditors' Committee has indicated that, if the Sale does not occur, the Creditors' Committee will seek to convert WUCC's case to a case under Chapter 7 of the Bankruptcy Code. If any of these potential outcomes occur, the recovery of secured creditors would be jeopardized, unsecured creditors would very likely receive no distribution whatsoever from this estate, and employees and other creditors who may yet benefit from the ongoing business would suffer further. Based on the information available, the Sale represents the best value which can be obtained for the assets of WUCC and CKMC, and also preserves the ongoing business and limits potential claims in the estate.

///

///

///

///

///

18

4671

## THE SALE OF ASSETS SHOULD BE APPROVED

**A.      The Court Should Authorize WUCC to Sell Its Assets Pursuant to the Terms of the Agreement and CKMC to Sell Its Assets Pursuant to the Terms of the Term Sheet.**

38.      Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  In order to approve a sale of substantially all the debtor's assets outside the ordinary course of business the following elements must be met.  The debtor must show (1) that a sound business reason exists for the sale; (2) there has been adequate and reasonable notice to interested parties, including full disclosure of the sale terms and the debtor's relationship with the buyer; (3) that the sale price is fair and reasonable; and (4) that the proposed buyer is proceeding in good faith. In re Medical Software Solutions, 286 B.R. 431, 439-440 (Bankr. D. Utah 2006); citing In re Delaware and Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991), and WBQ Partnership v. Virginia Dep't of Med. Assistance Serv. (In re WBQ Partnership), 189 B.R. 97, 102 (Bankr. E.D. Va. 1995).

39.      The Debtors submit that the Sale comports with each of these four criteria and demonstrates that the Debtors' respective business judgment to proceed with the Sale is sound.

40.      Sound Business Purpose.      In Lionel, the court enumerated several factors that may be considered in determining whether a sound business purpose exists to approve a sale.  These factors include: (1) the proportionate value of the asset to the estate as a whole; (2) the amount of elapsed time since the filing; (3) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (4) the effect of the proposed disposition on the future plans of reorganization; (5) the proceeds to be

19

obtained from the disposition vis-à-vis any appraisals of the property; (6) which of the alternatives of use, sale or lease the proposal envisions; and (7) whether the asset is increasing or decreasing in value. See In re Lionel Corp., 722 F.2d at 1071 (2d Cir. 1983), cited by In re Medical Software Solutions, 286 B.R. at 441 (Bankr. D. Utah 2006). This Court, in Medical Software Solutions, has found that the factors enumerated in Lionel, while not necessarily exhaustive, provide adequate guidance in most cases considering a sale outside of an approved plan, which is exactly the situation in these cases. In re Medical Software Solutions, 286 B.R. at 441.  In that case, this Court found that because the assets' value was decreasing rapidly, a good business reason existed for the sale, and found that the other factors did not warrant withholding sale approval. Id.

41.    Here, the Debtors submit that if the assets of the Debtors are not sold pursuant to the Agreement and Term Sheet, in the near future, the Debtors will run out of cash and will be forced to shut down any and all operations.  The Debtors have survived during their bankruptcy cases primarily, if not solely, from debtor in possession financing provided by SMP and its related entities.  However, the Debtors have no way of ensuring that SMP, or any other party, will continue to fund the Debtors' operations.   In the meantime, administrative expenses of the estate will continue to accrue and remain unpaid.  In essence, the Debtors are unsustainable as going concerns without additional, and significant, capital, which there is no assurance of obtaining.  As a result, the value of the assets will decline without an immediate transaction which will transfer the Debtors' assets to CS which is financially capable of maintaining operations, and the Debtors would be forced to liquidate because the Debtors simply do not have sufficient capital to reorganize.

42.    Additionally here, while the proportionate value of the assets to the total assets of the Debtors is high (indeed, the Debtors seek to sell substantially all of their

20

4671

assets), without the proposed Sale, the Debtors and their respective estates do not have any viable alternative business arrangement or plan which will provide payment to creditors.  After the consummation of the sales, the Debtors intend to propose one or more plans of reorganization which will address remaining value of estate assets, including equity in CS, CKMC's public shell and potential avoidance actions, and WUCC's promissory note and its avoidance actions.

43.     Finally, the Debtors' proposed Sale is being made with the support of the Creditors' Committee, whose constituents have the largest stake in the outcome of these cases.  For these reasons, the Debtors submit that there is a good business reason to sell their respective assets outside the context of a confirmed plan.

44.     <u>Accurate and Reasonable Notice</u>.     In connection with a proposed sale under §363 of the Bankruptcy Code, "four pieces of information must be presented to the creditors.  The notice should: place all parties on notice that the debtor is selling its business; disclose accurately the full terms of the sale; explain the effect of the sale as terminating the debtor's ability to continue in business; and explain why the proposed price is reasonable and why the sale is in the best interest of the estate."  <u>In re Delaware & Hudson Railway Co.</u>, 124 B.R. 169, 180 (D. Del. 1991).  A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections.  <u>In re Karpe</u>, 84 B.R. 926, 930 (Bankr. M.D. Pa. 1988).  The purpose of the notice is to provide an opportunity for objections and hearing before the court if there are objections.  <u>Id.</u>

45.     Rule 6004(a) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") provides in pertinent part that notice of a proposed sale not in the ordinary course of business must be given pursuant to Fed. R. Bankr. P. 2002(a)(2), (c)(1), (i) and (k), and, if applicable, in accordance with § 363(b)(2) of the Bankruptcy

Code.  Fed. R. Bankr. P. 6004(a).  Bankruptcy Rule 2002(a)(2) requires at least 20 days'
notice by mail of a proposed sale of property of the estate other than in the ordinary
course of business, unless the Court for cause shown shortens the time or directs another
method of giving notice.  Fed. R. Bankr. P. 2002(a)(2).  Bankruptcy Rule 2002(c)(1)
requires that the notice of a proposed sale include the date, time and place of any public
sale, the terms and conditions of any private sale, and the time fixed for filing objections.
It also provides that the notice of sale or property is sufficient if it generally describes the
property.  Fed. R. Bankr. P. 2002(c)(1).  Bankruptcy Rule 2002(i) requires that the notice
be mailed to committees elected pursuant to 11 U.S.C. § 705 or appointed pursuant to 11
U.S.C. § 1102.   Fed. R. Bankr. P. 2002(i).  Bankruptcy Rule 2002(k) requires that the
notice be given to the United States Trustee.  Fed. R. Bankr. P. 2002(k).

46.    Bankruptcy Rule 6004(c) provides that a motion for authority to sell
property free and clear of liens or other interests must be made in accordance with
Bankruptcy Rule 9014 and must be served on the parties who have liens or other interests
in the property to be sold.  Fed. R. Bankr. P. 6004(c).

47.    The Debtors have complied with all of the above provisions of the
Bankruptcy Code and the Bankruptcy Rules. The Debtors have complied with
Bankruptcy Rules 6004(a) and 2002(a)(2), (c)(1), (i) and (k), because the Notice that has
been filed contemporaneously herewith, which includes the date time and place of the
sale and the deadline for objecting thereto, was served on the United States Trustee, all of
the Debtors' known creditors, and all parties requesting special notice.  The Debtors have
complied with Bankruptcy Rule 6004(c), because the Notice and the Motion were also
served upon the parties who have alleged liens or interests in the assets to be sold.  The
Motion has been filed on regular notice.  Additionally, the Debtors have served a copy of

22

the Motion, with all exhibits thereto, upon parties previously contacted with respect to the sale of the Debtors' assets.

48.   The Debtors submit that the foregoing satisfies the requirements of Bankruptcy Rules 6004(a) and (c).

49.   <u>Fair and Reasonable Price</u>.   In order to be approved under § 363(b) of the Bankruptcy Code, the purchase price must be fair and reasonable.  <u>Coastal Indus., Inc. v. U.S. Internal Revenue Service</u> (<u>In re Coastal Indus., Inc.</u>), 63 B.R. 361, 368 (Bankr. N.D. Ohio 1986).  Several courts have held that "fair value" is given for property in a bankruptcy sale when at least 75% of the appraised value of such property is paid. <u>See</u> <u>In re Karpe</u>, 84 B.R. at 933; <u>In re Abbotts Dairies of Pennsylvania, Inc.</u>, 788 F.2d 143, 149 (3d Cir. 1986); <u>Willemain v. Kivitz</u>, 764 F.2d 1019 (4th Cir. 1985); <u>In re Snyder</u>, 74 B.R. 872, 878 (Bankr. E.D. Pa. 1987); <u>In re The Seychelles, Partnership and Genius Corp. v. Banyan Corp.</u>, 32 B.R. 708 (N.D. Tex. 1983).  However, the Debtors also realize that its "main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold."  <u>In re Integrated Resources, Inc.</u>, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650 (S.D.N.Y. 1992).  "It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."  <u>In re Atlanta Packaging Products, Inc.</u>, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988); <u>see also</u> <u>In re Wilde Horse Enterprises</u>, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) ["in any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold"].

50.   As discussed above, the Debtors have been exposed to the market for an extended period of time, to numerous investors.  CS is the only party that has demonstrated a sincere desire, coupled with the financial commitment, to purchase the

4671

Debtors' assets.  And, although CS appears to be the only interested party, the proposed Sale of the Debtors' respective assets will nevertheless be subject to overbid. Accordingly, the Debtors' submit that the consideration being received by the estate under the proposed Sale, which consideration includes $3,050,000 of cash, the assumption of liabilities in excess of $100 million, the provision of a promissory note, and additional cash required to satisfy the claims of the State of Utah and the Internal Revenue Service, is fair and reasonable.

51.     The proposed Sale is explicitly supported by nearly all major constituents in these cases.  Obviously, the proposed Sale is supported by the Debtors' management and board of directors, and SMP (which is an affiliate of CS and the primary lienholder in these cases).  But importantly, the sale is also supported by the Creditors' Committee, which directly represents the interests of the constituency which is most impacted by the Sale.

52.     Good Faith.    When a bankruptcy court authorizes a sale of assets pursuant to § 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser.  In re Abbotts Dairies, 788 F.2d at 149.  Such a procedure ensures that § 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and as such, it mirrors the requirement of § 1129, that the Bankruptcy Court independently scrutinizes the debtor's reorganization plan and makes a finding that it has been proposed in good faith.  Id. at 150.

53.     "Good faith" encompasses fair value, and further speaks to the integrity of the transaction.  In re Wilde Horse Enterprises, 136 B.R. at 842.  With respect to the Debtor's conduct in conjunction with the sale, the good faith requirement "focuses principally on the element of special treatment of the Debtor's insiders in the sale transaction."  See In re Industrial Valley Refrig. and Air Cond. Supplies, Inc., 77 B.R. 15,

4671

17 (Bankr. E.D. Pa. 1987).  With respect to the buyer's conduct, this Court should consider whether there is any evidence of "fraud, collusion between the purchaser and other bidders or the [debtor], or an attempt to take grossly unfair advantage of other bidders."  In re Abbotts Dairies, 788 F.2d at 147, In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978); In re Wilde Horse Enterprises, Inc., 136 B.R. at 842; In re Alpha Industries, Inc., 84 B.R. 703, 706 (Bankr. D. Mont. 1988).  In short, "[l]ack of good faith is generally determined by fraudulent conduct during the sale proceedings."  In re Apex Oil Co., 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988), citing In re Exennium, Inc., 715 F.2d 1401, 1404-05 (9th Cir. 1983).

54.    In In re Filtercorp, Inc., 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the following test for determining whether a buyer is a good faith purchaser:

> A good faith buyer "is one who buys 'in good faith' and 'for value.'"  [citations omitted.]  [L]ack of good faith is [typically] shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'"  [citations omitted.]

Filtercorp, 163 F.3d at 577.

55.    In the present case, the Debtors, CS, SMP, and the Creditors' Committee collectively negotiated the terms of the Agreement and the Term Sheet.  The Debtors have essentially reached the limits of available funds, and have reached the limits of their ability to continue to operate. The Debtors have been searching for outside investment for some time. Fortunately, an investor surfaced who had an interest in the business.  Other than in connection with the transactions discussed in this Motion and disclosed throughout these cases, neither the Debtors nor the Debtors' management have any relationship with CS or SMP.  The Agreement and Term Sheet were negotiated on behalf of the Debtors at arms length with outside professionals.

4671

56.     The Debtors are not aware of any fraud, collusion or attempt to take unfair advantage of any potential bidders or interested parties.  Based on the foregoing, the Debtors submit that the Court should find that CS is a good faith purchaser entitled to all of the protections afforded by § 363(m) of the Bankruptcy Code.

**B.      Section 363(f) of the Bankruptcy Code Permits A Debtor's Sale of Assets to Be Free and Clear of Any Liens, Claims or Interests.**

57.     The proposed Sale is free and clear of all interests in property, liens, claims and encumbrances other than Assumed Liabilities (as that term is respectively defined in the Agreement and the Term Sheet).  Here, CS is purchasing the assets subject only to the interests in property, liens, claims and encumbrances which constitute Assumed Liabilities.  CS is obtaining the assets of WUCC and CKMC free and clear of any and all interests in property, liens claims and encumbrances which do not constitute Assumed Liabilities.

58.     Bankruptcy Code § 363(f) provides that a debtor may sell property of the estate "free and clear of any interest in such property" if:

(1)     applicable non-bankruptcy law permits the sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

26

11 U.S.C. §363(f).  Because § 363(f) is in the disjunctive, the Debtors must only meet

one of the five subsections of § 363(f) in order to sell the Acquired Assets free and clear

of all interests in property, liens, claims, interests and encumbrances.  In re Whittemore,

37 B.R. 93, 94 (Bankr. D. Or. 1984).

59.    The bankruptcy statute does not define "interest," but courts have

interpreted the term broadly. See Precision Indus., Inc. v. Qualitech Steel SBQ, LLC, 327

F.3d 537, 545-46 (7th Cir.2003) (leasehold);.  Compak Companies, LLC v. Johnson, 415

B.R. 334, 339 (N.D.Ill. 2009) (license).

60.    Section 363(f)(2).    Section  363(f)(2)  of  the  Bankruptcy  Code

authorizes a sale to be free and clear of an interest if the interest holder consents to the

sale.  Here, with respect to CKMC, the only known lienholders against assets of CKMC,

based upon the Debtors' lien search, are affiliates of CS.  CKMC understands that such

affiliates consent to the proposed Sale free and clear of their interests in CKMC's assets.

Similarly, with respect to any lien claim or interest against WUCC which is held by SMP,

or an affiliate of SMP or CS, to the extent such lien, claim or interest does not constitute

an Assumed Liability, WUCC understands that such party consents to the Debtors' sale

free and clear of their interests, liens, and encumbrance.

61.    Additionally, with respect to Nevada Star's claims against the Debtors, the

Debtors understand that Nevada Star and CS have entered into a binding letter of intent

under which the Debtors believe that Nevada Star will consent to the sale of the Debtors'

assets free and clear of Nevada Star's interests and claims, subject to the agreement

between CS and Nevada Star.

62.    Section 363(f)(5).    Section  363(f)(5)  of  the  Bankruptcy  Code

authorizes a sale to be free and clear of an interest if the lienholder could be compelled, in

a legal or equitable proceeding, to accept a money satisfaction of such interest.

27

4671

63.    Recently, the Bankruptcy Court in In re Jolan, Inc., 2009 WL 1163928 (Bankr. W.D. Wash. 2009) concluded that there are a number of legal and equitable proceedings available under state law in which a junior lienholder could be compelled to accept a money satisfaction including, without limitation, "a senior secured party's disposition of collateral under the default remedies provided in part VI of Article 9" of Washington's Uniform Commercial Code (specifically, RCW 62A.9A-617), and the disposition of real property through "judicial and nonjudicial foreclosures, which operate to clear junior lienholders' interests, with their liens attaching to proceeds in excess of the costs of sale and the obligation or judgment foreclosed." Id. at 3-4.

64.    There are legal and equitable proceedings available in Utah which parallel the proceedings discussed by the Court in Jolan.   Utah Code Ann. § 70A-9a-617 is identical to RCW 62A.9A-617.   In addition, in the event of a trustee's sale of real property in Utah, disposition of sale proceeds are governed by Utah Code Ann. § 57-1-29, which states in relevant part:

> (1)(a) The trustee shall apply the proceeds of a trustee's sale in the following order: (i) first, to the costs and expenses of exercising the power of sale and of the sale, including the payment of the trustee's and attorney fees actually incurred not to exceed any amount provided for in the trust deed; (ii) second, to payment of the obligation secured by the trust deed; and (iii)(A) the balance, if any, to the person or persons legally entitled to the proceeds; or (B) the trustee, in the trustee's discretion, may deposit the balance of the proceeds with the clerk of the district court of the county in which the sale took place.

See also Randall v. Valley Title, 681 P.2d 219, 221 (Utah 2000) ("the surplus from the sale stands in the place of the foreclosed real estate and is subject to the same liens and interests that were attached to it.").

65.     In the event of foreclosure of personal property under the Utah Uniform Commercial Code, disposition of proceeds is governed by Utah Code Ann. § 70A-9a-615:

> (1) A secured party shall apply or pay over for application the cash proceeds of disposition under Section 70A-9a-610 in the following order to:
>
>> (a) the reasonable expenses of retaking, holding, preparing for disposition, processing, and disposing, and, to the extent provided for by agreement and not prohibited by law, reasonable attorney's fees and legal expenses incurred by the secured party;
>>
>> (b) the satisfaction of obligations secured by the security interest or agricultural lien under which the disposition is made;
>>
>> (c) the satisfaction of obligations secured by any subordinate security interest in or other subordinate lien on the collateral if:
>>
>>> (i) the secured party receives from the holder of the subordinate security interest or other lien an authenticated demand for proceeds before distribution of the proceeds is completed; and
>>>
>>> (ii) in a case in which a consignor has an interest in the collateral, the subordinate security interest or other lien is senior to the interest of the consignor; and
>>
>> (d) a secured party that is a consignor of the collateral if the secured party receives from the consignor an authenticated demand for proceeds before distribution of the proceeds is completed.

66.     Based on the foregoing, in a foreclosure proceeding under Utah law, liens are paid in the order of priority.  Of course, if there is insufficient value, the foreclosure sale will not result in payment of junior claims.  However, nothing prevents the junior lienholders from seeking and obtaining a money judgment against the debtor in state court or other court of competent jurisdiction.  As noted above, Randall, supra, and Utah

29

4671

Code Ann. § 70A-9a-617 that a junior lienholder may be compelled to accept a money judgment upon disposition of collateral by the senior lienholder. In short, applicable laws provide that junior lienholders may be compelled to accept a money judgment, but there is no provision that requires a junior lienholder to be paid in full in connection with a foreclosure proceeding by the senior lienholder. If value is present, then the junior lienholder is paid in the order of priority.

67.     Based on the foregoing, the Debtors respectfully submit that any party who asserts a junior lien against the Debtors' assets which are being sold to CS could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest. Since the result could be accomplished under these provisions of Utah law it can be accomplished under §363. Under these circumstances, the sales should be approved under § 363(f)(5) of the Bankruptcy Code.

### C.     The Court Should Authorize WUCC to Assume and Assign to the Winning Bidder Its Executory Contracts and Unexpired Leases.

68.     Barring exceptions not herein relevant, Sections 365(a) and 1107(a) authorizes a debtor in possession, "subject to the Court's approval, ... [to] assume or reject any executory contract or unexpired lease of the debtor." A debtor in possession may assume or reject executory contracts for the benefit of the estate. In re Klein Sleep Products, Inc., 78 F.3d 18, 25 (2d. Cir. 1996); In re Central Fla. Metal Fabrication, Inc., 190 B.R. 119, 124 (Bankr. N.D. Fla. 1995); In re Gucci, 193 B.R. 411, 415 (S.D.N.Y. 1996). In reviewing a debtor in possession's decision to assume or reject an executory contract, a bankruptcy court should apply the "business judgment test" to determine whether it would be beneficial to the estate to assume it. In re Continental Country Club, Inc., 114 B.R. 763, 767 (Bankr. M.D. Fla. 1990); see also In re Gucci, 193 B.R. at 415.

4671

The business judgment standard requires that the court follow the business judgment of the debtor unless that judgment is the product of bad faith, whim, or caprice. In re Prime Motors Inns, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991), *citing* Lubrizol Enterprises v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986).

69.     Pursuant to Section 365(f)(2) of the Bankruptcy Code, a debtor may assign its executory contracts and unexpired leases, provided the debtor first assumes such executory contracts and unexpired leases in accordance with Section 365(b)(1), and provides adequate assurance of future performance by the assignee. Pursuant to Section 365(b)(1), assumption of executory contracts and unexpired leases requires a debtor to: (a) cure any existing defaults under such agreements; (b) compensate all non-debtor parties to such agreements for any actual pecuniary loss resulting from the defaults; and (c) provide adequate assurance of future performance under the contract or lease. 11 U.S.C. § 365(b)(1); see also In re Bowman, 194 B.R. 227, 230 (Bankr. D. Ariz. 1995), In re AEG Acquisition Corp., 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), *aff'd* 161 B.R. 50 (9th Cir. B.A.P. 1993).

70.     The assumption and assignment of executory contracts further the goals of Chapter 11 of promoting reorganization by balancing the debtor's interest in maximizing the value of its estate against the contracting party's interest in receiving the benefit of its bargain and being protected against default by the debtor after assumption has occurred. In re Embers 86th Street. Inc., 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995).

71.     WUCC's executory contracts and unexpired leases are important assets of its estate and assumption and assignment of the agreements to the winning bidder meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. The Sale will provide a substantial benefit to this estate and its

31

4671

creditors.  Because WUCC will not be able to obtain the benefit of the sale transaction without the assumption of contracts referenced above, the assumption is undoubtedly a sound exercise of WUCC's business judgment.

72.     To the extent any defaults exist under the contracts which the winning bidder seeks to be assumed and assigned ("**Cure Claims**"), CS will pay such Cure Claims in connection with the Sale closing.  CS will pay such cure amounts at closing or within a reasonable period thereafter.  WUCC believes that the parties to the executory contracts and unexpired leases which will be assumed and assigned will consent to such assumption and assignment.  To the extent necessary, CS can and will demonstrate the ability to adequately ensure its future performance under the assumed contracts.

**D.     The Debtors Request the Court Waive the 14-Day Waiting Period Set Forth in Bankruptcy Rule 6004(h) and 6006(d).**

73.     Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use, sale or lease of property is stayed until the expiration of 14 days after entry of the Court order, unless the Court orders otherwise.  Bankruptcy Rule 6006(d) has a similar provision with respect to an order approving of a debtor's assumption and assignment of unexpired leases and executory contracts.

74.     In order to facilitate the most expeditious sale closing possible given all of the time exigencies in these cases, the Debtors request that the Order approving this transaction be effective immediately upon entry by providing that the 14-day waiting periods of Bankruptcy Rule 6004(h) and 6006(d) are waived.  This will enable the Debtors to consummate their sales in the most expeditious manner possible.

///

///

4671

## **CONCLUSION**

75.    **WHEREFORE**, based upon all of the foregoing, the Debtors respectfully request that the Court:

a.    Grant the Motion;

b.    Authorize the sale of the Debtors' assets to CS pursuant to the Agreement (**Exhibit "1"**) and Term Sheet (**Exhibit "2"**), or to an entity who is found to have submitted a higher and better offer, free and clear of any interest in property, liens, claims or encumbrance in such assets within the meaning of Section 363(f) of the Bankruptcy Code;

c.    Authorize and approve the assumption and assignment by WUCC of executory contracts and leases to the winning bidder on the terms set forth in the Motion, including the cure amounts set forth in the Motion and **Exhibit "3"** hereto;

d.    Find that the sale transaction with CS or any other winning bidder was entered into by the parties without collusion, in good faith and from arm's-length bargaining positions and that the winning bidder has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code and is a good faith buyer entitled to all of the protections afforded by that Section;

e.    Order that the Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to the auction, sale transaction, or the breach thereof;

f.    Provide that the Sale and the transactions contemplated thereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 7 or chapter 11 trustee of the Debtors;

33

4671

      g.      Provide that the terms and provisions of the sale and resulting order shall be binding in all respects upon all persons, including, but not limited to, the Debtors, their estates, their creditors and all governmental bodies;

      h.      Waive the 14-day period provided for in the Federal Rules of Bankruptcy Procedure 6004(h) and 6006 (d); and

      i.      Grant such other and further relief as the Court deems just and proper.

Dated:  July 15, 2011

**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**

By:   */s/ Krikor J. Meshefejian*
        Martin J. Brill
        David B. Golubchik
        Krikor J. Meshefejian
        Reorganization Counsel for
        Chapter 11 Debtors and Debtors in Possession

**DION-KINDEM & CROCKETT**

By:   */s/ Steven Skirvin*
        Steven Skirvin
        Local Counsel for
        Chapter 11 Debtors and Debtors in Possession

4671