MARTIN J. BRILL (Calif. Bar No. 53220) mjb@lnbyb.com
DAVID B. GOLUBCHIK (Calif. Bar No. 185520) dbg@lnbyb.com
KRIKOR J. MESHEFEJIAN (Calif. Bar No. 255030) kjm@lnbyb.com
**LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
*Reorganization Counsel for Chapter 11 Debtors and Debtors-in-Possession*

STEVEN R. SKIRVIN (Utah Bar No. 7626)
**DION-KINDEM & CROCKETT**
10808 S. River Front Parkway, Suite 308
South Jordan, UT  84095
Telephone: (801) 984-8045
Facsimile: (801) 984-4315
Email: srs@dkclaw.com
*Local Counsel for Chapter 11 Debtors and Debtors-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>WESTERN UTAH COPPER COMPANY, et al.,<br><br>Debtors and Debtors in Possession. | Bankruptcy No. 10-29159 WTT<br><br>Chapter 11<br><br>(Jointly Administered with Case No. 10-30002 WTT)<br><br>Honorable William T. Thurman<br><br>**Filed Electronically** |

**DECLARATION OF A. JOHN A. BRYAN, JR. IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER: (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING AND APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES AND DETERMINING CURE AMOUNTS;  (C) WAIVING THE 14-DAY STAY PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d); AND (D) GRANTING RELATED RELIEF**

4671

I, A. John A. Bryan, Jr., hereby declare:

1.     I am the principal and Chief Executive Officer of The Watley Group ("Watley").   In connection with the Chapter 11 bankruptcy filings by Copper King Mining Corporation ("Copper King") and Western Utah Copper Company ("WUCC"), the debtors and debtors in possession in the above-referenced jointly administered Chapter 11 bankruptcy cases (collectively, the "Debtors" or "Companies"), I have been retained as the Chief Executive Officer of both Debtors.

2.     I make this Declaration in support of the Motion For Entry Of An Order: (A) Authorizing The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of Liens, Claims, Encumbrances And Interests;  (B) Authorizing And Approving Assumption And Assignment Of Executory Contracts And Leases And Determining Cure Amounts;  (C) Waiving The 14-Day Stay Periods Set Forth In Bankruptcy Rules 6004(H) And 6006(D); And (D) Granting Related Relief (the "Motion").

3.     I have personal knowledge of the facts set forth herein and could and would competently testify as to these facts.   I am familiar with the operations of the Debtors, and their assets, liabilities, and contracts.   I am also familiar with and have substantial experience in the bankruptcy process, as I have served as the chief restructuring officer of numerous other entities which have successfully confirmed plans of reorganization, including entities before this Court.  I have access to all of the Debtors' books and records.  I took great pains to obtain all the books and records even resorting to litigation with Ted Davis in order to obtain all the books and records. All items in the Debtors' books and records constitute writings taken, made or maintained in the ordinary course of business by a person employed by the Debtors who had a business duty to such entities to keep such books and records as accurate and current as possible.  The facts alleged herein are based on my review of the Debtors' books and records, my personal

2

knowledge of the Debtors' business and discussions and due diligence conducted by me and my team at Watley.

4.     The terms of the proposed sale of the Debtors' respective assets are set forth in the Asset Purchase Agreement (the "*Agreement*") by and between WUCC and CS Mining, LLC ("CS"), a true and correct copy of which is attached as **Exhibit "1"** to this Declaration, and the Asset Purchase Term Sheet (the "*Term Sheet*") by and between CKMC and CS, a true and correct copy of which is attached as **Exhibit "2"** to this Declaration.

5.     By the Motion, the Debtors seek approval of the sale of substantially all assets of the Debtors (the "Sale") pursuant to the Agreement and the Term Sheet, and the assumption and assignment of executory contracts and unexpired leases contingent upon closing of the Sale, as well as related relief as requested herein.  A list of all executory contracts and unexpired leases proposed to be assumed and assigned to the Buyer and the amount of money that the Debtors believe needs to be paid to other parties to the assumed contracts and assumed leases to satisfy the cure requirements of Section 365(b) of the Bankruptcy Code is attached as **Exhibit "3"** to this Declaration.

6.     During my tenure as CEO of the Debtors, and under my direction, the Debtors attempted to obtain various forms of DIP financing, capital commitments, as well as permanent financing, for the purpose of financing the Debtors during the Chapter 11 and to implement a Chapter 11 plan of reorganization.  The Debtors have prepared a comprehensive strategic plan, several business plans, and a variety of comprehensive financial models in order to generate interest in the Debtors.  The Debtors have contacted and/or spoken with more than sixty potential investors, including existing creditors, banks, equity investors, institutional lenders, restructuring funds, hedge funds, turnaround funds, mining companies, and high net worth individuals (collectively "Investors") with

4671

the financial wherewithal to be able to invest in companies such as the Debtors.

7.    The Debtors initially contacted certain Investors that had knowledge of or a relationship with the Debtors, Watley or me and who might have interest in investing in the Debtors.  This list of potential investors includes:

     (a)     Empire Advisors, LLC
     (b)     Mr. Mark Arioto
     (c)     DYVA Management Ltd.
     (d)     Equity Investment Properties, Inc. ("EIPI")
     (e)     Mr. Roderick Thomson
     (f)     Mr. Guy DeSelliers
     (g)     Mr. Johann Rupert

8.    Empire Advisors, LLC reacted quickly, was a secured lender, was very knowledgeable, and conducted extensive diligence, including a review of available documents, discussions with management and consultants, as well as site visits.  Empire Advisors, LLC is the only investor to submit a formal binding offer to these cases.

9.    Other investors listed above also expressed significant interest in the business.  Mr. Arioto conducted significant diligence, visited the company and mine in Utah, and remains interested in making an offer; however, he was concurrently raising funds for his investment vehicle, and has not tendered an offer.

10.    Dyva Management Ltd., EIPI, Mr. Johann Rupert, and Mr. Roderick Thomson all passed because of, among other reasons, the lack of cash flow, litigation by creditors, lack of NI43-101 quality geological reports, mill start-up risk, and the Nevada Star claims. However, Mr. Thomson continues to monitor the business.  Mr. Guy DeSelliers remains interested.

11.    The Debtors also explored potential investors in China given the region's growth trajectory and their demand for base metals such as copper.  Although several Chinese investors expressed interest, three demonstrated enough interest to initiate a due

4

diligence investigation:

    i. Global Mining Group, Yianyi Zhu

    ii. P.T Tang (with Mohan Abraham)

    iii. Elite Epoch Investments Limited, Jimmy Pang and Simon Ng

12.    In August 2010, Marcus Southworth, President of the Debtors, visited China in order to meet with Elite Epoch. Prior to the trip to China, Mr. Southworth had several discussions with Elite Epoch, as it had expressed interest in the Debtors and conducted limited diligence. As a result of the meetings, a Memorandum of Understanding (MOU) was drafted that outlined the terms for a potential acquisition of the Debtors. In October 2010, Simon Ng of Elite Epoch flew to Los Angeles specifically to meet with me to discuss a potential investment. Mr. Ng also visited the Company's mine in Utah and spent many hours with the management team. After extensive discussions and negotiations with Elite Epoch, they decided not to move forward. Mr. Southworth also dealt with Mr. Lu Ming (Huizhong Tongchan Investment Co. Ltd), but he had to pass on the deal because Mr. Ming's financial situation changed.

13.    I also traveled to Hong Kong and Singapore at the end of January 2011 to meet with several potential investors and known business contacts, including:

    i. Cheever Asset Management

    ii. Fortune Fund

    iii. Galaxy Asset Management

    iv. Jaker Investments Limited

    v. Junefield (Holdings) Limited Hong Kong

    vi. Level 2 Acquisition Corporation

    vii. UBS

    viii. Unique Fidelity Engineering

4671

    ix.  Falcon Enery Group

    x.  Mr. Mohan Abraham

    xi.  P.T Tang

    xii.  Mr. Jay Chen

    xiii.  Mr. Martin Euler

    xiv.  Mr. Anthony Harrison

    xv.  Mr. Shawn Sanderson

14.    These investors passed because of, among other reasons, the lack of cash flow, litigation by creditors, lack of NI 43-101 quality geological reports, mill start-up risk, management issues, and the Nevada Star claims.

15.    The Debtors also contacted broker dealers with expertise and clients in mining. Avro Capital ("Avro") was very interested in the deal on behalf of some of its clients. The Debtors have been in discussions with Avro regarding the sale of the Debtors' assets since July 2010. Avro is based in Vancouver, Canada, and has extensive experience with mining transactions.  Avro felt the opportunity was attractive, but none of the investors it contacted were willing to pay as high a valuation as Empire/Clarity and those that were interested specifically stated that they would not pay any cash up front to the secured or unsecured creditors. Interested Avro investors only wanted to invest enough money to fund an exploratory drilling program and then, with no assurance of valuation, raise more money in the capital markets to fund capital expenditures and operations, creating tremendous risk for our creditors. Many Avro investors were not interested because they were either unwilling to commit the time for diligence, were unwilling to get involved with such a complex transaction, would only invest only in exploratory drilling operations, would invest only in active mining operations, among other reasons.  The list of investors approached by Avro includes:

6

4671

    i.  Sandfire Securities, Northland Capital, Northland Capital Partners, Dr. Brian Bapty

   ii.  Nevada Copper, Giulio Bonifacio, Eugene Toffolo

  iii.  Peninsula Corp, Peninsula Merchant Syndications, Sam Magid

  iv.  P.I. Financial Group

   v.  Haywood Securities

  vi.  Canaccord Capital, Canaccord Adams, Canaccord Genuity

 vii.  Creston Capital Corp, Robert Anderson

viii.  Dundee Wealth

  ix.  Frank Anderson

16.    Avro contacted its investors by telephone, email, and/or in person regarding the project. In the end, all accounts declined citing one or more of the following reasons: insufficient data, valuation too high to mitigate risk, resource body too small to rationalize purchase, ongoing litigation with Nevada Star among other reasons.

17.    The last method that the Debtors used to identify potential investors was referrals and various databases.  Referrals were provided by (i) companies in the mining industry that were familiar with the Debtors; (ii) investors sourced by me through previous relationships; and (iii) relationships of other members of the management team.

18.    More than thirty of these firms and individuals were contacted, including:

    i.  Antarctica Capital

   ii.  CBRE

  iii.  ELAC

  iv.  Felix Investments

   v.  Hatch Corporate Finance

  vi.  Kemper Capital Management

vii.  Mercantile Consulting

viii.  Mercatur

ix.  Platinum Partners

x.  Rising Sun Holdings

xi.  RW Wentworth

xii.  Saint Cloud

xiii.  SFA

xiv.  UBS

xv.  Mr. Paul Abramowitz

xvi.  Mr. Paul Bagley

xvii.  Mr. Anthony Blumberg

xviii.  Mr. Peter Clinton

xix.  Mr. Barry Couglan

xx.  Mr. Charles Davidson

xxi.  Mr. Ken Garnett

xxii.  Mr. Jeff Green

xxiii.  Mr. Richard Groeneweg

xxiv.  Mr. Jason Heywood

xxv.  Mr. Wayne Morrison

xxvi.  Mr. George McCaffrey

xxvii.  Mr. Alan Rude

xxviii.  Mr. Thomas Senefelder

xxix.  Mr. Angie Teo

xxx.  Mr. Marvin Tien

xxxi.  Mr. John Van Clief

4671

xxxii.  Mr. Peter Watson

19.    The vast majority of the investors listed above conducted very limited due diligence or elected to pass based on the conversations or documents provided by the Debtors and/or Watley.   Based on feedback from these investors, I believe that the primary investment challenges in this case include:

i.   The economic climate remains challenging and very uncertain and has deteriorated in the past few months. Many investors stated that they were putting all investments on hold for the immediate future;

ii.   Several investors shared a perception that Chapter 11 is highly complex and litigious and contained unknown risks;

iii.   The Nevada Star litigation was a problem for many investors especially offshore investors unfamiliar and fearful of the US court system;

iv.   The complex mineralogy of the WUCC properties and the difficulty processing ore in the floatation mill;

v.   Previous inability to economically employ the flotation mill;

vi.   The large amount of secured debt;

vii.   The large amount of unsecured debt;

viii.   The lack of in house management expert in engineering and managing mill operations going forward;

ix.   The difficulty and expense of performing due diligence;

x.   Lack of clear NI 43-101 reports on the mining properties.

20.    Notwithstanding the Debtors' extensive efforts to locate a suitable partners or buyer, to date, the highest and best offer was received from CS.  Indeed, as of the date of filing the Motion, CS' offer is the only credible offer which the estates have.

4671

21.     The Debtors have administered their respective bankruptcy cases primarily through the incurrence of post-petition debtor in possession loans.  The Debtors' cases have been fairly litigious, but the Sale of the Debtors' respective assets resolves the Debtors' cases.   Additionally, perhaps the most contentious issue in these cases, involving Nevada Star's assertions that a significant portion of the Debtors' real property holdings belong to Nevada Star, has been resolved based upon a settlement agreement that the Debtors are informed has been reached between Nevada Star and CS.

22.     There does not appear to be any viable alternative exit option in these cases.  The Debtors' exclusivity periods expired many months ago, yet no other party in interest has proposed, filed, or even indicated the intent and ability to file, a plan in these cases.  No other sale proposals have been made to the Debtors.  The alternative to the sales appears to be that the Debtors would have to cease operations, suffer foreclosure of their assets by secured creditors, and presumably, the liquidation sale of their assets. Indeed, the Creditors' Committee has indicated that, if the Sale does not occur, the Creditors' Committee will seek to convert WUCC's case to a case under Chapter 7 of the Bankruptcy Code.  If any of these potential outcomes occur, the recovery of secured creditors  would  be  jeopardized,  unsecured  creditors  would  very  likely  receive  no distribution whatsoever, and employees and other creditors who may yet benefit from the ongoing business would suffer further.  Based on my extensive history in this case, and my experience in the reorganization industry, I believe that the Sale represents the best value which can be obtained for the assets of WUCC and CKMC, and also preserves the ongoing business and limits potential claims in the estate.

23.     The sale agreements with CS were negotiated at arms-length in a fair and reasonable manner.  The Creditors' Committee, was an integral part in such negotiations. The  Copper  King   Board  of  Directors,  the  WUCC  Board  of  Directors,  WUCC

10

4671

management and officers, were all either actively involved or fully informed of the Sale

Transaction. I believe that the terms of the proposed sales are fair and reasonable and in

the best interest of the Debtors' estates and all creditors.  Moreover, based on the fact that

the proposed Sale is subject to overbid, I anticipate actively marketing the opportunity to

new and existing Investors between now and the August 22 sale date. I also anticipate

that any interested party can and will contact the Debtors in advance of the hearing on the

Motion and will bid for the assets. Based on the open auction process, created by the

Motion, and our active marketing of the Sale, I believe that Sale hearing will result in the

highest and best value for the Debtors' assets based on the current circumstances.

24.    I am not aware of any fraud, collusion or attempt to take unfair advantage

of any potential bidders or interested parties by CS, its representatives or affiliates.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge.  Executed this 15th day of

July, 2011.

A. JOHN A. BRYAN, JR.

4671

# EXHIBIT "1"

<u>**ASSET PURCHASE AGREEMENT**</u>

**by and between**

**CS MINING, LLC**

**as Purchaser,**

**and**

**WESTERN UTAH COPPER COMPANY,**

**as Seller, debtor and Chapter 11 debtor-in-possession**

# Table of Contents

**Page**

**1.    Transfer of Assets.** .................................................................................................... 3

    1.1    Purchase and Sale of Assets .................................................................... 3
    1.2    Excluded Assets ........................................................................................ 5
    1.3    Contracts. .................................................................................................. 6

**2.    Consideration.** ........................................................................................................... 6

    2.1    Purchase Price .......................................................................................... 6
    2.2    Assumed Liabilities ................................................................................. 7
    2.3    Excluded Liabilities ................................................................................ 8
    2.4    Payment of Cure Costs ............................................................................ 9
    2.5    Apportionment ........................................................................................ 9
    2.6    Purchase Price Allocation ....................................................................... 9
    2.7    Eminent Domain ................................................................................... 10
    2.8    Casualty ................................................................................................. 10
    2.9    Excluded Assets and Liabilities ........................................................... 10

**3.    Closing Transactions.** ............................................................................................. 11

    3.1    Closing .................................................................................................. 11
    3.2    Seller's Deliveries to Purchaser at Closing .......................................... 11
    3.3    Purchaser's Deliveries to Seller at Closing .......................................... 13
    3.4    Sales, Use and Other Taxes .................................................................. 13
    3.5    Possession ............................................................................................. 14
    3.6    Closing Date .......................................................................................... 14

**4.    Conditions Precedent to Closing.** ........................................................................... 14

    4.1    Conditions to Seller's Obligations ....................................................... 14
    4.2    Conditions to Purchaser's Obligations ................................................. 14

**5.    Seller's Representations and Warranties.** ............................................................... 16

    5.1    Organization........................................................................................... 16
    5.2    Validity and Enforceability ................................................................... 16
    5.3    Approvals and Consents ........................................................................ 16
    5.4    No Conflict ............................................................................................ 16
    5.5    Litigation................................................................................................ 16
    5.6    Compliance with Laws .......................................................................... 16
    5.7    Financial Statements ............................................................................. 17
    5.8    Absence of the Material Adverse Changes and Undisclosed Liabilities ......... 17
    5.9    Title to and Use of Property .................................................................. 17
    5.10   Assets Necessary to Continue to Conduct Business ............................. 17
    5.11   Real Property. ........................................................................................ 17
    5.12   Other Personal Property ........................................................................ 18

5.13    Intellectual Property..................................................................................18
5.14    Contracts..................................................................................................19
5.15    Business Permits ......................................................................................19
5.16    Employees and Labor Relations. ...............................................................19
5.17    ERISA; Seller Benefit Plans......................................................................20
5.18    Environmental Matters .............................................................................20
5.19    Insurance .................................................................................................21
5.20    Transactions with Related Parties .............................................................21
5.21    Complete Copies of Materials ..................................................................21
5.22    Broker's or Finder's Fees .........................................................................21
5.23    Liabilities Under Purchased Contracts.......................................................21
5.24    No Management Agreement ......................................................................21
5.25    Taxes .......................................................................................................21
5.26    Purchased Contracts .................................................................................21
5.27    Affiliate Transactions ...............................................................................22
5.28    All Material Information ...........................................................................22

6.      **Purchaser's Warranties and Representations.** ......................................22

6.1     Organization.............................................................................................22
6.2     Validity and Enforceability.......................................................................22
6.3     No Conflict ...............................................................................................22
6.4     Broker's or Finder's Fees .........................................................................22
6.5     Financial Wherewithal..............................................................................23
6.6     Approvals and Consents ...........................................................................23

7.      **"AS IS" Transaction.** .............................................................................23

8.      **Covenants and Agreements Regarding Bankruptcy** ...........................23

8.1     Bankruptcy Court Approvals .....................................................................23
8.2     Cooperation; Efforts .................................................................................23
8.3     Overbid Protection ....................................................................................24
8.4     Expense Reimbursement............................................................................24
8.6     Notification ...............................................................................................25
8.7     Assignment of Rights.................................................................................25

9.      **Commercially Reasonable Efforts.** .......................................................25

10.     **Conduct Pending Closing.** ....................................................................25

11.     **Employee Matters.** ................................................................................27

12.     **Additional Agreements.** ........................................................................28

12.1    Taxes .......................................................................................................28
12.2    Access ......................................................................................................29

12.3    Consent of Third Parties; Regulatory and Other Authorizations ...................... 29
12.4    Avoiding Abandonment ...................................................................................... 30
12.5    Releases ............................................................................................................. 30
12.6    Schedules .......................................................................................................... 31

**13.    Termination.** ................................................................................................................ 31

13.1    Termination by Mutual Consent ....................................................................... 31
13.2    Termination by Either Purchaser or Seller ....................................................... 31
13.3    Termination by Seller ....................................................................................... 31
13.4    Termination by Purchaser .................................................................................. 31
13.5    Effect of Termination ........................................................................................ 32
13.6    Notification of Certain Events ........................................................................... 32

**14.    Post-Closing Matters** ................................................................................................. 33

14.1    Transferred Employee Records .......................................................................... 33
14.2    Further Assurances ............................................................................................ 33
14.3    Reasonable Access to Records and Certain Personnel ..................................... 33
14.4    Use of Intellectual Property .............................................................................. 33
14.5    Brokerage Obligations ...................................................................................... 33
14.6    Reasonable Preference to Prior Seller Service Providers ................................. 33

**15.    Miscellaneous.** .......................................................................................................... 34

15.1    Attorneys' Fees ................................................................................................. 34
15.2    Notices ............................................................................................................... 34
15.3    Entire Agreement .............................................................................................. 34
15.4    Modification ...................................................................................................... 35
15.5    Severability ....................................................................................................... 35
15.6    Captions ............................................................................................................. 35
15.7    Further Assurances ............................................................................................ 35
15.8    Waiver ............................................................................................................... 35
15.9    Payment of Fees and Expenses ......................................................................... 35
15.10   Survival ............................................................................................................. 35
15.11   Assignments ...................................................................................................... 35
15.12   Binding Effect ................................................................................................... 35
15.13   Applicable Law ................................................................................................. 35
15.14   Construction ...................................................................................................... 36
15.15   CONSENT TO JURISDICTION ...................................................................... 36
15.16   Counterparts ...................................................................................................... 36
15.17   Non-Recourse .................................................................................................... 36
15.18   Time is of the Essence ....................................................................................... 36
15.19   Interpretation and Rules of Construction .......................................................... 36
15.20   Third Party Beneficiaries .................................................................................. 37
15.21   Headings ............................................................................................................ 37
15.22   Effectiveness ...................................................................... **Error! Bookmark not defined.**

**16.    Definitions** .................................................................................................................. 37

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "***Agreement***") is made and entered into as of July 12, 2011 (the "***Effective Date***") by and between CS MINING, LLC, a Delaware limited liability company ("***Purchaser***"), and WESTERN UTAH COPPER COMPANY, a Utah corporation, as debtor and Chapter 11 debtor-in-possession ("***Seller***").   In this Agreement, Seller and Purchaser are collectively referred to as the "***Parties***."

## RECITALS

The Parties hereby acknowledge that:

A.     Seller engages in exploration, development, extraction, and processing of metals, including copper, silver, and gold, from mineral resources located in and around the Milford Mineral Belt in Beaver County, Utah (such business, the "***Business***").

B.     Seller is a wholly-owned subsidiary of Copper King Mining Corporation ("***Copper King***"), a public corporation organized under the laws of the state of Nevada.

C.     In 2007, Seller received secured financing in the form of a secured loan (the "***First Lien Loan***") from DDB Utah, LLC; The Raymond W. Schmelzer Marital Trust; Top-Notch Investments, LLC; Rodney Evan Schmelzer; Brent Thomas Bingham; Bridge Loan Capital Fund, LP; DPI College, LC; Milford Copper Investors II, LLC; Reynolds Brothers, Inc.; Milford Investors, LLC; Advanced Strategic Planning, LLC; and Back Country Investments, LLC (the "***First Lien Lenders***").   The First Lien Loan was evidenced by a Secured Promissory Note (the "***First Note***") dated January 4, 2007, in the principal amount of $8,944,200.97. The First Lien Loan was secured by substantially all assets of Seller.

D.     In March 2007, Seller borrowed approximately $4 million (the "***Second Lien Loan***") from Bridge Loan Capital Fund, LP; DPI College, LC; Milford Copper Investors II, LLC; Reynolds Brothers, Inc.; Milford Investors, LLC; Advanced Strategic Planning, LLC; Back Country Investments, LLC; Bridge Loan Capital, LP; ME Dancy Consulting Services, Inc.; Jonathan B. Wells; Wendell Gile Trust; and Josh Romney (the "***Second Lien Lenders***").   The Second Lien Loan was secured by substantially all assets of Seller.

E.     In October of 2007, Seller borrowed approximately $1.2 million (the "***Third Lien Loan***" and collectively with the First Lien Loan and the Second Lien Loan, the "***Loans***") from Devin Durrant (the "***Third Lien Lender***" and collectively with the First Lien Lenders and the Second Lien Lenders, the "***Lenders***").  The Third Lien Loan was secured by substantially all assets of Seller.

F.     In February and March of 2007, Seller entered into various equipment leases and loan transactions with Zions Credit Corporation, which leases and loan transactions were assigned to Republic Bank in February and March of 2007 (the "***Republic Transactions***").   The Republic Transactions were secured by, or involved the sale and leaseback of, certain assets of Seller as set forth in the relevant documents.

G.     From September 2009 through April of 2010, Seller and Copper King entered into various loan and sale/leaseback transactions with Empire Advisors, LLC, Altus Metals, LLC ("***Altus***"), Strategic Capital Partners, LLC, and Winterfox, L.L.C. (the "***Additional Transactions***").   The Additional Transactions were secured by, or involved the sale and leaseback of, certain assets of Seller and Copper King as set forth in the relevant documents.

1

H.     On May 18, 2010 (the "*Petition Date*"), Seller and Copper King (collectively "*Debtors*")commenced separate bankruptcy cases ("*Cases*") by filing Voluntary Petitions under Chapter 11 of the Bankruptcy Code.  Debtors originally filed their Cases in the United States Bankruptcy Court for the District of Nevada, but the Cases were subsequently transferred to the United States Bankruptcy Court for the District of Utah (the "*Bankruptcy Court*").  Seller's bankruptcy case number is 10-29159-WTT (the "*Case*").  Copper King's bankruptcy case number is 10-30002-WTT (the "*CK Case*").

I.     From July 2010 through June of 2011, Altus and the Lenders advanced various debtor-in-possession loans to Seller (the "*DIP Loans*") pursuant to orders of the Bankruptcy Court.  Certain DIP Loans were secured by priming, super-priority liens on all or substantially all the assets of Seller, as detailed in the relevant orders of the Bankruptcy Court.

J.     Pursuant to the Bankruptcy Court's Order Granting Debtors' Motion For Order Approving (1) Settlement Agreement With Secured Creditors Pursuant To Federal Rule Of Bankruptcy Procedure 9019; and (2) Settlement Buyout Term Sheet ("*Settlement Order*") [Docket No. 575], the Bankruptcy Court found that the aggregate amount of the claims of the Lenders pursuant to the Loans totaled *at least* $53,000,000 (the "*Minimum Loan Claims*") as of the time of such Order.

K.     Pursuant to notices filed with the Bankruptcy Court on June 9, 2011, the Loans, and all right, title and interest related thereto, have been purchased by, and transferred to, Skye Mineral Partners, LLC, a Delaware limited liability company ("*SMP*").  SMP is owned and controlled by Clarity Copper, LLC and Skye Mineral Investors, LLC. None of Seller's or Copper King's officers, directors or insiders, as that term is defined in the Bankruptcy Code, are affiliated with Purchaser or SMP except as expressly stated hereinbelow.  Further, the Additional Transactions and DIP Loans, and all right, title and interest related thereto, have been purchased by, and transferred to, SMP.  Further, the Republic Transactions, and all right, title and interest thereto, shall be, simultaneously with or prior to the Closing (as defined in Section 3.1), transferred to SMP pursuant to definitive agreements currently being finalized between SMP and Republic Bank.

L.     Pursuant to certain actions taken on or about June 29, 2011, Seller's Board of Directors (the "New BOD") has been reconstituted.  Purchaser has been advised and understands that the New BOD is supportive of transactions contemplated by this Agreement and have not withdrawn the authority of A. John A. Bryan, Jr., the Chief Executive Officer of Seller, to complete the negotiation of this transaction and execution of this Agreement.

M.     The transactions contemplated by this Agreement shall be conditioned on the Bankruptcy Court's entry of a Final Order approving this Agreement and the terms of the sale of the Purchased Assets (as defined in Section 1) and the assumption of the Assumed Liabilities (as defined in Section 2.2) pursuant to Sections 363(b) and (f) and 365 of the Bankruptcy Code in accordance with the terms of this Agreement, which Final Order shall be in form and substance acceptable to Purchaser (the "*Sale Order*").

N.     Subject to entry of the Sale Order and on the terms and conditions of this Agreement, and pursuant to Sections 363 and 365 of the Bankruptcy Code, Seller wishes to sell or cause to be sold to Purchaser, and Purchaser wishes to purchase from Seller, certain of the assets and properties of Seller relating to the Business, and the assumption and assignment of certain executory contracts and unexpired leases pursuant to the terms hereof, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 363 and 365 of the Bankruptcy Code (such transactions, the "*Contemplated Transactions*").

2

O.     In accordance with this Agreement, the Parties desire that all secured claims with respect to the Purchased Assets, administrative claims, priority unsecured wage claims, and priority tax claims shall be paid, assumed or settled, as applicable.

## AGREEMENT

In consideration of their respective covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     **Transfer of Assets.**

1.1     Purchase and Sale of Assets.   On the Closing Date and on the terms and conditions of this Agreement, Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire, accept and receive from Seller, free and clear of all Encumbrances (excluding Assumed Liabilities), all of Seller's right, title and interest as of the Closing Date in and to all of Seller's assets and properties, real, personal, or mixed, tangible and intangible, of every kind, nature and description, wherever located, other than any Excluded Assets (such assets and properties other than Excluded Assets, the "**Purchased Assets**"), including but not limited to:

(a)     all right, title and interest in, to and under any real property, mining claims, and mineral rights, including all improvements and fixtures located thereon or related thereto or minerals and metals located therein, the Flotation Mill, extracted minerals and metals, water rights and rights to use or store water, dumps, stockpiles, tailings, easements, licenses, rights of way, and all other rights and interests associated with any of the foregoing, including but not limited to those properties, rights and interests set forth on Schedule 1.1(a) attached hereto and incorporated herein by this reference (the "**Purchased Real Property**");

(b)     all Furnishings and Equipment and motor vehicles of Seller, whether owned or leased by Seller, all of Seller's associated rights, title and interests thereto, including but not limited to the Furnishings and Equipment and motor vehicles set forth on Schedule 1.1(b) attached hereto and incorporated herein by this reference (the "**Purchased Furnishings and Equipment**");

(c)     all Inventory of Seller and all of Seller's associated rights, title and interests thereto, including but not limited to that identified on Schedule 1.1(c) attached hereto and incorporated herein by this reference (the "**Purchased Inventory**");

(d)     all security, escrow, customer, utility and other deposits, credits, prepaid expenses, deferred charges, advance payments and prepaid items and duties, and all of Seller's associated rights, title and interests thereto, including but not limited to the items identified on Schedule 1.1(d) (collectively, the "**Deposits**"), subject, in the case of any Deposit that is the subject of a Contract, to the right of Purchaser under Section 1.3 to designate, in its sole and absolute discretion, any such Contract as an Excluded Contract (in which case any such Deposit shall be deemed an Excluded Asset);

(e)     to the extent transferable, all Intangible Property Assets and all Intellectual Property and all software, programs and similar systems (including data and related documentation) owned or licensed by Seller, and all of Seller's associated rights, title and interests thereto, including but not limited to the items identified on Schedule 1.1(e);

3

(f)    any and all interest of Seller (i) as lessee or licensee of equipment, Furnishings and Equipment, or other personal property, tangible or intangible, under a Seller's Contract that is a Personal Property Lease, (ii) as lessee or licensee of real estate, real property, mining claims, and mineral rights, including all improvements and fixtures located thereon or related thereto or minerals and metals located therein and extracted minerals and metals associated therewith, (iii) in, under and to any Seller's Contract related to or incident to the Purchased Real Property, and (iv) in, under and to any other Seller's Contract, in each case as is described or set forth on Schedule 1.1(f), and all of Seller's associated rights, title and interests thereto, subject to the right of Purchaser under Section 1.3 to designate, in its sole and absolute discretion, any such Contract as an Excluded Contract, in which case any such interest of Seller shall be deemed an Excluded Asset (all such Seller's Contracts not so designated, the "***Purchased Contracts***");

(g)    all accounts receivable and notes receivable (whether current or non-current) and other rights to receive payments and the full benefit of any security for such accounts receivable, and all causes of action specifically pertaining to the collection of the foregoing (collectively, the "***Receivables***"), subject, in the case of any Receivable that arises out of a Contract, to the rights of Purchaser under Section 1.3 to designate, in its sole and absolute discretion, any such Contract as an Excluded Contract, in which case any such Receivable shall be deemed an Excluded Asset;

(h)    to the extent transferable and assignable, all of the Seller's interest in, to and under all Business Permits and all of Seller's associated rights, title and interests thereto, including, without limitation, those described on Schedule 1.1(h) attached hereto and incorporated herein by this reference (collectively, the "***Purchased Business Permits***"), subject to the rights of Purchaser under Section 1.3 to designate, in its sole and absolute discretion, any such Business Permit as an Excluded Contract, in which case any such Business Permit shall be deemed an Excluded Asset;

(i)    all Claims of Seller that are not Excluded Assets, including but not limited to any such Claims for (a) any refunds, rebates, credits, losses, including net operating losses, to the extent they are transferable, of or with respect to any Taxes paid by or on behalf of Seller, and (b) for proceeds or refunds under insurance policies relating to the assets, properties, Business or operations of Seller;

(j)    all rights of Seller to take delivery of all products ordered by Seller before the Closing Date for delivery, which products have not been delivered as of the Closing Date, to the extent the purchase orders for such products are Assumed Liabilities;

(k)    all cash and cash equivalents (including but not limited to operating account balances at banks and other financial institutions, certificates of deposit and other time deposits and petty cash) and marketable securities, wherever located, other than any Deposits, including any cash proceeds of any of the DIP Loans or other debtor-in-possession loans in the possession of Seller, but excluding the Purchase Price set forth in Section 2, below;

(l)    copies of all other books, records and materials of Seller relating to the Purchased Assets and operations of the Business; provided, however, that Purchaser agrees that the Sale Order will contain a provision reasonably acceptable to the Creditors Committee that requires Purchaser to make such records available to the Creditors Committee or other designated representative of unsecured creditor; and

(m)     any other mutually agreeable assets related to the Business set forth on Schedule 1.1(m) attached hereto and incorporated herein by this reference.

1.2     Excluded Assets.  The Purchased Assets shall exclude any right, title or interest of Seller in or to all of the following (collectively, the "***Excluded Assets***"):

(a)     any Deposits of or taken from the Purchase Price set aside for payroll and sales tax or retainers set aside for professionals of Seller (notwithstanding Section 1.1(d));

(b)     the Purchase Price and Seller's rights under this Agreement;

(c)     the Excluded Contracts, including any refund, credit or payment due to Seller thereunder;

(d)     all Furnishings and Equipment of Seller other than Purchased Furnishings and Equipment;

(e)     all Claims (A) for Avoidance Actions, or (B) arising under any Excluded Contract or relating exclusively to any Excluded Asset, subject to Section 12.5 below;

(f)     all books and records relating to any pre-Closing Period that the Seller is required by law to retain, including, without limitation, (i) Tax Returns, financial statements, and corporate or other entity filings (*provided, however*, that Purchaser shall have the right to make, and the Seller shall deliver, copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets), (ii) minute books, stock ledgers, and stock certificates of Seller or of any Affiliates, and (iii) documents relating to proposals to acquire the Business by Persons other than Purchaser;

(g)     all securities, whether capital stock or debt, and other ownership interests issued by Seller or of any Affiliates;

(h)     all assets of any Section 401(k) or other employee pension or benefit plan;

(i)     all work histories, personnel and medical records of employees and former employees of Seller who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; *provided, however*, so far as legally permissible under applicable data protection, medical confidentiality or similar laws, Purchaser will be provided the originals of all personnel and medical records of employees of Seller who have accepted employment with Purchaser in connection with the sale hereunder, with the prior written consent of such employee or after posted written notice or other appropriate notice to such employees if legally required.  If an employee objects to the transfer of personnel or medical records to Purchaser, the records will not be provided;

(j)     any item expressly excluded pursuant to the provisions of Section 1.1 above;

(k)     any and all claims of Seller or Seller's Affiliates (including, without limitation, any claims for loans or advances or claims for breach of fiduciary duty) against any of the officers, directors or shareholders of Seller or Seller's Affiliates; and

5

(l)     any other asset that, although included in the definition of Purchased Assets, Purchaser notifies Seller in writing not later than five (5) days prior to the Closing that Purchaser does not wish to purchase such asset.

1.3     Contracts.

(a)     As part of the Sale Motion, Seller shall obtain approval from the Bankruptcy Court for the sale, assumption and assignment by Seller to Purchaser of the Purchased Contracts, as may be amended in accordance with Section 1.3(b), below.  Seller shall serve the Sale Motion on all counterparties to all Purchased Contracts along with a notice specifically stating that Seller is or may be seeking the sale, assumption and assignment of such Seller's Contracts and shall notify such parties of the deadline for objecting to the Cure Costs listed in Schedule 5.14(c), which deadline shall be not less than three (3) calendar days prior to the hearing to approve the Sale Motion.  As part of the Sale Motion, Seller shall file with the Bankruptcy Court the list identifying such Seller's Contracts and the amounts necessary to cure defaults under each of such Contract as determined by Seller in accordance with Schedule 5.14(c), so as to enable any such party to object to the proposed Cure Costs and the Bankruptcy Court to determine such Cure Costs as promptly as reasonably possible.  In cases in which Seller is unable to establish that a default exists, the relevant Cure Cost shall be set at Zero Dollars ($0.00).  Purchaser acknowledges its obligation under Section 365 of the Bankruptcy Code to provide adequate assurance to all counter-parties to Purchaser Contracts.

(b)     On or prior to the date that is ten (10) days prior to Closing ("**Assumption Date**"), Purchaser shall have the right, in Purchaser's sole and absolute discretion, to designate any Seller's Contract as an Excluded Contract.  Any such designation may be made by Purchaser by giving notice thereof in accordance with Section 15.2 on or prior to the Assumption Date.  All such designations made by Purchaser as of the Assumption Date shall be become final and binding upon Purchaser and, except as otherwise set forth below, all Seller's Contracts as to which Purchaser has made no such designation shall be deemed a Purchased Contract.  Appropriate deletions shall be made to Schedules 1.1(f) at the Closing to reflect any Excluded Contracts.

(c)     If first approved by the Bankruptcy Court through the Sale Order or one or more other Final Orders that are no less favorable to Purchaser than the provisions of the Sale Order, at Closing, Seller shall assume each Purchased Contract and assign such Purchased Contract to Purchaser.  At Closing, Purchaser shall assume the obligations of Seller under each Purchased Contract assigned to it pursuant to this Agreement.

2.     **Consideration.**

2.1     Purchase Price.

(a)     *Purchase Price*.  The consideration to be delivered by Purchaser for the sale and transfer of the Purchased Assets in accordance with this Agreement (the "***Purchase Price***") shall consist of:

(i) the assumption of Assumed Liabilities (equal to approximately One Hundred Million Seven Hundred Thirty Five Thousand Eight Hundred Fifteen and 12/100 Dollars ($100,735,815.12) as of the Effective Date);

(ii) cash in an amount equal to Three Million Fifty Thousand and No/100 Dollars ($3,050,000.00) (together with the cash required pursuant to Section 2.1(a)(iv) below and the Cure Costs provided in Section 2.2(c) below, the "***Cash Component***");

(iii) an unsecured promissory note executed by Purchaser in favor of Seller or its designee pursuant to which Purchaser shall pay to Seller or its designee (A) the sum of Two Hundred Thousand and No/100 Dollars ($200,000.00) on the first (1st) anniversary of the Closing Date, (B) the sum of Two Hundred Thousand and No/100 Dollars ($200,000.00) on the second (2nd) anniversary of the Closing Date, (C) the sum of Three Million and No/100 Dollars ($3,000,000.00) on the third (3rd) anniversary of the Closing Date, and (D) provided that the average COMEX Copper High Grade Comex Spot Settlement Daily Price exceeds $3.75/lb. for the 12-month period immediately preceding the fifth (5th) anniversary of the Closing Date, an additional One Million and No/100 Dollars ($1,000,000) payable on the fifth (5th) anniversary of the Closing Date (the "***Promissory Note***");

(iv) cash required as of the Closing Date under four to five year proposed payment plans with (A) the State of Utah with respect to unpaid property taxes for the principal amount of $851,679.85 (subject to reduction to $726,146.83 if payments are timely paid in accordance with the payment plan) paid over the course of the payment plan, (B) the State of Utah with respect to unpaid payroll taxes for a maximum principal amount of $130,000, and (C) the Internal Revenue Service with respect to unpaid payroll taxes for payment of the principal amount of $1,506,795 over the course of the payment plan, or in the alternative to the foregoing, such other cash payments or settlements at Closing acceptable to Purchaser; provided that the foregoing descriptions are for informational purposes and/or represent agreements in principal with the relevant authorities, and it is the intent of this Agreement that, upon the Closing, the referenced payment plans or settlements will settle such obligations in full and Seller and Seller's estate shall not be liable for any portion of such tax obligations; and

(v) a release of all claims of Purchaser and SMP against the Seller and its Affiliates in the Case.

(b) *Deposit*.   Within five (5) days of the execution of this Agreement, Purchaser shall deposit a cash deposit in the amount of Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "***Purchaser Deposit***") into the trust account of counsel for Seller, Levene, Neale, Bender, Yoo & Brill L.L.P., located at 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067 ("***Seller's Counsel***"), which amount shall be held in escrow by Seller's Counsel pending the Closing.  If Purchaser completes the purchase of the Purchased Assets hereunder, the Purchaser Deposit shall be credited towards the Cash Component of the Purchase Price.  If Seller materially defaults hereunder or fails to satisfy a closing condition of Seller set forth in Section 4.2 below and Purchaser does not complete the purchase of the Purchased Assets hereunder, then the Purchaser Deposit shall be fully refunded and returned to Seller.  If the Purchaser materially defaults hereunder and does not complete the purchase of the Purchased Assets, then the Purchaser Deposit shall be retained by Seller as liquidated damages representing full and complete damages for such default, notwithstanding any other remedies available to Seller in law or equity.

(c) *Payment*.   The Purchase Price shall be payable on the Closing Date in accordance with the terms of the Sale Order by payment of the Cash Component and the payment of the Cure Costs pursuant to Section 2.1(a) hereof; provided, however, that any increase in the Purchase Price by Purchaser pursuant to the last sentence of Section 2.1(a) above shall be payable at Closing by check or wire transfer of immediately available funds to an account specified by Seller.

2.2   Assumed Liabilities.   The following shall constitute "***Assumed Liabilities***" of Seller: (a) those Liabilities of Seller for Utilities and Apportionable Operating Expenses, to the extent

7

(and only to the extent) such items are required under Section 2.5 to be borne by Purchaser; (b) Seller's obligations under the Purchased Contracts and Seller's obligations to be performed under the Purchased Business Permits included in the Purchased Assets that are assigned or otherwise transferred to Purchaser pursuant to this Agreement; (c) the Cure Costs for the Purchased Contracts, estimated to be up to $300,000, as defined in Section 1.3, to the extent that such Cure Costs are not paid at Closing; (d) the Loans and responsibility of payment for the Minimum Loan Claims in the aggregate amount outstanding and due thereunder as of the Closing Date (an aggregate amount of at least Fifty Three Million Dollars ($53,000,000) per Final Order of the Bankruptcy Court; the amounts owed under the Loans equals approximately Ninety One Million Nine Hundred Seventy Nine Thousand Three Hundred Seventy Four and 14/100 Dollars ($91,979,374.14) as of the Effective Date provided that this parenthetical is not intended to limit the amount of the obligation to be paid but simply stated for informational purposes); (e) the Republic Transactions and responsibility of payment for the aggregate amount outstanding and due thereunder as of the Closing Date (in an aggregate amount approximately One Million Eight Hundred Thousand Dollars ($1,800,000) as of the Effective Date provided that this parenthetical is not intended to limit the amount of the obligation to be paid but simply stated for informational purposes); (f) the Additional Transactions, (as defined in Recital G) and responsibility for payment of the aggregate amount outstanding and due thereunder as of the Closing Date (in an aggregate amount of approximately Five Million Six Hundred Ninety Nine Thousand Six Hundred Forty Eight and 28/100 Dollars ($5,699,648.28) as of the Effective Date, provided that this parenthetical is not intended to limit the amount of the obligation to be paid but simply stated for informational purposes); (g) the DIP Loans and responsibility of payment for the aggregate amount outstanding and due thereunder as of the Closing Date (in an aggregate amount of approximately One Million Two Hundred Fifty Six Thousand Seven Hundred Ninety Two and 70/100 Dollars ($1,256,792.70) as of the Effective Date provided that this parenthetical is not intended to limit the amount of the obligation to be paid but simply stated for informational purposes); (h) any debtor-in-possession loans made to Seller pursuant to order of the Bankruptcy Court following the Effective Date and prior to the Closing Date, including but not limited to any such loans made by SMP pursuant to that certain "DEBTOR'S MOTION FOR AUTHORITY TO OBTAIN FINANCING ON A SENIOR SECURED BASIS PURSUANT TO 11 U.S.C. § 364 AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE" filed with the Bankruptcy Court on June 22, 2011 (CM/ECF # 680) (the "*SMP DIP Loan*"), provided, however, that such debtor-in-possession loans either (A) are not opposed by Purchaser or (B) do not exceed Four Hundred Thousand ($400,000); (i) payments and responsibilities following the Closing Date with (A) the State of Utah with respect to unpaid property taxes for the principal amount of $851,679.85 (subject to reduction to $726,146.83 if payments are timely paid in accordance with the plan) paid over the course of the payment plan, (B) the State of Utah with respect to unpaid payroll taxes for a maximum principal amount of $130,000, and (C) the Internal Revenue Service with respect to unpaid payroll taxes for payment of the principal amount of $1,506,795 over the course of the payment plan; provided that the foregoing descriptions are for informational purposes and/or represent agreements in principal with the relevant authorities, and it is the intent of this Agreement that, upon the Closing, the referenced payment plans or settlements will settle such obligations in full and Seller and Seller's estate shall not be liable for any portion of such tax obligations; (j) those Liabilities identified on Schedule 2.2 attached hereto, to the extent not paid by Seller from cash prior to Closing or included in Deposits which are Excluded Assets pursuant to Section 1.2(b); and (k) liabilities under any reclamation bonds transferred to Purchaser pursuant to this Agreement, limited to $1,600,000, if applicable.

      2.3    Excluded Liabilities.  Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall not be obligated to pay, assume or to perform or otherwise discharge any Liability of Seller or its Affiliates or any Liabilities or obligations constituting an Encumbrance upon the Purchased Assets, regardless of whether any such Liabilities or obligations are fixed, absolute or contingent, liquidated or unliquidated, matured or unmatured, asserted or unasserted, known or unknown, other than the Assumed Liabilities (such Liabilities not assumed by Purchaser, the "*Excluded*

*Liabilities*"). Without limiting the foregoing, Purchaser shall not be obligated to pay, assume, perform or discharge, and does not assume, perform or discharge, any of the following Liabilities:  (i) any Liability of Seller or its Affiliates that arises on or before the Closing Date, under a Purchased Contract or the ownership or operation of the Business or otherwise, and is not specifically assumed by Purchaser; (ii) any Liability of Seller or its Affiliates relating to any Excluded Contracts or other Seller's Contracts which is not a Purchased Contract (including without limitation, any possible Cure Costs relating thereto); (iii) any Liability of Seller or its Affiliates relating to any of the Excluded Assets; (iv) any Liability of Seller or its Affiliates relating to Seller's execution, delivery or performance of this Agreement or any document contemplated by this Agreement; (v) any and all Liabilities of Seller or its Affiliates of any sort whatsoever (whether now existing or hereafter arising) under Environmental Laws relating to or arising out of or in connection with the Business (including, without limitation, administrative or civil fines or penalties for violations of Environmental Laws, or remediation or response costs for contamination) ("*Environmental Claims*"), other than liabilities under reclamation bonds transferred to Purchaser up to $1,600,000; (vi) any brokerage or investment banking fees or similar fees of Seller; (vii) any Liability of Seller or its Affiliates with respect to the WARN Act, or any similar federal, state or other law, rule or regulation; (viii) any Liability of Seller or its Affiliates to employees or under any collective bargaining agreements; (ix) any compensation and reimbursement of expenses of Seller or its Affiliates to Seller's legal counsel and other advisors; (x) any accrued but unpaid payroll or sales tax as of the Closing Date (other than those paid or assumed pursuant to <u>Sections</u> <u>2.1(iv)</u> or <u>2.2(i)</u>; (xi) any Liability of Seller to any of its Affiliates; (xii) any Cure Cost related to Contracts that are not Purchased Contracts; (xiii) any liabilities relating to penalties, fines, settlements, interest, costs and expenses incurred as a result of any actual or alleged violation by Seller of any requirement of any Legal Requirement or the litigation related to the Legal Requirement; (xiv) other than the Assumed Liabilities, any liabilities associated with any and all indebtedness of Seller for borrowed money or services performed; (xv) any liabilities with respect to negligence or other torts committed prior to the Closing Date; and (xvi) any liabilities for expenses (a) relating to the negotiation and preparation of this Agreement and (b) relating to transactions contemplated hereunder, in each case to the extent incurred by Seller.

2.4    <u>Payment of Cure Costs</u>.  Subject to <u>Sections</u> <u>2.2</u> and <u>2.3</u>, all Cure Costs under Purchased Contracts shall be the responsibility of Purchaser.  Following entry of the Sale Order, upon funding of the Cure Costs by Purchaser, Seller shall pay Cure Costs under any Purchased Contract at Closing and shall pay such Cure Costs directly to the parties to whom and pursuant to the terms by which the Bankruptcy Court directs such payments to be made in the Sale Order or Final Order approving the assumption and assignment of the Purchased Contracts in conjunction with the Sale Order.

2.5    <u>Apportionment</u>.  At or about the Closing Date, the Seller and Purchaser shall (i) make mutually satisfactory arrangements with respect to, or take readings or other measurements of, gas, water, electricity and other utilities (the "*Utilities*"); (ii) mutually determine all real property Taxes and all charges, fees or other expenses arising out of or relating to any Purchased Contract, other than Cure Costs, which accrued but were not paid by Seller during or in respect of any period prior to Closing or which were paid by the Seller in respect of any period following the Closing, other than any such real property Taxes, charges, fees or expenses that are, under express provision of this Agreement or other agreement or instrument related hereto, expressly provided to be paid or borne by either Purchaser or Seller, or otherwise specifically addressed in this Agreement (the "*Apportionable Operating Expenses*").  Responsibility for the Utilities and Apportionable Operating Expenses are to be apportioned equitably as of the Closing Date, such that Seller shall bear costs and expenses for the period up to the Closing Date and Purchaser shall bear such costs and expenses for the period from and including the Closing Date.

2.6    <u>Purchase Price Allocation</u>.  Purchaser shall use its commercially reasonable efforts to deliver to Seller, no later than ninety (90) days following the Closing Date, a schedule (the "*Allocation Schedule*") allocating the Purchase Price among the various assets comprising the Purchased

Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local Tax law) or any successor provision. Purchaser will prepare the Allocation Schedule in good faith. Purchaser and Seller shall report and file all Tax Returns (including any amended Tax Returns and claims for refund) consistent with the Allocation Schedule and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings), provided that subject to applicable law, Purchaser may amend the Allocation Schedule if deemed necessary by Purchaser and provide Seller with notice thereof.  Purchaser and Seller shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms.  Not later than ninety (90) days prior to the filing of their respective Forms 8594 (and analogous state law forms) relating to the Contemplated Transactions, each Party shall deliver to the other Party a copy of its Form 8594 (and such analogous state law forms).

        2.7    <u>Eminent Domain</u>.  If prior to the Closing, Seller receives (i) any written notice of any condemnation proceeding or other proceedings in the nature of eminent domain in connection with any portion of the Purchased Real Property or (ii) any notice of a contemplated commencement of such a proceeding (each a "***Taking***") which after giving affect thereto would prevent Purchaser from conducting the Business as contemplated by Seller (such Taking, a "***Material Taking***"), Purchaser shall have the right, at its sole option, of terminating this Agreement by written notice to Seller within thirty (30) after receipt by Purchaser of written notice from Seller of the Taking. If Purchaser does not terminate this Agreement pursuant to the provisions of this <u>Section 2.7</u>, at Purchaser's option: (i) the total consideration payable for the Purchased Real Property under this Agreement shall be reduced by the total of any awards or damages received by the holder of any existing mortgage thereon and by Seller; or (ii) Purchaser may require Seller to assign to Purchaser all of Seller's right, title and interest in and to any such claims, awards or damages to which Seller may have become entitled or may thereafter be entitled by reason of any exercise of the power of eminent domain or condemnation with respect to the Purchased Real Property or any portion thereof. Purchaser shall not have any right to terminate this Agreement for any Taking which is not a Material Taking. Seller shall not agree to any award or damages or compromise any claim without Purchaser's prior written approval.

        2.8    <u>Casualty</u>.  Seller shall bear the risk of loss with respect to the Purchased Assets prior to the Closing. If prior to the Closing, there shall be loss or damage to the Purchased Assets as a result of fire or casualty which after giving affect thereto would prevent Purchaser from conducting the Business as contemplated by Purchaser or if the cost to restore any such loss or damage is greater than Three Hundred Thousand Dollars ($300,000) as determined by Purchaser's contractors, Purchaser shall have the right, at its sole option, to terminate this Agreement, at which time this Agreement shall be null and of no further force or effect, and, except as otherwise set forth in this Agreement, neither party shall have any further rights, duties or obligations under this Agreement. If this Agreement is not terminated, Purchaser shall be entitled to the proceeds of any insurance paid or payable to Seller on account of any such loss or damage and to an assignment of all proceeds and claims to such proceeds of any insurance policies, and Seller shall execute and deliver to Purchaser any and all documents or instruments required before or after the Closing to transfer all interest in such claims or proceeds to Purchaser or to whomever Purchaser shall direct and shall credit Purchaser for deductibles under such policies. In connection with the foregoing, Seller shall not agree to any award or damages or compromise any claim without Purchaser's prior written approval.

        2.9    <u>Excluded Assets and Liabilities</u>.   Notwithstanding anything to the contrary contained herein, Purchaser shall not purchase any of the Excluded Assets nor assume any liability for any of the Excluded Liabilities.

### 3.    Closing Transactions.

3.1    Closing.  The Closing of the transactions provided for herein (the "**Closing**") shall take place at the offices of Levene, Neale, Bender, Yoo & Brill L.L.P., located at 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067 at 10:00 a.m. on August 25, 2011, or as promptly as practicable following the satisfaction or waiver by the appropriate Party of all the conditions contained in Section 4, or on such other date or at such other place and time as may be agreed to by the Parties hereto; *provided, however*, that the date of the Closing shall be automatically extended if any of the conditions set forth in Section 4 shall not be satisfied or waived, *subject, however*, to the provisions of Section 14; *provided, further*, that in no event shall the Closing occur after the Outside Date without the express consent of Purchaser (the date on which the Closing occurs, hereinafter the "**Closing Date**").

3.2    Seller's Deliveries to Purchaser at Closing.  On the Closing Date, Seller shall make the following deliveries to or for the benefit of Purchaser:

(a)    the certificate contemplated by Section 4.2(a), duly executed by Seller and dated as of the Closing Date;

(b)    grant deed(s) in form and substance satisfactory to Purchaser, duly executed by Seller, with respect to the Purchased Real Property, conveying good title to the Purchased Real Property free and clear of Encumbrances other than the Permitted Encumbrances, together with any necessary transfer declarations or other filings (and in recordable form if required by Purchaser) (the "**Deed**"), provided that the provisions in the Deed shall not exceed those expressly approved by the Bankruptcy Court;

(c)    an Assignment and Assumption of Leases and Contracts substantially in the form attached as Exhibit A hereto, duly executed by Seller, pursuant to which Seller's interest in all Purchased Contracts and Business Permits shall be assigned to Purchaser (the "**Assignment of Contracts and Interests**");

(d)    either (i) an executed acknowledgement or agreement to the Assignment of Purchased Contracts by each party to the Purchased Contracts, pursuant to which each party to the Purchased Contracts agrees and consents to the assignment and assumption of the Purchased Contracts by Purchaser, and the continued effectiveness of the Purchased Contracts following assignment and assumption by Purchaser along with payment of any cure amounts in accordance with Sections 2.1 and 2.4 hereof, and any estoppel certificates with respect to the Purchased Contracts requested by Purchaser in the form requested by Purchaser or (ii) a Final Order approving assignment and assumption of the Purchased Contracts and the Cure Costs, and the continued effectiveness thereof subject to payment of the Cure Costs in accordance with Sections 2.1 and 2.4 hereof, or inclusion of the foregoing in the Sale Order (the "**Required Consents**");

(e)    a Bill of Sale and Assignment, substantially in the form attached as Exhibit B hereto, duly executed by Seller, pursuant to which Seller's interest in any Purchased Assets not otherwise assigned at the Closing shall be assigned to Purchaser (the "**Bill of Sale**");

(f)    an Assignment of Intangible Property Assets, duly executed by Seller, pursuant to which Seller's interest in and to the Intangible Property Assets shall be assigned to Purchaser, if not incorporated into the Assignment of Purchased Contracts and required by Purchaser (the "**Assignment of Intangible Property Assets**"), provided that the provisions in the Deed shall not exceed those expressly approved by the Bankruptcy Court;

(g)     all documents reasonably necessary to deliver certificates of title, duly executed by Seller, or required to convey ownership of any motor vehicles or similar equipment constituting Purchased Assets;

(h)     appropriate evidence of the valid taking of all necessary corporate action by Seller in connection with the Contemplated Transactions, including, without limitation:  (i) certified copies of the articles of incorporation and bylaws of Seller, (ii) certified copies of resolutions duly adopted by Seller's directors approving the Contemplated Transactions and authorizing the execution, delivery, and performance by Seller of this Agreement; and (iii) a certificate as to the incumbency of officers of Seller executing this Agreement and any instrument or other document delivered in connection with the Contemplated Transactions;

(i)     certified copies of all Final Orders of the Bankruptcy Court approving the Contemplated Transactions, including the Sale Order, evidence of the entry of all such Final Orders on the docket of the Case;

(j)     an affidavit of an officer of the Seller, sworn to under penalty of perjury, setting forth the name, address and Federal tax identification number of the Seller and stating that Seller is not a "foreign person" within the meaning of Section 1445 of the Code; if, on or before the Closing Date, Purchaser shall not have received such affidavit, Purchaser may withhold from the cash payments to Seller at Closing such sums as are required to be withheld therefrom under Section 1445 of the Code;

(k)     all Deposits and Receivables;

(l)     the Purchased Business Permits to Seller or replacements thereof satisfactory to Seller, either issued in Purchaser's name or to be issued in Purchaser's name within thirty (30) days following Closing, along with (i) all necessary documents, agreements, and forms to properly transfer such Purchased Business Permits and issue such permits in the name of Seller and (ii) acknowledgement or proof of recognition of the issuing authority, or other proof of proper transfer satisfactory to Seller, for each of the Purchased Business Permits ("**Business Permit Transfers**");

(m)     all documentation necessary to properly transfer any of the Purchased Assets to Purchaser in accordance with the terms of this Agreement;

(n)     certified copies of the order of the Bankruptcy Court pertaining to the Contemplated CK Transactions, evidence of the entry of the CK Sale Order as a Final Order on the docket of the CK Case, or such other resolution of the Copper King case and/or transfer and sale of any assets of Copper King to Purchaser in form satisfactory to Purchaser;

(o)     possession and title to the Purchased Assets;

(p)     the Powers of Attorney contemplated by <u>Section 12.4</u>, duly executed by authorized officers of Seller;

(q)     inclusion of provisions in the Sale Order of that expressly comply with the terms of <u>Sections</u> <u>2.2</u> and <u>2.3</u>, including but not limited to the exclusion of, and release of Purchaser from Environmental Claims and tort claims, through the Closing Date, relating to or arising out of or in connection with the Business (including, without limitation, administrative or civil fines or penalties for violations of Environmental Laws, or remediation or response costs for

12

contamination) associated with pre-Closing activities or circumstances, provided that such exclusion and release shall not apply to any activities after the Closing;

(r)     true and correct copies of all Purchased Contracts and all correspondence, amendments, modifications and waivers related thereto, to the extent not previously provided to Purchaser;

(s)     proof satisfactory to Purchaser that upon Closing, the Earmarked Fund shall be treated in accordance with Section 2.1(a) as required by this Agreement; and

(t)     any other documents, funds or other things reasonably requested by Purchaser or contemplated by this Agreement to be delivered by Seller to Purchaser at the Closing.

3.3     Purchaser's Deliveries to Seller at Closing.  On the Closing Date, Purchaser shall make the following deliveries to or for the benefit of Seller:

(a)     Payment, by wire transfer of immediately available funds into an account designated by Seller in accordance with and subject to Section 2, an amount equal to the Cash Component, including adjustments, if applicable, per Section 2, less the Purchaser Deposit;

(b)     Payment, by wire transfer of immediately available funds into an account designated by Seller equal to the Cure Costs of all Purchased Contracts to be assigned to Purchaser at Closing;

(c)     the certificate contemplated by Section 4.1(a), duly executed by Purchaser;

(d)     the Assignment of Purchased Contracts, duly executed by Purchaser;

(e)     an Assumption Agreement with respect to the Assumed Liabilities, substantially in the form attached as Exhibit C hereto, duly executed by Purchaser (the "**Assumption of Liabilities**");

(f)     any certificates of title required to convey ownership of any motor vehicles or similar equipment owned by Seller, if endorsement thereof is required by Purchaser;

(g)     the Promissory Note consistent with commercially reasonable terms consistent with the terms hereof to be negotiated prior to Closing with the Seller and the Committee; and

(h)     such other documents or instruments as are necessary or appropriate to carry out the Contemplated Transactions or contemplated by this Agreement to be delivered by Purchaser to Seller at the Closing.

3.4     Sales, Use and Other Taxes.  To the extent not exempt under the Bankruptcy Code, any sales, purchase, transfer, stamp, documentary stamp, use or similar taxes under the laws of the State of Utah, or under any federal law or the laws or regulations of any federal agency or authority, which may be payable by reason of the sale or transfer of the Purchased Assets under this Agreement or the Contemplated Transactions (the "**Transfer Taxes**"), if any, shall be borne and paid by Purchaser.

3.5     Possession.   Right to possession of the Purchased Assets shall transfer to Purchaser on the Closing Date.  Seller shall transfer and deliver to Purchaser on the Closing Date such keys, locks and safe combinations and other similar items as Purchaser may reasonably require to obtain occupation and control of the Purchased Assets, and shall also make available to Purchaser at a location designated by Purchaser at Closing the originals of all documents in Seller's actual possession that are required to be transferred to Purchaser by this Agreement.

3.6     Closing Date.  All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.  Unless provided otherwise herein or agreed otherwise in writing by the Parties, documents delivered at the Closing shall be dated as of the Closing Date.

**4.     Conditions Precedent to Closing.**

4.1     Conditions to Seller's Obligations.  Seller's obligation to make the deliveries required of Seller at the Closing Date and otherwise consummate the Contemplated Transactions shall be subject to the satisfaction by Purchaser or waiver by Seller of each of the following conditions:

(a)     All of the representations and warranties of Purchaser contained herein shall continue to be true and correct at the Closing in all material respects, and Purchaser shall have substantially performed or tendered performance of each material covenant on Purchaser's part to be performed which, by its terms, is required to be performed at or before the Closing, and Seller shall have received a certificate by an officer of Purchaser, dated as of the Closing Date, to such effect and to the effect that each of the conditions precedent to Closing set forth in Section 4.2 have been satisfied or waived by Purchaser.

(b)     Purchaser shall have tendered delivery of all items required to be delivered by Purchaser under Section 3.3.

(c)     No action, suit or other proceedings that is not stayed by the Bankruptcy Court shall be pending before any Governmental Body seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Body having appropriate jurisdiction.

(d)     Proof satisfactory to Committee that upon Closing, the Earmarked Fund shall be treated in accordance with Section 2.1(a) as required by this Agreement and the Promissory Note will be assigned to the Committee at Closing; and

(e)     The Bankruptcy Court shall have entered the Sale Order in accordance with Section 8 below and the Sale Order shall not have been stayed as of the Closing Date, except for any immaterial modifications, conditions or limitations which do not, individually or in the aggregate, adversely affect Seller.

4.2     Conditions to Purchaser's Obligations.  Purchaser's obligation to make the deliveries required of Purchaser at the Closing and otherwise consummate the Contemplated Transactions shall be subject to the satisfaction by Seller or waiver by Purchaser of each of the following conditions:

(a)     All of the representations and warranties of Seller contained herein shall continue to be true and correct at the Closing in all material respects, and Seller shall have substantially performed or tendered performance of each and every covenant and agreement on Seller's part to be performed which, by its terms, is required to be performed at or before the Closing (provided, however, that Seller shall have performed in all respects its obligations under Section 1.1 to sell, assign, transfer, convey and deliver to Purchaser all of the Seller's right, title and interest in and to all Purchased Assets free and clear of all Encumbrances (excluding any Assumed Liabilities)), and Purchaser shall have received a certificate by officers of Seller, dated as of the Closing Date, to such effect and to the effect that each of the conditions precedent to Closing set forth in Section 4.1 have been satisfied or waived by Seller.

(b)     Seller shall have tendered delivery of all items required to be delivered by Seller under Section 3.2.

(c)     No action, suit or other proceedings that is not stayed by the Bankruptcy Court shall be pending before any Governmental Body seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Body having appropriate jurisdiction.

(d)     The Bankruptcy Court shall have entered the Sale Order in accordance with Section 8 below and in substantially the form agreed to by Purchaser.

(e)     Since the date of this Agreement, there shall not have been any theft, damage, destruction or loss of a material portion of the Purchased Assets.

(f)     Since the date of this Agreement there shall have been no event, condition, change, development or other matter, or any worsening of any existing event, condition, change, development or other matter that, individually or in combination with any other event, condition, change, development or other matter or worsening thereof, has had or could reasonably be expected to have a Material Adverse Effect.

(g)     Seller shall have obtained the Required Consents, in form and substance reasonably satisfactory to Purchaser or the Final Order obviating the need for such Required Consents.

(h)     Seller shall have obtained the Business Permit Transfers, or Purchaser shall have obtained replacements for any Purchased Business Permits for which Business Permit Transfers have not been obtained; the foregoing shall have been satisfied with respect to all relevant Purchased Business Permits, including but not limited to the Seller's Large Mine Permit and reclamation and other bonds.  Seller or Purchaser shall have obtained a replacement for that certain reclamation bond and indemnity made, transferred or guaranteed by Reynolds Brothers Excavation, Inc. and certain other related parties.

(i)     Satisfaction by Seller of Section 12.5.

(j)     The CK Sale Order shall have been, or shall be as of the Closing Date, entered on the docket of the CK Case as a Final Order, or there shall have been, or shall be as of the Closing Date such other resolution of the Copper King case and/or transfer and sale of any assets of Copper King to Purchaser in form satisfactory to Purchaser.

5.    **Seller's Representations and Warranties.**

Seller hereby makes the following representations and warranties to Purchaser:

5.1    <u>Organization</u>.  Seller is a corporation organized under the laws of the State of Utah.  Seller has all requisite corporate power and authority to own, lease and, subject to the provisions of the Bankruptcy Code applicable to debtors-in-possession, to operate its properties and to enter into this Agreement and to consummate the Contemplated Transactions.  Seller has no Subsidiaries.

5.2    <u>Validity and Enforceability</u>.  The execution, delivery and performance of this Agreement by Seller and the consummation by Seller of the Contemplated Transactions has been duly authorized by all requisite corporate action, subject to approval of the Bankruptcy Court.  Subject to the entry and effectiveness of the Sale Order, this Agreement has been duly and validly executed and delivered by Seller and (assuming this Agreement constitutes a valid and binding agreement of Purchaser) constitutes a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, except as to the effect, if any, of (i) applicable bankruptcy, insolvency, moratorium, reorganization, or other similar laws affecting the rights of creditors generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies.  No actions of any holders of capital stock of Seller are necessary for the approval of this Agreement and the transactions contemplated hereby.

5.3    <u>Approvals and Consents</u>.  No Consent by, or declaration, filing or registration with, any Governmental Body or any other Person is required to be made or obtained by Seller in connection with the execution, delivery and performance of this Agreement by Seller and the consummation of the Contemplated Transactions, except for (a) Consents by, or declarations or filings with, the Bankruptcy Court and (b) Consents, declarations, filings, registrations or rulings identified in <u>Schedule 5.3</u>.  The items referred to in clauses (a) and (b) of this <u>Section 5.3</u> are hereinafter referred to as the "***Seller's Required Approvals***."

5.4    <u>No Conflict</u>.  Subject to the entry of the Sale Order, to the best of Seller's knowledge, neither the execution, delivery or performance of this Agreement by Seller, nor the consummation by Seller of the Contemplated Transactions, nor compliance by Seller with any of the provisions hereof, (a) conflict with or result in any breach of the articles of incorporation of Seller, (b) result in a violation or breach of, or constitute (with or without notice or lapse of time) a default (or give rise to any right of termination, cancellation, vesting, payment, exercise, acceleration, suspension or revocation) under, any of the terms, conditions or provisions of, any note, bond, mortgage, deed of trust, security interest, or Contract to which Seller is a party or by which Seller's properties or assets may be bound or affected, (c) violate any Legal Requirement applicable to the Seller or to the Seller's properties or assets, (d) result in the creation or imposition of any Encumbrance on any asset of the Seller, or (e) cause the suspension or revocation of any Business Permits.

5.5    <u>Litigation</u>. There is no material Legal Proceeding (other than the Chapter 11 Cases of Seller and Copper King, the Litigation, pending litigation initiated by the SEC against Copper King and existing investigations by the SEC, IRS and Department of Labor)  pending or, to the Seller's Knowledge, threatened against or affecting Seller that, once the Sale Order is given effect, could result in the imposition of any Liability on Purchaser in respect of the Purchased Assets, nor, to the Seller's knowledge, is there any material judgment or Order of any Governmental Body (other than the Bankruptcy Court) outstanding against Seller.

5.6    <u>Compliance with Laws</u>.  Other than as disclosed to Purchaser and set forth on <u>Schedule 5.6</u> with respect to the Internal Revenue Service and U.S. Department of Labor, Seller has not been given notice or been charged with any material violation of any Law of any Governmental Body.

Seller is not in violation of any Legal Requirement.  Other than as disclosed to Purchaser with respect to the Internal Revenue Service and U.S. Department of Labor and set forth on Schedule 5.6, no material investigation or review by any Governmental Body is pending or, to the Knowledge of the Seller, threatened, against Seller or any of its assets and properties, nor has any Governmental Body indicated to Seller an intention to conduct the same.  Seller has complied in all material respects with all applicable Laws in the operation of the Business and ownership and use of the Purchased Assets.

        5.7      <u>Financial Statements</u>.  Seller has provided Purchaser with access to Seller's financial information.  Seller advised Purchaser that Seller cannot verify the veracity of the financial records or that they are accurate.  As a result, Seller makes no representations of any kind with respect to its financial records.

        5.8      <u>Absence of the Material Adverse Changes and Undisclosed Liabilities</u>.  To Seller's Knowledge, there has been no Material Adverse Effect with respect to the Purchased Assets since the Petition Date, other than the filing of the Case.

        5.9      <u>Title to and Use of Property</u>.  Seller has, and subject to the Sale Order, shall convey to Purchaser at the Closing, legal, equitable, good and marketable title to all of the Purchased Assets, in each case free and clear of all Encumbrances (excluding any real property taxes, easements and Assumed Liabilities).  The Purchased Assets include all property of the Seller, tangible and intangible, used or useable in connection with the Business or necessary to conduct the Business as it is currently conducted.  The documents delivered to Seller in accordance with Section 3.2, when duly executed and delivered to Seller by Purchaser at the Closing, will effectively vest in Purchaser full legal, equitable, good, valid and marketable title to the Purchased Assets, subject to the Permitted Encumbrances.

        5.10      <u>Assets Necessary to Continue to Conduct Business</u>.  The Purchased Assets constitute substantially all of the assets, properties and rights used in the Business as presently conducted other than the Excluded Assets.

        5.11      <u>Real Property.</u>

        (a)      Seller owns a fee interest in all Purchased Real Property used in the connection with the operation of the Business, subject to the pending disputes with Nevada Star with respect to certain properties and Diversified Minerals with respect to certain other properties.

        (b)      There are no leases, subleases, licenses and other agreements granting to any Person or entity other than the Seller any right to the possession, use, occupancy or enjoyment of the real property used in connection with the operation of the Business, or any portion thereof. No portion of the Business has suffered any material damage by fire or other casualty which has not heretofore been completely repaired and restored to its original condition.  Seller has not received any notice or formal communication that the whole or any part of the Purchased Real Property is subject to any proceedings for condemnation, eminent domain or other taking, and to the knowledge of Seller, no such condemnation or other taking is threatened. Seller has not received any formal notice from any Governmental Body concerning any actual or contemplated public improvements made or to be made by any Governmental Body, the costs of which are or could become special assessments against or an Encumbrance upon the Purchased Real Property and, to the Knowledge of Seller, no such public improvement is threatened, to the extent that Seller owns such Real Property.

        (c)      Other than Permitted Encumbrances and except as set forth on Schedule 5.11(c), there are no contract rights, leases, subleases, easements or other Contracts, written or oral,

granting to any party the right to purchase, use or occupancy related to any portion of the Purchased Real Property.

(d)    To Seller's knowledge, the Purchased Real Property is supplied with utilities adequate for the use and operation of the Business as conducted by Seller as of the date hereof; and such utilities, to the Knowledge of Seller, extend to the Purchased Real Property through legal rights of way or validly created easements.

(e)    There is no option to purchase, right of first offer, right of first refusal or other provision granting any party any right to acquire the Purchased Real Property or any portion thereof.

(f)    Other than the Litigation with Nevada Star and Diversified Minerals, there are no proceedings, motions, lawsuits, complaints, or outstanding Orders which are pending or, to the Knowledge of Seller, threatened against or which affect the Real Property.

(g)    To the Knowledge of Seller, the Purchased Real Property is not subject to any real property Tax increases or reception of Taxes occasioned by retroactive revaluation, special assessments, changes in the land usage, or loss of any exemption or benefit status.

(h)    Except as set forth on Schedule 5.11(j), Seller has not entered into any Contracts affecting or impacting the Purchased Real Property which will bind Purchaser or the Purchased Real Property on or after the Closing Date.

(i)    To Seller's knowledge, Seller has maintained the material buildings and improvements located on the Purchased Real Property consistent with normal practice, has not delayed any appropriate material maintenance.

(j)    There are no unpaid claims for labor, materials, or equipment on the Real Property as a result of any improvement, repairs or alterations for which a mechanic's lien or other claim could be filed by any Person that will be effective following Closing.

(k)    Seller has received all required authorizations required in connection with its use of the Purchased Real Property and all buildings, improvements and personal property thereon, except where a failure to obtain such Authorizations would not, individually or in the aggregate, have a material adverse effect on the Business or the Purchased Assets.

5.12    Other Personal Property.

(a)    Schedule 5.12(a) sets forth an accurate and complete list of all Furnishings and Equipment and Inventory.

(b)    Schedule 5.12(b) sets forth an accurate and complete list of all Deposits of the Seller.

(c)    Schedule 5.12(c) sets forth an accurate and complete list of all Receivables of the Seller.

5.13    Intellectual Property. Seller owns, has licenses to use, or otherwise possesses legally enforceable rights to use, all Intellectual Property, used or useable in connection with the Business or necessary for the conduct of the Business as presently conducted.  Seller is not, and during the three (3)

year period prior to the Effective Date has not been, a party to any action, nor are there, or during the one (1) year period prior to the Effective Date have there been, any actions, or to Seller's knowledge, threatened, alleging infringement, misappropriation or other wrongful use or exploitation by Seller or challenging Seller's ownership, use, validity, or enforceability, of any Intellectual Property, nor, to the Knowledge of Seller, is there any reasonable basis therefor. To the Knowledge of Seller, Seller has not infringed upon or otherwise violated the intellectual property rights of third parties or received any Claim, complaint, demand or notice alleging any such infringement or violation, or knows of any basis for any such Claim.

     5.14    Contracts.

    (a)    Schedule 5.14(a) is an accurate and complete list of Personal Property Leases.

    (b)    Schedule 5.14(b) is an accurate and complete list of all Other Contracts.

    (c)    Schedule 5.14(a) and Schedule 5.14(b) together constitute an accurate and complete list of all of the Seller's Contracts. True and complete copies of each such written Contract (and written summaries of the terms of any such oral Contracts, and oral modifications of any written Contract) have been delivered to Purchaser.

    (d)    Schedule 5.14(c) constitutes an accurate and complete schedule of the amounts that Seller reasonably believes are owed as Cure Costs of the Purchased Contracts.

    5.15    Business Permits. Schedule 5.15 is an accurate and complete list of all Business Permits and all such Business Permits are in full force and effect. No material violations are or have been committed in respect of any Business Permit and no proceeding is pending or threatened to revoke or limit any Business Permit. To the extent permitted by law, Seller has the power to assign such Business Permits.. Nothing set forth herein shall be deemed a representation as to the reclamation bond in connection with the Business, the status of which is uncertain as of the date of this Agreement.

    5.16    Employees and Labor Relations.

    (a)    Seller has no Benefit plans in effect.

    (b)    There are no labor disputes, material grievances, arbitration proceedings, or any material union organization activities, strikes or work stoppages pending, or to the Seller's Knowledge, threatened between Seller and any of its employees which will impair the Contemplated Transactions herein. None of the employees of Seller is represented by a labor union and Seller is not a party to any collective bargaining agreement. There are no unfair labor practice charges, complaints or proceedings pending or, to the Seller's Knowledge, threatened against or involving Seller. There are no representation proceedings pending and no labor organization or group of employees has made a demand for recognition which, to the Seller's Knowledge, will impair the Contemplated Transactions herein.

    (c)    Other than unpaid payroll taxes and related obligations disclosed in the bankruptcy documents on Schedule 5.16, to Seller's Knowledge, Seller is in compliance in all material respects with all applicable Laws relating to employment and employment practices, the employment of labor, and has not engaged in any unfair labor practice or unlawful employment practice. Other than certain claims asserted by the Department of Labor in the Bankruptcy Case, Seller has not received written or, to Seller's knowledge, oral notice of any employment-related

charge or complaint against Seller before the Equal Employment Opportunity Commission or the Department of Labor or any other Governmental Body.

(d)     To Seller's Knowledge, Seller has not implemented any plant closing or mass layoff of employees that could implicate the Worker Adjustment and Refraining Notification Act of 1988, as amended or any similar state, local or foreign laws (collectively, the "***WARN Act***"). To Seller's Knowledge, all previous reductions in workforce implemented by Seller has complied with the WARN Act.

5.17    ERISA; Seller Benefit Plans.

(a)     Seller has not had, and currently does not have, any Benefits Plan.

(b)     For purposes of this Agreement, "***Seller Benefit Plan***" means each "employee benefit plan" as defined in Section 3(3) of ERISA and each other plan, policy, program, agreement, understanding and arrangement (whether written or oral) providing compensation or other benefits to any current or former director, officer, employee or consultant (or to any dependent or beneficiary thereof) of Seller which is now or has been maintained, sponsored or contributed to by Seller or under the terms of which Seller has or is reasonably likely to have any obligation or liability, whether actual or contingent, including, without limitation, all employment, consulting, severance, termination, incentive, bonus, deferred compensation, retirement, pension, savings, profit sharing, retention, change in control, vacation, holiday, cafeteria, medical, disability, life, accident, fringe benefit, welfare and stock-based compensation plans, policies, programs, agreements, understandings or arrangements.

(c)     Notwithstanding anything to the contrary contained in this Agreement, Purchaser is not assuming any Seller Benefit Plan or any other plan referenced in this Section 5.17.

5.18    Environmental Matters.  Seller has provided Purchaser with copies of all material documents and reports in its possession or control describing or otherwise relating to past or present events, conditions, circumstances, activities, practices, incidents, agreements, actions or plans which have given rise to or would be reasonably likely to give rise to any material Liability of Seller under Environmental Laws and any material environmental Liability that would adversely affect the value of the Purchased Assets.  To Seller's Knowledge, Seller is in material compliance with all Environmental Laws, which compliance includes the possession by Seller of all Business Permits and other governmental authorizations required under applicable Environmental Laws for the operation of the Business, and compliance with the terms and conditions thereof.  Other than documents provided to Purchaser, to Seller's Knowledge, Seller has not received any written notice not subsequently resolved with respect to the Business of, or any property owned or leased by, Seller from any Governmental Body or third party alleging that the Seller is not in compliance with or subject to any Liability under any Environmental Laws.  Except for releases authorized under or pursuant to Environmental Laws, or Business Permits issued thereunder, to Seller's Knowledge, there has been no release of any Hazardous Substance in excess of a quantity for which a report is required under Environmental Laws, on any real property of the Seller in connection with the Business.  To Seller's Knowledge, Seller is not liable for any costs, obligations, penalties, fines or forfeitures for failure to comply with any Environmental Laws or necessary to achieve or maintain compliance with Environmental Laws, other than such costs in the ordinary course of business, or with respect to any environmental conditions or any release or presence of any Hazardous Substance, nor is Seller required to remedy any such existing condition or remove any Hazardous Substance from Seller's real property.

5.19    Insurance.   Schedule 5.19 sets forth a list of all policies or binders of fire, liability, product liability, workers' compensation, vehicular and other insurance held by or on behalf of the Seller.  To Seller's Knowledge, such policies or binders are valid and binding in accordance with its terms, are in full force and effect, and insure against risks and Liabilities specific to the respective policies to an extent and in a manner customary in the industry in which the Seller operates.  Seller is not in default with respect to any post-petition provisions contained in any such policy or binder nor, to Seller's Knowledge, has Seller failed to give any notice or present any Claims under any such policy or binder in due and timely fashion.  Except as set forth on Schedule 5.19, there are no outstanding unpaid Claims for which the administrator of the Seller's insurance policies or the Seller has established a reserve in excess of $50,000 under any such policy or binder, and Seller has not received any notice of cancellation or non-renewal of any such policy or binder.  Except as set forth on Schedule 5.19, Seller has not received any written notice from any of its insurance carriers or any Governmental Body that any insurance premiums will or may be materially increased in the future or that any insurance coverage listed on Schedule 5.19 will or may not be available in the future on substantially the same terms as now in effect, and to the Seller's Knowledge, there is no basis for the issuance of any such action.

5.20    Transactions with Related Parties.   No officer, director or shareholder of Seller, or officer, director, partner, manager or relative of any such officers, directors and shareholders, has with respect to the Business or the Purchased Assets (a) loaned money or other property to Seller that has not been repaid or returned which may impair the Contemplated Transactions herein, (b) any contractual relationship or other claims, express or implied, of any kind whatsoever against Seller which may impair the Contemplated Transactions herein, or (c) any interest in any of the Purchased Assets which may impair the Contemplated Transactions herein.

5.21    Complete Copies of Materials.   Seller has delivered or made available true and complete copies in all material respects of each document listed on the Schedules attached hereto.

5.22    Broker's or Finder's Fees.   No agent, broker, person or firm acting on behalf of Seller is, or will be, entitled to any commission or broker's or finder's fees from Purchaser in connection with the Contemplated Transactions, other than Gary Post, who is not an employee, officer, director or insider of Seller, and whose fees, if any, shall not be paid from, and will have no bearing on, any consideration provided for under this Agreement.  To the extent applicable, Purchaser shall pay Gary Post any fees.

5.23    Liabilities Under Purchased Contracts.   Seller is not aware of any Liabilities under any Purchased Contracts, except as expressly set forth in the Purchased Contracts.

5.24    No Management Agreement.   There is no management agreement in effect with respect to the operation of the Business which may impair the Contemplated Transactions herein.

5.25    Taxes.   Except as set forth on Schedule 5.25, to Seller's Knowledge, there is no action, suit, investigation, audit, claim or assessment pending or proposed or threatened with respect to Taxes of the Business and the Purchased Assets, and, to Seller's Knowledge, no basis exists therefore which may impair the Contemplated Transactions herein; (ii) Seller has not waived any statute of limitations in respect of Taxes associated with the Business and the Purchased Assets which waiver is currently in effect; and (iii) none of the Purchased Assets is properly treated as owned by persons other than Seller for income Tax purposes.

5.26    Purchased Contracts.   Seller has made available to Purchaser true, correct and complete copies of all Purchased Contracts, together with all modifications and supplements thereto. To Seller's Knowledge, each of the Purchased Contracts is in full force and effect in accordance with its

21

terms. Except as set forth in <u>Schedule 5.26</u>, Seller is not in breach of any of the material provisions of any material Purchased Contract, nor, to the knowledge of Seller, is any other party to any material Purchased Contract in default thereunder, nor does any event or condition exist which with notice or the passage of time or both would constitute a material default thereunder.

5.27   <u>Affiliate Transactions</u>.   Except as set forth on <u>Schedule 5.27</u>, no Affiliate of Seller and no employee, officer or director of Seller or any of its Affiliates (a) owns, directly or indirectly, in whole or in part, any Permits, real property, leasehold interests or other property, the use of which is necessary for the operation of the Business, (b) has any claim or cause of action or any other action, suit or proceeding against, or owes any amount to Seller related to the Business which would impair the Contemplated Transactions herein, or (c) is a party to any contract related to the Business pursuant to which Seller provides to, or receives services from, any such Person, except as to any such individual in his or her capacity as a Business employee.

5.28   <u>All Material Information</u>.   No representation or warranty made herein by Seller and no statement contained in any schedule or certificate furnished or to be furnished to Purchaser by Seller in connection with the transactions contemplated by this Agreement contains or shall contain an untrue statement of a material fact or omits to state any material fact necessary in order to make any representation, warranty, or other statement of Seller not misleading.

## 6.   **Purchaser's Warranties and Representations.**

In addition to the representations and warranties contained elsewhere in this Agreement, Purchaser hereby makes the following representations and warranties to Seller:

6.1   <u>Organization</u>.   Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.   Purchaser has all requisite limited liability company power and authority to own, lease and operate its properties, execute and deliver this Agreement, and to perform its obligations hereunder and consummate the Contemplated Transactions.

6.2   <u>Validity and Enforceability</u>.   This Agreement has been duly executed and delivered by Purchaser and constitutes the valid and binding obligation of Purchaser enforceable against it in accordance with its terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other laws (whether statutory, regulatory or decisional), now or hereafter in effect, relating to or affecting the rights of creditors generally or by equitable principles (regardless of whether considered in a proceeding at law or in equity).

6.3   <u>No Conflict</u>.   The execution, delivery and performance of this Agreement and all writings relating hereto by Purchaser have been duly and validly authorized.   The execution and delivery of this Agreement, the consummation of the Contemplated Transactions, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Purchaser do not and will not: (i) conflict with or result in a breach of the certificate of formation or limited liability company agreement of Purchaser; (ii) violate any Legal Requirement; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Purchaser is a party or by which Purchaser or its assets or properties may be bound.

6.4   <u>Broker's or Finder's Fees</u>.   No agent, broker, person or firm acting on behalf of Purchaser is, or will be, entitled to any commission or broker's or finder's fees from Seller in connection with the Contemplated Transactions.

6.5     _Financial Wherewithal_.   Purchaser has the financial ability or financial commitments to pay all accounts required to be paid by Purchaser under this Agreement.

6.6     _Approvals and Consents_.   No Consent by, or declaration, filing or registration with, any Governmental Body or any other Person is required to be made or obtained by Purchaser in connection with the execution, delivery and performance of this Agreement by Purchaser and the consummation of the Contemplated Transactions, except for Consents by, or declarations or filings with, the Bankruptcy Court.

**7.     "AS IS" Transaction.**   Purchaser hereby acknowledges and agrees that, except only as expressly provided in this Agreement, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets, including, without limitation, the transferability of the Purchased Assets or any portion thereof, the terms, amount, validity, collectability or enforceability of the Receivables or any Assumed Liabilities or Seller's Contract, the merchantability or fitness of the Furnishings and Equipment, the Inventory or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating to the Purchased Assets or any portion thereof.   Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions the Purchased Assets and all such other matters relating to or affecting or comprising the Purchased Assets and/or the Assumed Liabilities as Purchaser deemed necessary or appropriate and that in proceeding with the Contemplated Transactions, except for the representations set forth in this Agreement. Purchaser is purchasing the Purchased Assets based upon this Agreement and such independent inspections and investigations. Accordingly, except only for the express representations set forth in this Agreement, Purchaser will accept the Purchased Assets at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS."

**8.     Covenants and Agreements Regarding Bankruptcy.**

8.1     _Bankruptcy Court Approvals_.   Not later than two (2) business days after execution of this Agreement by all parties hereto, Seller shall make a motion (the "***Sale Motion***") for the Sale Order.  Following the filing of the Sale Motion, Seller shall use best efforts to obtain the Sale Order.

8.2     _Cooperation; Efforts_.   Seller and Purchaser shall use their reasonable best efforts to cooperate, assist and consult with each other to procure the entry of the Sale Procedures Order and the Sale Order (together with the Sale Procedures Order, the "***363/365 Orders***") as promptly thereafter as practicable, provided that Seller is not required to obtain the Sales Procedure Order prior to the hearing on the Sale Motion but that the procedures contemplated by this Agreement may be sought in connection with the Sale Motion, in each case in a form and substance acceptable to Purchaser in its reasonable discretion. Without limiting the generality of the foregoing, Seller shall (i) comply with all requirements under the Bankruptcy Code and Federal Bankruptcy Rules in connection with obtaining the 363/365 Orders, and (ii) comply or cause the compliance with the notice requirements of the 363/365 Orders and any other applicable Final Order of the Bankruptcy Court as they relate to the Case, the Federal Bankruptcy Rules (including, without limitation, Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure) and any applicable rules of the Bankruptcy Court with respect to the transactions contemplated by this Agreement. In the event that the 363/365 Orders or any other Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any party (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Seller and Purchaser will cooperate in taking such steps diligently to defend against such appeal, petition or motion and Seller and Purchaser shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion.

Notwithstanding anything to the contrary herein, however, nothing shall be deemed to prohibit or otherwise restrain Purchaser from making any filing in the Bankruptcy Court to challenge or object to the entry of a Final Order by the Bankruptcy Court approving the entry by Seller into an Alternative Sale Transaction (as defined in <u>Section 16</u> below).

8.3    <u>Overbid Protection</u>.  The Sale Procedures Order, or other Order that addresses bid procedures with respect to the Contemplated Transactions and Alternative Sale Transactions, shall contain the following overbid protections: (i) a higher bid will not be considered by Seller unless such bid includes the satisfaction (through cash payment, assumption to be agreed to with the respective creditor, or otherwise so that Seller's estate has no further liability with respect to such claim(s)) of all secured, administrative, unsecured priority claims (the "***Initial Overbid***") plus the Expense Reimbursement ($200,000); and the Break-Up Fee ($600,000); (ii) any bids thereafter must be higher than the then existing highest or better bid (as determined in the reasonable discretion of Seller) by at least $200,000 ((i) and (ii) constituting, as applicable, a "***Qualifying Bid***").  For purposes of computation of the Initial Overbid only and for no other purposes whatsoever with respect to this Agreement, the Cases, or otherwise, the Parties agree that the combined amount of the Loans, Additional Transactions and DIP Loans subject to the Assumed Liability shall be deemed to be $65,000,000 and that any Qualified Bid is required to satisfy the Loans, Additional Transactions and DIP Loans in the total amount of $65,000,000 and not the amounts owed as of the Effective Date pursuant to such Loans, Additional Transactions and DIP Loans set forth in <u>Section 2.2</u> above, *provided, however*, that the Initial Overbid must also include the other amounts set forth in <u>Sections</u> <u>2.1</u> and <u>2.2</u> above in addition to such assumption of the Loans, Additional Transactions and DIP Loans.  Not later than seven (7) days prior to the hearing on the Sale Motion, each bidder (the "***Bidder***") will submit to Seller (i) two marked copies of this Agreement marked to show changes from this Agreement for Bidder's bid; and (ii) $500,000 deposit in cash or cash-equivalent to be maintained in Seller's counsel's trust account pending the conclusion of the hearing on the Sale Motion and entry of the Final Orders, which funds shall not be refundable to Bidder unless Bidder is not the successful bidder at the hearing on the Sale Motion.

8.4    <u>Expense Reimbursement</u>.  If Seller (i) determines that a Qualifying Bid (or Bids) (which is not Purchaser's bid) is the superior bid, and (ii) executes a definitive agreement embodying such superior bid, and in the event that the Bankruptcy Court enters a Final Order approving Alternative Sale Transaction and such Alternative Sale Transaction is consummated, Seller shall pay to Purchaser from the proceeds of such Alternative Sale Transaction an amount equal to all of the out-of-pocket expenses, up to a total of Two Hundred Thousand Dollars ($200,000) incurred by Purchaser or its Affiliates in connection with the transactions contemplated by this Agreement (the "***Expense Reimbursement***").  These amounts are intended to compensate Purchaser for the time and expense dedicated to this transaction and the value added by Purchaser in (i) establishing a bid standard or minimum for other bidders, (ii) placing the Seller's estate in a position to attract other bidders to the auction and (iii) for serving, by its name and its expressed interest, as a catalyst for other potential or actual bidders. The Expense Reimbursement shall constitute an administrative priority claim against the Seller's estate under Sections 503(b) and 507(a)(1) of the Bankruptcy Code and shall be paid at the closing of such Alternative Sale Transaction.

8.5    <u>Break-up Fee.</u>  If there is an auction and Seller (i) determines that a Qualifying Bid (or Bids) (which is not Purchaser's bid) is the superior bid, and (ii) executes a definitive agreement embodying such superior bid, and in the event that the Bankruptcy Court enters a Final Order approving Alternative Sale Transaction (as defined below in <u>Section 16</u>) and such Alternative Sale Transaction is consummated, Seller shall pay to Purchaser from the proceeds of such Alternative Sale Transaction a break-up fee in the amount of Six Hundred Thousand Dollars ($600,000) (the "***Break-Up Fee***").  The Break-Up Fee shall be free and clear of all claims, liens and interests in or on the property of the Seller or the bankruptcy estate of Seller.

8.6    <u>Notification</u>.  Seller shall keep Purchaser informed on a current basis of all proposals or offers from any Person for a possible transaction involving the Business, any of the Purchased Assets or the stock of Seller or any other Person that owns, directly or indirectly, any interest in the Purchased Assets. Seller shall promptly provide (but in any event within two (2) days after receipt thereof) Purchaser with written copies of any such proposals or offers and/or a written description of all oral offers (including all material terms and the identity of the proponent of such proposal or offer).

8.7    <u>Assignment of Rights</u>.  If, in connection with the auction or sale referred to in the Sale Procedures Order, Seller or any of its Affiliates enter into confidentiality or similar agreements with any Person, Seller shall assign all rights under those agreements to the extent relating to the Business to Purchaser at the Closing.

**9.**    <u>**Commercially Reasonable Efforts.**</u>  Subject to the terms and conditions of this Agreement:

9.1    During the period prior to Closing, Seller and Purchaser shall (a) use their commercially reasonable efforts (i) to cause the conditions in <u>Section 4</u> to be satisfied, (ii) to deliver or cause to be delivered at the Closing the items to be delivered by Seller and Purchaser pursuant to <u>Section 3.2</u> and <u>Section 3.3</u>, and (iii) to take all other actions to consummate the Contemplated Transactions, and (b) not take any action that will have the effect of unreasonably delaying, impairing or impeding the receipt of any authorizations, Consents, or Orders to be sought pursuant to this Agreement.

9.2    From and after the Closing, Seller and Purchaser shall use commercially reasonable efforts to deliver or cause to be delivered such additional documents and other papers and to take or cause to be taken such further actions as may be necessary, proper or advisable to make effective the Contemplated Transactions and to carry out the provisions hereof.

9.3    From and after the Closing, Purchaser and Seller shall reasonably cooperate in the transition of the Business from Seller to Purchaser, provided that neither Party shall be required to expend other than nominal unreimbursed costs in providing such cooperation.

**10.**    <u>**Conduct Pending Closing.**</u>

10.4    Except with the prior written consent of Purchaser, as otherwise contemplated or permitted by this Agreement or as required by the Bankruptcy Code, from the Effective Date until the Closing Date, Seller shall operate the Business in the ordinary course of business (taking into account Seller's status as debtors-in-possession), comply with all Legal Requirements applicable to the operation of its business and preserve its present business organization intact.  From the Effective Date until the Closing Date, Seller shall use commercially reasonable efforts to:

(a)    maintain in full force and effect the Business Permits in all material respects;

(b)    maintain all of the Purchased Assets in a manner consistent with past practices, reasonable wear and tear excepted and maintain the types and levels of insurance currently in effect in respect of the Purchased Assets;

(c)    upon any damage, destruction or loss to any Purchased Assets, apply any insurance proceeds received with respect thereto to the prompt repair, replacement and restoration thereof to the condition of such Purchased Assets before such event or, if required, to such other

(better) condition as may be required by applicable Legal Requirements, in each case in compliance with the other provisions of this Agreement; and

> (d) consult with Purchaser on all material aspects of the Business as may be reasonably requested from time to time by Purchaser, including, but not limited to, personnel, accounting and financial functions.

10.5 Except as otherwise contemplated or permitted by this Agreement, from the Effective Date until the Closing Date, Seller shall not, without the prior written consent of Purchaser or order of the Bankruptcy Court:

> (a) Enter into any new Seller's Contracts or terminate or amend any of the Seller's Contracts (or execute any amendments or modifications to any Seller's Contracts), or cancel, modify or waive any claims held in respect of the Purchased Assets or waive any material rights of value;

> (b) do any act or fail to do any act that will cause a material breach or default in any of the Seller's Contracts;

> (c) sell, transfer or otherwise dispose of any of the Purchased Assets except in the ordinary course of business, consistent with past practices;

> (d) modify any of its Business practices from those in place on the date hereof,

> (e) change management or control of Seller or permit a change of management or change of control of Seller or Copper King;

> (f) hire any person that would be a Transferred Employee under this Agreement;

> (g) make or rescind any material Tax election or take any material Tax position (unless required by law) or file any Tax Return or change its fiscal year or financial or Tax accounting methods, policies or practice, or settle any Tax Liability, except in each case as would not reasonably be expected to materially affect  Purchaser;

> (h) modify, rescind or terminate a material Business Permit, allowance, or credit (or application therefor) relating to the Business or the Purchased Assets;

> (i) dispose of or fail to keep in effect any material rights in, to, or for the use of any of the Intangible Property Assets, except for rights which expire or terminate in accordance with their terms;

> (j) subject its assets to any material Encumbrances (excluding any real property taxes and easements);

> (k) directly or indirectly make any dividend or other distribution to shareholders or repurchase or reacquire any equity interests;

> (l) issue any purchase order for goods or services in excess of $50,000;

(m)     incur any Indebtedness in excess of $50,000, except any debtor-in-possession financing that would constitute an Assumed Liability;

(n)     distribute any Deposits to Seller;

(o)     settle any Claims, unless consented to by Purchaser or such settlements do not increase the Purchase Price hereunder; or

(p)     authorize any of the foregoing, or commit or agree to take actions, whether in writing or otherwise, to do any of the foregoing.

10.6     Seller shall promptly inform Purchaser in writing of the occurrence or non-occurrence of any event actually known by Seller which would cause any condition set forth in <u>Section 4.2</u> not to be satisfied or the breach of any covenant hereunder by Seller.

10.7     Purchaser and Purchaser's financial advisors, legal counsel, accountants, consultants, financing sources and other authorized representatives shall be authorized and entitled, in Purchaser's discretion, to contact and to enter into discussions and negotiate with Seller's lessors, lenders, bankers, vendors, suppliers, strategic business partners and other third parties, including but not limited to Governmental Bodies, regarding the Contemplated Transactions and Purchaser's potential business relationships with such persons following the Closing, and Seller shall provide contact information and other reasonable cooperation to Purchaser in connection with such activities.   From the date of this Agreement through the Closing Date, Seller shall afford Purchaser and such persons reasonable access during ordinary business hours to the Property (for inspection purposes) and to Seller's employees, consultants and independent contractors and to all the books and records of Seller relating to the Business or to the assets or Liabilities of Seller and shall furnish to Purchaser and such persons, as promptly as practicable, all other information as Purchaser or any of such persons may reasonably request in furtherance of the Contemplated Transactions; *provided, however*, that no investigation pursuant to this <u>Section 10.4</u> shall affect any representations or warranties made herein or the conditions herein to the obligations of the parties to consummate the Contemplated Transactions.

10.8     Each Party agrees that it will not make any public announcement or issue any press release or respond to any press inquiry with respect to this Agreement or the Contemplated Transactions without the prior approval of the other Party (which approval will not be unreasonably withheld), except as may be required (i) by any applicable Legal Requirement, or (ii) to administer the Case.

## 11.     <u>Employee Matters.</u>

11.9     Purchaser may make offers of employment to some of the employees of Seller employed as of the Closing Date.   Such offers shall provide for base salary or hourly wage rate, as applicable, and other compensation as Purchaser shall determine at its sole discretion.   Seller shall (i) cooperate with and use its reasonable commercial efforts to make reasonably accessible to Purchaser those employees of Seller to whom Purchaser anticipates making offers of employment and (ii) assist Purchaser in its efforts to secure satisfactory employment arrangements with those employees of Seller. Effectively immediately prior to the Closing, Seller shall terminate the employment of all employees of Seller and pay said employees all accrued salaries, vacation pay, accrued sick pay, accrued holiday pay and any other accrued benefits and Purchaser shall not have any obligations with respect thereto. Purchaser has disclosed to Seller that Purchaser intends to offer employment to the following employees who are insiders of Seller, as that term is defined in the Bankruptcy Code:  David McMullin.

11.10   Seller shall be solely liable for complying with the WARN Act and any and all comparable state law obligations, including without limitation, the and comparable Utah or Nevada Laws (and for any failures to so comply), in any case, applicable to employees of Seller for any reason (including, for the avoidance of doubt, any employees of Seller who are not offered employment with Purchaser and/or who do not accept and commence employment with Purchaser).

11.11   Any employment opportunity offered by Purchaser may be "at will" and may be terminated by Purchaser or any of its affiliates at any time for any reason.  Nothing in this Agreement shall: (i) be deemed to prevent or restrict in any way the right of Purchaser to terminate, reassign, promote or demote any of the Transferred Employees after the Closing or to change the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such Transferred Employees; (ii) create any third-party rights in any Transferred Employees or any current or former employees or other service providers of Seller (or any beneficiaries or dependents of the foregoing); or (iii) obligate Purchaser or any of its affiliates to offer any employment opportunity to any employee of Seller or adopt or maintain any employee benefit plan or other compensatory arrangement at any time.

11.12   Seller shall be solely liable for all wages, remuneration and other Liabilities, whether actual or contingent: (i) associated with any employee or other service provider of Seller (or any dependent thereof) who does not become a Transferred Employee, including in connection with any termination of any such service relationship; (ii) that arise in connection with any Transferred Employee (or any dependent thereof) on or prior to the Closing Date (including any lawsuits filed by any such Transferred Employees); and (iii) that arises with respect to any Seller Benefit Plan at any time.  Without limiting the generality of the foregoing, Purchaser shall not, at any time, have any obligation or liability with regard to any wages, benefits, severance, retention, employment, change-of-control, pension, retirement, equity or other plan, program, policy or agreement of or with Seller.

## 12.   **Additional Agreements.**

12.1   Taxes.

(a)   Seller shall be liable for all Taxes (whether assessed or unassessed) applicable to the Business or the Purchased Assets through the Closing Date, except as otherwise set forth in this Agreement.  Purchaser covenants to pay any and all Transfer Taxes, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties; provided that Seller shall use reasonable best efforts to have all Transfer Taxes exempted pursuant to the Sale Order. Purchaser shall be liable for and covenants to pay any and all Loss and Expense incurred by any of them in connection with or arising from, all Taxes (whether assessed or unassessed) applicable to the Business or the Purchased Assets, in each case attributable to periods (or portions thereof) beginning on or after the Closing Date; provided, however, that Purchaser shall not be liable for or pay, and shall not indemnify or hold harmless Seller, its Affiliates, directors, officers, employees or agents from and against, any Taxes for which Seller is liable under this Agreement, including without limitation, pursuant to the first sentence of this Section 12.1 or other provisions of this Agreement. For purposes of this Section 12.1, any Straddle Period shall be treated on a "closing of the books" basis as two partial periods, one ending at the close of the Closing Date and the other beginning on the day after the Closing Date, except that Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis

(b)   Seller or Purchaser, as the case may be, shall provide reimbursement for any Tax paid by one party all or a portion of which is the responsibility of the other party in

accordance with the terms of this Section 12.1. Within a reasonable time prior to the payment of any such Tax, the party paying such Tax shall give notice to the other party of the Tax payable and the portion which is the liability of each party, although failure to do so will not relieve the other party from its liability hereunder.

(c)     After the Closing Date, each of Seller and Purchaser shall (and cause their respective Affiliates to) at each party's own expense: (i) assist the other party in preparing any Tax Returns which such other party is responsible for preparing and filing; (ii) cooperate fully in preparing for any audits of, or disputes with taxing authorities regarding, any Tax Returns of the Business or the Purchased Assets; (iii) make available to the other and to any taxing authority as reasonably requested all information, records, and documents relating to Taxes of the Business or the Purchased Assets; (iv) provide timely notice to the other in writing of any pending or threatened Tax audits or assessments relating to Taxes of the Business or the Purchased Assets for taxable periods for which the other may have a liability under this Section 12.1; and (v) furnish the other with copies of all correspondence received from any taxing authority in connection with any Tax audit or information request with respect to any such taxable period. Any returns or reports with respect to Transfer Taxes that are required to be filed shall be prepared and, to the extent Seller is permitted by law or administrative practice, filed by Seller when due.

(d)     Seller and Purchaser shall each comply with all of their respective requirements and obligations under state tax bulk sales or similar laws that apply when a person sells some or all of its assets; provided that the receipt of a tax clearance certificate shall not be a condition of Closing and, further, provided that any tax obligation related to such transaction shall be paid by Purchaser.

(e)     Notwithstanding anything to the contrary in this Agreement, the obligations of the parties set forth in this Section 12.1 shall be unconditional and absolute and shall remain in effect without limitation as to time.

12.2     Access.  Upon reasonable notice, Seller, each of its directors, officers, agents and employees shall afford Purchaser and its representatives reasonable access during regular business hours from the date hereof through the Closing to the Purchased Real Property and any and all properties, contracts, books, records, data and personnel of Seller relating to the Business. Seller shall afford to Purchaser and its representatives reasonable access to and an opportunity to speak with any third parties to the Purchased Contracts. Seller, its directors, officers, agents and employees shall cooperate in connection with the foregoing. Seller shall provide to Purchaser such information and documents concerning the Business as reasonably may be requested by Purchaser. In exercising its rights under this Section 12.2, Purchaser shall not unreasonably interfere with Seller's Business and shall coordinate the exercise of such rights through Seller.

12.3     Consent of Third Parties; Regulatory and Other Authorizations.

(a)     Seller will act diligently and reasonably to obtain before the Closing Date, each consent, approval or waiver, in form and substance reasonably satisfactory to Purchaser, required to be obtained prior to Closing; provided, that Seller shall not make any agreement or understanding affecting, in any material respect, the Business or the Purchased Assets as a condition for obtaining any such consents or waivers except with the prior written consent of Purchaser, which consent shall not be unreasonably withheld. During the period prior to the Closing Date, Purchaser shall use commercially reasonable efforts to cooperate with Seller to obtain the consents, approvals and waivers contemplated by this Section 12.3.

(b)    During the period prior to the Closing Date, Seller and Purchaser shall use commercially reasonable efforts, and shall cooperate with each other, to (1) obtain any consents and approvals of any Governmental Body required to be obtained by them in order to permit the consummation of the transactions contemplated hereby or (2) otherwise satisfy the conditions set forth in Sections 3.2, 3.3 and 4; provided, that Seller shall not make any agreement or understanding affecting, in any material respect, the Business or the Purchased Assets as a condition for obtaining any such consents or waivers or satisfying the conditions set forth in Sections 3.2, 3.3 and 4 except with the prior written consent of Purchaser, which consent shall not be unreasonably withheld.

12.4    Avoiding Abandonment.

(a)    Provided that Purchaser indemnifies and holds harmless Seller for all actions or failures to act, as the case may be, after the Closing, Seller hereby authorizes Purchaser to operate under each Business Permit related to the Business after the Closing, to the extent permitted by applicable law, rule or regulation and to the extent necessary to enable Purchaser to conduct the Business while Purchaser seeks to replace any non-transferable Business Permit. Seller will take all steps reasonably necessary to maintain its authorizations under the Business Permits that Purchaser operates under during the period between Closing and the issuance of Purchaser's own Permits and Seller will cooperate with Purchaser in preparing and submitting any applications that must be submitted by Purchaser.

(b)    Prior to the Closing, Seller agrees to use commercially reasonable efforts as may be requested by Purchaser to assist Purchaser in (i) obtaining all Business Permits as may be necessary for Purchaser to conduct the Business (including, taking all steps reasonably necessary to relinquish the Business Permits) and (ii) making such Business Permits effective as of the Closing Date or as promptly thereafter as is practicable.

(c)    Seller shall execute a power of attorney, in form and substance reasonably acceptable to the parties, authorizing Purchaser to operate the Business under the Business Permits (the "**Power of Attorney**") and such other powers of attorney and other agreements, assignments, amendments, addenda and other documents as may be necessary to enable Purchaser to conduct the Business, in each case as are reasonably requested by Purchaser.

(d)    During the term of the Purchased Contracts and any extensions, Seller will not take or fail to take any action under the Purchased Contracts that would impair the ability of Seller to perform its obligations under the Purchased Contracts.

12.5    Releases.  Seller acknowledges that the terms and conditions of this Section 12.5 are a condition to Purchaser's obligation to purchase the Purchased Assets pursuant to this Agreement and that Purchaser is relying on the release set forth in this Section 12.5 in consummating such purchase. Effective as of the Closing Date, Seller hereby releases and forever discharges Purchaser, SMP, and their Affiliates, and each of their respective individual, joint or mutual, past, present and future directors, officers, members, managers, Affiliates, stockholders, controlling persons, successors and assigns (individually, a "**Releasee**" and collectively, "**Releasees**") from any and all claims, demands, proceedings, causes of action, orders, obligations, contracts, agreements, debts and liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which Seller or any of its Affiliates now has, has ever had or may hereafter have against the respective Releasees arising contemporaneously with or prior to the Closing Date or on account of or arising out of any matter, cause or event occurring contemporaneously with or prior to the Closing Date, including, but not limited to, any Avoidance Actions, any rights under any of the documents evidencing the Assumed Liabilities or with

30

respect to the Case, whether pursuant to their respective organizational documents, contract, Bankruptcy law or otherwise and whether or not relating to claims pending on, or asserted after, the Closing Date; provided, however, that nothing contained herein shall operate to release any obligations of Purchaser arising under the Agreement. Seller hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any proceeding of any kind against any Releasee, based upon any matter purported to be released hereby. Further, Seller shall obtain a Final Order, or include in the Sale Order, that applies the provisions and releases hereof to any and all third parties that may assert any such claims or actions or any other actions on Seller's behalf or in place of Seller; the foregoing shall be a condition to Seller's obligation to complete the Contemplated Transactions. If any provision of this <u>Section 12.5</u> is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this <u>Section 12.5</u> will remain in full force and effect. Any provision of this <u>Section 12.5</u> held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

      12.6   <u>Schedules</u>.  The Parties have completed the Schedules attached hereto as accurately and completely as possible as of the Effective Date. If the Parties or Purchaser determines that the Schedules are incomplete or inaccurate in any respect prior to Closing, the Parties shall amend the Schedules prior to Closing to correct such incomplete or inaccurate Schedule(s), as approved by and is acceptable to Purchaser, and subject to applicable Bankruptcy Law and Final Orders of the Bankruptcy Court.

## 13.   <u>Termination.</u>

      13.1   <u>Termination by Mutual Consent</u>.  This Agreement may be terminated at any time prior to the Closing Date by mutual written agreement of the Parties.

      13.2   <u>Termination by Either Purchaser or Seller</u>.  This Agreement may be terminated at any time prior to the Closing Date by either Purchaser or Seller if any Governmental Body shall have issued a Final Order permanently restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions and either (i) thirty (30) days shall have elapsed from the issuance of such Final Order and such Final Order has not been removed or vacated.

      13.3   <u>Termination by Seller</u>.  This Agreement may be terminated at any time prior to the Closing Date by Seller as follows:

      (a)   if there has been a material breach by Purchaser, which Purchaser has failed to cure within fifteen (15) days following its receipt of written notice thereof from Seller;

      (b)   if any condition precedent of Seller specified in <u>Section 4.1</u> shall not have been satisfied or waived and shall have become impossible to satisfy, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Seller; or

      (c)   if the Closing Date shall not have occurred on or before 5:00 p.m. Pacific time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Seller's failure to meet its obligations hereunder, including without limitation using all diligent and commercially reasonable efforts to obtain approval of the Sale Order by the dates set forth herein.

      13.4   <u>Termination by Purchaser</u>.  This Agreement may be terminated at any time prior to the Closing Date by Purchaser as follows:

(a)     if there has been a material breach by Seller, which Seller has failed to cure within five (5) days following its receipt of written notice thereof from Purchaser;

(b)     if any condition precedent of Purchaser specified in <u>Section 4.2</u> shall not have been satisfied or waived or, in the reasonable judgment of Purchaser, shall have become reasonably unlikely to be satisfied, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Purchaser;

(c)     if the Bankruptcy Court enters any Final Order confirming any Chapter 11 Plan or approving any transaction involving either:  (a) the consummation of the sale of all, or any portions which, in the aggregate, involve substantially all, of the Business by the Seller to a purchaser other than the Purchaser and/or one or more of its Affiliates, at any time during the pendency of the Case or as a part of, or pursuant to, any plan of reorganization confirmed in the Case; or (b) the filing of a plan of reorganization by Seller in the Case that does not include a sale of all, or any portions of which in the aggregate involve substantially all, of the Business by the Seller to the Purchaser and/or one or more Affiliates of the Purchaser;

(d)     if the Sale Order shall not have been entered by 5:00 p.m. Mountain time on August 15, 2011;

(e)     if the Closing Date shall not have occurred on or before 5:00 p.m. Pacific time on the Outside Date;

(f)     if the Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if any trustee is appointed in the Cases;

(g)     if there is a change of management or control of Seller; or

(h)     if for any reason (other than Purchaser's failure to provide adequate assurance of future performance sufficient to satisfy the relevant requirements of Section 365 of the Bankruptcy Code) Seller shall be unable, or shall fail, to assume and assign to Purchaser at the Closing all Seller's material Contracts that are or become Purchased Contracts pursuant to <u>Section 1.3</u>.

13.5     <u>Effect of Termination</u>.   In the event of termination by either Party of this Agreement pursuant to this <u>Section 13</u>, written notice thereof shall as promptly as practicable be given to the other Party and thereupon this Agreement shall terminate and the Contemplated Transactions shall be abandoned without further action by the Parties hereto.  Upon termination of this Agreement, (a) except as provided in this <u>Section 13.5</u> this Agreement shall cease to have any force or effect, (b) the Parties shall not have any Liability to each other, except for fraud, breach of representation or warranty, or breach of contract arising on or before the date of such termination, and (c) the Parties under this Agreement shall cease to have any further obligations under this Agreement except pursuant to <u>Sections 13</u>, <u>15.1</u>, <u>15.9</u>, <u>15.15</u>, and <u>15.17</u> (as such obligations are affected by any defined terms contained herein relating thereto), (d) all filings, applications and other submissions made pursuant to the Contemplated Transactions shall, to the extent practicable, be withdrawn from the government authority or person to which made; and (e) the Purchaser Deposit shall be handled in accordance with <u>Section 2.1(c)</u>.

13.6     <u>Notification of Certain Events</u>.   Seller shall give notice to Purchaser promptly upon becoming aware of any occurrence, or failure to occur, of any event, which occurrence or failure to occur has caused or could reasonably be expected to cause any condition to the obligations of Purchaser

to effect the Contemplated Transactions not to be satisfied.  If Seller gives Purchaser a notice pursuant to this <u>Section 13.6</u>, then Purchaser shall be permitted to terminate this Agreement pursuant to <u>Section 13.4</u>.

**14.**    **Post-Closing Matters.**  From time to time following the Closing:

14.1    <u>Transferred Employee Records</u>.  To the extent consistent with applicable law and this Agreement, Seller shall make available to Purchaser such data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

14.2    <u>Further Assurances</u>.  Seller and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Seller and its successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Contemplated Transactions.

14.3    <u>Reasonable Access to Records and Certain Personnel</u>.  In order to facilitate Seller's efforts to administer and close the Case (including, without limitation, the preparation of filings in the Case and state, local and federal Tax Returns and other filings, reconciliation of claims filed in the Case, removal of corporate and other records and information relating or belonging to entities other than Seller), Purchaser shall, for a period of six (6) months following the Closing, permit Seller and their agents and other professionals employed in the Case to have a reasonable number of copies of the books and records of the Business existing as of the Closing Date for the purposes of the continuing administration of the Case (including, without limitation, the allowance or disallowance of any claims, the pursuit of any avoidance, preference or similar actions, and the preparation of final Tax Returns), which copies Purchaser shall deliver to such Person upon reasonable advance notice.

14.4    <u>Use of Intellectual Property</u>.  Following the Closing Date, Seller shall not use any Intellectual Property Assets included in the Purchased Assets in connection with any business activity.

14.5    <u>Brokerage Obligations</u>.  Seller and Purchaser each represent and warrant to the other that such Party has incurred no liability to any broker or agent with respect to the payment of any commission or other compensation regarding the consummation of the Contemplated Transactions for which the other Party could bear responsibility.  It is agreed that if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Purchaser or Seller in connection with this transaction by any Party, all such claims shall be handled and paid by the Party whose actions form the basis of such claim and such Party shall indemnify, defend (with counsel reasonably satisfactory to the Party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the Contemplated Transactions.

14.6    <u>Reasonable Preference to Prior Seller Service Providers</u>.  The holders of allowed claims of the unsecured creditors in the Seller's Case shall be provided by Purchaser a reasonable preference to provide Purchaser goods and services previously provided by such creditors to the Seller; provided that the Purchaser shall have reasonable discretion to select goods and services providers in the Purchaser's best business judgment, based on the price of bids and quality of goods and services.

33

15. **Miscellaneous.**

15.1   Attorneys' Fees.  In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, each Party in that action or proceeding shall bear its own attorneys' fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees).

15.2   Notices.  Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other shall be deemed effected upon personal delivery in writing, one Business Day after being dispatched by reputable overnight courier (e.g., FedEx), postage prepaid, or in the case of delivery by facsimile, as of the date of facsimile transmission (with answer back confirmation of such transmission).  Notices shall be addressed as set forth below, but each Party may change his address by written notice in accordance with this Section 15.2.

To Seller:      Western Utah Copper Company
                1208 South 200 West, Box 492
                Milford, Utah 84751
                Attn: Chief Executive Officer
                Facsimile:  435-387-5088

With a copy to (which shall not constitute notice):

                Levene, Neale, Bender, Yoo & Brill L.L.P.
                10250 Constellation Boulevard
                Suite 1700
                Los Angeles, CA  90067
                Attn:  Martin J. Brill, Esq.
                Facsimile:  (310) 229-1234

To Purchaser:   CS Mining, LLC
                500 S. Front St., Suite 1200
                Columbus, OH 43215
                Facsimile: (888) 846-2353

                Clarity Copper, LLC
                100 North Crescent Drive
                Beverly Hills, California 90210
                Attn: Clint Walker
                Facsimile: (310) 432-5000

With a copy to (which shall not constitute notice):

                Smith Knowles, P.C.
                4723 Harrison Blvd. #200
                Ogden, UT  84403
                Attn: M. Darin Hammond
                Facsimile: (801) 476-0399

15.3   Entire Agreement.  This Agreement and the documents to be executed pursuant hereto contain the entire agreement between the Parties relating to the sale of the Business.  Any oral

representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

15.4    Modification.  This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the Parties hereto which expressly indicates the intention to modify, amend or supplement this Agreement.

15.5    Severability.  Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

15.6    Captions.  All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

15.7    Further Assurances.  Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the Contemplated Transactions or the intentions of the Parties with respect thereto.

15.8    Waiver.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver; *provided, however,* that the Consent of a Party to the Closing shall constitute a waiver by such Party of any condition precedent to Closing not satisfied as of the Closing Date.

15.9    Payment of Fees and Expenses.  Except as provided in Section 15.1 above, each Party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the Contemplated Transactions.

15.10    Survival.  The respective representations and warranties of Purchaser and Seller under this Agreement shall lapse and cease to be of any further force or effect effective upon the Closing. Except as provided in the immediately preceding sentence, the covenants and agreements of Seller and Purchaser herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

15.11    Assignments.  This Agreement shall not be assigned by any Party hereto without the prior written consent of the other Party hereto, which consent the Parties may grant or withhold in their sole and absolute discretion, except that Purchaser may assign any or all of its rights or obligations to any of its Affiliates (provided, however, that in such instance, Purchaser shall remain liable for the Cash Component) and may collaterally assign any or all of its rights or obligations hereunder to a lender of Purchaser.

15.12    Binding Effect.  This Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties hereto.

15.13    Applicable Law.  This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and to the extent not inconsistent with the Bankruptcy Code, the law of the State of Utah applicable to contracts made and performed in such State.

15.14    Construction.    In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

15.15    CONSENT TO JURISDICTION.    THE PARTIES AGREE THAT THE BANKRUPTCY COURT (AS DEFINED HEREIN) SHALL BE THE EXCLUSIVE FORUM FOR ENFORCEMENT OF THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS AND (ONLY FOR THE LIMITED PURPOSE OF SUCH ENFORCEMENT) SUBMIT TO THE JURISDICTION THEREOF; PROVIDED THAT IF THE BANKRUPTCY COURT DETERMINES THAT IT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THEN EACH PARTY (A) AGREES THAT ALL SUCH ACTIONS OR PROCEEDINGS SHALL BE HEARD AND DETERMINED IN THE SUPERIOR COURT FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT (B) IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS IN ANY SUCH ACTION OR PROCEEDING, (C) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE VENUE OR JURISDICTION OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT, AND (D) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS AS PROVIDED IN SECTION 15.2 (PROVIDED THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY CALIFORNIA LAW).

15.16    Counterparts.    This Agreement may be signed in counterparts.    The Parties further agree that this Agreement may be executed by the exchange of facsimile or electronic pdf signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

15.17    Non-Recourse.    No past, present or future stockholder, director, officer, employee, or incorporator of Seller or Purchaser shall have any Liability for any Liability of Seller or Purchaser, as the case may be, under this Agreement or for any claim, counter-claim, cause of action or demand based on, in respect of, or by reason of, the Contemplated Transactions except for any claim against any individual based on the fraud or gross negligence of such individual in connection with any representations of Seller or Purchaser hereunder, as the case may be.

15.18    Time is of the Essence.    Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

15.19    Interpretation and Rules of Construction.    In this Agreement, except to the extent that the context otherwise requires:

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

(b)    the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)   whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)   the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)   all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)   the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)   any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

(h)   references to a person are also to its permitted successors and assigns; and

(i)   the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

15.20   <u>Third Party Beneficiaries</u>.  This Agreement is intended to be solely for the benefit of the Parties hereto and is not intended to confer, and shall not be deemed to confer, any benefits upon, or create any rights in or in favor of, any person or entity other than the Parties hereto, and their respective permitted assigns.

15.21   <u>Headings</u>.  The Section title and headings in this Agreement are and shall be without substantive meaning or context of any kind whatsoever and are for convenience of reference only.

15.22   <u>Board Liability</u>.  The new board of directors of Seller as of the time of the execution of this Agreement shall not be liable for the representations and warranties of Seller made in this Agreement.

**16.**   **<u>Definitions</u>.**  In addition to the other terms defined elsewhere in this Agreement, for the purposes of same, the following words and terms shall have the meaning set forth below (such meanings being equally applicable to both the singular and plural form of the terms defined).  The exhibits and schedules referenced in this <u>Section 16</u> and throughout the Agreement are deemed to be part of the Agreement and are incorporated herein by reference.

16.1   "***363/365 Orders***" shall have the meaning provided for under <u>Section 8.2</u>.

16.2   "***Additional Transactions***" shall have the meaning provided for under <u>Recital G</u>.

16.3   "***Affiliate***" of a Person means a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the first-mentioned Person.  For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through ownership of voting securities or by

contract or otherwise, and the terms "controlling" and "controlled by" have meanings correlative to the foregoing.

16.4    "*Agreement*" shall have the meaning provided for in the preamble.

16.5    "*Allocation Schedule*" shall have the meaning provided for under Section 2.6.

16.6    "*Alternative Sale Transaction*" is a proposal or offer from any Person (other than Purchaser) to enter into any agreement or arrangement (whether or not binding) relating to, any possible transaction involving the sale of the Business, some or all of the assets that will constitute Purchased Assets (other than such assets that are disposed of in the ordinary course of business in compliance with Section 8.2 hereof), or the stock of Seller or any other Person that owns, directly or indirectly, a greater than five percent interest in either of Seller or the Purchased Assets.

16.7    "*Altus*" shall have the meaning provided for under Recital G.

16.8    "*Apportionable Operating Expenses*" shall have the meaning provided for under Section 2.5.

16.9    "*Assignment of Intangible Property Assets*" shall have the meaning provided for under Section 3.2(f).

16.10    "*Assignment of Purchased Contracts*" shall have the meaning provided for under Section 3.2(d).

16.11    "*Assumed Liabilities*" shall have the meaning provided for under Section 2.2.

16.12    "*Assumption of Liabilities*" shall have the meaning provided for under Section 3.3(e).

16.13    "*Avoidance Action*" means all preference or avoidance claims and actions of the Seller, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code.

16.14    "*Bankruptcy Court*" shall have the meaning provided for under Recital H.

16.15    "*Bidder*" shall have the meaning provided for under Section 8.3.

16.16    "*Bill of Sale*" shall have the meaning provided for under Section 3.2(e).

16.17    "*Break-Up Fee*" shall have the meaning provided for under Section 8.5.

16.18    "*Business*" shall have the meaning provided for under Recital A.

16.19    "*Business Day*" means any day other than a Saturday or Sunday or a legal holiday on which banks in Salt Lake City, Utah are closed.

16.20    "*Business Permit*" means any business permit, license, bond, orders, certificate of occupancy, registration, certificate of public convenience and necessity, approval, easement, authorization or operating right issued or granted to Seller by any Governmental Body having jurisdiction over the Seller's Business or used in connection with Seller's Business.

16.21    "*Business Permit Transfers*" shall have the meaning provided for under Section 3.2(l).

16.22    "*Case*" shall have the meaning provided for under Recital H.

16.23    "*Cases*" shall have the meaning provided for under Recital H.

16.24    "*Cash Component*" shall have the meaning provided for under Section 2.1(a).

16.25   "*CK Case*" shall have the meaning provided for under <u>Recital H</u>.

16.26   "*CK Sale Order*" means a Final Order of the Bankruptcy Court approving to Purchaser the sale of substantially all unpatented mining claims and other assets held in the name of Copper King, pursuant to Sections 363(b) and (f) and 365 of the Bankruptcy Code, which Final Order shall be in form and substance acceptable to Purchaser.

16.27   "*Claim*" means any claim, cause of action, right of recovery, right of set-off, and right of recoupment of every kind and nature including but not limited to prepayments, warranties, guarantees, refunds, reimbursements, and indemnities.

16.28   "*Closing*" shall have the meaning provided for under <u>Section 3.1</u>.

16.29   "*Closing Date*" shall have the meaning provided for under <u>Section 3.1</u>.

16.30   "*Code*" means the Internal Revenue Code of 1986, as amended.

16.31   "*Committee*" shall have the meaning provided for under <u>Section 2.1(a)</u>.

16.32   "*Consent*" means any consent, approval, authorization, affirmative vote, waiver, agreement or license by, or report or notice to, any Person.

16.33   "*Contemplated Transactions*" shall have the meaning provided for under <u>Recital M</u>.

16.34   "*Contract*" means any executory contract or unexpired lease within the meaning of the Bankruptcy Code.

16.35   "*Copper King*" shall have the meaning provided in <u>Recital B</u>.

16.36   "*Copyright*" means all copyrightable works, and all United States and foreign registered copyrights and applications, registrations and renewals therefor owned by the Seller, and any past, present or future claims or causes of actions arising out of or related to any infringement or misappropriation of any of the foregoing.

16.37   "*Cure Cost*" means the amount required to be paid as a cure amount under Section 365 of the Bankruptcy Code so that Seller may sell, assume and assign any Seller's Contract to Purchaser.

16.38   "*Debtors*" shall have the meaning provided for under <u>Recital H</u>.

16.39   "*Deed*" shall have the meaning provided for in <u>Section 3.2(b)</u>.

16.40   "*Deposits*" shall have the meaning provided for under <u>Section 1.1(d)</u>.

16.41   "*DIP Loans*" shall have the meaning provided for under <u>Recital I</u>.

16.42   "*Domain Name*" means the internet domain names owned by Seller, and all registrations, applications and renewals related to the foregoing.

16.43   "*Effective Date*" shall have the meaning provided for in the preamble.

16.44   "*Encumbrance*" means any claim, lien, pledge, option, royalty, license, charge, easement, Tax assessment, security interest, deed of trust, mortgage, right-of-way, encroachment, building or use restriction, conditional sales agreement, encumbrance or other right of third parties of any sort whatsoever, whether voluntarily incurred or arising by operation of law, and includes any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof.

16.45   "*Entity*" means any corporation (including any nonprofit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust,

cooperative, foundation, society, political party, union, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

16.46   "*Environmental Claims*" shall have the meaning provided for under <u>Section 2.3</u>.

16.47   "*Environmental Laws*" means all federal, state and local Laws governing health and safety, pollution or the protection of the environment.

16.48   "*ERISA*" shall have the meaning provided for under <u>Section 5.17(a)</u>.

16.49   "*ERISA Affiliate*" shall have the meaning provided for under <u>Section 5.17(a)</u>.

16.50   "*Excluded Asset*" shall have the meaning provided for under <u>Section 1.2</u>.

16.51   "*Excluded Contract*" means any Seller's Contract that becomes an Excluded Contract by operation of <u>Section 1.3</u>.

16.52   "*Excluded Liability*" shall have the meaning provided for under <u>Section 2.3</u>.

16.53   "*Expense Reimbursement*" shall have the meaning provided for under <u>Section 8.4</u>.

16.54   "*Final Order*" means an Order of the Bankruptcy Court entered pursuant to Fed. R. Bankr. P. 7054, 7058, and 9021 and Fed. R. Civ. P. 54 and 58, the operation or effect of which has not been stayed, reversed or amended, and as to which Order the time to appeal or to seek review, reconsideration, or rehearing other than pursuant to Fed. R. Bankr. P. 9024 and Fed. R. Civ. P. 60 has expired and as to which (i) no appeal or request for reconsideration, review, to alter or amend, or for rehearing was filed, or (ii) if an appeal or request for review or rehearing was filed, such appeal or request for review or rehearing is no longer pending.

16.55   "*First Lien Lenders*" shall have the meaning provided for under <u>Recital C</u>.

16.56   "*First Lien Loan*" shall have the meaning provided for under <u>Recital C</u>.

16.57   "*First Note*" shall have the meaning provided for under <u>Recital C</u>.

16.58   "*Flotation Mill*" means that certain flotation mill located on the Seller's properties designed for flotation processing of copper ores and the production of magnetite and a copper, gold and silver concentrate product.

16.59   "*Fundraising Fees*" shall have the meaning provided for under <u>Section 12.8</u>.

16.60   "*Furnishings and Equipment*" means all mining equipment, machinery, supplies, spare parts, tools, laboratory equipment, computer hardware, equipment, racks, stands, displays, desks, chairs, tables, cubicles and other furniture and furnishings, hardware, vehicles, trucks, loaders, tools, and other equipment, and miscellaneous office and store supplies, and all other items of tangible personal property owned or used by the Seller in the conduct of the Business.  As used herein, the Furnishings and Equipment do not include any equipment or other tangible property held by the Seller pursuant to a Contract where Purchaser does not assume the underlying Contract relating to such personal property at the Closing.

16.61   "*GAAP*" means United States generally accepted accounting principles, applied on a consistent basis during the periods involved.

16.62   "*Governmental Body*" means any: (a) nation, principality, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, officer, official, representative, organization, unit, body or Entity and any court or other tribunal, including the

Bankruptcy Court); (d) multi-national organization or body; or (e) individual, Entity or body exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

16.63   "*Hazardous Substance*" means any hazardous waste, toxic substance, pollutant or contaminant as those terms are defined in Environmental Laws.

16.64   "*Indebtedness*" means (a) any obligation for borrowed money, including any obligation for accrued and unpaid interest thereon and any prepayment or other penalties or premiums, (b) any capitalized lease obligations, (c) any obligation evidenced by a note, deed, mortgage or secured by any property of Seller, (d) any reimbursement obligations in respect of letters of credit, and (e) all guarantees issued in respect of obligations of any other Person of the type described in clauses (a) through (d).

16.65   "*Initial Overbid*" shall have the meaning provided for under Section 8.3.

16.66   "*Intangible Property Assets*" means any Intellectual Property Assets or Other Intangible Property Assets owned or held by the Seller.  As used in this Agreement, Intangible Property Assets shall in all events exclude:  (i) any materials containing information about employees (other than Transferred Employees), disclosure of which is prohibited under applicable law, and (ii) any software or other item of intangible property held by the Seller pursuant to a license or Contract where Purchaser does not assume the underlying Contract relating to such intangible personal property at the Closing.

16.67   "*Intellectual Property Assets*" means intellectual property or other proprietary rights of every kind throughout the world, both domestic and foreign, which, in each case, are related to the Business, including all inventions and improvements thereon, Patents, Trademarks, Domain Names, Trademark Rights, Copyrights, Technology and trade secrets.

16.68   "*Inventory*" means all saleable goods, minerals, metals, mineral or metal products or concentrates, raw materials, ore, ore stockpiles, dumps, stockpiles, tailings, metal or mineral stockpiles, inventory in transit, geological samples, drill samples, laboratory samples and other items of inventory owned and held by Seller or used in connection with the Business, wherever located.

16.69   "*Knowledge*" of a Person means to the best of such Person's knowledge after reasonable inquiry and, with respect to Seller's knowledge, refers to the knowledge of all officers of the Seller.  Nothing set forth herein shall impute Knowledge to the Seller's New BOD.

16.70   "*Legal Requirement*" means any applicable federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, requirement, notice requirement, guideline, Order, specification, determination, decision, opinion or interpretation issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Body.

16.71   "*Lenders*" shall have the meaning provided for under Recital E.

16.72   "*Liability*" means any claim, as defined under 11 U.S.C. § 101(5), or debt, as defined under 11 U.S.C. § 101(12), and shall include any direct or indirect liability, Indebtedness, indemnification, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of any type whatsoever, whether accrued or unaccrued, absolute or contingent, matured or unmatured, liquidated or unliquidated, known or unknown, asserted or unasserted, due or to become due.

16.73   "*Loans*" shall have the meaning provided for under Recital E.

16.74 "*Material Adverse Effect*" means any material adverse effect on or change with respect to the business, operations, assets, Liabilities, financial condition, results of operations, properties or prospects of Seller or the Business, taken as a whole, or any material adverse effect on the ability of Seller to consummate the Contemplated Transactions or perform its obligations under this Agreement.

16.75 "*Material Taking*" shall have the meaning provided for under Section 2.7.

16.76 "*Minimum Loan Claims*" shall have the meaning provided for under Recital J.

16.77 "*Nevada Star*" shall have the meaning provided for under Section 16.81.

16.78 "*Nevada Star Agreement*" shall mean that certain Agreement and NS Option entered into as of July 23, 2002 by and between the Seller and Nevada Star Resource Corp. ("*Nevada Star*"), and agreements entered into by and between Seller and Nevada Star associated therewith.

16.79 "*Order*" means any judgment, order or decree of any Governmental Body that is binding on any Person or its property under applicable law.

16.80 "*Other Contracts*" means any Seller's Contract other than a Personal Property Lease.

16.81 "*Other Intangible Property Assets*" means all intangible personal property (other than the Intellectual Property Assets) owned or held by Seller, including, without limitation, (A) the books and records pertaining to the Business; (B) proprietary information relating to the Business, including but not limited to catalogues, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, software programs, and telephone exchange numbers identified with the Business; (C) all goodwill of the Business; and (D) all geological, drilling, laboratory, mining and milling reports and data, laboratory assays and similar data and reports, owned or held by the Seller of any kind; (E) all historical data and mining and milling plans, results, samples and reports; and (F) all drawings, designs, engineering, and similar reports or records with respect to the Purchased Assets, mines, Flotation Mill, and any proposed additional facilities.

16.82 "*Outside Date*" means September 15, 2011.

16.83 "*Party*" shall have the meaning provided for in the preamble.

16.84 "*Patent*" means the United States patents and patent applications owned by the Seller, including, any continuations, divisionals, continuations in part, or reissues of patent applications and patents issuing thereon and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

16.85 "*Permitted Encumbrances*" means those exceptions to title to the Purchased Real Property that are acceptable to Purchaser and Purchaser shall be subject to post-Closing, and are set forth on Schedule 5.11(c).

16.86 "*Person*" means an individual, Entity or Governmental Body.

16.87 "*Personal Property Lease*" means any Seller's Contract that is a lease or license of equipment or other personal property, tangible or intangible.

16.88 "*Power of Attorney*" shall have the meaning provided for under Section 12.4(c).

16.89 "*Promissory Note*" shall have the meaning provided for under Section 2.1(a).

16.90 "*Petition Date*" shall have the meaning provided for under Recital H.

16.91   "*Purchase Price*" shall have the meaning provided for under <u>Section 2.1(a)</u>.

16.92   "*Purchased Assets*" shall have the meaning provided for under <u>Section 1.1</u>.

16.93   "*Purchased Business Permits*" shall have the meaning provided for under <u>Section 1.1(h)</u>.

16.94   "*Purchased Contracts*" shall have the meaning provided for under <u>Section 1.1(f)</u>.

16.95   "*Purchased Furnishings and Equipment*" shall have the meaning provided for under <u>Section 1.1(b)</u>.

16.96   "*Purchased Inventory*" shall have the meaning provided for under <u>Section 1.1(c)</u>.

16.97   "*Purchased Real Property*" shall have the meaning provided for in <u>Section 1.1(a)</u>.

16.98   "*Purchaser*" shall have the meaning provided for in the preamble.

16.99   "*Purchaser Deposit*" shall have the meaning provided for in under <u>Section 2.1(c)</u>.

16.100   "*Qualifying Bid*" shall have the meaning provided for in under <u>Section 8.3</u>.

16.101   "*Receivables*" shall have the meaning provided for under <u>Section 1.1(g)</u>.

16.102   "*Releasee(s)*" shall have the meaning provided for under <u>Section 12.5</u>.

16.103   "*Republic Transactions*" shall have the meaning provided for under <u>Recital F</u>.

16.104   "*Required Consents*" shall have the meaning provided for under <u>Section 3.2(d)</u>.

16.105   "*Sale Motion*" shall have the meaning provided for under <u>Section 8</u>.

16.106   "*Sale Order*" shall have the meaning provided for under <u>Recital L</u>.

16.107   "*Second Lien Lenders*" shall have the meaning provided for under <u>Recital D</u>.

16.108   "*Second Lien Loan*" shall have the meaning provided for under <u>Recital D</u>.

16.109   "*Security Agreement*" shall have the meaning provided for in <u>Recital B</u>.

16.110   "*Seller Benefit Plan*" shall have the meaning provided for under <u>Section 5.17(g)</u>.

16.111   "*Seller's Contract*" means any Contract (a) to which Seller is a party or by which Seller is bound and (b) that is related to the Business.

16.112   "*Seller's Counsel*" shall have the meaning provided for under <u>Section 2.1(c)</u>.

16.113   "*Seller's Financial Statements*" shall have the meaning provided for under <u>Section 5.7</u>.

16.114   "*Seller's Required Approval*" shall have the meaning provided for under <u>Section 5.4</u>.

16.115   "*Seller*" shall have the meaning provided for in the preamble.

16.116   "*Settlement Order*" shall have the meaning provided for under <u>Recital J</u>.

16.117   "*SMP*" shall have the meaning provided for under <u>Recital K</u>.

16.118   "*SMP DIP Loan*" shall have the meaning provided for under <u>Section 2.2</u>.

16.119   "*Superior Bid*" means a bid made by a Person other than Purchaser, and which is on terms which Seller's Board of Directors determines in good faith would result in an

Alternative Sale Transaction that is materially more favorable (a) to Seller than the transaction contemplated by this Agreement taking into account all the terms and conditions of such proposal and this Agreement and the transactions contemplated hereby and (b) is reasonably capable of being completed on the terms proposed, taking into account all financial, regulatory, legal and other aspects of such bid; provided, however, no bid shall be deemed to be a Superior Bid if the bid is subject to a financing contingency.

16.120 "**Straddle Period**" means any taxable year or period beginning on or before and ending after the Closing Date.

16.121 "*Taking*" shall have the meaning provided for under Section 2.7.

16.122 "**Tax**" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

16.123 "**Tax Return**" means any return, declaration, report, claim for refund, transfer pricing report or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

16.124 "**Technology**" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, know how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

16.125 "**Third Lien Lender**" shall have the meaning provided for under Recital E.

16.126 "**Third Lien Loan**" shall have the meaning provided for under Recital E.

16.127 "**Trademark**" means all trademark registrations and applications for trademark registration owned by Seller, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

16.128 "**Trademark Rights**" means all common law rights in the United States in any Trademarks, trade names, corporate names, logos, slogans, designs, trade dress, and unregistered trademarks and service marks owned by Seller, together with all translations, adaptations, derivations and combinations thereof, and the goodwill associated with any of the foregoing.

16.129 "**Transfer Taxes**" shall have the meaning provided for under Section 3.4.

16.130 "**Transferred Employee**" means any employee of Seller, upon accepting an offer of employment from Purchaser.

16.131 "**Utilities**" shall have the meaning provided for under Section 2.5.

16.132 "**WARN Act**" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder.

IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement as of the day and year first above written.

**PURCHASER:**

CS MINING, LLC,
a Delaware limited liability company

By:      SKYE MINERAL INVESTORS, LLC
Title:   Member

      By:      EMPIRE ADVISORS, LLC
      Title:   Manager

      By:   _____
      Name:  David J. Richards
      Title:   President

By:      CLARITY COPPER, LLC
Title:   Member

      By:   _____
      Name:  Clint Walker
      Title:   Manager

**SELLER:**

WESTERN UTAH COPPER COMPANY,
a Utah corporation

By:      _____
Name:        A. John A. Bryan, Jr.
Its:             Chief Executive Officer

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

ACKNOWLEDGED AND AGREED:

**<u>SMP</u>:**

**SKYE MINERAL PARTNERS, LLC**

By:    SKYE MINERAL INVESTORS, LLC
Title:  Member

      By:    EMPIRE ADVISORS, LLC
      Title:  Manager

      By: _____
      Name:  David J. Richards
      Title:   President

By:    CLARITY COPPER, LLC
Title:  Member

      By: _____
      Name:  Clint Walker
      Title:  Manager

[ACKNOWLEDGEMENT PAGE TO ASSET PURCHASE AGREEMENT]

## EXHIBITS AND SCHEDULES

### EXHIBITS

EXHIBIT A     FORM OF ASSIGNMENT OF LEASES, CONTRACTS AND INTERESTS

EXHIBIT B     FORM OF BILL OF SALE

EXHIBIT C     FORM OF ASSUMPTION AGREEMENT

### SCHEDULES

SCHEDULE 1.1(a)     PURCHASED REAL PROPERTY

SCHEDULE 1.1(b)     PURCHASED FURNISHINGS AND EQUIPMENT

SCHEDULE 1.1(c)     PURCHASED INVENTORY

SCHEDULE 1.1(d)     DEPOSITS

SCHEDULE 1.1(e)     INTANGIBLE PROPERTY ASSETS

SCHEDULE 1.1(f)     PURCHASED CONTRACTS

SCHEDULE 1.1(h)     PURCHASED BUSINESS PERMITS

SCHEDULE 1.1(m)     OTHER PURCHASED ASSETS

SCHEDULE 2.2     CERTAIN LIABILITIES

SCHEDULE 5.3     SELLER'S REQUIRED APPROVALS

SCHEDULE 5.6     SELLER'S NON-COMPLIANCE WITH LAWS

SCHEDULE 5.11(c)     CONTRACTS REGARDING PURCHASE OR USE OF PURCHASED REAL PROPERTY; PERMITTED ENCUMBRANCES

SCHEDULE 5.11(j)     CONTRACTS AFFECTING PURCHASED REAL PROPERTY POST-CLOSING

SCHEDULE 5.12(a)     FURNISHINGS AND EQUIPMENT AND INVENTORY

SCHEDULE 5.12(b)     DEPOSITS

SCHEDULE 5.12(c)     RECEIVABLES

SCHEDULE 5.14(a)     PERSONAL PROPERTY LEASES

i

SCHEDULE 5.14(b)     OTHER CONTRACTS

SCHEDULE 5.14(c)     CURE COSTS

SCHEDULE 5.1     BUSINESS PERMITS

SCHEDULE 5.16(c)     SELLER'S NON-COMPLIANCE WITH LABOR LAWS

SCHEDULE 5.19     SELLER'S INSURANCE

SCHEDULE 5.25     TAX NON-COMPLIANCE

SCHEDULE 5.26     PURCHASED CONTRACT BREACHES

SCHEDULE 5.27     AFFILIATE TRANSACTIONS

<u>**EXHIBIT A**</u>

**FORM OF ASSIGNMENT OF LEASES, CONTRACTS AND INTERESTS**

---

**ASSIGNMENT OF LEASES, CONTRACTS AND INTERESTS**

THIS GENERAL ASSIGNMENT ("<u>Assignment</u>") is executed as of _____, 20\_\_\_\_, by and between WESTERN UTAH COPPER COMPANY, a Utah corporation ("<u>Assignor</u>"), and CS MINING, LLC, a Delaware limited liability company ("<u>Assignee</u>"), with reference to the following:

R E C I T A L S:

A.      Assignor as of even date herewith conveyed to Assignee the real property, improvements and personal property located thereon and associated therewith (the "<u>Purchased Assets</u>") as are more particularly described in and pursuant to that certain Asset Purchase Agreement (the "<u>Agreement</u>") dated _____, 2011, by and between Assignor as "Seller," and Assignee, as "Buyer."  All capitalized terms not otherwise defined herein shall have the same meaning given to them in the Agreement.

B.      In connection with the conveyance of the Purchased Assets, Assignor and Assignee intend that all of Assignor's right, title and interest in and under any and all Business Permits, Intangible Property Assets, Intellectual Property, data, plans, specifications, maps, licenses, permits, guaranties, warranties, certificates and other instruments listed on <u>Schedule 1</u> or otherwise pertaining in any way to the Purchased Assets or stated herein, including but not limited to such of the foregoing as are listed on <u>Schedule 1</u> hereto, and such Purchased Contracts as are set forth on <u>Schedule 2</u> hereto (collectively, the "<u>Permits, Data and Contracts</u>") shall be conveyed to Assignee as of the Closing.

A G R E E M E N T:

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      <u>Warranties and Guaranties</u>.  Effective as of the Closing Date, Assignor hereby assigns, sets over, conveys and transfers to Assignee, free and clear, any and all of Assignor's right, title and interest in, to and under all guaranties, warranties, certificates, contracts and agreements from any contractors, subcontractors, vendors or suppliers regarding their performance, quality of workmanship and quality of materials supplied in connection with the construction, manufacture, development, installation and operation of any and all Purchased Real Property, Purchased Furnishings and Equipment, Purchased Inventory, and other personal property, fixtures and improvements located on the Purchased Assets or that constitute part of the Purchased Assets.

2.      <u>Governmental Approvals and Certificates</u>.  To the extent permissible by law, Assignor hereby assigns, sets over, conveys and transfers to Assignee, free and clear, any and all of Assignor's right, title and interest in and under any permits, entitlements, zoning, use, occupancy and operating permits, mining permits and all other permits, licenses, approvals and certificates obtained in connection with the Purchased Assets, including but not limited to such of the foregoing as are specifically set forth on <u>Schedule 1</u> hereto.

3.      Plans, Data Specifications and Other Intangible Property.  Assignor hereby assigns, sets over, conveys and transfers to Assignee, free and clear, any and all of Assignor's right, title and interest in, to and under all (a) maps, plans, specifications and related documents prepared in connection with the development, construction and operation of any and all improvements located on the Purchased Assets or that constitute part of the Purchased Assets and (b) any and all Intellectual Property and Intangible Property Assets, including, without limitation, (i) the books and records pertaining to the Business; (ii) proprietary information relating to the Business, including but not limited to catalogues, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, software programs, and telephone exchange numbers identified with the Business; (iii) all goodwill of the Business; and (iv) all geological, drilling, laboratory, mining and milling reports and data, laboratory assays and similar data and reports, owned or held by the Seller of any kind; (v) all historical data and mining and milling plans, results, samples and reports; and (vi) all drawings, designs, engineering, and similar reports or records with respect to the Purchased Assets, mines, Flotation Mill, and any proposed additional facilities.

4.      Contracts.  Assignor hereby assigns, sets over, conveys and transfers to Assignee, free and clear, all of Assignee's right, title and interest, in, to and under all Purchased Contracts, including but not limited to such of the foregoing as are set forth specifically on Schedule 2 hereto.

5.      Original Documents. Assignor and Assignee agree that the originals of all of the Permits, Data and Contracts and all writings memorializing the Permits, Data and Contracts as well as the original of this Assignment, shall be delivered to Assignee to the extent the same are in the possession and control of Assignor, and expressly excluding and excepting (a) any original documents that were filed as part of a public record and not returned to Assignor, (b) any documents of which Assignee has not been provided originals by the relevant third party, and (c) any lost documents, *provided, however*, that with regard to any lost document Assignor shall execute an affidavit of lost document, in favor of Assignee, and Assignor shall indemnify Assignee from any loss suffered by Assignee that results from a third-party's assertion of an adverse claim of ownership regarding the lost document, and *provided, further,* that, failure to deliver any original documents shall not limit or diminish the effectiveness of this Agreement in transferring to the Assignee all of Assignor's right, title and interest in, under and to the Permits, Data and Contracts.  To the extent that Assignor subsequently discovers an original document that was not delivered to Assignee pursuant to this Agreement, such original document promptly shall be delivered to the Assignee by the Assignor.  Assignor also shall, and shall cause its controlled affiliates to, cooperate with Assignee by executing, acknowledging and delivering any additional transfer documents (including any assignments, assumptions, consents or other documents or instruments) and taking such other actions that Assignee shall reasonably request that Assignee shall reasonably request to more effectively or completely sell, grant, convey, transfer and assign the Permits, Data and Contracts or vest the same in the Assignee, so long as the same is consistent with the terms of the Agreement.

6.      Authorization to File Documents.  Assignor specifically authorizes Assignee or its representatives to file and/or submit all necessary filings and other documents in the appropriate records or with the appropriate regulatory authorities or governmental bodies in order to fully effect and/or perfect the assignments of the Permits, Data and Contracts contemplated hereunder and under the Agreement and to fully and properly transfer all of the Permits, Data and Contracts, and Assignors shall execute any of the foregoing provided by Assignee, as applicable.  Further, Assignor hereby irrevocably appoint Assignee as its true and lawful attorney-in-fact, for foregoing purposes to file and submit all necessary documents and filings.

7.      Acceptance.  Assignee hereby accepts the foregoing assignments and agrees to assume and keep, perform and fulfill all of the terms, covenants, conditions, duties and obligations which are required to be kept, performed and fulfilled by the Assignor under the Permits, Data and Contracts.

8.      <u>Indemnification by Assignor</u>.   Subject to the Agreement, Assignor shall indemnify, defend and hold Assignee harmless from and against any and all claims, costs, demands, losses, damages, liabilities, lawsuits, actions and other proceedings in law or in equity or otherwise, judgments, awards and expenses of every kind including, without limitation, attorneys' fees (collectively, "<u>Liabilities</u>") arising out of or relating to, directly or indirectly, in whole or in part, the Plans, Permits and Contracts occurring prior to the Close of Escrow, as defined in the Agreement.

9.      <u>Indemnification by Assignee</u>.   Subject to the Agreement, Assignee shall indemnify, defend and hold Assignor harmless from and against any and all Liabilities arising out of or relating to Assignee's use of or operation under Plans, Permits and Contracts occurring from and after the Close of Escrow.

10.     <u>Miscellaneous</u>.   Assignor and Assignee each agrees to execute such other documents and perform such other acts as may be necessary or desirable to effectuate this Assignment.  In the event of any action or suit by either party hereto against the other arising from or interpreting this Agreement, the prevailing party in such action or suit shall, in addition to such other relief as may be granted, be entitled to recover its costs of suit and actual attorneys' fees, whether or not the same proceeds to final judgment.  This Assignment shall be governed by and construed in accordance with the laws of the State of Utah, and shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns.  This Assignment may be executed electronically or by facsimile in multiple counterparts, all of which when duly delivered taken together, shall be binding on all parties.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed this Assignment as of the date first above written.

"ASSIGNOR":        **WESTERN UTAH COPPER COMPANY**,
A Utah corporation

By:_____
Name:
Title:


"ASSIGNEE":        **CS MINING, LLC**,
a Delaware limited liability company

        By:    SKYE MINERAL INVESTORS, LLC
        Title:  Member

            By:    EMPIRE ADVISORS, LLC
            Title:  Manager

            By:_____
            Name:  David J. Richards
            Title:   President

        By:    CLARITY COPPER, LLC
        Title:  Member

            By:_____
            Name:  Clint Walker
            Title:   Manager

## SCHEDULE 1

## List of Applicable Permits, Data and Plans

### *[To come]*

Copies of all studies, reports, maps and other documents related to the Purchased Assets in Seller's possession or under its control, including, without limitation, the following:

(a)    all engineering reports, surveys, topographic maps, soil tests, biological surveys, wetlands maps, seismic studies, environmental impact reports, traffic circulation, grading flood control and drainage plans, design renderings, market analyses, feasibility studies, tentative parcel and final maps, and all correspondence with governmental agencies and their personnel concerning the same;

(b)    any soils or toxic materials reports, engineering tests, environmental or geological studies, assessments and surveys and similar data pertaining to any portion of the Purchased Assets;

(c)    water and water rights reports and documents;

(d)    mineral, mineral extraction and mining reports;

(e)    the most recent property tax bills, notices of assessments and any petitions, appeals or related documents;

(f)    any other notices, claims, complaints, litigation, actions or other legal proceedings involving any governmental authority or private party;

(g)    any contracts, licenses or other agreements affecting the ownership, operation, maintenance, repair, improvement and/or development of the Purchased Assets;

(h)    all leases, licenses and use and occupancy permits or agreements affecting the Purchased Assets and any related assignments or amendments;

(i)    any permits, licenses, agricultural or farming agreements;

(j)    zoning and entitlements documents and files, development rights and plans;

(k)    copies of CC&Rs, covenants or agreements binding upon the Purchased Assets; and

(l)    any and all other plans, specifications, maps, licenses, permits, guaranties, warranties, certificates, contracts, agreements, reports, surveys and other similar instruments or documents pertaining in any way to the Purchased Assets.

A-5

## SCHEDULE 2

### Schedule of Contracts

*[To Come]*

## EXHIBIT B

## FORM OF BILL OF SALE

---

## BILL OF SALE

FOR GOOD AND VALUABLE CONSIDERATION, the receipt of which is hereby acknowledged, WESTERN UTAH COPPER COMPANY, a Utah corporation ("Seller"), does hereby sell, transfer, and convey to CS MINING, LLC, a Delaware limited liability company ("Buyer"), all right, title and interest in and to the following personal property, equipment and vehicles which Seller warrants to be free and clear of all other claims, rights, interests or encumbrances, to-wit (collectively, the "Assets"):

The equipment and vehicles itemized or listed on Schedule 1 attached hereto and incorporated herein by this reference, or contained in any descriptions appended to such Schedule 1.

Seller does hereby covenant with and warrant to Buyer that Seller (a) is the lawful owner of such equipment and vehicles, (b) has good title and right to sell the same as provided for herein, (c) will warrant and defend the title thereto unto Buyer, its successors and assigns, against the claims and demands of all persons whosoever, and (d) is conveying the Assets in accordance with the terms of Asset Purchase Agreement dated _____, 2011, by and between Seller and Buyer.

DATED as of _____, 2011.

**SELLER**:                              **BUYER:**

**WESTERN UTAH COPPER COMPANY**          **CS MINING, LLC**

By:_____       By:    SKYE MINERAL INVESTORS, LLC
Name: _____       Title: Member
Title: _____
                                                By:    EMPIRE ADVISORS, LLC
                                                Title:  Manager


                                                        By:_____
                                                        Name:  David J. Richards
                                                        Title:    President

                                         By:    CLARITY COPPER, LLC
                                         Title: Member


                                                By:_____
                                                Name:  Clint Walker
                                                Title:   Manager

## **SCHEDULE 1**

**ASSETS**

*[To come]*

<u>**EXHIBIT C**</u>

**FORM OF ASSUMPTION AGREEMENT**

---

**ASSUMPTION AGREEMENT**

THIS ASSUMPTION AGREEMENT ("<u>Assumption</u>") is executed as of _____, 20____, by and between WESTERN UTAH COPPER COMPANY, a Utah corporation ("<u>Seller</u>"), and CS MINING, LLC, a Delaware limited liability company ("<u>Buyer</u>"), with reference to the following:

R E C I T A L S:

A.    Seller as of even date herewith conveyed to Buyer certain real property, improvements and personal property located thereon and associated therewith (the "<u>Purchased Assets</u>") as are more particularly described in and pursuant to that certain Asset Purchase Agreement (the "<u>Agreement</u>") dated _____, 2011, by and between Seller and Buyer. All capitalized terms not otherwise defined herein shall have the same meaning given to them in the Agreement.

B.    In connection with the conveyance of the Purchased Assets, as part of the consideration provided by Buyer to Seller under the Agreement, Buyer has agreed to assume certain liabilities of Seller listed <u>Schedule 1</u> hereto (the "<u>Assumed Liabilities</u>") as of the Closing.

A G R E E M E N T:

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    <u>Assumption</u>.    Effective as of the Closing Date, Buyer hereby assumes all of Seller's obligations for performance and payment of funds under the Assumed Liabilities; *provided, however*, that the foregoing assumption specifically excludes the following (the "<u>Exclusions</u>"): (i) any and all claims or causes of action that the counterparties to the Assumed Liabilities or third parties may have against Seller or its representatives with respect to the Assumed Liabilities due to Seller's actions prior to Closing, (ii) any liabilities of any kind of Seller associated with the misconduct, omissions, bad actions, tortious conduct, intentional conduct or unlawful actions of Seller or its representatives, and (iii) any liabilities that Seller may have to any affiliate. Seller shall remain liable for any of the foregoing Exclusions, and shall indemnify and hold Buyer harmless with respect to such Exclusions. Buyer accepts the foregoing assumption and to assume and keep, perform and fulfill all of the terms, covenants, conditions, duties and obligations with respect to the foregoing assumption which are required to be kept, performed and fulfilled by the Seller under Assumed Liabilities, subject to the foregoing Exclusions.

2.    <u>Assignment</u>. In connection with Buyer's assumption of the Assumed Liabilities, Seller hereby sells, conveys, transfers, sets over and assigns to Buyer all of Sellers right in, to and under the agreements and documentation evidencing the Assumed Liabilities (the "<u>Assumed Liabilities' Documents</u>"), and all of Seller's rights, defenses, offsets and counterclaims with respect to or under the Assumed Liabilities, but specifically excluding any specific rights or defenses of Seller with respect to defending against any of the Exclusions.

3.      Original Documents. Seller and Buyer agree that the originals of all of the Assumed Liabilities' Documents and all writings memorializing the Assumed Liabilities' Documents as well as the original of this Assumption, shall be delivered to Buyer to the extent the same are in the possession and control of Seller, and expressly excluding and excepting (a) any original documents that were filed as part of a public record and not returned to Seller, (b) any documents of which Buyer has not been provided originals by the relevant third party, and (c) any lost documents, *provided, however,* that with regard to any lost document Seller shall execute an affidavit of lost document, in favor of Buyer, and Seller shall indemnify Buyer from any loss suffered by Buyer that results from a third-party's assertion of an adverse claim of ownership regarding the lost document, and *provided, further,* that, failure to deliver any original documents shall not limit or diminish the effectiveness of this Agreement in transferring to the Buyer all of Seller's right, title and interest in, under and to the Assumed Liabilities' Documents, subject to and as set forth in Section 2.  To the extent that Seller subsequently discovers an original document that was not delivered to Buyer pursuant to this Agreement, such original document promptly shall be delivered to the Buyer by the Seller.  Seller also shall, and shall cause its controlled affiliates to, cooperate with Buyer by executing, acknowledging and delivering any additional transfer documents (including any assignments, assumptions, consents or other documents or instruments) and taking such other actions that Buyer shall reasonably request that Buyer shall reasonably request to more effectively or completely sell, grant, convey, transfer and assign the rights transferred to Buyer pursuant to Section 2 or vest the same in the Buyer, so long as the same is consistent with the terms of the Agreement.

4.      Indemnification by Seller.  Subject to the Agreement, Seller shall indemnify, defend and hold Buyer harmless from and against any and all claims, costs, demands, losses, damages, liabilities, lawsuits, actions and other proceedings in law or in equity or otherwise, judgments, awards and expenses of every kind including, without limitation, attorneys' fees (collectively, "Liabilities") arising out of or relating to, directly or indirectly, in whole or in part, the Assumed Liabilities arising out of the Exclusions or occurring prior to the Closing, as defined in the Agreement.

5.      Indemnification by Buyer.  Subject to the Agreement and the Exclusions, Buyer shall indemnify, defend and hold Seller harmless from and against any and all Liabilities arising out of or relating to Buyer's actions or omissions occurring from and after the Closing.

6.      Miscellaneous.  Seller and Buyer each agrees to execute such other documents and perform such other acts as may be necessary or desirable to effectuate this Assumption.  In the event of any action or suit by either party hereto against the other arising from or interpreting this Agreement, the prevailing party in such action or suit shall, in addition to such other relief as may be granted, be entitled to recover its costs of suit and actual attorneys' fees, whether or not the same proceeds to final judgment. This Assumption shall be governed by and construed in accordance with the laws of the State of Utah, and shall be binding upon and inure to the benefit of Seller and Buyer and their respective successors and assigns.  This Assumption may be executed electronically or by facsimile in multiple counterparts, all of which when duly delivered taken together, shall be binding on all parties.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed this Assumption as of the date first above written.

"SELLER":      **WESTERN UTAH COPPER COMPANY**,
A Utah corporation

By:_____
Name:
Title:


"BUYER":      **CS MINING, LLC**,
a Delaware limited liability company

By:      SKYE MINERAL INVESTORS, LLC
Title:      Member

By:      EMPIRE ADVISORS, LLC
Title:      Manager

By:_____
Name:  David J. Richards
Title:    President

By:      CLARITY COPPER, LLC
Title:      Member

By:_____
Name:  Clint Walker
Title:    Manager

## SCHEDULE 1

### Assumed Liabilities

***[To come]***

## SCHEDULE 1.1(a)

## PURCHASED REAL PROPERTY

All of Sellers Interest in, under and to the following real property, mining claims, and mineral rights, including all improvements and fixtures located thereon or related thereto or minerals and metals located therein, the Flotation Mill, extracted minerals and metals, water rights and rights to use or store water, dumps, stockpiles, tailings, easements, licenses, rights of way, and all other rights and interests associated with any the foregoing or following:

**I.    PATENTED MINING CLAIMS**

| | Claim Name | Survey No. or Lot No. | Property/Unit Number | Mining District | Legal Description Section(s) Township Range |
|---|---|---|---|---|---|
| 1 | Ben Harrison Mine | 5474 | 37356 | Beaver Lake | Sec. 5,8 T27S R11W |
| 2 | Ben Harrison Fraction | 5474 | 37357 | Beaver Lake | Sec. 5,8 T27S R11W |
| 3 | Bulwer | 5481 | 37377 | Beaver Lake | Sec. 6,7 T27S R11W |
| 4 | Chalcoprite | 5474 | 37358 | Beaver Lake | Sec. 6,7 T27S R11W |
| 5 | Chrysocolla | 5248 | 24847 | Beaver Lake | Sec. 5,6 T27S R11W |
| 6 | Emerson | 5481 | 37378 | Beaver Lake | Sec. 12 T27S R11W |
| 7 | F. W. | 5474 | 37359 | Beaver Lake | Sec. 6,7 T27S R11W |
| 8 | Florence | 5481 | 37379 | Beaver Lake | Sec. 1 T27S R11W |
| 9 | Fraction | 5481 | 37360 | Beaver Lake | Sec. 6, T27S R11W |
| 10 | Francis | 5481 | 37380 | Beaver Lake | Sec. 7 T27S R11W |
| 11 | Galveston Mine | 5474 | 37363 | Beaver Lake | Sec. 7,8 T27S R11W |
| 12 | Galveston Mine No. 2 | 5474 | 37362 | Beaver Lake | Sec. 8, T27S R11W |
| 13 | Galveston Mine No. 3 | 5474 | 37364 | Beaver Lake | Sec. 8, T27S R11W |
| 14 | Galveston Mine No. 4 | 5474 | 37361 | Beaver Lake | Sec. 8,16 T27S R11W |
| 15 | Granite | 5209 | 62269 | Beaver Lake | Sec. 30 T26S R11W |
| 16 | Hill Top | 5481 | 37381 | Beaver Lake | Sec. 6 T27S R12W |
| 17 | Iron King | 5481 | 37382 | Beaver Lake | Sec. 7 T27S R11W |
| 18 | Janice | 5481 | 37383 | Beaver Lake | Sec. 1 T27S R12W |
| 19 | Johanna | 5481 | 37384 | Beaver Lake | Sec. 6 T27S R12W |
| 20 | Klondyke No. 2 | 5474 | 37365 | Beaver Lake | Sec. 5,8 T27S R11W |
| 21 | Laffyette | 5481 | 37385 | Beaver Lake | Sec. 6 T27S R12W |
| 22 | Lake Superior | 5481 | 37386 | Beaver Lake | Sec. 1 T27S R12W |
| 23 | Layphette | 5209 | 62270 | Beaver Lake | Sec. 31 T27S R11W |
| 24 | Layphette #1 | 5209 | 62271 | Beaver Lake | Sec. 30, 31 T27S R11W |
| 25 | Little Dick | 5481 | 37389 | Beaver Lake | Sec. 6  7 T27S R12W |

| | Claim Name | Survey No. or Lot No. | Property/Unit Number | Mining District | Legal Description Section(s) Township Range |
|---|---|---|---|---|---|
| 26 | Little Mildred | 5481 | 37390 | Beaver Lake | Sec. 1 T27S R12W |
| 27 | Mary I No. 1 | 5474 | 37367 | Beaver Lake | Sec. 6 T27S R11W |
| 28 | Mary I No. 2 | 5474 | 37368 | Beaver Lake | Sec. 6 T27S R11W |
| 29 | Maud | 5474 | 37369 | Beaver Lake | Sec. 7 T27S R11W |
| 30 | May | 5474 | 37370 | Beaver Lake | Sec. 1 T27S R11W |
| 31 | Michigan Boy | 5481 | 37391 | Beaver Lake | Sec. 1 T27S R12W |
| 32 | Minerva | 5481 | 37392 | Beaver Lake | Sec. 6 T27S R11W |
| 33 | Noun | 5474 | 37371 | Beaver Lake | Sec. 7 T27S R11W |
| 34 | O.K. Copper Mine | Lot 39 | 24747 | Beaver Lake | Sec. 7 T27S R11W |
| 35 | Pronoun | 5474 | 37372 | Beaver Lake | Sec. 7 T27S R11W |
| 36 | Trojan | 5474 | 37373 | Beaver Lake | Sec. 7 T27S R11W |
| 37 | Van | 5481 | 37396 | Beaver Lake | Sec. 7 T27S R11W |
| 38 | Variah | 5474 | 37374 | Beaver Lake | Sec. 6,7 T27S R11W |
| 39 | Verb | 5474 | 37375 | Beaver Lake | Sec. 7 T27S R11W |
| 40 | Volney | 5481 | 37398 | Beaver Lake | Sec. 6 T27S R11W |
| 41 | Voltaire | 5481 | 1393 | Beaver Lake | Sec. 31 T26S R 11W |
| 42 | Wallace | 5481 | 37399 | Beaver Lake | Sec. 12 T27S R12W |
| 43 | Wandering Jew | 5474 | 37376 | Beaver Lake | Sec. 7 T27S R11W |
| 44 | Anchor | 5112 | 37485 | San Francisco | Sec. 7 T27S R12W |
| 45 | Anchor No. 2 (East 1/2) | 5118 | 37486 | San Francisco | Sec. 7 T27S R12W |
| 46 | Carbonate | Lot 52 | 37482 | San Francisco | Sec. 7 T27S R11W |
| 47 | Homestake | 5112 | 37484 | San Francisco | Sec. 7 T27S R12W |
| 48 | Rattler | Lot 45 | 37481 | San Francisco | Sec. 7 T27S R12W |
| 49 | Stepmother | 5112 | 37483 | San Francisco | Sec. 7 T27S R12W |
| 50 | Burlington Mining Claim | 5391 | 116 | San Francisco | Sec. 12 T27S R13W |
| 51 | Burlington Mining Claim No. 1 | 5391 | 52933 | San Francisco | Sec. 12 T27S R13W |
| 52 | Burlington Mining Claim No. 2 | 5390 | 52937 | San Francisco | Sec. 12 T27S R13W |
| 53 | Burlington Mining Claim No. 3 | 5391 | 52934 | San Francisco | Sec. 12 T27S R13W |
| 54 | Burlington Mining Claim No. 4 | 5391 | 52935 | San Francisco | Sec. 12 T27S R13W |
| 55 | Burlington Mining Claim No. 8 | 5391 | 52936 | San Francisco | Sec. 12 T27S R13W |
| 56 | Selma No. 3 | 5391 | 113 | San Francisco | Sec. 11 T27S R13W |
| 57 | Selma No. 4 | 5391 | 52928 | San Francisco | Sec. 11 T27S R13W |
| 58 | Selma No. 5 | 5391 | 52929 | San Francisco | Sec. 12 T27S R13W |
| 59 | Selma No. 6 | 5391 | 52930 | San Francisco | Sec. 12 T27S R13W |
| 60 | Selma No. 7 | 5391 | 52931 | San Francisco | Sec. 12 T27S R13W |

| | Claim Name | Survey No. or Lot No. | Property/Unit Number | Mining District | Legal Description Section(s) Township Range |
|---|---|---|---|---|---|
| 61 | Selma No. 8 | 5391 | 52932 | San Francisco | Sec. 12 T27S R13W |
| 62 | Billy Nig | 5556 | 112 | San Francisco | Sec. 12 T27S R13W |
| 63 | Triumphant No. 2 | 5556 | 52926 | San Francisco | Sec. 12 T27S R13W |
| 64 | Triumphant No. 3 | 5556 | 52927 | San Francisco | Sec. 12 T27S R13W |
| 65 | Beaver Lake #2 | | | | Tax Parcel No.: SA-02-38 |

## II.    FEE SIMPLE PROPERTY

| 1 | **Legal Description:** |
|---|---|
| | Beg. At the NE Corner of the SE1/4, Sec. 34, T27S R11W. SLB&M; thence N 750 ft; W 550 ft.; S 750 ft.; E 550 ft. to the POB. |

| 2 | **Legal Description:** |
|---|---|
| | Beg. 1321.6 ft. E & 352.7 ft. N of the SW Corner of the SE1/4, Sec. 7., T28S., R10W; thence N. 730.1 ft; S 52º37' W 364.5 ft.; S 32º22' W 602.38 ft.; E 612.1 ft. to POB, cont. 5.99 ac. |

| 3 | **Legal Description:** |
|---|---|
| | Beginning 486 ft. E. of the SW Corner of the SE1/4, Sec. 7, T28S R10W, SLB&M; thence E. 835.6 ft.; N. 352.7 ft.; W. 612.1 ft.; S. 32º22' W. 417.55 ft. to the POB. |

| 4 | **Legal Description:** |
|---|---|
| | Beginning 486 ft. E. of the SW Corner of the SE1/4, Sec. 7, T28S R10W, SLB&M; thence E. 835.6 ft.; N. 352.7 ft.; W. 612.1 ft.; S. 32º22' W. 417.55 ft. to the POB. |

| 5 | **Legal Description:** |
|---|---|
| | W1/2 W1/2 NW1/4, Sec. 13, T27S R11W. |

| 6 | Legal Description: |
|---|---|
| | Beginning 550 feet West from the Southeast corner of the Northeast quarter of Section 34, Township 27 South, Range 11 West, Salt Lake Base and Meridian, and running thence West 2090 feet, thence North 1320 feet, thence East 2640 feet, thence South 570 feet, thence West 550 feet, thence South 750 feet to the point of beginning. |
| | Subject to a Right of Way for a County Road, and incidental purposes as now exists. |

| Property/Unit Number | Legal Description          Section(s) Township Range |
|---|---|
| 07-0700-0260 | Beg. 1321.6 ft. E & 352.7 ft. N of the SW Corner of the SE1/4, Sec. 7., T28S., R10W; thence N. 730.1 ft; S 52º37' W 364.5 ft.; S 32º22' W 602.38 ft.; E 612.1 ft. to POB, cont. 5.99 ac. |
| 02-0081-0006 | W1/2 W1/2 NW1/4, Sec. 13, T27S R11W. |
| 02-0023-0006 | Beginning 486 ft. E. of the SW Corner of the SE1/4, Sec. 7, T28S R10W, SLB&M; thence E. 835.6 ft.; N. 352.7 ft.; W. 612.1 ft.; S. 32º22' W. 417.55 ft. to the POB. |
| 02-0082-0003 | Beg. At the NE Corner of the SE1/4, Sec. 34, T27S R11W. SLB&M; thence N 750 ft; W 550 ft.; S 750 ft.; E 550 ft. to the POB. |
| 02-0082-0001 | T27S R11W, Sec. 34., Com. 550 ft W. from the SE Corner of the NE1/4 of Sec. 34.; thence W. 2090 ft., N. 1320 ft.; E. 2640 ft.; E. 2640 ft.; S 570 ft. W 550 ft.; S 750 ft. to the POB. |

## III.   UNPATENTED MINING CLAIMS

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range Township     Section | Subdivision | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 1 | UMC401692 | PIT 1 | BEAVER | UNPATENTED CLAIM | 9/25/2007 | 26 0270S 0110W 015 | SW SE | 401692 |
| 2 | UMC401693 | PIT 2 | BEAVER | UNPATENTED CLAIM | 9/25/2007 | 26 0270S 0110W 015 | NE NW SW SE | 401693 |
| 3 | UMC401694 | PIT 3 | BEAVER | UNPATENTED CLAIM | 9/25/2007 | 26 0270S 0110W 015 | SW | 401694 |
| 4 | UMC401695 | PIT 4 | BEAVER | UNPATENTED CLAIM | 9/25/2007 | 26 0270S 0110W 015 | NW SW | 401695 |
| 5 | UMC401696 | PIT 5 | BEAVER | UNPATENTED CLAIM | 9/24/2007 | 26 0270S 0110W 015 | SW | 401696 |
| 6 | UMC401697 | PIT 6 | BEAVER | UNPATENTED CLAIM | 9/24/2007 | 26 0270S 0110W 015 | NW SW | 401697 |
| 7 | UMC401698 | PIT 7 | BEAVER | UNPATENTED CLAIM | 9/24/2007 | 26 0270S 0110W 015 | SW | 401698 |
| 8 | UMC401699 | PIT 8 | BEAVER | UNPATENTED CLAIM | 9/24/2007 | 26 0270S 0110W 015 | NW SW | 401699 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range Township        Section | Subdivision | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 9 | UMC401700 | PIT 9 | BEAVER | UNPATENTED CLAIM | 9/24/2007 | 26 0270S 0110W 015 | SW | 401700 |
| 10 | UMC401701 | PIT 10 | BEAVER | UNPATENTED CLAIM | 9/24/2007 | 26 0270S 0110W 015 | NW SW | 401701 |
| 11 | UMC403503 | BIG B 172 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0300S 0140W 022 | NW | 403503 |
| 12 | UMC403504 | BIG B 174 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0300S 0140W 022 | NW | 403504 |
| 13 | UMC403505 | BIG B 176 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0300S 0140W 022 | NW | 403505 |
| 14 | UMC403506 | BIG B 178 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0300S 0140W 021 | NE | 403506 |
| 15 | UMC403507 | BIG B 180 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0300S 0140W 021 | NE | 403507 |
| 16 | UMC403508 | BIG B 182 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0300S 0140W 021 | NE | 403508 |
| 17 | UMC403509 | BIG B 199 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0300S 0140W 015 | SW | 403509 |
| 18 | UMC403510 | BIG B 200 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0300S 0140W 015 | NW SW | 403510 |
| 19 | UMC403511 | BIG B 201 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0300S 0140W 015 | SW | 403511 |
| 20 | UMC403512 | BIG B 202 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0300S 0140W 015 | NW SW | 403512 |
| 21 | UMC403513 | BIG B 203 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0300S 0140W 015 | SW | 403513 |
| 22 | UMC403514 | BIG B 204 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0300S 0140W 015 | NW SW | 403514 |
| 23 | UMC408346 | QF-5 | BEAVER | UNPATENTED CLAIM | 1/5/2009 | 26 0270S 0110W 006-7 | SW NW | 408346 |
| 24 | UMC408347 | QF-6 | BEAVER | UNPATENTED CLAIM | 1/5/2009 | 26 0270S 0110W 006 | SW | 408347 |
| 25 | UMC408348 | QF-7 | BEAVER | UNPATENTED CLAIM | 1/5/2009 | 26 0270S 0110W 006 | SW SE | 408348 |
| | | | | | | | | |
| 26 | UMC403408 | GAP NO 1 | JUAB | UNPATENTED CLAIM | 11/2/2007 | 26 0140S 0110W 035 | NE | 403408 |
| 27 | UMC403409 | GAP NO 2 | JUAB | UNPATENTED CLAIM | 11/2/2007 | 26 0140S 0110W 035 | NE | 403409 |
| 28 | UMC403410 | GAP NO 3 | JUAB | UNPATENTED CLAIM | 11/2/2007 | 26 0140S 0110W 035 | NE | 403410 |
| 29 | UMC403411 | GAP NO 4 | JUAB | UNPATENTED CLAIM | 11/2/2007 | 26 0140S 0110W 035 | NE | 403411 |
| 30 | UMC403412 | GAP NO 5 | JUAB | UNPATENTED CLAIM | 11/2/2007 | 26 0140S 0110W 035 | NE NW | 403412 |
| | | | | | | | | |
| 31 | UMC271017 | M&M # 1 | BEAVER | UNPATENTED CLAIM | 9/15/1983 | 26 0300S 0140W 007 | SE | 271017 |
| 32 | UMC271018 | M&M # 2 | BEAVER | UNPATENTED CLAIM | 9/15/1983 | 26 0300S 0140W 007 | SW SE | 271018 |
| 33 | UMC271019 | M&M # 3 | BEAVER | UNPATENTED CLAIM | 9/15/1983 | 26 0300S 0140W 007 | SE | 271019 |
| 34 | UMC271020 | M&M # 4 | BEAVER | UNPATENTED CLAIM | 9/15/1983 | 26 0300S 0140W 007 | SW SE | 271020 |
| 35 | UMC271021 | M&M # 5 | BEAVER | UNPATENTED CLAIM | 9/30/1983 | 26 0300S 0140W 007 | NE SW SE | 271021 |
| 36 | UMC271022 | M&M # 6 | BEAVER | UNPATENTED CLAIM | 9/30/1983 | 26 0300S 0140W 007 | SW SE | 271022 |
| 37 | UMC271023 | M&M # 7 | BEAVER | UNPATENTED CLAIM | 10/16/1983 | 26 0300S 0140W 007 | NE NW SW SE | 271023 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range Township      Section | Subdivision | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 38 | UMC271024 | M&M # 8 | BEAVER | UNPATENTED CLAIM | 10/16/1983 | 26 0300S 0140W 007 | NW SW | 271024 |
| 39 | UMC271025 | M&M # 9 | BEAVER | UNPATENTED CLAIM | 10/16/1983 | 26 0300S 0140W 007 | NW SW | 271025 |
| | | | | | | | | |
| 40 | UMC326736 | CLASSIC | BEAVER | UNPATENTED CLAIM | 5/30/1989 | 26 0270S 0110W 009 | SE | 326736 |
| 41 | UMC354981 | BLU # 5 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 018 | NE | 354981 |
| 42 | UMC354982 | BLU # 6 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 008 | SW | 354982 |
| 43 | UMC354983 | BLU # 7 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 007 | SE | 354983 |
| 44 | UMC354984 | BLU # 8 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 008 | SW | 354984 |
| 45 | UMC354985 | BLU # 9 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 007 | SE | 354985 |
| 46 | UMC354986 | BLU # 10 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 008 | SW | 354986 |
| 47 | UMC354987 | RKY # 67 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NW SW | 354987 |
| 48 | UMC354988 | RKY # 68 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | SW | 354988 |
| 49 | UMC354989 | RKY # 69 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 027 | NW | 354989 |
| 50 | UMC354990 | RKY # 102 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NW | 354990 |
| 51 | UMC354991 | RKY # 103 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NE NW | 354991 |
| 52 | UMC354992 | ROCKY # 15 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 028 | NE | 354992 |
| 53 | UMC354993 | ROCKY # 16 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 027 | NW | 354993 |
| 54 | UMC354994 | ROCKY # 17 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 021 | SE | 354994 |
| 55 | UMC354995 | ROCKY # 18 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | SW | 354995 |
| 56 | UMC354996 | ROCKY # 19 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 021 | SE | 354996 |
| 57 | UMC354997 | ROCKY # 20 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | SW | 354997 |
| 58 | UMC354998 | ROCKY # 21 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 021 | SE | 354998 |
| 59 | UMC354999 | ROCKY # 22 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | SW | 354999 |
| 60 | UMC355000 | ROCKY # 23 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 021 | NE SE | 355000 |
| 61 | UMC355001 | ROCKY # 24 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NW SW | 355001 |
| 62 | UMC355002 | ROCKY # 25 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 021 | NE | 355002 |
| 63 | UMC355003 | ROCKY # 26 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NW | 355003 |
| 64 | UMC355004 | ROCKY # 27 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 021 | NE | 355004 |
| 65 | UMC355005 | ROCKY # 28 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NW | 355005 |
| 66 | UMC355006 | ROCKY # 29 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 021 | NE | 355006 |
| 67 | UMC355007 | ROCKY # 30 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NW | 355007 |
| 68 | UMC355008 | ROCKY # 31 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 021 | NE | 355008 |
| 69 | UMC355009 | ROCKY # 32 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NW | 355009 |
| 70 | UMC355010 | ROCKY # 56 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 017 | SE | 355010 |
| 71 | UMC355011 | ROCKY # 57 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 017 | SW SE | 355011 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range Township     Section | Subdivision | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 72 | UMC355012 | ROCKY # 58 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 017 | SE | 355012 |
| 73 | UMC355013 | ROCKY # 59 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 017 | SW SE | 355013 |
| 74 | UMC355014 | ROCKY # 61 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 017 | SW SE | 355014 |
| 75 | UMC355015 | ROCKY # 62 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 017 | NE SE | 355015 |
| 76 | UMC355016 | ROCKY # 63 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 017 | NE NW SW SE | 355016 |
| 77 | UMC355017 | ROCKY # 64 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 017 | NE | 355017 |
| 78 | UMC355018 | ROCKY # 65 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 017 | NE NW | 355018 |
| 79 | UMC355019 | ROCKY # 166 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NE | 355019 |
| 80 | UMC355020 | ROCKY # 167 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NE | 355020 |
| 81 | UMC355021 | ROCKY # 168 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NE | 355021 |
| 82 | UMC355022 | ROCKY # 184 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NE NW | 355022 |
| 83 | UMC355023 | ROCKY # 187 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NW | 355023 |
| 84 | UMC355024 | RTL # 20 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 023 | SW | 355024 |
| 85 | UMC355025 | RTL # 21 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 023 | SW | 355025 |
| 86 | UMC355026 | RTL # 22 | BEAVER | UNPATENTED CLAIM | 2/1/1994 | 26 0270S 0110W 023 | SW | 355026 |
| 87 | UMC355027 | RTL # 23 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NE SE | 355027 |
| 88 | UMC355028 | RTL # 24 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | SE | 355028 |
| 89 | UMC355029 | RTL # 25 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NE SE | 355029 |
| 90 | UMC355030 | RTL # 26 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | SE | 355030 |
| 91 | UMC355031 | RTL # 27 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NE SE | 355031 |
| 92 | UMC355032 | RTL # 28 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | SE | 355032 |
| 93 | UMC355033 | RTL # 29 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NE SE | 355033 |
| 94 | UMC355034 | RTL # 30 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | SE | 355034 |
| 95 | UMC355035 | RTL # 31 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NE NW SW SE | 355035 |
| 96 | UMC355036 | RTL # 32 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | SW SE | 355036 |
| 97 | UMC355037 | RTL # 33 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | NW SW | 355037 |
| 98 | UMC355038 | RTL # 34 | BEAVER | UNPATENTED CLAIM | 2/15/1994 | 26 0270S 0110W 022 | SW | 355038 |
| 99 | UMC355073 | BLU # 1 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 018 | NE | 355073 |
| 100 | UMC355074 | BLU # 2 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 017 | NW | 355074 |
| 101 | UMC355075 | BLU # 3 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 018 | NE | 355075 |
| 102 | UMC355076 | BLU # 4 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 008 | SW | 355076 |
| 103 | UMC355077 | BLU # 15 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 018 | NE | 355077 |
| 104 | UMC355078 | BLU # 16 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 017 | NW | 355078 |
| 105 | UMC355079 | BLU # 17 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 018 | NE | 355079 |
| 106 | UMC355080 | BLU # 18 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 017 | NW | 355080 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range<br>Township      Section | Subdivision | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 107 | UMC355081 | BLU # 19 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 019 | NE | 355081 |
| 108 | UMC355082 | BLU # 20 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 017 | NW | 355082 |
| 109 | UMC355090 | RKY # 98 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 008 | SW | 355090 |
| 110 | UMC355091 | RKY # 99 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 008 | SW | 355091 |
| 111 | UMC355092 | RKY # 100 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 008 | SW | 355092 |
| 112 | UMC355093 | RKY # 134 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 008 | SW SE | 355093 |
| 113 | UMC355094 | RKY # 135 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 008 | SW SE | 355094 |
| 114 | UMC355095 | RKY # 136 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 008 | SW SE | 355095 |
| 115 | UMC355096 | RKY # 137 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 008 | SW SE | 355096 |
| 116 | UMC355097 | RKY # 169 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 008 | SE | 355097 |
| 117 | UMC355098 | RKY # 170 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 008 | SE | 355098 |
| 118 | UMC355099 | RKY # 171 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 008 | SE | 355099 |
| 119 | UMC355100 | RKY # 172 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 008 | SE | 355100 |
| 120 | UMC355101 | ROCKY # 11 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 023 | NW | 355101 |
| 121 | UMC355102 | ROCKY # 12 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 023 | NW | 355102 |
| 122 | UMC355103 | ROCKY # 13 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 023 | NW | 355103 |
| 123 | UMC355104 | ROCKY # 14 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 023 | NW | 355104 |
| 124 | UMC355105 | ROCKY # 33 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 021 | SW SE | 355105 |
| 125 | UMC355106 | ROCKY # 34 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 021 | SW SE | 355106 |
| 126 | UMC355107 | ROCKY # 35 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 021 | SW SE | 355107 |
| 127 | UMC355108 | ROCKY # 36 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 021 | SW SE | 355108 |
| 128 | UMC355109 | ROCKY # 37 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 021 | NE NW SW SE | 355109 |
| 129 | UMC355110 | ROCKY # 38 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 021 | NE NW | 355110 |
| 130 | UMC355111 | ROCKY # 39 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 021 | NW | 355111 |
| 131 | UMC355112 | ROCKY # 40 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 021 | NE NW | 355112 |
| 132 | UMC355113 | ROCKY # 41 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 021 | NW | 355113 |
| 133 | UMC355114 | ROCKY # 42 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 021 | NE NW | 355114 |
| 134 | UMC355115 | ROCKY # 43 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 021 | NW | 355115 |
| 135 | UMC355116 | ROCKY # 44 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 021 | NE NW | 355116 |
| 136 | UMC355117 | ROCKY # 45 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 021 | NW | 355117 |
| 137 | UMC355118 | ROCKY # 66 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 017 | NE | 355118 |
| 138 | UMC355119 | ROCKY # 67 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 017 | NE NW | 355119 |
| 139 | UMC355120 | ROCKY # 68 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 017 | NE | 355120 |
| 140 | UMC355121 | ROCKY # 69 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 017 | NE NW | 355121 |
| 141 | UMC355122 | ROCKY # 70 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 017 | NE | 355122 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range Township      Section | Subdivision | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 142 | UMC355123 | ROCKY # 71 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 017 | NE NW | 355123 |
| 143 | UMC355124 | ROCKY # 401 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 005 | SE | 355124 |
| 144 | UMC355125 | ROCKY # 402 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 009 | NW | 355125 |
| 145 | UMC355126 | ROCKY # 403 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 009 | NW | 355126 |
| 146 | UMC355127 | ROCKY # 404 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 009 | NW | 355127 |
| 147 | UMC355128 | ROCKY # 405 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 009 | NW SW | 355128 |
| 148 | UMC355129 | RTL # 9 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 026 | NW | 355129 |
| 149 | UMC355130 | RTL # 10 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 026 | NW SW | 355130 |
| 150 | UMC355131 | RTL # 11 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 026 | NW | 355131 |
| 151 | UMC355132 | RTL # 12 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 026 | NW SW | 355132 |
| 152 | UMC355133 | RTL # 17 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 023 | NW SW | 355133 |
| 153 | UMC355134 | RTL # 18 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 023 | SW | 355134 |
| 154 | UMC355135 | RTL # 19 | BEAVER | UNPATENTED CLAIM | 3/25/1994 | 26 0270S 0110W 023 | NW SW | 355135 |
| 155 | UMC355269 | KB # 10 | BEAVER | UNPATENTED CLAIM | 4/13/1994 | 26 0260S 0110W 031 | SE | 355269 |
| 156 | UMC355270 | KB # 11 | BEAVER | UNPATENTED CLAIM | 4/13/1994 | 26 0260S 0110W 031 | SE | 355270 |
| 157 | UMC355271 | KB # 12 | BEAVER | UNPATENTED CLAIM | 4/13/1994 | 26 0260S 0110W 031 | SE | 355271 |
| 158 | UMC355272 | KB # 13 | BEAVER | UNPATENTED CLAIM | 4/13/1994 | 26 0260S 0110W 031 | SE | 355272 |
| 159 | UMC355273 | KB # 14 | BEAVER | UNPATENTED CLAIM | 4/13/1994 | 26 0260S 0110W 031 | SW SE | 355273 |
| 160 | UMC355274 | KB # 15 | BEAVER | UNPATENTED CLAIM | 4/14/1994 | 26 0260S 0110W 031 | SW | 355274 |
| 161 | UMC355275 | KB # 16 | BEAVER | UNPATENTED CLAIM | 4/14/1994 | 26 0260S 0110W 031 | SW | 355275 |
| 162 | UMC355276 | KB # 17 | BEAVER | UNPATENTED CLAIM | 4/14/1994 | 26 0260S 0110W 031 | SW | 355276 |
| 163 | UMC355277 | KB # 18 | BEAVER | UNPATENTED CLAIM | 4/14/1994 | 26 0260S 0110W 031 | SW | 355277 |
| 164 | UMC355279 | KB # 20 | BEAVER | UNPATENTED CLAIM | 4/15/1994 | 26 0260S 0110W 031 | SW | 355279 |
| 165 | UMC355315 | KB # 63 | BEAVER | UNPATENTED CLAIM | 4/22/1994 | 26 0270S 0110W 008 | NW SW | 355315 |
| 166 | UMC355316 | KB # 64 | BEAVER | UNPATENTED CLAIM | 4/22/1994 | 26 0270S 0110W 008 | NW SW | 355316 |
| 167 | UMC355317 | KB # 65 | BEAVER | UNPATENTED CLAIM | 4/22/1994 | 26 0270S 0110W 008 | NW SW | 355317 |
| 168 | UMC355318 | KB # 66 | BEAVER | UNPATENTED CLAIM | 4/22/1994 | 26 0270S 0110W 008 | NE NW SW SE | 355318 |
| 169 | UMC355319 | KB # 67 | BEAVER | UNPATENTED CLAIM | 4/22/1994 | 26 0270S 0110W 008 | NE SE | 355319 |
| 170 | UMC355320 | KB # 68 | BEAVER | UNPATENTED CLAIM | 4/22/1994 | 26 0270S 0110W 008 | NE SE | 355320 |
| 171 | UMC355321 | KB # 69 | BEAVER | UNPATENTED CLAIM | 4/22/1994 | 26 0270S 0110W 008 | NE SE | 355321 |
| 172 | UMC356293 | QUAG # 24 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NW | 356293 |
| 173 | UMC356294 | QUAG # 25 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NW | 356294 |
| 174 | UMC356295 | QUAG # 26 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NW | 356295 |
| 175 | UMC356296 | QUAG # 27 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NW | 356296 |
| 176 | UMC356297 | QUAG # 28 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NE NW | 356297 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian Range Township    Section | Subdivision | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 177 | UMC356298 | QUAG # 29 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NE | 356298 |
| 178 | UMC356299 | QUAG # 30 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NE | 356299 |
| 179 | UMC356300 | QUAG # 31 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NE | 356300 |
| 180 | UMC356301 | QUAG # 32 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NE | 356301 |
| 181 | UMC356302 | QUAG # 33 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NE SE | 356302 |
| 182 | UMC356303 | QUAG # 34 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NE SE | 356303 |
| 183 | UMC356304 | QUAG # 35 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NE SE | 356304 |
| 184 | UMC356305 | QUAG # 36 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NE SE | 356305 |
| 185 | UMC356306 | QUAG # 37 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NE NW SW SE | 356306 |
| 186 | UMC356307 | QUAG # 38 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NW SW | 356307 |
| 187 | UMC356308 | QUAG # 39 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NW SW | 356308 |
| 188 | UMC356309 | QUAG # 40 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | NW SW | 356309 |
| 189 | UMC356310 | QUAG # 42 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 006 | SW | 356310 |
| 190 | UMC356312 | QUAG # 56 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 007 | NW SW | 356312 |
| 191 | UMC356313 | QUAG # 57 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 007 | NW SW | 356313 |
| 192 | UMC356314 | QUAG # 58 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0110W 007 | NW SW | 356314 |
| 193 | UMC356315 | QUAG # 59 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0120W 012 | NE SE | 356315 |
| 194 | UMC356316 | QUAG # 60 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0120W 012 | NE SE | 356316 |
| 195 | UMC356317 | QUAG # 61 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0120W 012 | NE SE | 356317 |
| 196 | UMC356318 | QUAG # 70 | BEAVER | UNPATENTED CLAIM | 9/8/1994 | 26 0270S 0120W 012 | NE SE | 356318 |
| 197 | UMC356319 | QUAG # 71 | BEAVER | UNPATENTED CLAIM | 9/19/1994 | 26 0270S 0120W 012 | NE | 356319 |
| 198 | UMC356320 | QUAG # 72 | BEAVER | UNPATENTED CLAIM | 9/20/1994 | 26 0270S 0120W 012 | NE | 356320 |
| 199 | UMC356347 | QUAG F | BEAVER | UNPATENTED CLAIM | 9/19/1994 | 26 0270S 0110W 006 | SW SE | 356347 |
| 200 | UMC356348 | QUAG F # 2 | BEAVER | UNPATENTED CLAIM | 9/20/1994 | 26 0270S 0110W 007 | NW | 356348 |
| 201 | UMC358571 | BLU 21 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 017 | NW SW | 358571 |
| 202 | UMC358572 | BLU 22 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 017 | NE NW | 358572 |
| 203 | UMC358573 | BLU 23 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 017 | NW SW | 358573 |
| 204 | UMC358574 | BLU 24 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 017 | NE NW SW | 358574 |
| 205 | UMC358575 | BLU 25 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 017 | SW | 358575 |
| 206 | UMC358576 | ROCKY 206 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NW | 358576 |
| 207 | UMC358577 | ROCKY 207 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NW | 358577 |
| 208 | UMC358578 | ROCKY 208 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NW | 358578 |
| 209 | UMC358579 | ROCKY 209 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NW | 358579 |
| 210 | UMC358580 | ROCKY 210 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NW SW | 358580 |
| 211 | UMC358581 | ROCKY 406 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 009 | SW | 358581 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range  Township      Section | Subdivision | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 212 | UMC358582 | ROCKY 407 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 009 | SW | 358582 |
| 213 | UMC358583 | ROCKY 408 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 009 | SW | 358583 |
| 214 | UMC358584 | ROCKY 409 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 008 | SE | 358584 |
| 215 | UMC358585 | RTL 35 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NE | 358585 |
| 216 | UMC358586 | RTL 36 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NE SE | 358586 |
| 217 | UMC358587 | RTL 37 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NE | 358587 |
| 218 | UMC358588 | RTL 38 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NE SE | 358588 |
| 219 | UMC358589 | RTL 39 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NE | 358589 |
| 220 | UMC358590 | RTL 40 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NE SE | 358590 |
| 221 | UMC358591 | RTL 41 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NE | 358591 |
| 222 | UMC358592 | RTL 42 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NE SE | 358592 |
| 223 | UMC358593 | RTL 43 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NE NW | 358593 |
| 224 | UMC358594 | RTL 44 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NE NW SW SE | 358594 |
| 225 | UMC358595 | RTL 45 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NW | 358595 |
| 226 | UMC358596 | RTL 46 | BEAVER | UNPATENTED CLAIM | 9/3/1995 | 26 0270S 0110W 027 | NW SW | 358596 |

Any and all right and claim of WUCC to the following:

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range  Township      Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 1 | UMC370730 | BINGHAM # 1 | BEAVER | UNPATENTED CLAIM | 11/6/2003 | 26 0260S 0130W 035 | SW | 370730 |
| 2 | UMC401572 | BINGHAM-1 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0110W 035 | NW | 401572 |
| 3 | UMC401573 | BINGHAM-2 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0110W 035 | NE | 401573 |
| 4 | UMC401574 | BINGHAM-3 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0110W 035 | SW | 401574 |
| 5 | UMC401575 | BINGHAM-4 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0110W 035 | SE | 401575 |
| 6 | UMC401576 | BINGHAM-5 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 011 | NW | 401576 |
| 7 | UMC401577 | BINGHAM-6 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 011 | NE | 401577 |
| 8 | UMC401578 | BINGHAM-7 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 011 | SW | 401578 |
| 9 | UMC401579 | BINGHAM-8 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 011 | SE | 401579 |
| 10 | UMC401580 | BINGHAM-9 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 023 | NW | 401580 |
| 11 | UMC401581 | BINGHAM-10 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 023 | NE | 401581 |
| 12 | UMC401582 | BINGHAM-11 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 023 | SW | 401582 |
| 13 | UMC401583 | BINGHAM-12 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 023 | SE | 401583 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range Township      Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 14 | UMC401584 | BINGHAM-13 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 026 | NW | 401584 |
| 15 | UMC401585 | BINGHAM-14 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 026 | NE | 401585 |
| 16 | UMC401586 | BINGHAM-15 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 026 | SW | 401586 |
| 17 | UMC401587 | BINGHAM-16 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 026 | SE | 401587 |
| 18 | UMC401588 | BINGHAM-17 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 035 | NW | 401588 |
| 19 | UMC401589 | BINGHAM-18 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 035 | NE | 401589 |
| 20 | UMC401590 | BINGHAM-19 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 035 | SW | 401590 |
| 21 | UMC401591 | BINGHAM-20 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0110W 035 | SE | 401591 |
| 22 | UMC401592 | BINGHAM-21 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0260S 0110W 034 | NW | 401592 |
| 23 | UMC401593 | BINGHAM-22 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0260S 0110W 034 | NE | 401593 |
| 24 | UMC401594 | BINGHAM-23 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0260S 0110W 034 | SW | 401594 |
| 25 | UMC401595 | BINGHAM-24 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0260S 0110W 034 | SE | 401595 |
| 26 | UMC401596 | BINGHAM-25 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 003 | NW | 401596 |
| 27 | UMC401597 | BINGHAM-26 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 003 | NE | 401597 |
| 28 | UMC401598 | BINGHAM-27 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 003 | SW | 401598 |
| 29 | UMC401599 | BINGHAM-28 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 003 | SE | 401599 |
| 30 | UMC401600 | BINGHAM-29 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 010 | NW | 401600 |
| 31 | UMC401601 | BINGHAM-30 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 010 | NE | 401601 |
| 32 | UMC401602 | BINGHAM-31 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 010 | SW | 401602 |
| 33 | UMC401603 | BINGHAM-32 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 010 | SE | 401603 |
| 34 | UMC401604 | BINGHAM-33 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 015 | NW | 401604 |
| 35 | UMC401605 | BINGHAM-34 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 027 | NW | 401605 |
| 36 | UMC401606 | BINGHAM-35 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 027 | SW | 401606 |
| 37 | UMC401607 | BINGHAM-36 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 034 | NW | 401607 |
| 38 | UMC401608 | BINGHAM-37 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 034 | SW | 401608 |
| 39 | UMC401609 | BINGHAM-38 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 034 | SE | 401609 |
| 40 | UMC401610 | BINGHAM-39 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0260S 0110W 033 | NW | 401610 |
| 41 | UMC401611 | BINGHAM-40 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0260S 0110W 033 | NE | 401611 |
| 42 | UMC401612 | BINGHAM-41 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0260S 0110W 033 | SW | 401612 |
| 43 | UMC401613 | BINGHAM-42 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0260S 0110W 033 | SE | 401613 |
| 44 | UMC401614 | BINGHAM-43 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 004 | NW | 401614 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range  Township      Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 45 | UMC401615 | BINGHAM-44 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 004 | NE | 401615 |
| 46 | UMC401616 | BINGHAM-45 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 004 | SW | 401616 |
| 47 | UMC401617 | BINGHAM-46 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 004 | SE | 401617 |
| 48 | UMC401618 | BINGHAM-47 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 009 | NW | 401618 |
| 49 | UMC401619 | BINGHAM-48 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 009 | NE | 401619 |
| 50 | UMC401620 | BINGHAM-49 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 009 | SW | 401620 |
| 51 | UMC401621 | BINGHAM-50 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 009 | SE | 401621 |
| 52 | UMC401622 | BINGHAM-51 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 021 | NW | 401622 |
| 53 | UMC401623 | BINGHAM-52 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 021 | SW | 401623 |
| 54 | UMC401624 | BINGHAM-53 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 028 | NW | 401624 |
| 55 | UMC401625 | BINGHAM-54 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 028 | SW | 401625 |
| 56 | UMC401626 | BINGHAM-55 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 028 | SE | 401626 |
| 57 | UMC401627 | BINGHAM-56 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 033 | NW | 401627 |
| 58 | UMC401628 | BINGHAM-57 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 033 | NE | 401628 |
| 59 | UMC401629 | BINGHAM-58 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 005 | NW | 401629 |
| 60 | UMC401630 | BINGHAM-59 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 005 | NE | 401630 |
| 61 | UMC401631 | BINGHAM-60 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 005 | SW | 401631 |
| 62 | UMC401632 | BINGHAM-61 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 005 | SE | 401632 |
| 63 | UMC401633 | BINGHAM-62 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0270S 0110W 017 | SW | 401633 |
| 64 | UMC401634 | BINGHAM-63 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0270S 0110W 017 | SE | 401634 |
| 65 | UMC401635 | BINGHAM-64 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0270S 0110W 020 | NW | 401635 |
| 66 | UMC401636 | BINGHAM-65 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0270S 0110W 020 | NE | 401636 |
| 67 | UMC401637 | BINGHAM-66 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0270S 0110W 020 | SW | 401637 |
| 68 | UMC401638 | BINGHAM-67 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0270S 0110W 020 | SE | 401638 |
| 69 | UMC401639 | BINGHAM-68 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0270S 0110W 029 | NW | 401639 |
| 70 | UMC401640 | BINGHAM-69 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0270S 0110W 029 | NE | 401640 |
| 71 | UMC401641 | BINGHAM-70 | BEAVER | UNPATENTED CLAIM | 10/4/2007 | 26 0270S 0110W 029 | SW | 401641 |
| 72 | UMC401642 | BINGHAM-71 | BEAVER | UNPATENTED CLAIM | 10/4/2007 | 26 0270S 0110W 029 | SE | 401642 |
| 73 | UMC401643 | BINGHAM-72 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0260S 0110W 031 | NW | 401643 |
| 74 | UMC401644 | BINGHAM-73 | BEAVER | UNPATENTED CLAIM | 10/4/2007 | 26 0260S 0110W 031 | NE | 401644 |
| 75 | UMC401645 | BINGHAM-74 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0260S 0110W 031 | SW | 401645 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range<br>Township      Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 76 | UMC401646 | BINGHAM-75 | BEAVER | UNPATENTED CLAIM | 10/4/2007 | 26 0260S 0110W 031 | SE | 401646 |
| 77 | UMC401647 | BINGHAM-76 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0110W 007 | NE | 401647 |
| 78 | UMC401648 | BINGHAM-77 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0110W 007 | SW | 401648 |
| 79 | UMC401649 | BINGHAM-78 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0110W 007 | SE | 401649 |
| 80 | UMC401650 | BINGHAM-79 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0110W 018 | NW | 401650 |
| 81 | UMC401651 | BINGHAM-80 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0110W 018 | NE | 401651 |
| 82 | UMC401652 | BINGHAM-81 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0110W 018 | SW | 401652 |
| 83 | UMC401653 | BINGHAM-82 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0110W 018 | SE | 401653 |
| 84 | UMC401654 | BINGHAM-83 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0110W 019 | NW | 401654 |
| 85 | UMC401655 | BINGHAM-84 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0110W 019 | NE | 401655 |
| 86 | UMC401656 | BINGHAM-85 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0110W 019 | SW | 401656 |
| 87 | UMC401657 | BINGHAM-86 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0110W 019 | SE | 401657 |
| 88 | UMC401658 | BINGHAM-87 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0120W 025 | NW | 401658 |
| 89 | UMC401659 | BINGHAM-88 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0120W 025 | SW | 401659 |
| 90 | UMC401660 | BINGHAM-89 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 001 | NW | 401660 |
| 91 | UMC401661 | BINGHAM-90 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 001 | NE | 401661 |
| 92 | UMC401662 | BINGHAM-91 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 001 | SW | 401662 |
| 93 | UMC401663 | BINGHAM-92 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 001 | SE | 401663 |
| 94 | UMC401664 | BINGHAM-93 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 012 | NW | 401664 |
| 95 | UMC401665 | BINGHAM-94 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 012 | NE | 401665 |
| 96 | UMC401666 | BINGHAM-95 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 012 | SW | 401666 |
| 97 | UMC401667 | BINGHAM-96 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 012 | SE | 401667 |
| 98 | UMC401668 | BINGHAM-97 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 013 | NW | 401668 |
| 99 | UMC401669 | BINGHAM-98 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 013 | NE | 401669 |
| 100 | UMC401670 | BINGHAM-99 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 013 | SW | 401670 |
| 101 | UMC401671 | BINGHAM-100 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 013 | SE | 401671 |
| 102 | UMC401672 | BINGHAM-101 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0120W 026 | NW | 401672 |
| 103 | UMC401673 | BINGHAM-102 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0120W 026 | NE | 401673 |
| 104 | UMC401674 | BINGHAM-103 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0120W 026 | SW | 401674 |
| 105 | UMC401675 | BINGHAM-104 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0120W 026 | SE | 401675 |
| 106 | UMC401676 | BINGHAM-105 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0120W 035 | NW | 401676 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range Township     Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 107 | UMC401677 | BINGHAM-106 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0120W 035 | NE | 401677 |
| 108 | UMC401678 | BINGHAM-107 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0120W 035 | SW | 401678 |
| 109 | UMC401679 | BINGHAM-108 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0260S 0120W 035 | SE | 401679 |
| 110 | UMC401680 | BINGHAM-109 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 011 | NW | 401680 |
| 111 | UMC401681 | BINGHAM-110 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 011 | NE | 401681 |
| 112 | UMC401682 | BINGHAM-111 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 011 | SW | 401682 |
| 113 | UMC401683 | BINGHAM-112 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 011 | SE | 401683 |
| 114 | UMC401684 | BINGHAM-113 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 014 | NW | 401684 |
| 115 | UMC401685 | BINGHAM-114 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 014 | NE | 401685 |
| 116 | UMC401686 | BINGHAM-115 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 014 | SW | 401686 |
| 117 | UMC401687 | BINGHAM-116 | BEAVER | UNPATENTED CLAIM | 9/22/2007 | 26 0270S 0120W 014 | SE | 401687 |
| 118 | UMC401688 | BINGHAM-117 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0120W 015 | NW | 401688 |
| 119 | UMC401689 | BINGHAM-118 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0120W 015 | NE | 401689 |
| 120 | UMC401690 | BINGHAM-119 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0120W 015 | SW | 401690 |
| 121 | UMC401691 | BINGHAM-120 | BEAVER | UNPATENTED CLAIM | 9/23/2007 | 26 0270S 0120W 015 | SE | 401691 |
| 122 | UMC401824 | BINGHAM-121 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 004 | SW | 401824 |
| 123 | UMC401825 | BINGHAM-122 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 004 | SE | 401825 |
| 124 | UMC401826 | BINGHAM-123 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 003 | SW | 401826 |
| 125 | UMC401827 | BINGHAM-124 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 003 | SE | 401827 |
| 126 | UMC401828 | BINGHAM-125 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 001 | SW | 401828 |
| 127 | UMC401829 | BINGHAM-126 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 001 | SE | 401829 |
| 128 | UMC401830 | BINGHAM-127 | BEAVER | UNPATENTED CLAIM | 9/27/2007 | 26 0280S 0120W 006 | SW | 401830 |
| 129 | UMC401831 | BINGHAM-128 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 004 | NW | 401831 |
| 130 | UMC401832 | BINGHAM-129 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 004 | NW | 401832 |
| 131 | UMC401833 | BINGHAM-130 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 004 | NE | 401833 |
| 132 | UMC401834 | BINGHAM-131 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 004 | NE | 401834 |
| 133 | UMC401835 | BINGHAM-132 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 003 | NW | 401835 |
| 134 | UMC401836 | BINGHAM-133 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 003 | NW | 401836 |
| 135 | UMC401837 | BINGHAM-134 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0280S 0130W 003 | NE | 401837 |
| 136 | UMC401838 | BINGHAM-135 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0280S 0130W 003 | NE | 401838 |
| 137 | UMC401839 | BINGHAM-136 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 001 | NW | 401839 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range  Township       Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 138 | UMC401840 | BINGHAM-137 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 001 | NW | 401840 |
| 139 | UMC401841 | BINGHAM-138 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 001 | NE | 401841 |
| 140 | UMC401842 | BINGHAM-139 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0280S 0130W 001 | NE | 401842 |
| 141 | UMC401843 | BINGHAM-140 | BEAVER | UNPATENTED CLAIM | 9/27/2007 | 26 0280S 0120W 006 | NW | 401843 |
| 142 | UMC401844 | BINGHAM-141 | BEAVER | UNPATENTED CLAIM | 9/27/2007 | 26 0280S 0120W 006 | NW | 401844 |
| 143 | UMC401845 | BINGHAM-142 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0130W 033 | SW | 401845 |
| 144 | UMC401846 | BINGHAM-143 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0130W 033 | SW | 401846 |
| 145 | UMC401847 | BINGHAM-144 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0130W 033 | SE | 401847 |
| 146 | UMC401848 | BINGHAM-145 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0130W 033 | SE | 401848 |
| 147 | UMC401849 | BINGHAM-146 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0130W 034 | SW | 401849 |
| 148 | UMC401850 | BINGHAM-147 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0130W 034 | SW | 401850 |
| 149 | UMC401851 | BINGHAM-148 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 034 | SE | 401851 |
| 150 | UMC401852 | BINGHAM-149 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 034 | SE | 401852 |
| 151 | UMC401853 | BINGHAM-150 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 035 | SW | 401853 |
| 152 | UMC401854 | BINGHAM-151 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 035 | SW | 401854 |
| 153 | UMC401855 | BINGHAM-152 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 035 | SE | 401855 |
| 154 | UMC401856 | BINGHAM-153 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 035 | SE | 401856 |
| 155 | UMC401857 | BINGHAM-154 | BEAVER | UNPATENTED CLAIM | 9/27/2007 | 26 0270S 0120W 031 | SW | 401857 |
| 156 | UMC401858 | BINGHAM-155 | BEAVER | UNPATENTED CLAIM | 9/27/2007 | 26 0270S 0120W 031 | SW | 401858 |
| 157 | UMC401859 | BINGHAM-156 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 031 | SW | 401859 |
| 158 | UMC401860 | BINGHAM-157 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 031 | SW | 401860 |
| 159 | UMC401861 | BINGHAM-158 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 031 | SE | 401861 |
| 160 | UMC401862 | BINGHAM-159 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0130W 033 | NW | 401862 |
| 161 | UMC401863 | BINGHAM-160 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0130W 033 | NE | 401863 |
| 162 | UMC401864 | BINGHAM-161 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 034 | NW | 401864 |
| 163 | UMC401865 | BINGHAM-162 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 034 | NE | 401865 |
| 164 | UMC401866 | BINGHAM-163 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 035 | NW | 401866 |
| 165 | UMC401867 | BINGHAM-164 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 035 | NE | 401867 |
| 166 | UMC401868 | BINGHAM-165 | BEAVER | UNPATENTED CLAIM | 9/27/2007 | 26 0270S 0120W 031 | NW | 401868 |
| 167 | UMC401869 | BINGHAM-166 | BEAVER | UNPATENTED CLAIM | 9/27/2007 | 26 0270S 0120W 031 | NW | 401869 |
| 168 | UMC401870 | BINGHAM-167 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 031 | NW | 401870 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range  Township      Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 169 | UMC401871 | BINGHAM-168 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 031 | NW | 401871 |
| 170 | UMC401872 | BINGHAM-169 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 031 | NE | 401872 |
| 171 | UMC401873 | BINGHAM-170 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 028 | SW | 401873 |
| 172 | UMC401874 | BINGHAM-171 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 028 | SE | 401874 |
| 173 | UMC401875 | BINGHAM-172 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 027 | SW | 401875 |
| 174 | UMC401876 | BINGHAM-173 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 027 | SE | 401876 |
| 175 | UMC401877 | BINGHAM-174 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 026 | SW | 401877 |
| 176 | UMC401878 | BINGHAM-175 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 026 | SE | 401878 |
| 177 | UMC401879 | BINGHAM-176 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 025 | SW | 401879 |
| 178 | UMC401880 | BINGHAM-177 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 025 | SE | 401880 |
| 179 | UMC401881 | BINGHAM-178 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0120W 030 | SW | 401881 |
| 180 | UMC401882 | BINGHAM-179 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0120W 030 | SW | 401882 |
| 181 | UMC401883 | BINGHAM-180 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 030 | SE | 401883 |
| 182 | UMC401884 | BINGHAM-181 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 029 | SW | 401884 |
| 183 | UMC401885 | BINGHAM-182 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 029 | SE | 401885 |
| 184 | UMC401886 | BINGHAM-183 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 028 | SW | 401886 |
| 185 | UMC401887 | BINGHAM-184 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 028 | SE | 401887 |
| 186 | UMC401888 | BINGHAM-185 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0120W 025 | SW | 401888 |
| 187 | UMC401889 | BINGHAM-186 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0120W 025 | SE | 401889 |
| 188 | UMC401890 | BINGHAM-187 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 030 | SW | 401890 |
| 189 | UMC401891 | BINGHAM-188 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 030 | SW | 401891 |
| 190 | UMC401892 | BINGHAM-189 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 030 | SE | 401892 |
| 191 | UMC401893 | BINGHAM-190 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 028 | NW | 401893 |
| 192 | UMC401894 | BINGHAM-191 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 028 | NE | 401894 |
| 193 | UMC401895 | BINGHAM-192 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 027 | NW | 401895 |
| 194 | UMC401896 | BINGHAM-193 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 027 | NE | 401896 |
| 195 | UMC401897 | BINGHAM-194 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 026 | NW | 401897 |
| 196 | UMC401898 | BINGHAM-195 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 026 | NE | 401898 |
| 197 | UMC401899 | BINGHAM-196 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 025 | NW | 401899 |
| 198 | UMC401900 | BINGHAM-197 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0130W 025 | NE | 401900 |
| 199 | UMC401901 | BINGHAM-198 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 030 | NW | 401901 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range Township     Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 200 | UMC401902 | BINGHAM-199 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 030 | NW | 401902 |
| 201 | UMC401903 | BINGHAM-200 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 030 | NE | 401903 |
| 202 | UMC401904 | BINGHAM-201 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 029 | NW | 401904 |
| 203 | UMC401905 | BINGHAM-202 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 029 | NE | 401905 |
| 204 | UMC401906 | BINGHAM-203 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 028 | NW | 401906 |
| 205 | UMC401907 | BINGHAM-204 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 028 | NE | 401907 |
| 206 | UMC401908 | BINGHAM-205 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0120W 025 | NW | 401908 |
| 207 | UMC401909 | BINGHAM-206 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0120W 025 | NE | 401909 |
| 208 | UMC401910 | BINGHAM-207 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0110W 030 | NE | 401910 |
| 209 | UMC401911 | BINGHAM-208 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0270S 0130W 022 | SW | 401911 |
| 210 | UMC401912 | BINGHAM-209 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 022 | SE | 401912 |
| 211 | UMC401913 | BINGHAM-210 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 023 | SE | 401913 |
| 212 | UMC401914 | BINGHAM-211 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 024 | SW | 401914 |
| 213 | UMC401915 | BINGHAM-212 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 024 | SE | 401915 |
| 214 | UMC401916 | BINGHAM-213 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 019 | SW | 401916 |
| 215 | UMC401917 | BINGHAM-214 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 019 | SW | 401917 |
| 216 | UMC401918 | BINGHAM-215 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 019 | SE | 401918 |
| 217 | UMC401919 | BINGHAM-216 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 020 | SW | 401919 |
| 218 | UMC401920 | BINGHAM-217 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 020 | SE | 401920 |
| 219 | UMC401921 | BINGHAM-218 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 021 | SW | 401921 |
| 220 | UMC401922 | BINGHAM-219 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 021 | SE | 401922 |
| 221 | UMC401923 | BINGHAM-220 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 022 | SW | 401923 |
| 222 | UMC401924 | BINGHAM-221 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 022 | SE | 401924 |
| 223 | UMC401925 | BINGHAM-222 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 023 | SW | 401925 |
| 224 | UMC401926 | BINGHAM-223 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 023 | SE | 401926 |
| 225 | UMC401927 | BINGHAM-224 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0120W 024 | SW | 401927 |
| 226 | UMC401928 | BINGHAM-225 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0120W 024 | SE | 401928 |
| 227 | UMC401929 | BINGHAM-226 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0270S 0130W 022 | NW | 401929 |
| 228 | UMC401930 | BINGHAM-227 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 023 | NE | 401930 |
| 229 | UMC401931 | BINGHAM-228 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 024 | NW | 401931 |
| 230 | UMC401933 | BINGHAM-230 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 019 | NW | 401933 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range Township      Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 231 | UMC401934 | BINGHAM-231 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 029 | NW | 401934 |
| 232 | UMC401935 | BINGHAM-232 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 019 | NE | 401935 |
| 233 | UMC401936 | BINGHAM-233 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 020 | NW | 401936 |
| 234 | UMC401937 | BINGHAM-234 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 020 | NE | 401937 |
| 235 | UMC401938 | BINGHAM-235 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 021 | NW | 401938 |
| 236 | UMC401939 | BINGHAM-236 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 021 | NE | 401939 |
| 237 | UMC401940 | BINGHAM-237 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 022 | NW | 401940 |
| 238 | UMC401941 | BINGHAM-238 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 022 | NE | 401941 |
| 239 | UMC401942 | BINGHAM-239 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 023 | NW | 401942 |
| 240 | UMC401943 | BINGHAM-240 | BEAVER | UNPATENTED CLAIM | 9/28/2007 | 26 0270S 0120W 023 | NE | 401943 |
| 241 | UMC401944 | BINGHAM-241 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0120W 024 | NW | 401944 |
| 242 | UMC401945 | BINGHAM-242 | BEAVER | UNPATENTED CLAIM | 9/29/2007 | 26 0270S 0120W 024 | NE | 401945 |
| 243 | UMC401946 | BINGHAM-243 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 014 | SE | 401946 |
| 244 | UMC401947 | BINGHAM-244 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 013 | SW | 401947 |
| 245 | UMC401948 | BINGHAM-245 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 013 | SE | 401948 |
| 246 | UMC401949 | BINGHAM-246 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 018 | SW | 401949 |
| 247 | UMC401950 | BINGHAM-247 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 018 | SW | 401950 |
| 248 | UMC401951 | BINGHAM-248 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 018 | SW | 401951 |
| 249 | UMC401952 | BINGHAM-249 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 017 | SW | 401952 |
| 250 | UMC401953 | BINGHAM-250 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 017 | SE | 401953 |
| 251 | UMC401954 | BINGHAM-251 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 014 | NE | 401954 |
| 252 | UMC401955 | BINGHAM-252 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 013 | NW | 401955 |
| 253 | UMC401956 | BINGHAM-253 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 013 | NE | 401956 |
| 254 | UMC401957 | BINGHAM-254 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 018 | NW | 401957 |
| 255 | UMC401958 | BINGHAM-255 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 018 | NW | 401958 |
| 256 | UMC401959 | BINGHAM-256 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 018 | NE | 401959 |
| 257 | UMC401960 | BINGHAM-257 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 017 | NW | 401960 |
| 258 | UMC401961 | BINGHAM-258 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 017 | NE | 401961 |
| 259 | UMC401962 | BINGHAM-259 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 007 | SW | 401962 |
| 260 | UMC401963 | BINGHAM-260 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 007 | SW | 401963 |
| 261 | UMC401964 | BINGHAM-261 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 007 | SE | 401964 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range  Township    Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 262 | UMC401965 | BINGHAM-262 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 008 | SW | 401965 |
| 263 | UMC401966 | BINGHAM-263 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 008 | SE | 401966 |
| 264 | UMC401967 | BINGHAM-264 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 009 | SW | 401967 |
| 265 | UMC401968 | BINGHAM-265 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 007 | NW | 401968 |
| 266 | UMC401969 | BINGHAM-266 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 007 | NW | 401969 |
| 267 | UMC401970 | BINGHAM-267 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 007 | NE | 401970 |
| 268 | UMC401971 | BINGHAM-268 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 008 | NW | 401971 |
| 269 | UMC401972 | BINGHAM-269 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 008 | NE | 401972 |
| 270 | UMC401973 | BINGHAM-270 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 009 | NW | 401973 |
| 271 | UMC401974 | BINGHAM-271 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 001 | SW | 401974 |
| 272 | UMC401975 | BINGHAM-272 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 001 | SE | 401975 |
| 273 | UMC401976 | BINGHAM-273 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 006 | SW | 401976 |
| 274 | UMC401977 | BINGHAM-274 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 006 | SW | 401977 |
| 275 | UMC401978 | BINGHAM-275 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0120W 006 | SE | 401978 |
| 276 | UMC401979 | BINGHAM-276 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0270S 0120W 005 | SW | 401979 |
| 277 | UMC401980 | BINGHAM-277 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0270S 0120W 005 | SE | 401980 |
| 278 | UMC401981 | BINGHAM-278 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0270S 0120W 004 | SW | 401981 |
| 279 | UMC401982 | BINGHAM-279 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 001 | NW | 401982 |
| 280 | UMC401983 | BINGHAM-280 | BEAVER | UNPATENTED CLAIM | 9/30/2007 | 26 0270S 0130W 001 | NE | 401983 |
| 281 | UMC401984 | BINGHAM-281 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0270S 0120W 006 | NW | 401984 |
| 282 | UMC401985 | BINGHAM-282 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0270S 0120W 006 | NE | 401985 |
| 283 | UMC401986 | BINGHAM-283 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0270S 0120W 005 | NW | 401986 |
| 284 | UMC401987 | BINGHAM-284 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0270S 0120W 005 | NE | 401987 |
| 285 | UMC401988 | BINGHAM-285 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0270S 0120W 004 | NW | 401988 |
| 286 | UMC401989 | BINGHAM-286 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0120W 031 | SW | 401989 |
| 287 | UMC401990 | BINGHAM-287 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0120W 031 | SE | 401990 |
| 288 | UMC401991 | BINGHAM-288 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0120W 033 | SW | 401991 |
| 289 | UMC401992 | BINGHAM-289 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0120W 031 | NW | 401992 |
| 290 | UMC401993 | BINGHAM-290 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0120W 031 | NE | 401993 |
| 291 | UMC401994 | BINGHAM-291 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0120W 033 | NW | 401994 |
| 292 | UMC401995 | BINGHAM-292 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0120W 029 | SW | 401995 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian   Range Township        Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 293 | UMC401996 | BINGHAM-293 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0120W 029 | SE | 401996 |
| 294 | UMC401997 | BINGHAM-294 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0120W 028 | SW | 401997 |
| 295 | UMC401998 | BINGHAM-295 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0120W 028 | SE | 401998 |
| 296 | UMC401999 | BINGHAM-296 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0120W 027 | SW | 401999 |
| 297 | UMC402000 | BINGHAM-297 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0120W 027 | SE | 402000 |
| 298 | UMC402001 | BINGHAM-298 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0120W 029 | NW | 402001 |
| 299 | UMC402002 | BINGHAM-299 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0120W 029 | NE | 402002 |
| 300 | UMC402003 | BINGHAM-300 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0120W 028 | NW | 402003 |
| 301 | UMC402004 | BINGHAM-301 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0120W 028 | NE | 402004 |
| 302 | UMC402005 | BINGHAM-302 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0120W 027 | NW | 402005 |
| 303 | UMC402006 | BINGHAM-303 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0120W 027 | NE | 402006 |
| 304 | UMC402007 | BINGHAM-304 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0270S 0110W 025 | SW | 402007 |
| 305 | UMC402008 | BINGHAM-305 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0270S 0110W 025 | NW | 402008 |
| 306 | UMC402009 | BINGHAM-306 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0110W 030 | SW | 402009 |
| 307 | UMC402010 | BINGHAM-307 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0110W 030 | SW | 402010 |
| 308 | UMC402011 | BINGHAM-308 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0110W 030 | SE | 402011 |
| 309 | UMC402012 | BINGHAM-309 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0110W 026 | SW | 402012 |
| 310 | UMC402013 | BINGHAM-310 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0110W 030 | NW | 402013 |
| 311 | UMC402014 | BINGHAM-311 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0110W 030 | NW | 402014 |
| 312 | UMC402015 | BINGHAM-312 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0110W 030 | NE | 402015 |
| 313 | UMC402016 | BINGHAM-313 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0110W 028 | NW | 402016 |
| 314 | UMC402017 | BINGHAM-314 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0110W 028 | NE | 402017 |
| 315 | UMC402018 | BINGHAM-315 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0110W 027 | NW | 402018 |
| 316 | UMC402019 | BINGHAM-316 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0110W 027 | NE | 402019 |
| 317 | UMC402020 | BINGHAM-317 | BEAVER | UNPATENTED CLAIM | 10/1/2007 | 26 0260S 0110W 026 | NW | 402020 |
| 318 | UMC402021 | BINGHAM-318 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0110W 019 | SW | 402021 |
| 319 | UMC402022 | BINGHAM-319 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0110W 019 | SW | 402022 |
| 320 | UMC402023 | BINGHAM-320 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0110W 019 | NE | 402023 |
| 321 | UMC402024 | BINGHAM-321 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0110W 018 | SW | 402024 |
| 322 | UMC402025 | BINGHAM-322 | BEAVER | UNPATENTED CLAIM | 10/2/2007 | 26 0260S 0110W 018 | SW | 402025 |
| 323 | UMC402026 | BINGHAM-323 | BEAVER | UNPATENTED CLAIM | 11/4/2007 | 26 0270S 0110W 015 | NE | 402026 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range Township      Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 324 | UMC402027 | BINGHAM-324 | BEAVER | UNPATENTED CLAIM | 11/4/2007 | 26 0270S 0110W 015 | SW | 402027 |
| 325 | UMC402028 | BINGHAM-325 | BEAVER | UNPATENTED CLAIM | 11/4/2007 | 26 0270S 0110W 015 | SE | 402028 |
| 326 | UMC402029 | BINGHAM-326 | BEAVER | UNPATENTED CLAIM | 11/4/2007 | 26 0270S 0110W 021 | NE | 402029 |
| 327 | UMC402030 | BINGHAM-327 | BEAVER | UNPATENTED CLAIM | 11/4/2007 | 26 0270S 0110W 022 | NW | 402030 |
| 328 | UMC402031 | BINGHAM-328 | BEAVER | UNPATENTED CLAIM | 11/4/2007 | 26 0270S 0110W 022 | NE | 402031 |
| 329 | UMC402032 | BINGHAM-329 | BEAVER | UNPATENTED CLAIM | 11/4/2007 | 26 0270S 0110W 021 | SE | 402032 |
| 330 | UMC402033 | BINGHAM-330 | BEAVER | UNPATENTED CLAIM | 11/4/2007 | 26 0270S 0110W 022 | SW | 402033 |
| 331 | UMC402034 | BINGHAM-331 | BEAVER | UNPATENTED CLAIM | 11/4/2007 | 26 0270S 0110W 022 | SE | 402034 |
| 332 | UMC402035 | BINGHAM-332 | BEAVER | UNPATENTED CLAIM | 11/4/2007 | 26 0270S 0110W 027 | NE | 402035 |
| 333 | UMC402036 | BINGHAM-333 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0270S 0110W 006 | NW | 402036 |
| 334 | UMC402037 | BINGHAM-334 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0270S 0110W 006 | NE | 402037 |
| 335 | UMC402038 | BINGHAM-335 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0270S 0110W 006 | SW | 402038 |
| 336 | UMC402039 | BINGHAM-336 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0270S 0110W 006 | SE | 402039 |
| 337 | UMC402040 | BINGHAM-337 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0270S 0110W 007 | NW | 402040 |
| 338 | UMC402041 | BINGHAM-338 | BEAVER | UNPATENTED CLAIM | 10/18/2007 | 26 0270S 0110W 008 | NW | 402041 |
| 339 | UMC402042 | BINGHAM-339 | BEAVER | UNPATENTED CLAIM | 10/18/2007 | 26 0270S 0110W 008 | NE | 402042 |
| 340 | UMC402043 | BINGHAM-340 | BEAVER | UNPATENTED CLAIM | 10/18/2007 | 26 0270S 0110W 008 | SW | 402043 |
| 341 | UMC402044 | BINGHAM-341 | BEAVER | UNPATENTED CLAIM | 10/18/2007 | 26 0270S 0110W 008 | SE | 402044 |
| 342 | UMC402045 | BINGHAM-342 | BEAVER | UNPATENTED CLAIM | 10/18/2007 | 26 0270S 0110W 017 | NW | 402045 |
| 343 | UMC402046 | BINGHAM-343 | BEAVER | UNPATENTED CLAIM | 10/18/2007 | 26 0270S 0110W 017 | NE | 402046 |
| 344 | UMC402047 | BINGHAM-344 | BEAVER | UNPATENTED CLAIM | 11/3/2007 | 26 0270S 0110W 007 | NE | 402047 |
| 345 | UMC406892 | BINGHAM-345 | BEAVER | UNPATENTED CLAIM | 6/12/2008 | 26 0260S 0110W 031 | NW | 406892 |
| 346 | UMC406893 | BINGHAM-346 | BEAVER | UNPATENTED CLAIM | 6/12/2008 | 26 0270S 0110W 007 | SW | 406893 |
| 347 | UMC406894 | BINGHAM-347 | BEAVER | UNPATENTED CLAIM | 6/12/2008 | 26 0270S 0110W 018 | NW | 406894 |
| 348 | UMC406895 | BINGHAM-348 | BEAVER | UNPATENTED CLAIM | 6/12/2008 | 26 0270S 0110W 018 | SW | 406895 |
| 349 | UMC406896 | BINGHAM-349 | BEAVER | UNPATENTED CLAIM | 6/12/2008 | 26 0270S 0110W 019 | NW | 406896 |
| 350 | UMC406897 | BINGHAM-350 | BEAVER | UNPATENTED CLAIM | 6/12/2008 | 26 0270S 0110W 019 | SW | 406897 |
| 351 | UMC406898 | BINGHAM-351 | BEAVER | UNPATENTED CLAIM | 6/12/2008 | 26 0270S 0110W 034 | SW | 406898 |
| 352 | UMC406899 | BINGHAM-352 | BEAVER | UNPATENTED CLAIM | 6/12/2008 | 26 0270S 0110W 035 | SE | 406899 |
| 353 | UMC406900 | BINGHAM-353 | BEAVER | UNPATENTED CLAIM | 6/12/2008 | 26 0270S 0110W 022 | NE | 406900 |
| 354 | UMC407358 | BINGHAM-354 | BEAVER | UNPATENTED CLAIM | 6/24/2008 | 26 0280S 0120W 006 | SW | 407358 |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range Township     Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 355 | UMC407359 | BINGHAM-355 | BEAVER | UNPATENTED CLAIM | 6/24/2008 | 26 0270S 0130W 023 | NE | 407359 |
| 356 | UMC407360 | BINGHAM-356 | BEAVER | UNPATENTED CLAIM | 6/24/2008 | 26 0270S 0130W 014 | NE | 407360 |
| 357 | UMC407361 | BINGHAM-357 | BEAVER | UNPATENTED CLAIM | 6/24/2008 | 26 0270S 0120W 007 | NW | 407361 |
| 358 | UMC407362 | BINGHAM-358 | BEAVER | UNPATENTED CLAIM | 6/24/2008 | 26 0260S 0110W 030 | SW | 407362 |
| 359 | UMC402600 | LOTTERY # 1 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 008 | SE | 402600 |
| 360 | UMC402601 | LOTTERY # 2 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 008 | NE | 402601 |
| 361 | UMC402602 | LOTTERY # 3 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 005 | SE | 402602 |
| 362 | UMC402603 | LOTTERY # 4 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 005 | SW | 402603 |
| 363 | UMC402604 | LOTTERY # 5 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 004 | SW | 402604 |
| 364 | UMC402605 | LOTTERY # 6 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 009 | NW | 402605 |
| 365 | UMC402606 | LOTTERY # 7 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 009 | SW | 402606 |
| 366 | UMC402607 | LOTTERY # 8 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 009 | SE | 402607 |
| 367 | UMC402608 | LOTTERY # 9 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 010 | SW | 402608 |
| 368 | UMC402609 | LOTTERY # 10 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 015 | NW | 402609 |
| 369 | UMC402610 | LOTTERY # 11 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 015 | SW | 402610 |
| 370 | UMC402611 | LOTTERY # 12 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 022 | NW | 402611 |
| 371 | UMC402612 | LOTTERY # 13 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 021 | NE | 402612 |
| 372 | UMC402613 | LOTTERY # 14 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 009 | NE | 402613 |
| 373 | UMC402614 | LOTTERY # 15 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 010 | NW | 402614 |
| 374 | UMC402615 | LOTTERY # 16 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 003 | SW | 402615 |
| 375 | UMC402616 | LOTTERY # 17 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 004 | SE | 402616 |
| 376 | UMC402617 | LOTTERY # 18 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 003 | SE | 402617 |
| 377 | UMC402618 | LOTTERY # 19 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 010 | NE | 402618 |
| 378 | UMC402619 | LOTTERY # 20 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 010 | SE | 402619 |
| 379 | UMC402620 | LOTTERY # 21 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 017 | NE | 402620 |
| 380 | UMC402621 | LOTTERY # 22 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 008 | SW | 402621 |
| 381 | UMC402622 | LOTTERY # 23 | BEAVER | UNPATENTED CLAIM | 10/29/2007 | 26 0300S 0140W 023 | NW | 402622 |
| 382 | UMC402623 | LOTTERY # 24 | BEAVER | UNPATENTED CLAIM | 11/1/2007 | 26 0300S 0140W 018 | NE | 402623 |
| 383 | UMC402624 | LOTTERY # 25 | BEAVER | UNPATENTED CLAIM | 11/1/2007 | 26 0300S 0140W 007 | NE | 402624 |
| | | | | | | | | |
| 383 | UMC383285 | LADY-1 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0110W 013 | SW | |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range Township     Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 384 | UMC383286 | LADY-2 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0110W 013 | SE | |
| 385 | UMC383287 | LADY-3 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0110W 013 | NW | |
| 386 | UMC383288 | LADY-4 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0110W 013 | NE | |
| 387 | UMC383289 | LADY-5 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0110W 012 | SW | |
| 388 | UMC383290 | LADY-6 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0110W 012 | SE | |
| 389 | UMC383291 | LADY-7 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0110W 012 | NW | |
| 390 | UMC383292 | LADY-8 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0110W 012 | NE | |
| 391 | UMC383293 | LADY-9 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0110W 001 | SE | |
| 392 | UMC383294 | LADY-10 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0100W 018 | NW | |
| 393 | UMC383295 | LADY-11 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0100W 018 | NE | |
| 394 | UMC383296 | LADY-12 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0100W 007 | SW | |
| 395 | UMC383297 | LADY-13 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0100W 007 | SW | |
| 396 | UMC383298 | LADY-14 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0100W 007 | NW | |
| 397 | UMC383299 | LADY-15 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0100W 006 | SW | |
| 398 | UMC383300 | LADY-16 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0100W 006 | SE | |
| 399 | UMC383301 | LADY-17 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0100W 006 | NW | |
| 400 | UMC383302 | LADY-18 | MILLARD | UNPATENTED CLAIM | 2/3/2006 | 26 0150S 0100W 006 | NE | |
| | | | | | | | | |
| 401 | UMC383303 | LADY-19 | JUAB | UNPATENTED CLAIM | 2/3/2006 | 26 0140S 0100W 31 | SW | |
| 402 | UMC383304 | LADY-20 | JUAB | UNPATENTED CLAIM | 2/3/2006 | 26 0140S 0100W 31 | NW | |
| 403 | UMC383305 | LADY-21 | JUAB | UNPATENTED CLAIM | 2/4/2006 | 26 0140S 0110W 25 | SE | |
| 404 | UMC383306 | LADY-22 | JUAB | UNPATENTED CLAIM | 2/4/2006 | 26 0140S 0110W 25 | NE | |
| 405 | UMC383307 | LADY-23 | JUAB | UNPATENTED CLAIM | 2/4/2006 | 26 0140S 0110W 25 | NW | |
| 406 | UMC383308 | LADY-24 | JUAB | UNPATENTED CLAIM | 2/4/2006 | 26 0140S 0110W 26 | NE | |
| 407 | UMC383309 | LADY-25 | JUAB | UNPATENTED CLAIM | 2/4/2006 | 26 0140S 0110W 26 | NW | |
| 408 | UMC383310 | LADY-26 | JUAB | UNPATENTED CLAIM | 2/4/2006 | 26 0140S 0110W 26 | SW | |
| 409 | UMC383311 | LADY-27 | JUAB | UNPATENTED CLAIM | 2/4/2006 | 26 0140S 0110W 35 | NW | |
| 410 | UMC383312 | LADY-28 | JUAB | UNPATENTED CLAIM | 2/4/2006 | 26 0140S 0110W 35 | NW | |
| 411 | UMC383313 | LADY-29 | JUAB | UNPATENTED CLAIM | 2/4/2006 | 26 0140S 0110W 35 | SW | |
| 412 | UMC383314 | LADY-30 | JUAB | UNPATENTED CLAIM | 2/4/2006 | 26 0140S 0110W 35 | SW | |

| | Serial No. | Claim Name/Number | County | Claim Type | Mc Loc Dt | Meridian  Range Township      Section | Subdivision(s) | Ser Part |
|---|---|---|---|---|---|---|---|---|
| 413 | UMC383315 | LADY-31 | JUAB | UNPATENTED CLAIM | 2/4/2006 | 26 0140S 0110W 35 | SE | |
| | | | | | | | | |

## IV.   WATER RIGHTS

The following Utah Water Rights:

| 1. | Water Right No. 71-4763 (a29564), for a flow of 0.35 c.f.s., from an underground well source, with various points of diversion located in §§ 6,16, 20, 21 and 22, in Township 27 South, Range 11 West, SLB&M. |
|---|---|
| B. | Water Right No. 71-4783 (a29565), for a flow of 0.35 c.f.s., from an underground well source, with various points of diversion located in §§ 7 and 8, Township 27 South, Range 11 West, SLB&M. |
| 3. | Any and all other water rights owned by Company, and any rights to water right Utah Water Right No. 71-4396, Application Number A68810, Change Application A34822 |

| 1 | (71-4396)  546.23 acre feet. |
|---|---|
| 2 | (71-5111)  3.0 acre feet. |
| 3 | (71-4763)  Fixed 10 year application limited to 50 ac. ft. annually |
| 4 | (71-4783)  Fixed 10 year application limited to 50 ac. ft. annually |
| 5 | (71-4773)  Change Application is 1.73 acre feet. |

## V.   EASEMENTS AND RIGHTS OF WAY

All easements for roads granted pursuant to communications and agreements with the Beaver County Commission, including but not limited to that certain letter to Seller dated as of January 19, 2007, and pursuant to that certain hearing held as of September 6, 2005.

That certain right of way granted to seller by the Bureau of Land Management pursuant to Title V of the Federal Land Policy and Management Act of October 21, 1976 (90 Stat. 2776; 43 U.S.C. 1761) for an electrical transmission line granted on August 2, 2005.

That certain right of way for a 138 KV Electrical Transmission Line approximately 7 miles long.

Those certain easements for pipelines and water wells utilized in connection with the Purchased Assets, and any other rights, or interests of Seller in, under or to easements or rights of way for pipelines or water wells.

Any other right, title or interest in under or to rights of way, easements or licenses owned by Seller.


## VI.    ADDITIONAL PROPERTIES, RIGHTS AND INTERESTS

All of Sellers' right, title and interest in, under and to the real property, mining claims, and mineral rights, including all improvements and fixtures located thereon or related thereto or minerals and metals located therein, the Flotation Mill, extracted minerals and metals, water rights and rights to use or store water, dumps, stockpiles, tailings, easements, licenses and rights of way:

(a) that are **described or set forth on the documents and attachments appended hereto or below**, and all other rights and interests associated with any the foregoing;

(b) that are **located in Beaver, Millard or Juab counties, or Beaver Lake or San Francisco mining districts**;

(c) that are to be, or should be, conveyed to Seller pursuant to existing contracts or rights of Seller, including, but not limited to, with respect to any properties to be conveyed by Nevada Star or Diversified Mineral Resources; and

(d) all other rights and interests associated with any the foregoing.


| Account No. | Tax Parcel No. | Legal Description |
|---|---|---|
|  |  |  |
| 07-0700-02545 | SA-02-38 | Beaver Lake #2 Pat. Mining Claim |
| 07-0700-0255 | SA-02-38 | Beaver Lake #2 Pat. Mining Claim |
| 07-0700-0031 | SA-02-109 | T26S R11W, Volltaire, Layphette, Layphette#1, Granite, 73.81 Ac. |
| 07-0700-0086 | SA-02-193 | Billy Nig, Triumphant 2, Triumphant 3, Burlington, Burlington 1, Burlington 2, Burlington 3, Burlington 4, Burlington 8, Selma 3, Selma 4, Selma 5, Selma 6, Selma 7and Selma 8. |
| 02-0082-0001 | 2644-1 | T27S R11W, Sec. 34., Com. 550 ft W. from the SE Corner of the NE1/4 of Sec. 34.; thence W. 2090 ft., N. 1320 ft.; E. 2640 ft.; E. 2640 ft.; S 570 ft. W 550 ft.; S 750 ft. to the POB. |

| Account No. | Tax Parcel No. | Legal Description |
|---|---|---|
| 02-0082-0003 | 2646 | Beg. At the NE Corner of the SE1/4, Sec. 34, T27S R11W. SLB&M; thence N 750 ft; W 550 ft.; S 750 ft.; E 550 ft. to the POB. |
| 07-0700-0260 | PU01 St. Assess. | Beg. 1321.6 ft. E & 352.7 ft. N of the SW Corner of the SE1/4, Sec. 7., T28S., R10W; thence N. 730.1 ft; S 52º37' W 364.5 ft.; S 32º22' W 602.38 ft.; E 612.1 ft. to POB, cont. 5.99 ac. |
| 07-0700-0235 | PU01 St. Assess. | Rattler, Carbonate, Stepmother, Homestake, Anchor, E1/2 Anchor #2, Ben Harrison, Ben Harrison Fraction, Bulwer, Chalcoprite, Cryscoclla, Emerson, F.W., Florence, Fraction, Francis, Galveston, Balveston 2-3-4, Hilltop, Homestake, Iron King, Janice, Johanna, Klondyke 2, Lake Superior, Little Dick, Little Mildred, Mary 1-2, Maud, May, Michigan Boy, Minerva, Noun, OK Copper Mine, Pronoun, Rattler, Stepmother, Trojan, Van, Variah, Verb, Volney, Wallace, Wandering Jew. |
| 02-0023-0006 | 2168 | Beginning 486 ft. E. of the SW Corner of the SE1/4, Sec. 7, T28S R10W, SLB&M; thence E. 835.6 ft.; N. 352.7 ft.; W. 612.1 ft.; S. 32º22' W. 417.55 ft. to the POB. |
| 02-0081-0006 | 2637-A | W1/2 W1/2 NW1/4, Sec. 13, T27S R11W. |
| N/A | N/A | Beginning at the East 1/4 corner of Sec. 34, Twp. 27 S., R. 11 W., SLB&M; thence South 500.00 ft.; thence West 660.00 ft.; thence North 500.00 ft.; thence East 660.00 feet to the POB. |

## SCHEDULE 1.1(b)

## PURCHASED FURNISHINGS AND EQUIPMENT

All of Sellers' right, title and interest in, under and to the following equipment, vehicles, machinery and other personal property:

(a)      that are **described or set forth on the documents and attachments appended hereto**, and all other rights and interests associated with any the foregoing;

(b)      that are **located in Beaver, Millard or Juab counties, or Beaver Lake or San Francisco mining districts, or elsewhere**;

(c)      that are otherwise owned or held or in which Seller hold any interest;

(d)      that is subject to the Republic Transactions and not owned by Republic;

(e)      all other rights and interests associated with any the foregoing, or any of the following; and

(f)      all items set forth below:

| TYPE (MODEL YEAR, IF APPLICABLE) | # UNIT | SERIAL OR VIN NUMBERS |
|---|---|---|
| 20' Lengths of Drill Pipe Rods for Model T685 Rotodrill | 40 | N/A |
| 2000' of Matrix Reverse Circulation Drill Pipe, 20' Lengths | 40 | S/N: DM685S2935 |
| Ford Truck (1978) | 1 | VIN#: U81D1B8524 |
| Grahm Scmidt Compressor, including Chevy Truck | | VIN#: CE539P852985DP |
| International Model Truck F9300 with Schramm Rotodrill (1988) | 1 | VIN#: 2HSFEGUR1JC011166 |
| Kenworth W900D Flat Water Truck | 1 | VIN#: S336095GL, S/N: 538914217 |
| Mack Rod Truck with 2000 Matrix Reverse Circulation Drill Pipe and Water Tank (1969) | 1 | VIN#: DM685S2935 |
| Schramm Model T685H Rotodrill, attached to International Truck | 1 | S/N: 1376 (Truck VIN#: 2HSFEGUR1JC011166) |
| 4' X 4' Ball Mill, including Balls, Grates and Test Equipment | 1 | Unknown |
| Allis Chalmers Ball Grinding Mills 8' X 12' (1952), including Balls, Grates and Test Equipment | 2 | Unknown |
| C Pumps | | |
| Clarkson Series KGA Gate Valves, One Lot - Approximately 12 8" Valves and 20 4" Valves, more or less | 1 | Unknown |
| Cominco Engineering Services Limited (CESL) 12' X 42' Column Flotation Cells, including Spargers, Flow Valves and Meters | 2 | Unknown |
| Denver 16' X 9'6" Thickener and Tank | 1 | S/N: 28X198800001 |
| Disk Filters, 6'-9', 10 Disks, with Vacuum Package | 1 | Unknown |
| Disk Filters, 8'-10', 8 Disks, with Vacuum Package | 1 | Unknown |
| EIMCO Hi-Rate Thickener | 1 | S/N: 76386-01A |
| Enviro-Clear® Hi-Capacity Thickener | 1 | S/N: 91-54802 |
| Ford F-600 (1961) | 1 | VIN#: F60DP180641 |
| Gear Spray Lubrication Systems | 2 | Unknown |

| TYPE (MODEL YEAR, IF APPLICABLE) | # UNIT | SERIAL OR VIN NUMBERS |
|---|---|---|
| Hardinge Koppers 5' X 8' Ball Mill, including Balls, Grates and Test Equipment | 1 | S/N: 68861 |
| Compositech Horizontal Belt Filters Model #4630, including Receiver Tanks, Piping and Vacuum System | 2 | S/N: 0186-001-1, S/N: 0186-001-2 |
| Magnetite Separators | 3 | S/N: A111-830 or A111830-10 or A111830-13; S/N: A111830-11; S/N: A111830-12 |
| Minnovex 2.6M X 13M Column Flotation Cells, including Spargers and Valves | 2 | Unknown |
| North American Industries Double Girder Top-Running/Overhead Crane, 95' Span, 5 Ton Capacity | 1 | Unknown |
| North American Industries Single Girder Top-Running/Overhead Crane, 40' Span, 5 Ton Capacity | 1 | Unknown |
| North American Industries Single Girder Top-Running/Overhead Crane, 45' Span, 5 Ton Capacity | 1 | Unknown |
| Reese 24" X 75' Conveyors, including 7.5 HP Motor, TAII 225 Gearbox, Rollers, Belting, Head Puller Cleaner | 2 | Unknown |
| Simons Feeders 4' X 8' | 2 | Unknown |
| Sulzer Slurry Pump | 1 | S/N: 100072025 |
| Toshiba Controls and MCC Controls with Computer System | 1 | Numerous |
| Trommel Structures with Polyurethane Bend Panels/Filters | 3 | Unknown |
| Trunnion Bearing Lubrication Systems | 2 | SN: 1503; S/N: 1510 |
| Warman Pumps, One Lot - Approximately 20, more or less | 1 | Unknown |
| WEMCO Flotation Cells, 2 Banks of 4 | 8 | 870686932 |
| WesTech Hi-Capacity Thickener | 1 | S/N: 3929B-3 |
| WS Tyler 1205S Double Deck F-Class Screeners, including One Lot of Miscellaneous Screener Parts | 4 | Unknown |
| Caterpillar® 14G Motor Road Grader (1985) | 1 | S/N: 96U06420 |
| Caterpillar® 16G Motor Road Grader (1988-1989) | 1 | S/N: 93U02885 |
| Caterpillar® 330CL Track Hoe | 1 | S/N: DKY02492 |
| Caterpillar® 385BL Excavator (2003) | 1 | S/N: ANS00295 |
| Caterpillar® 773B Haul Truck (1995) | 1 | S/N: 63W04374 |
| Caterpillar® 773B Haul Trucks (1995) | 3 | S/N: 63W03899 (63W3899); S/N: 63W04504 (63W4504); S/N: 63W04509 (63W4509) |
| Caterpillar® 966G Wheel Loader (2000) | 1 | S/N: 3SW00823 |
| Caterpillar® 988G Loader (2002) | 1 | S/N: BNH00506 |
| Caterpillar® 992C Wheel Loader (1991) | 1 | S/N: 49Z01839 (49Z1839) |
| Caterpillar® D10R Track Dozer (1999) | 1 | S/N: 3KR01362 (3KR1362) |
| Caterpillar® Gen Set Model 3412 | 1 | |
| Ingersoll Rand Blast Hole Rock Drill DM45E (1989) | 1 | S/N: DM-45 |
| International Model 4900 Mechanic Truck (1991) | 1 | VIN#: 1HTSDNGN2MH320457 |
| John Deere 544J Wheel Loader (2005) | 1 | S/N: D544JZ614210 |
| John Deere Skid Steer 260 (2002) | 1 | S/N: KV0260A160243 |

| TYPE (MODEL YEAR, IF APPLICABLE) | # UNIT | SERIAL OR VIN NUMBERS |
|---|---|---|
| Kenworth Model T300 Mechanic Truck, including 10,000 lb Hydraulic Crane (2006) | 1 | VIN#: 2NKMHD7XX6M144394 |
| Load King 55 Ton Lowboy Detachable Trailer (2005) | 1 | VIN#: 5LKL5135251025335 |
| P&H® 20-Ton Rough Terrain Crane | 1 | |
| Peterbilt Model 335 (2007) Mechanics Service Unit Truck with Stellar 2 Crane & Mechanics Body | 1 | |
| Sterling LT7500 Water Trucks - 4000 Gallon (2007) | 2 | VIN#: 2FZHATDC07AY13460; VIN#: 2FZHATDC47AY13459 |
| TRIO 36" Diameter Sand Screw | 2 | S/N: TSW3625-376; S/N: TESW3625-376 |
| Volvo Heavy Haul Tractor Truck Rig (1992) | 1 | VIN#: 4V1BDBCHXNN650136 |
| Emerson GM Diesel Generator, SO. 055, Model 06FG157394, 100KW, GEN. P1776/7 (10/15/1987) | 1 | S/N: TO6414T157394 |
| Emerson Generator 1.3 MW (Refurbished by GE) | 1 | S/N: 06G157394, P1776/7 |
| MQ Power 220 Generators | 4 | S/N: DCA-220SSJU, S/N: Unknown, S/N: Unknown, S/N: Unknown |
| KVA 5000/6667 Substation (1982), Transformer 44000 Delta, Three Phase | 1 | Unknown |
| Various Transforming Units and Condensing Units, GE Transformers, including KVA 500 Voltage Rating 4160-480, Assorted Electrical Components | | One Component S/N: B977317 |
| Wacker Generator (2005) with Genset Motor | 1 | S/N: 45KVANQ (Genset S/N: 7203342) |
| Whisperwatt Generator A/C Generator DF-200J with John Deere Engine | 1 | S/N: DCFA220SSJU (John Deer: S/N: 6068HF485) |
| Wacker Generators | 2 | |
| Water Wells, including Piping,, Head Frames, Bowls and All Other Components | 3 | |
| Water Tanks | 3 | |
| Power Poles | All | |
| Wires for Power Poles | All | |
| Trailers | | |
| TMS Compressors | | |
| Perkin Elner Analyst 200 Atomic Absorption Spectrometer | | |
| Labconco Protector Laboratory Hood | | |
| BICO Impactor 71075 | | |
| Furnace Quick Dryer | | |
| BICO Rig & Puck 71238 | | |
| BICO Pulverizer UA53 | | |
| Braun Pulverizer | | |
| Donaldson Torrit Fire Asey | 1 | S/N: 2776374 |

| TYPE (MODEL YEAR, IF APPLICABLE) | # UNIT | SERIAL OR VIN NUMBERS |
|---|---|---|
| Glassware Dryer Oven 6097 | | |
| *All other mining, milling, laborator and office equipment owend by Seller* | | |
| *All other vehicles, rolling stock and heavy machinery owned by Seller* | | |

| Asset | Description | Serial Number |
|---|---|---|
| BUILDINGS | Addition to Laboratory | |
| BUILDINGS | Laboratories Drying Center | |
| BUILDINGS | Laboratory | |
| BUILDINGS | Mill | |
| BUILDINGS | Mill - Safety Building | |
| BUILDINGS | Large -Maintenance Shop | |
| BUILDINGS | Office Building- mill | |
| BUILDINGS | Flooring & Installation - Floor Heating | |
| | | |
| COMPUTER & OFFICE EQUIP | 00 - Admin #2 - Computer Station | |
| COMPUTER & OFFICE EQUIP | 29 - Admin #3 - Computer Station | |
| COMPUTER & OFFICE EQUIP | 30 - HP Design Jet 500 Printer | |
| COMPUTER & OFFICE EQUIP | 32 - Admin #1 - Computer Station | |
| COMPUTER & OFFICE EQUIP | 33- Admin #4 - Computer Station | |
| COMPUTER & OFFICE EQUIP | 38- Admin #5 - Computer Station | |
| COMPUTER & OFFICE EQUIP | 41 - Admin #5 - Printer | Cannon MP830 |
| COMPUTER & OFFICE EQUIP | 44 - Geologist - Computer System | |
| COMPUTER & OFFICE EQUIP | 47 - Security - Computer System | |
| COMPUTER & OFFICE EQUIP | 50 - Ricon Copier | AF1C10 3228C |
| COMPUTER & OFFICE EQUIP | 51 - Admin #6 - Computer Station | |
| COMPUTER & OFFICE EQUIP | 54 - Canon 1PF 8000 | |
| COMPUTER & OFFICE EQUIP | 55 - Colortrack Smart LF | |
| COMPUTER & OFFICE EQUIP | 60 - Coilmac 41ECI | |
| COMPUTER & OFFICE EQUIP | 67 - President Computer System | |
| COMPUTER & OFFICE EQUIP | Acer Computer, Screen - Maintenance #2 | |
| COMPUTER & OFFICE EQUIP | Brother Printer - Maintenance #2 | |
| COMPUTER & OFFICE EQUIP | KDS Computer, Screen - Maintenance #2 | |
| COMPUTER & OFFICE EQUIP | Durabook Laptop - Maint #2 | SY8501001312 |
| COMPUTER & OFFICE EQUIP | 00 - Admin #2 - Cannon Pixma Printer | IP4000 |
| COMPUTER & OFFICE EQUIP | 29 - Admin #3 - Printer | Brother HL-5240 Laser - SNU61443M65752078 |
| COMPUTER & OFFICE EQUIP | 33 - Admin #4 - Cannon Printer | MP530 |
| COMPUTER & OFFICE EQUIP | 33 - Admin #4 - Paper Shreader | Aurora A51019CS |
| COMPUTER & OFFICE EQUIP | 38 - Admin #5 Adding Machine | Cannon MP25DV |
| COMPUTER & OFFICE EQUIP | 47 - Security - Cannon Printer | |
| COMPUTER & OFFICE EQUIP | 51 - Admin #6 - Printer | Cannon MP830 |
| COMPUTER & OFFICE EQUIP | Vice President - Computer Station | |
| COMPUTER & OFFICE EQUIP | Printer Room - Computer System | |
| COMPUTER & OFFICE EQUIP | Printer Room - Canon MP83 Printer | |

| Asset | Description | Serial Number |
|---|---|---|
| COMPUTER & OFFICE EQUIP | 67 - President Canon MP830 | |
| COMPUTER & OFFICE EQUIP | 44 - Geologist Printer | Canon MP530 |
| COMPUTER & OFFICE EQUIP | Laboratory Computer System | |
| COMPUTER & OFFICE EQUIP | Laboratories Printer | Canon MP530 |
| COMPUTER & OFFICE EQUIP | Laboroatory - Durabook Laptop | 00144-472-113-919 |
| | | |
| EQUIPMENT & TOOLS | 56 - Survey GST 235W | #6693703 and #5212533 |
| EQUIPMENT & TOOLS | 57 - Survey Equipment | Tri Pods (2) and Story Pole |
| EQUIPMENT & TOOLS | 58 - Prizim Bars - Survey Equipment | |
| EQUIPMENT & TOOLS | 59 - Olympus SZET Microscope | |
| EQUIPMENT & TOOLS | Quincy Air Compressor | 5HP 17 CFM |
| EQUIPMENT & TOOLS | Miller Welder SR4 404 | 500 AMP |
| EQUIPMENT & TOOLS | Millermatic 350 Wire Feed Welder | |
| EQUIPMENT & TOOLS | Arbor Press with Stand-Jet, Two Ton | |
| EQUIPMENT & TOOLS | 30 Gallon Parts Washer (NAPA) | |
| EQUIPMENT & TOOLS | 6" Balldor Bench Grinder | |
| EQUIPMENT & TOOLS | 8" Black and Decker Bench Grinder | |
| EQUIPMENT & TOOLS | Commercial Swamp Cooler | |
| EQUIPMENT & TOOLS | Battery Charger | 6V 12V 24V |
| EQUIPMENT & TOOLS | Target Rock Saw 5 HP | |
| EQUIPMENT & TOOLS | Core Splitters 12 Manual (Three) | |
| EQUIPMENT & TOOLS | Small Pallet Jack | |
| EQUIPMENT & TOOLS | 1000 LB Engine Stands (Three) | |
| EQUIPMENT & TOOLS | NAPA 3 Ton Floor Jacks (Two) | |
| EQUIPMENT & TOOLS | Norco 3 Ton Floor Jack | |
| EQUIPMENT & TOOLS | Air/Hydraulic Jack 35 Ton (NAPA) | |
| EQUIPMENT & TOOLS | Bumper Jack 5000 lb | |
| EQUIPMENT & TOOLS | Non Flammable Cabinets (Two) | |
| EQUIPMENT & TOOLS | 20 Ton Floor Stand OTC | |
| EQUIPMENT & TOOLS | Victor Journeyman Torch Sets (Two) | |
| EQUIPMENT & TOOLS | Jet Drill Press JDP_20MF | |
| EQUIPMENT & TOOLS | Drill Index Cabinets | |
| EQUIPMENT & TOOLS | Drillbit Set 1/16-1/2 by 64ths | |
| EQUIPMENT & TOOLS | Drill bit Set 1/2-1" by 64ths | |
| EQUIPMENT & TOOLS | Milwaukee Metal Saw | |
| EQUIPMENT & TOOLS | 4x10 Steel Work Bench | |
| EQUIPMENT & TOOLS | 8" Witton Vises (two) | |
| EQUIPMENT & TOOLS | Wrench Set 2"-3" by 1/8" | |
| EQUIPMENT & TOOLS | Lincoln Grease Guns (Three) | |
| EQUIPMENT & TOOLS | Chest Freezer | |
| EQUIPMENT & TOOLS | Commercial Ice Machine | |
| EQUIPMENT & TOOLS | 1000 lb Scale | |
| EQUIPMENT & TOOLS | Quality Lift Car Lift - 12,000 lb | |
| EQUIPMENT & TOOLS | Herbert-nutal Lathe With Tooling 10x35 Swing | |
| EQUIPMENT & TOOLS | Shop Press (25 Ton) | |
| EQUIPMENT & TOOLS | Pressure Washer HE Hydro | |
| EQUIPMENT & TOOLS | Tranny Flush machine-Turbo Tank | |

| Asset | Description | Serial Number |
|---|---|---|
| EQUIPMENT & TOOLS | Samson High Reach Oil Drain Barrel | |
| EQUIPMENT & TOOLS | Reed 10" Vise | |
| EQUIPMENT & TOOLS | Tranny Jack 1000 lb | |
| EQUIPMENT & TOOLS | TiG Torch With Regulator (Weldcraft) | |
| EQUIPMENT & TOOLS | Mac Mentor Scan Tool | |
| EQUIPMENT & TOOLS | Air Gun | |
| EQUIPMENT & TOOLS | Millermatic 251 Welder | |
| EQUIPMENT & TOOLS | Victor Torch | |
| EQUIPMENT & TOOLS | Welding Table | |
| EQUIPMENT & TOOLS | Energy Logic Furnace | |
| EQUIPMENT & TOOLS | Miller Goldstar 500 amp Welder | |
| EQUIPMENT & TOOLS | 15 Gallon Parts Washer | |
| EQUIPMENT & TOOLS | NAPA Power Pro Pressure Washer | Model 81-106 - Industrial Series |
| EQUIPMENT & TOOLS | Misc. Tire Tools and Accessories | |
| EQUIPMENT & TOOLS | 3,000 lb Trans Jack | |
| EQUIPMENT & TOOLS | 500 lb Clutch Jack | |
| EQUIPMENT & TOOLS | Air Over Hyd 3.5 Ton Bottle Jack | NAPA Model 791-7330 |
| EQUIPMENT & TOOLS | Bottle Jack 20 ton | |
| EQUIPMENT & TOOLS | Bottle Jack 50 Ton (2) | |
| EQUIPMENT & TOOLS | Floor Jack 3.5 Ton | NAPA Model 791-6425 |
| EQUIPMENT & TOOLS | Misc Cat Gauges | |
| EQUIPMENT & TOOLS | Enter Pac Ram 60 Ton | |
| EQUIPMENT & TOOLS | Enter Pac Ram 12 Ton | |
| EQUIPMENT & TOOLS | Nitrogen Recharge Kit | |
| EQUIPMENT & TOOLS | Achumacker 6/12 Vold Battery Charger | |
| EQUIPMENT & TOOLS | Ridgid 10 Gal Shop Vac | |
| EQUIPMENT & TOOLS | Quincy Air Compressor - 10 HP | |
| EQUIPMENT & TOOLS | OTC Press 55Ton | |
| EQUIPMENT & TOOLS | Battery Charger - 6v, 12v, 24v | |
| EQUIPMENT & TOOLS | Matco Tool Chest | |
| EQUIPMENT & TOOLS | Small Metal work Bench | |
| EQUIPMENT & TOOLS | Craftsman 6" Grinder | |
| EQUIPMENT & TOOLS | Jet Drill Press JDP-20MF | |
| EQUIPMENT & TOOLS | Cat Jack Stands - Set | |
| EQUIPMENT & TOOLS | Cress C-163210 Furnace with Watlow 935 Controller | 220v/1 ph, W/High Limit Controler |
| EQUIPMENT & TOOLS | Cabinet Dust Collector Donalson Torit Series 81 | |
| EQUIPMENT & TOOLS | 47" Fume Hood W/Blower - Labconco Basic | |
| EQUIPMENT & TOOLS | Thermolyne Cast Aluminum Hot Plate | 24" x 12" 3200W 120 V |
| EQUIPMENT & TOOLS | InCal Internal Calibration - Ohaus Explorer | Pro Analytical Balance, Range 210 g |
| EQUIPMENT & TOOLS | Cahn C-35 Microbalance | W/Pans and Tare Wt. |
| EQUIPMENT & TOOLS | Drying Oven Forma - Scientific | |
| EQUIPMENT & TOOLS | Bisc UA V-Belt Disk Pulverizer | Model: 242-53x5 |
| EQUIPMENT & TOOLS | Bico Vibratory Pulverizer | Model: VP-1989 I HP 3 PH |
| EQUIPMENT & TOOLS | W.S. Tyler Ro-Tap | |
| EQUIPMENT & TOOLS | Test Sieve Various Sizes | |
| EQUIPMENT & TOOLS | Bico 5"x7" Badger Jaw Crusher | Model: #241-38 W/Dust Control Base |

| Asset | Description | Serial Number |
|-------|-------------|---------------|
| EQUIPMENT & TOOLS | Bico Pollution Control Dust Collector | Model: PC43-3 |
| EQUIPMENT & TOOLS | Temp Meter, TDS Salinity | Extech Exstik EC400 Cond. |
| EQUIPMENT & TOOLS | Temp Meter - PH100 | Extech ExStik |
| EQUIPMENT & TOOLS | Vitural Measurment & Control | Model VB-302 |
| EQUIPMENT & TOOLS | Perkin Elmer Analyst 200 | |
| EQUIPMENT & TOOLS | 28" Fume Hood w/Blower | Labconco Basic |
| EQUIPMENT & TOOLS | Vielp Scientifica ESP Stirrer | F20610179 |
| EQUIPMENT & TOOLS | Nichiryo Nichipet EX | H6x026482 |
| EQUIPMENT & TOOLS | Microwave | |
| EQUIPMENT & TOOLS | Refridgerator | |
| EQUIPMENT & TOOLS | Eberbach Tabel Top Shaker | |
| EQUIPMENT & TOOLS | Gilson Screen Co. Mini Splitter | Model SP-3 |
| EQUIPMENT & TOOLS | 3/4" Jones Riffle Splitter | H-3966 |
| EQUIPMENT & TOOLS | 1 1/2" Jones Riffle Splitter | H-3990 |
| EQUIPMENT & TOOLS | Pans for Jones Riffle Splitter | |
| EQUIPMENT & TOOLS | Boblet 250 Miller Welder | Kenworth Service Truck |
| EQUIPMENT & TOOLS | Tools & Equipment - Kenworth Service Truck | |
| EQUIPMENT & TOOLS | Lube Truck Equipment & Tools | |
| EQUIPMENT & TOOLS | 2002 Service Truck Equipment & Tools | |
| EQUIPMENT & TOOLS | 8" Vise | |
| EQUIPMENT & TOOLS | DeWalt Chop Saw | |
| EQUIPMENT & TOOLS | 1200 LB Trans Jack | NAPA Professional |
| EQUIPMENT & TOOLS | DeWalt 6" Bench Grinder | Model DW756 |
| EQUIPMENT & TOOLS | BABCO 6" Bench Vise | |
| EQUIPMENT & TOOLS | Plates (144) | |
| EQUIPMENT & TOOLS | Mickys (10) | |
| EQUIPMENT & TOOLS | 1" Air Hose 50' Long (8) | |
| EQUIPMENT & TOOLS | 1/2" Waterhose 50'Long (4) | |
| EQUIPMENT & TOOLS | Banner & Banns for Air & Water | |
| EQUIPMENT & TOOLS | Bull Hoses 50' Long (2) | |
| EQUIPMENT & TOOLS | Bull Hose Whip Chects (4) | |
| EQUIPMENT & TOOLS | 5' Rock Bolts (88) | |
| EQUIPMENT & TOOLS | Chain Binder | |
| EQUIPMENT & TOOLS | (3) Short & (1) Long Bars | |
| EQUIPMENT & TOOLS | Shovels (4) | |
| EQUIPMENT & TOOLS | Pick | |
| EQUIPMENT & TOOLS | Fin Hoe's (5) | |
| EQUIPMENT & TOOLS | Dubble Jacks (2) | |
| EQUIPMENT & TOOLS | Crow Bars (2) | |
| EQUIPMENT & TOOLS | Bent Bar | |
| EQUIPMENT & TOOLS | Oilers (2) | |
| EQUIPMENT & TOOLS | Gardner Denver Machines (7) | |
| EQUIPMENT & TOOLS | Legs (7) | |
| EQUIPMENT & TOOLS | Set Gages & Hoses | |
| EQUIPMENT & TOOLS | 4' Mats (40) | |
| EQUIPMENT & TOOLS | 6' Mats (9) | |
| EQUIPMENT & TOOLS | Spoil Rope | |

| Asset | Description | Serial Number |
|---|---|---|
| EQUIPMENT & TOOLS | Honda Pump | |
| EQUIPMENT & TOOLS | Fuel Can | |
| EQUIPMENT & TOOLS | 8' Ladder | |
| EQUIPMENT & TOOLS | Mine Belts (4) | |
| EQUIPMENT & TOOLS | 5 Gal Propane Tank with Heater | |
| EQUIPMENT & TOOLS | Air Hose Stems (6) & Wings (7) | |
| EQUIPMENT & TOOLS | Water Hose Stems (6) | |
| EQUIPMENT & TOOLS | Double Connectors (2) | |
| EQUIPMENT & TOOLS | Air Spuds for Jack Legs (5) | |
| EQUIPMENT & TOOLS | Splicens for Air Hose | |
| EQUIPMENT & TOOLS | Water Needles (3) | |
| EQUIPMENT & TOOLS | N.4. Head Washers (5) | |
| EQUIPMENT & TOOLS | Water Valves (2) | |
| EQUIPMENT & TOOLS | Steel Pullers (2) | |
| EQUIPMENT & TOOLS | Acorn Nuts (6) | |
| EQUIPMENT & TOOLS | 6' Hanging Rods (8) | |
| EQUIPMENT & TOOLS | Dril Bits (Cleaner) (7) | |
| EQUIPMENT & TOOLS | 47 - Security - Two Way Radio | Moterola NNTN4497BR |
| EQUIPMENT & TOOLS | Motorola Radios - Shop 17 | NNTN4497BR |
| EQUIPMENT & TOOLS | Laboratories Motorola Radio | Radius CP200 - #18 018TJAP126 |
| EQUIPMENT & TOOLS | Acculab Scale - Laboratory | 167555 |
| EQUIPMENT & TOOLS | PLANIX - Tamaya Digital Planimeter | PLANIX 105 |
| EQUIPMENT & TOOLS | Infrared Thermometor W/Laser | |
| EQUIPMENT & TOOLS | Generator | SN 2H001289 |
| EQUIPMENT & TOOLS | BOTTLE JACKS 12 - 20 T | |
| EQUIPMENT & TOOLS | AIR COMPRESSOR - SERVICE TRUCK | EM-30 |
| | | |
| FURNITURE & FIXTURES | 25- 20th and Main Picture | |
| FURNITURE & FIXTURES | 26 - The Prayer Picture | |
| FURNITURE & FIXTURES | 27 - To Save a Nation Picture | |
| FURNITURE & FIXTURES | 28 - Admin #2 - Wall Clock | |
| FURNITURE & FIXTURES | 31 - Picture- Frisco Utah 1883 | |
| FURNITURE & FIXTURES | 34- Admin #4 - 4' Wide - 5 Drawer File Cabinet | |
| FURNITURE & FIXTURES | 35- Admin #4 - Side by Side 6' Tall File Cabinet | |
| FURNITURE & FIXTURES | 36- Picture - Horses | |
| FURNITURE & FIXTURES | 37- Admin #4 - 5 Drawer File Cabinet | |
| FURNITURE & FIXTURES | 39- Admin #5 - 4 Drawer File Cabinets (4) | |
| FURNITURE & FIXTURES | 42 - Admin #5 - Wall Clock | |
| FURNITURE & FIXTURES | 43 - Railroad Cut Picture | |
| FURNITURE & FIXTURES | 45 - Geologist 4 Drawer File Cabinet | |
| FURNITURE & FIXTURES | 46 - Geologist Wood & Metal Plan Drawer Cabinet | |
| FURNITURE & FIXTURES | 48 - Security - 4 Drawer File Cabinet | |
| FURNITURE & FIXTURES | 49 - Security Office Desk | |
| FURNITURE & FIXTURES | 52 - Admin #6 - FireKing 4 Drawer Filing Cabinet | |
| FURNITURE & FIXTURES | 51 - Plan Desk | |
| FURNITURE & FIXTURES | 52 - Admin #6 - 4 drawer File Cabinet (4) | |
| FURNITURE & FIXTURES | 53 - Folding Tables (2) | |

| Asset | Description | Serial Number |
|---|---|---|
| FURNITURE & FIXTURES | 61 - Vice President - 4 Drawer File Cabinets (2) | |
| FURNITURE & FIXTURES | 62 -Conference Room Table and Chairs | |
| FURNITURE & FIXTURES | 63 - The Day is Ours Pic | |
| FURNITURE & FIXTURES | 64 - Men of Iron pic | |
| FURNITURE & FIXTURES | 65 - Hold a man wavered pic | |
| FURNITURE & FIXTURES | 66 - Not a man wavered pic | |
| FURNITURE & FIXTURES | 68 - Picture - Victory is Ours | |
| FURNITURE & FIXTURES | 4 Drawer Filing Cabinet - Main #2 | |
| FURNITURE & FIXTURES | Misc. Desks and Chairs (Three) - Maintenance #2 | |
| FURNITURE & FIXTURES | Large Safety Cabinet - Maintenance #2 | |
| FURNITURE & FIXTURES | Storage Cabinet - Maintenance #2 | |
| FURNITURE & FIXTURES | Filing Cabinets (Two) - Maintenance #2 | |
| FURNITURE & FIXTURES | Desk - Maintenance #2 | |
| FURNITURE & FIXTURES | Work Bench 10x4 - Maintenance #2 | |
| FURNITURE & FIXTURES | Desks (Two) - Maintenance Shop #7 | |
| FURNITURE & FIXTURES | Misc. Chairs - Maintenance #7 | |
| FURNITURE & FIXTURES | Four Drawer Filing Cabinet - Maintenance  #7 | |
| FURNITURE & FIXTURES | Nono-Flamable Cabinets (Two) - Maintenance #7 | |
| FURNITURE & FIXTURES | 00 - Admin #2 Reception Desk | |
| FURNITURE & FIXTURES | 00 - Admin #2 - Lobby Chairs (3) | |
| FURNITURE & FIXTURES | 00 - Admin #2  - Office Chair | |
| FURNITURE & FIXTURES | 33 - Admin #4 Office Desk | |
| FURNITURE & FIXTURES | 33 - Admin #4 - Office Chair | |
| FURNITURE & FIXTURES | 38 - Admin #5 - Hoier Refridgerator | |
| FURNITURE & FIXTURES | 38 - Admin #5 - Desk | |
| FURNITURE & FIXTURES | 38 - Admin #5 - Office Chairs (2) | |
| FURNITURE & FIXTURES | 47 - Security - Office Chair | |
| FURNITURE & FIXTURES | 51 - Admin #6 - Office Desk | |
| FURNITURE & FIXTURES | 51 Admin #6 - Office Chair | |
| FURNITURE & FIXTURES | 67 - President 4 Drawer File Cabinet (2) | |
| FURNITURE & FIXTURES | Laboratories 4 Drawer File Cabinet | |
| FURNITURE & FIXTURES | Telvlar Server  (2) - Laboratories | |
| | | |
| MILL EQUIPMENT | Model 4630 Belt Filter Systems (Two) | |
| MILL EQUIPMENT | Receiver Tanks (Two) | |
| MILL EQUIPMENT | Header Piping (Two Sets) | |
| MILL EQUIPMENT | Model 5530 Vacuum Systems | |
| MILL EQUIPMENT | 6' -9" x 10 Disc (One) | |
| MILL EQUIPMENT |  Vacuum Package for 6' x 9" x 10 Dics | |
| MILL EQUIPMENT | 8' - 10" x 8 Disc Agedisk Filter | |
| MILL EQUIPMENT | Vacuum Package for 8' - 10" x 8 Disc | |
| MILL EQUIPMENT | Mill Water Control Valves | Mag Curcuit - K&M |
| MILL EQUIPMENT | Sump Pump | Minerals Eq. Company |
| MILL EQUIPMENT | Mill Slurry Pump #2 | |
| MILL EQUIPMENT | Curcuit Pumps | |
| MILL EQUIPMENT | Sulzer Pumps | Techflor |
| MILL EQUIPMENT | Metering Pump | |

| Asset | Description | Serial Number |
|-------|-------------|---------------|
| MILL EQUIPMENT | 26' Eimco Hi-Rate Thickener | Serial Number 76386-01A |
| MILL EQUIPMENT | Enviro-Clear Hi-Capacity Thickener | Serial Number 91-54802 |
| MILL EQUIPMENT | 16' Denver Thickener and Tank | Serial No. 28 |
| MILL EQUIPMENT | 5' x 8' Hardinge Koppers Ball Mill | Serial Number 68861 |
| MILL EQUIPMENT | 8x6 100hp Steel Impellers Pumps (2) | |
| MILL EQUIPMENT | 3x2 15hp Steel Impellers Pumps (6) | |
| MILL EQUIPMENT | 4x3 25hp Steel Impellers Pumps (5) | |
| MILL EQUIPMENT | 2 x 1.5 hp Steel Impellers Pumps (5) | |
| MILL EQUIPMENT | Fail Close Actuator | |
| MILL EQUIPMENT | Alstrom (3) - 750 KVA, 4160 Delta, 480-277 LV | Serial # PAJ-1185, PAJ-1186, PAJ-1187 |
| MILL EQUIPMENT | Alstrom (4) 750/862 KVA, HV 4160 Delta | Serial # PDL-1541, PDL-1535, PDL-1536 |
| MILL EQUIPMENT | Allis Chalmers (1), KVA 225, 208Y/120 | Serial #3054763 |
| MILL EQUIPMENT | GE (1), 4160-480, 500KVA | Serial # N977317 |
| MILL EQUIPMENT | Hammond Manufacturing (1), KVA 600 4160 | Part # 150138 |
| MILL EQUIPMENT | Cutler Hammer (1), 225KVA, Dry Type Trans | Style U46D28T22H, Serial # L0421 |
| MILL EQUIPMENT | Allis Chalmers (1), 150 KVA, | Serial # 354684 |
| MILL EQUIPMENT | Acme (dry) (11) | 230Y-133, Volts 460 Delta |
| MILL EQUIPMENT | Piston Ring Seal Assemblies (8) | |
| MILL EQUIPMENT | Ridgid Threader | RGT 4NPT 120 V 60 HZ Threader |
| MILL EQUIPMENT | 2.6M x 13M Minnovex Column Flotation Cells (2) | |
| MILL EQUIPMENT | 12' CESL Flotation Cells (2) | |
| MILL EQUIPMENT | Mag Separators (3) | Serial # A111-830-11, A111-830-12, A11830-12 |
| MILL EQUIPMENT | Density Scale | |
| MILL EQUIPMENT | Cyclone Packs | |
| MILL EQUIPMENT | Lube System | |
| MILL EQUIPMENT | Lincoln Airless Spray System | |
| MILL EQUIPMENT | Positioners & Meters | |
| MILL EQUIPMENT | Gas Meter Docking Station | |
| MILL EQUIPMENT | Water Control Valve & Sleeve M2 | |
| MILL EQUIPMENT | Reagent Holding Tank | |
| MILL EQUIPMENT | Rougher Cells | |
| MILL EQUIPMENT | Screens | 5x14 Double Deck W.S. Tyler 12055 F-Class |
| MILL EQUIPMENT | Toshiba Controls | |
| | | |
| MINING EQUIP | 1 - 1995 Caterpillar Haul Truck 773B | HT-74 SSN#63W03899 |
| MINING EQUIP | 2 - Caterprillar Haul Truck 773B | HT-99 SN#63W04374 |
| MINING EQUIP | 3 - Caterpillar Haul Truck | HT-04 SN#63W04504 |
| MINING EQUIP | 4 - Caterpillar Haul Truck 773B | HT- 09 SN# 63W4509 |
| MINING EQUIP | 5 - Caterpillar Loader 992C | SN# 49Z01839 |
| MINING EQUIP | 6- 2003 Caterpillar Trackhoe 385B | TH- 95 SN#0385BTAN500295 |
| MINING EQUIP | 7 - Caterpillar Loader 988G | SN# CBNH00506 |
| MINING EQUIP | 8 - P&H 20 Ton Terex Crane | SN# 55963 |
| MINING EQUIP | 9 - 1974 Dozer - D8D-12 | D8H SN 45A3412 |
| MINING EQUIP | 10 - Caterpillar Dozer D10R | SN#3KR01362 |

| Asset | Description | Serial Number |
|---|---|---|
| MINING EQUIP | 11 - Water Truck | ID# 3460 |
| MINING EQUIP | 21 - 2006 Kenworth Service Truck | Vin# 2NKMHD7XX6M144394 |
| MINING EQUIP | 22 - 2007 Sterling Lube Truck | Vin# 2FZHADC47AY13462 |
| MINING EQUIP | 23 - 2007 Sterling Fuel Truck | VIN# 2FZHATDC67AY13463 |
| MINING EQUIP | 73- Chevy  - Mud Pump | PT-85 |
| MINING EQUIP | 77 - Caterpillar 330C Trackhoe | SN#  0330CCDKY02492 |
| MINING EQUIP | 78 - Caterpillar 4160 Backhoe | unknown |
| MINING EQUIP | 80 - Caterpillar 966G Loader | L-23 Sn# 6NC21062 |
| MINING EQUIP | 89 - 2007 Sterling L10 Water Truck | 2FZHATDC67AY13463 |
| MINING EQUIP | 91 - 1986 Kenworth Water Truck | Id# S336095GL Ken's |
| MINING EQUIP | 92 - Caterpillar 966G Loader | Sn# 3SW00823 |
| MINING EQUIP | 93 - International Drill 489 | Id# 2H8FEGURIJC811166 |
| MINING EQUIP | 94 - Caterpillar RG 20 Grader | SN96U06420 |
| MINING EQUIP | 95 - Mack R6867T Drill Pipe Truck | PT-79 Id#1M2N179Y1FA090079 |
| MINING EQUIP | 97 - 1961 Ford F600 Drill Truck | Vin# F60DP180641 |
| MINING EQUIP | 98 - John Deere 310 Backhoe | Id# T0310DG781830 |
| MINING EQUIP | 100 - Fuel Trailer | Tyler's Fuel Trailer |
| MINING EQUIP | 102 - MQ Power 220 DF2400J | Sn# 8010031 |
| MINING EQUIP | 2007 Water Triuck | ID #3459, Model L10 WTR TR |
| MINING EQUIP | Ingersol Rand Blast Hole Drill | SN DM-45 |
| MINING EQUIP | Ford 9000 Air Compressor Truck | CT-750 |
| MINING EQUIP | CAT 16G Road Grader | SN-93U02885 |
| MINING EQUIP | CAT Model SR 4B - Generator | |
| | | |
| VEHICLES & TRAILERS | 71 - 1992 Volvo WCM | LB-35 SN# 4V1BDBCHXNN650136 |
| VEHICLES & TRAILERS | 72 - 2005 LoadKind Trailer | SN#  5LK5135251025335 |
| VEHICLES & TRAILERS | 83 - 2002 Black Ford Ranger | Vin# 1FTZR45EX2PB45081 |
| VEHICLES & TRAILERS | 86 - 1956 International Truck | S-162 587414 |
| VEHICLES & TRAILERS | 101 - Wacker MGTLE | PP-98 ID# 5454898 |
| VEHICLES & TRAILERS | 103 - MQ Power DF2400J | Sn# 8016049 |
| VEHICLES & TRAILERS | 104 -2006 Ranco Trailer | Sn# 1R9BSE3035L008235 |

| Make | Year | Model | Vehicle ID No. |
|---|---|---|---|
| Ford | 2000 | Excursion | 1FMNU41S5TE40174 |
| Dodge | 2000 | Ram 2500 | 3E7KF2368YG113513 |
| Dodge | 2000 | Ram | 3B7KF2365YG161714 |
| Dodge | 1998 | Ram 2500 | 1B7KF2364WJ246636 |
| Ford | 2004 | F250 | 1FTNW21P44ED59968 |
| Ford | 2003 | Explorer | 1FMZU72K03ZA01547 |
| Chev | 2007 | Pickup | 2GCEK19B771117647 |
| Ford | 2005 | F250 | 1FTSW21UX5EA70557 |
| Jeep | 2002 | Grand Cher | 1J4GW48S42C264621 |
| Volvo | 1992 | Tractor | 4V1BDBCHXNN650136 |
| Trailer | 2005 | Loadking | 5LK5135251025335 |
| Trailer | 2006 | Ranco | 1R9BSE3035L008235 |

| Make | Year | Model | Vehicle ID No. |
|------|------|-------|----------------|
| Ford | 2000 | Ranger | 1FTZR15X9YPB48837 |
| Sterling | 2007 | L10Wtr Tr | 2FZHATDC07AY13460 |
| Sterling | 2007 | L10Wtr Tr | 2FZHATDC47AY13459 |
| Sterling | 2007 | L10 Fuel Truck | 2FZHATDC67AY13463 |
| Sterling | 2007 | L10 Lube Truck | 2FZHADC47AY13462 |
| Kenworth | 2006 | Mec Truck | 2NKMHD7XX6M144394 |
| Ford | 2002 | Ranger | 1FTZR45EX2PB45081 |
| Dodge | 2001 | Ram 2500 | 3B7KF23621G229747 |
| Dodge | 2001 | Ram 2500 | 1B7KC23601J233285 |
| Dodge | 2002 | Ram 2500 | 3B7KF23662M295401 |
| Dodge | 1995 | Ram | 1B7MC36C8SS145130 |
| Ford | 2002 | Ranger | 1FTZR45E52PB40029 |
| Chev | 1998 | Malibu | 1G1NE52M2W6181086 |
| Ford | 1961 | F600 | F60DP180641 |
| Dodge | 2001 | Ram 2500 | 3B7KF23701G708810 |
| Dodge | 2005 | Ram 2500 | 3D7KS28C15G833960 |
| Dodge | 2002 | Ram 2500 | 3B7KF23642M294389 |
| Ford | 2003 | F350 | 1FTSX31P23EC84143 |
| Chev | 2003 | k1500 | 1GCEK19T93Z343196 |
| Dodge | 2001 | Ram | 1B7KF23601J21993 |
| Toyota | 2007 | Pickup | 5TBDV58107S473216 |
| Ford | 2008 | F150 | 1FTPW14V48FB24368 |
| Ford | 2007 | F150 | 1FTPW14557KC30897 |
| Kenworth | 1986 | W900D | S336095GL |
| GMC | 2007 | Pickup | 1GTHK23D27F128397 |
| Ford | 2009 | F150 | 1FTPW14V19FA36783 |
| Ford | 2006 | F250 | 1FTSW21P66ED80794 |

All of Seller's right, title and interest in and to the following:

| ITEM (MODEL YEAR, IF APPLICABLE) | # UNIT | VIN OR SERIAL NUMBERS (IF APPLICABLE) |
|----------------------------------|--------|----------------------------------------|
| **REICH CIRCULATION DRILL RIG CP650 (1998)** | 1 | S/N: RD98614 |
| **Allis Chalmers Ball Grinding Mills 8' X 12' (1952) - Refurbished** | 2 | Unknown |
| **Sterling LT7500 Water Trucks - 4000 Gallon (2007)** | 2 | VIN#: 2FZHATDC07AY13460; VIN#: 2FZHATDC47AY13459 |
| **Sterling 7500 Lube Service Truck (2007)** | 1 | VIN#: 2FZHATDC47AY13462 |
| **Sterling 7500 Fuel Truck - 3,500 Gallon (2007)** | 1 | VIN#: 2FZHATDC67AY13463 |
| **JOHN DEERE MODEL 310SG LOADER BACKHOE (2005)** | 1 | S/N/VIN#: TO310SG946891 / S/N: T0310SG948891 |

| ITEM (MODEL YEAR, IF APPLICABLE) | # UNIT | VIN OR SERIAL NUMBERS (IF APPLICABLE) |
|---|---|---|
| ELECTRIC PRODUCTS ILI CORP. MODEL 750D34 S/N 1467-2 ENGINE; DETROIT DIESEL MODEL 16V149TI S/N: 16E6002348 GENERATOR 1,200 KW | 1 | S/N: 1467-2 (Detroit Diesel Engine S/N: 78905) / S/N 1467-2; S/N: 16E6002348 |
| CATERPILLAR D8H DOZER (1974) | 1 | S/N: 46A34012 |
| LOADKI 553SS (2005) | 1 | VIN # 5LKL5135251025335 |
| RANC L W21-40-3 (2005) | 1 | VIN #: 1R9BSE3035L008235 |
| JOHN DEERE BACKHOE 310D (1996) | 1 | S/N: G781830 / S/N: S7818830 |
| Mechanics Service Unit Truck w/Stellar 2 Crane & Mechanics Body on 2007 Model 335 Peterbilt Chassis | 1 | Unknown |
| Diamond Drill with 1,000' of Rods, Tooling and Mud Pumps | 1 | S/N: HM DD0273 |
| VOLVO HEAVY HAUL RIG (1992) | 1 | VIN#: 4V1BDBCHXNN650136 |
| JOY AIR COMPRESSOR COMPLETELY REBUILT MODEL NUMBER DB61MS1 600 CFM 350 HP DETROIT DIESEL MOUNTED ON A 1961 FORD F-600 | 1 | S/N: 00492219BHC (Detroit Diesel S/N: 550-MTW or 550-MTM) / VIN #F60PP180641 |
| SINGLE-GIRDER, TOP-RUNNING CRANE, CAPACITY 5 TONS, SPAN 40' | 1 | Unknown |
| DOUBLE-GIRDER, TOP-RUNNING CRANE, CAPACITY 5 TONS, SPAN 95' | 1 | Unknown |
| DELCO REMY GM MODEL 1108734 S/N 78905 GENERATOR 150KW CONDEC PACIFIC DIESEL COMPANY MODEL/PART/NUMBER 3169-0815 S/N AA89424DA POWERED BY JOHN DEERE MODEL 6619AF-00 S/N 031602RG 175 KW | 1 | S/N: TO6414T157394 (Condec Pacific: NAA89424DA; John Deere: 031602RG) / S/N 78905; S/N AA89424DA; S/N 031602RG |
| Ford Truck Ranger 4x4 XL (2002) | 1 | VIN#: 1FTZR45EX2P645081 |
| EMERSON GENERATOR 75 KW | 1 | S/N: 06G157394 |
| ONE 4X4 BALL MILL INCLUDES BALL, GRATES AND TEST EQUIPMENT | 1 | Unknown |
| Ford F-600 (1961) | 1 | VIN#: F60DP180641 |
| Ball Mill Liners | 2 | Unknown |
| Ball Mill Lube Skids (Separately Purchased) | 2 | Unknown |
| Ball Mill Charge of Balls | Numerous | Unknown |
| Trommel Structures with Polyurethane Bend Panels/Filters | 3 | N/A |

| ITEM (MODEL YEAR, IF APPLICABLE) | # UNIT | VIN OR SERIAL NUMBERS (IF APPLICABLE) |
|---|---|---|
| **Kenworth Model T300 Mechanic Truck, including 10,000 lb Hydraulic Crane (2006)** | 1 | VIN#: 2NKMHD7XX6M144394 |
| **Heavy Duty Crane Bridge** | 1 | N/A |

## SCHEDULE 1.1(c)

## PURCHASED INVENTORY

All of Sellers' right, title and interest in, under and to, to the extent they are considered Inventory, all extracted minerals and metals, water rights and rights to use or store water, dumps, stockpiles, tailings, easements, licenses, concentrates, products of the Flotation Mill, including any of the following:

(g)   that are **described or set forth on the documents and attachments appended hereto**, and all other rights and interests associated with any the foregoing;

(h)   that are **located in Beaver, Millard or Juab counties, or Beaver Lake or San Francisco mining districts**; and

(i)   all other rights and interests associated with any the foregoing.

**SCHEDULE 1.1(d)**

**DEPOSITS**

Any deposits held by the Seller in its deposit account with US Bank, including Account#: 153152296346, ABA Routing #: 124302150 with a branch office in Cedar City, 633 North Main Street, Suite A, Cedar City, UT 84720 USA, and any other deposit accounts held by Seller, as of the Closing Date, but excluding the Purchase Price.

## SCHEDULE 1.1(e)

## INTANGIBLE PROPERTY ASSETS

Copies of all studies, data, reports, maps, surveys and other documents related to the Purchased Assets in Seller's possession or under its control, including, without limitation, the following:

(m)   all engineering reports, surveys, topographic maps, soil tests, biological surveys, wetlands maps, seismic studies, environmental impact reports, traffic circulation, grading flood control and drainage plans, design renderings, market analyses, feasibility studies, tentative parcel and final maps, and all correspondence with governmental agencies and their personnel concerning the same;

(n)   any soils or toxic materials reports, engineering tests, environmental or geological studies, assessments and surveys and similar data pertaining to any portion of the Purchased Assets;

(o)   water and water rights reports and documents;

(p)   mineral, mineral extraction and mining reports;

(q)   the most recent property tax bills, notices of assessments and any petitions, appeals or related documents;

(r)   any other notices, claims, complaints, litigation, actions or other legal proceedings involving any governmental authority or private party;

(s)   any contracts, licenses or other agreements affecting the ownership, operation, maintenance, repair, improvement and/or development of the Purchased Assets;

(t)   all leases, licenses and use and occupancy permits or agreements affecting the Purchased Assets and any related assignments or amendments;

(u)   any permits, licenses, agricultural or farming agreements;

(v)   zoning and entitlements documents and files, development rights and plans;

(w)   geologic data and libraries, mine designs, information and data;

(x)   any Intellectual Property Assets;

(y)   copies of CC&Rs, covenants or agreements binding upon the Purchased Assets; and

(z)   any and all other plans, specifications, maps, licenses, permits, guaranties, warranties, certificates, contracts, agreements, reports, surveys and other similar instruments or documents pertaining in any way to the Purchased Assets.

## SCHEDULE 1.1(f)

## PURCHASED CONTRACTS

1.      The Seller's right, title and interest to and under all of Sellers's leases of mining claims, mineral rights or real property, including but not limited to:

1.1      That certain Mining Lease and Option Agreement between Beverly Prodzinski a.k.a. Beverly Bealer, widow of Alfred W, Bealer, whose address is 201 N. 100 W.,  Milford, Utah 84751 (hereinafter referred to as the "Lessor") and Cortex Mining & Exploration Co., Inc. dated May 5, 1990, as amended and assigned to Seller, including by that certain Amendment To Mining Lease and Option Agreement between Lessor and Seller entered into and made effective as of April 1, 2004.

1.2      That certain mining lease entered into as of the 28th day of April, 1994 by and between Horn Silver Mines, Inc., a Utah Corporation of Salt Lake City, Utah, and Dotson Exploration Co., of Milford, Beaver County, Utah, as amended and assigned to Seller.

1.3      That certain Mineral Lease and Option to Purchase Agreement by and between Gilbert A. McCulley, D. Carol McCulley, Grant Wood, and Gayle Wood, and Seller as of July 27th, 2004.

1.4      That certain Mineral Lease and Option to Purchase Agreement (the "Agreement"), by and between Horn Silver Mines, Inc., a Utah corporation, whose address is 1005 E. 3900 S., Salt Lake City, Utah 84124 (hereinafter referred to as the "Lessor"), and Western Utah Copper Company, a Utah corporation, whose address is P.O. Box 681659, Park City, Utah 84068-1659 (hereinafter referred to as "WUCC"), is entered into and made effective as of December 19, 2002.

1.5      That certain Mining Lease Agreement made and entered into as of the 30th day of October, 1995, by and between A.J.L. Corporation, a Nevada corporation, and Cortex Mining and Exploration Co., Inc., a Utah corporation.

1.6      Those certain Utah State Trust Lands Administration Leases detailed as follows:

| Lease No. | County | Origination | Legal Description |
|---|---|---|---|
| | | | |
| 49556.0 | Beaver | 12/1/2004 | LOT 1(35.33), N2, NE4SW4, S2SW4, SE4, S16, T27S R11W [ALL] |
| 50379.0 | Washington | 5/1/2006 | LOTS 1(40.19), 2(40.14), 3(40.08), 4(40.03), S2N2, S2, T42S R19W(ALL) |
| 50379.0 | Washington | 5/1/2006 | T42S R19.0W S36 SL (ALL) |
| 51085.0 | Beaver | 10/1/2007 | LOTS 1(40.51), 2(40.40), 3(40.30), 4(40.19), S2N2, S2. T30S R19W SL [ALL] |
| 51086.0 | Beaver | 10/1/2007 | T29.0S R19.0W S36 SL (All) |
| | | | |
| **Total Acres** | | | |

1.7      The Nevada Star Agreement, and all rights and remedies of Seller of any kind thereunder.

1.8      Any rights under Seller's mineral leases of the following properties, to the extent not covered by the above:

| | Claim Name | Survey No. | Property/Unit Number | Mining District | Legal Description Section(s) Township Range |
|---|---|---|---|---|---|
| | | | | | |
| 1 | Annie J. | 4839 | 57681 | Beaver Lake | Sec. 8 T27S R11W |
| 2 | Copper C | 4605 | 27268 | Beaver Lake | Sec. 5, 31 T26,27S R11W |

| | Claim Name | Survey No. | Property/Unit Number | Mining District | Legal Description Section(s) Township Range |
|---|---|---|---|---|---|
| 3 | Ouray | 4839 | 57682 | Beaver Lake | Sec. 8 T27S R11W |
| 4 | Last Chance | 4839 | 57683 | Beaver Lake | Sec. 8 T27S R11W |
| 5 | Bonanza | 4839 | 57689 | Beaver Lake | Sec. 8 T27S R11W |
| 6 | Bonanza #2 | 5531 | 27264 | Beaver Lake | Sec. 5 T27S R11W |
| 7 | Klondyke | 5624 | 57732 | Beaver Lake | Sec. 5 T27S R11W |
| 8 | Klondyke Extension | 5624 | 57992 | Beaver Lake | Sec. 6 T27S R11W |
| 9 | Klondyke #3 | 5624 | 57733 | Beaver Lake | Sec. 5 T27S R11W |
| 10 | Klondyke #4 | 5624 | 57734 | Beaver Lake | Sec. 5 T27S R11W |
| 11 | Daisy | 4839 | 57736 | Beaver Lake | Sec. 8 T27S R11W |
| 12 | Daisy #2 | 4839 | 57737 | Beaver Lake | Sec. 8 T27S R11W |
| 13 | Oreo | 5530 | 57991 | Beaver Lake | Sec. 5 T27S R11W |
| 14 | Dull Knife | 5205 | 57674 | San Francisco | Sec. 14 T27S R13W |
| 15 | Hesperides | 5205 | 57675 | San Francisco | Sec. 14 T27S R13W |
| 16 | Frisco | 5205 | 57679 | San Francisco | Sec. 14 T27S R13W |
| 17 | Frisco #3 | 5205 | 57800 | San Francisco | Sec. 14 T27S R13W |
| 18 | Copper Spring | 4709 | 27224 | San Francisco | Sec. 10 T27S R13W |
| 19 | Excelsior #3 | 4709 | 57641 | San Francisco | Sec. 11 T27S R13W |
| 20 | Excelsior #4 | 4709 | 57987 | San Francisco | Sec. 11 T27S R13W |
| 21 | Lookout #2 Mine | 5199 | 57680 | San Francisco | Sec. 11,12 T27S R13W |
| 22 | Scorpion | 5199 | 57799 | San Francisco | Sec. 11 T27S R13W |
| 23 | Scorpion #1 | 5199 | 57798 | San Francisco | Sec. 11,12 T27S R13W |
| 24 | Good Hope #1 | 5199 | 57796 | San Francisco | Sec. 12 T27S R13W |
| 25 | Good Hope #2 | 5199 | 57797 | San Francisco | Sec. 12 T27S R13W |
| 26 | Homestake #1 | 5118 | 57801 | San Francisco | Sec. 12 T27S R13W |
| 27 | Homestake #2 | 5118 | 57802 | San Francisco | Sec. 7,12 T27S R13W |
| 28 | Anchor #2 (West Half) | 5118 | 57990 | San Francisco | Sec. 7, T27S R13W |
| 29 | Ruby Mine a.k.a Ruby Lode | 5205 | 57673 | San Francisco | Sec. 14 T27S R13W |
| 30 | Alturas | 5303 | 57777 | San Francisco | Sec. 2 T27S R13W |
| 31 | Anaconda | 4673 | 27228 | San Francisco | Sec. 3, T27S R13W |
| 32 | Antelope | 5303 | 57778 | San Francisco | Sec. 2 T27S R13W |
| 33 | Antler | 5303 | 57776 | San Francisco | Sec. 2 T27S R13W |
| 34 | Arkansas Pass | 4492A | 27246 | San Francisco | Sec. 3 T27S R13W |
| 35 | Augusta | 4611 | 27198 | San Francisco | Sec. 3 T27S R13W |
| 36 | Bandit | 5827 | 57652 | San Francisco | Sec. 3 T27S R13W |
| 37 | Belmont Copper Silver Mine | 4492A | 57664 | San Francisco | Sec. 3 T27S R13W |
| 38 | Black Bird #4 a.k.a. Blackbird #4 | 6010 | 57644 | San Francisco | Sec. 2, 11 T27S R13W |
| 39 | Boston | 4611 | 57610 | San Francisco | Sec. 3 T27S R13W |
| 40 | Buckhorn | 5303 | 57779 | San Francisco | Sec. 2 T27S R13W |
| 41 | Burro | 4611 | 57816 | San Francisco | Sec. 10 T27S R13W |
| 42 | Burro #1 | 5826 | 57792 | San Francisco | Sec. 10 T27S R13W |
| 43 | Burro #2 | 5826 | 57793 | San Francisco | Sec. 10 T27S R13W |
| 44 | Burro #3 | 5393 | 57752 | San Francisco | Sec. 10 T27S R13W |
| 45 | Burro #4 | 5393 | 57794 | San Francisco | Sec. 3, 10 T27S R13W |
| 46 | Burro #5 | 5393 | 57795 | San Francisco | Sec. 10 T27S R13W |
| 47 | Cactus Mine U.S. a.k.a. Cactus | 39A | 57608 | San Francisco | Sec. 3 T27S R13W |
| 48 | Cactus Extension | 4492A | 57817 | San Francisco | Sec. 3 T27S R13W |
| 49 | Cactus Millsite | 39B | 27196 | San Francisco | Sec. 24 T27S R13W |
| 50 | Calliope | 5303 | 57790 | San Francisco | Sec. 2 T27S R13W |

| | Claim Name | Survey No. | Property/Unit Number | Mining District | Legal Description Section(s) Township Range |
|---|---|---|---|---|---|
| 51 | Camille | 4709 | 27191 | San Francisco | Sec. 2 T27S R13W |
| 52 | Comet | 64 | 18861 | San Francisco | T27S R13W |
| 53 | Contact | 5303 | 57786 | San Francisco | Sec. 3 T27S R13W |
| 54 | Copperopolis #3 | 4709 | 57599 | San Francisco | Sec. 10, T27S R13W |
| 55 | Copperopolis #4 | 4709 | 57600 | San Francisco | Sec. 10, T27S R13W |
| 56 | Copperopolis #5 | 4709 | 57602 | San Francisco | Sec. 10, T27S R13W |
| 57 | Copperopolis #6 | 4709 | 57700 | San Francisco | Sec. 11 T27S R13W |
| 58 | Copperopolis #7 | 4709 | 57701 | San Francisco | Sec. 10 T27S R13W |
| 59 | Copperopolis #8 | 4709 | 57702 | San Francisco | Sec. 10 T27S R13W |
| 60 | Copperopolis #9 | 4709 | 57703 | San Francisco | Sec. 11 T27S R13W |
| 61 | Cottonwood | 4709 | 57746 | San Francisco | Sec. 2, 11 T27S R13W |
| 62 | Daisy | 4709 | 57735 | San Francisco | Sec. 2 T27S R13W |
| 63 | Dandy | 5303 | 57788 | San Francisco | Sec. 3 T27S R13W |
| 64 | Divide | 5303 | 57781 | San Francisco | Sec. 3 T27S R13W |
| 65 | Dump | 5825 | 27194 | San Francisco | Sec. 4 T27S R13W |
| 66 | Earth | 5394 | 57657 | San Francisco | Sec. 4 T27S R13W |
| 67 | Elinore | 5303 | 27234 | San Francisco | Sec. 3 T27S R13W |
| 68 | Elinore Fraction | 5303 | 57645 | San Francisco | Sec. 3 T27S R13W |
| 69 | Elk | 5303 | 57780 | San Francisco | Sec. 2 T27S R13W |
| 70 | Emerald | 5303 | 57647 | San Francisco | Sec. 2 T27S R13W |
| 71 | Estelle a.k.a. Esteel | 4611 | 57611 | San Francisco | Sec. 3 T27S R13W |
| 72 | Eva | 5303 | 57646 | San Francisco | Sec. 2 T27S R13W |
| 73 | Excelsior | 4709 | 57639 | San Francisco | Sec. 11 T27S R13W |
| 74 | Excelsior #2 | 4709 | 57640 | San Francisco | Sec. 11 T27S R13W |
| 75 | Excelsior #6 | 4709 | 57739 | San Francisco | Sec. 11 T27S R13W |
| 76 | Excelsior #7 | 4709 | 57740 | San Francisco | Sec. 11 T27S R13W |
| 77 | Franklin | 5303 | 57773 | San Francisco | Sec. 2, T27S R13W |
| 78 | Gadfly (Portion) (P.T. Gadfly 16.259 Ac.) | 5303 | 57989 | San Francisco | Sec. 24 T27S R13W |
| 79 | Good Fortune | 5394 | 57658 | San Francisco | Sec. 3 T26S R13W |
| 80 | Good Luck | 5394 | 57750 | San Francisco | Sec. 3 T26S R13W |
| 81 | Gray Horse | 4709 | 57988 | San Francisco | Sec. 11 T27S R13W |
| 82 | High | 4709 | 57738 | San Francisco | Sec. 11 T27S R13W |
| 83 | High Point | 5303 | 57649 | San Francisco | Sec. 2, 3 T27S R13W |
| 84 | Hillside Lode | 4706 | 57656 | San Francisco | Sec. 10 T27S R13W |
| 85 | Igneous | 5303 | 57787 | San Francisco | Sec. 3 T27S R13W |
| 86 | Iron Chief | 4673 | 57643 | San Francisco | Sec. 2 T27S R13W |
| 87 | Jinney #1 | 5394 | 57765 | San Francisco | Sec. 4, 33 T26S R13W |
| 88 | Jinney #2 | 5394 | 57766 | San Francisco | Sec. 33 T26S R13W |
| 89 | Jinney #3 | 5394 | 57767 | San Francisco | Sec. 4 T26S R13W |
| 90 | Jinney #4 | 5394 | 57768 | San Francisco | Sec. 4, 33 T26S R13W |
| 91 | Jupitor | 5394 | 57769 | San Francisco | Sec. 4 T26S R13W |
| 92 | Lambson | 5303 | 57785 | San Francisco | Sec. 34 T26S R13W |
| 93 | Laura | 4611 | 57612 | San Francisco | Sec. 3 T27S R13W |
| 94 | Louise R. | 4611 | 57613 | San Francisco | Sec. 3 T27S R13W |
| 95 | Maggie | 5303 | 57783 | San Francisco | Sec. 34 T26S R13W |
| 96 | Maggie #1 | 5303 | 57784 | San Francisco | Sec. 34 T26S R13W |
| 97 | Mamie | 5394 | 57770 | San Francisco | Sec. 4 T27S R13W |
| 98 | Mars | 5394 | 57771 | San Francisco | Sec. 4 T26S R13W |

| | Claim Name | Survey No. | Property/Unit Number | Mining District | Legal Description Section(s) Township Range |
|---|---|---|---|---|---|
| 99 | Mascot | 5827 | 27239 | San Francisco | Sec. 3, 4 T27S R13W |
| 100 | May Queen | 4709 | 57741 | San Francisco | Sec. 11 T27S R13W |
| 101 | May Queen #2 | 4709 | 57742 | San Francisco | Sec. 11 T27S R13W |
| 102 | Midvale Placer | 48.77 | | San Francisco | NW1/4 Sec. 9, T27S R11W |
| 103 | Moose | 5303 | 57650 | San Francisco | Sec. 3 T27S R13W |
| 104 | Morrison #2 | 4876 | | San Francisco | |
| 105 | Nana | 4754 | 57704 | San Francisco | Sec. 3 T27S R13W |
| 106 | Neptune | 5394 | 57654 | San Francisco | Sec. 4 T27S R13W |
| 107 | New Years | 4492A | 57762 | San Francisco | Sec. 3 T27S R13W |
| 108 | New Years Spring M.S. | 4492B | 27243 | San Francisco | Sec. 34 T26S R13W |
| 109 | Old Crow | 4706 | | San Francisco | |
| 110 | Olga | 4709 | 57749 | San Francisco | Sec. 11 T27S R13W |
| 111 | Ophir | 4492A | 57751 | San Francisco | Sec. 3 T27S R13W |
| 112 | Pathfinder | 4709 | 57747 | San Francisco | Sec. 11 T27S R13W |
| 113 | Puritan | 4673 | 57642 | San Francisco | Sec. 2, 3 T27S R13W |
| 114 | Purity | 4492A | 57661 | San Francisco | Sec. 3 T27S R13W |
| 115 | Quartz #1 | 5303 | 57782 | San Francisco | Sec. 34 T26S R13W |
| 116 | Raleigh | 5303 | 57789 | San Francisco | Sec. 3 T27S R13W |
| 117 | Regulator | 4709 | 57743 | San Francisco | Sec. 11 T27S R13W |
| 118 | Regulator #2 | 4709 | 57744 | San Francisco | Sec. 11 T27S R13W |
| 119 | Royalist | 5303 | 57775 | San Francisco | Sec. 2 T27S R13W |
| 120 | San Antonio | 4492A | 57763 | San Francisco | Sec. 3 T27S R13W |
| 121 | Sapho | 4709 | 57748 | San Francisco | Sec. 11 T27S R13W |
| 122 | Saturn | 5394 | 57655 | San Francisco | Sec. 4 T26S R13W |
| 123 | Sun | 5394 | 57659 | San Francisco | Sec. 4 T26S R13W |
| 124 | Texas | 4492A | 57660 | San Francisco | Sec. 3,4 T27S R13W |
| 125 | Townsite | 4755 | | San Francisco | |
| 126 | Townsite Extension | 4753 | 27195 | San Francisco | Sec. 10, 11 T27S R13W |
| 127 | Triumphant | 5303 | 57774 | San Francisco | Sec. 2, T27S R13W |
| 128 | Tunnel | 4611 | 57705 | San Francisco | Sec. 4 T27S R13W |
| 129 | U-Bet a.k.a. Ubet | 5303 | 57791 | San Francisco | Sec. 2 T27S R13W |
| 130 | Uncle Sam | 4709 | 57745 | San Francisco | Sec. 2 T27S R13W |
| 131 | Union | 4752 | 57606 | San Francisco | Sec. 3 T27S R13W |
| 132 | Venus | 5394 | 57772 | San Francisco | Sec. 4 T26S R13W |
| 133 | Volcanic | 5827 | 57607 | San Francisco | Sec. 3 T27S R13W |
| 134 | West Dip | 4492A | 57764 | San Francisco | Sec. 3 T27S R13W |
| 135 | W.P.J. a.k.a. WPJ | 4709 | 57759 | San Francisco | Sec. 10 T27S R13W |
| 136 | Boom, Sarault, Montreal, Niagara Falls Consolidated | 3446 | 1008 | Rocky | Sec. 22 T27S R11W |
| 140 | Montreal #1, Albert, Annex, Contact, Dundee, Fraction, George, Tip Top | 6253 | 1008 | Rocky | Sec. 22 T27S R11W |
| 148 | Homestreatch | 6254 | 1009 | Rocky | Sec. 22 T27S R11W |
| 149 | Lookout | 6254 | 1009 | Rocky | Sec. 22 T27S R11W |
| 150 | Colorado | 6254 | 1009 | Rocky | Sec. 22 T27S R11W |
| 151 | Triangle | 6255 | 1009 | Rocky | Sec. 22 T27S R11W |
| 152 | Albion | 6256 | 1009 | Rocky | Sec. 22 T27S R11W |
| 153 | Apex & Gothland | 6019 | 53403 | Rocky | Sec. 22 T27S R11W |

| | Claim Name | Survey No. | Property/Unit Number | Mining District | Legal Description Section(s) Township Range |
|---|---|---|---|---|---|
| 154 | Bawana #2 | 7300 | 1010 | Rocky | Sec. 22 T27S R11W |
| 155 | Bawana #3 | 7300 | 53391 | Rocky | Sec. 22 T27S R11W |
| 156 | Carnarthan | 5476 | 1013 | Rocky | Sec. 22 T27S R11W |
| 157 | Amelia | 38 | 1015 | Rocky | Sec. 22 T27S R11W |
| 158 | Marguerite | 5476 | 53382 | Rocky | Sec. 22 T27S R11W |
| 159 | Candy B | 7300 | 53392 | Rocky | Sec. 22 T27S R11W |
| 160 | Candy C | 7300 | 53393 | Rocky | Sec. 22 T27S R11W |
| 161 | Old Hickory | 37 | 53404 | Rocky | Sec. 22 T27S R11W |
| 162 | Summit | 3080 | 53406 | Rocky | Sec. 22 T27S R11W |
| 163 | Burning Shame | 6143 | 13155 | North Star | Sec. 8 T28S R11W |
| 164 | Independence Lode | 5304 | 13156 | Beaver Lake | Sec. 29 T26S R11W |
| 165 | Amended Midnight Lode | 5009 | 13157 | Beaver Lake | Sec. 6 T27S R11W |
| 166 | Elkton | 4638 | 13158 | Beaver Lake | Sec. 6 T27S R11W |
| 167 | Roadside Mine | 4637 | 13159 | Beaver Lake | Sec. 6 T27S R11W |
| 168 | The Jewel | 5476 | 57681 | Rocky | Sec. 22, T27S R11W |
| 169 | Marguerite No. 15 | 5476 | 27268 | Rocky | Sec. 22, T27S R11W |

2.      The Seller's right, title and interest to and under all the following contracts:

2.1     Any agreements with power companies or suppliers, including that certain Master Electric Service and Facilities Improvements Agreement between Rocky Mountain Power and Western Utah Copper Company dated as of the 28th day of October, 2008.

2.2     Those associated with the Republic Transactions, including any equipment leases thereunder.

2.3     The rights of Seller under communications and agreements with the Beaver County Commission with respect to roads, including but not limited to that certain letter to Seller dated as of January 19, 2007, and pursuant to that certain hearing held as of September 6, 2005.

**<u>SCHEDULE 1.1(h)</u>**

**PURCHASED BUSINESS PERMITS**

1.      All permits held by Seller issued by the Utah Department of Oil, Gas and Mining, including its Large Mine Permit No. M/001/0067.

2.      All Mine Safety and Health Administration Registrations and permits.

3.      All bonds and bonding held by the Seller with respect to its Business.

4.      All of WUCC's right, title and interest in, under and to the following permits:

| Large Mine Permit | | |
|---|---|---|
| **Permit No.** | **Name of Operation** | **Bond Amount** |
| M/001/0067 | WUCC Copper Mine | $ 1,600,000.00 |
| **Small Mine Permits** | | |
| S/001/0074 | Marie Pit Overburden Dump<br>Gene Henrie (dba Quality Crushing) | $     5,400.00 |
| S/001/0075 | Essex Mill Tailings<br>Gene Henrie (dba Quality Crushing) | $    18,000.00 |
| S/001/0076 | Bawana Low Grade Ore Piles | $     9,000.00 |
| S/001/0077 | Mary I Breccia Pipe | $           - |
| S/001/0078 | OK Mine Pit | $           - |

| Exploration Permits | | |
|---|---|---|
| E/001/0152 | Goldfinger Trend | $     5,000.00 |
| E/001/159 | Copper Ranch | $    26,720.00 |
| E/001/161 | Bawana Underground Mine | $           - |

## SCHEDULE 1.1(m)

### OTHER PURCHASED ASSETS

*None.*

## SCHEDULE 2.2

**CERTAIN LIABILITIES**

*None.*

## SCHEDULE 5.3

**SELLER'S REQUIRED APPROVALS**

*None.*

## SCHEDULE 5.6

**SELLER'S NON-COMPLIANCE WITH LAWS**

*None.*

## SCHEDULE 5.11(c)

**CONTRACTS REGARDING PURCHASE OR USE OF PURCHASED REAL PROPERTY; PERMITTED ENCUMBRANCES**

1.　　Those leases and purchased contracts set forth on <u>Schedule 1.1(f)</u>; and

2.　　Any easements to utilities or governmental entities of public record.

## SCHEDULE 5.11(j)

**CONTRACTS AFFECTING PURCHASED REAL PROPERTY POST-CLOSING**

Those leases and purchased contracts set forth on Schedule 1.1(f).

## SCHEDULE 5.12(a)

## FURNISHINGS AND EQUIPMENT AND INVENTORY

Those furnishings and equipment specifically set forth on Schedule 1.1(b) and that inventory set forth on Schedule 1.1.(c).

## SCHEDULE 5.12(b)

## DEPOSITS

Those Deposits currently held by the Seller in its deposit account with US Bank, including Account#: 153152296346, ABA Routing #: 124302150 with a branch office in Cedar City, 633 North Main Street, Suite A, Cedar City, UT 84720 USA in the approximate amount of [less than Fifty Thousand and No/100 Dollars ($50,000)], and any other deposit accounts held by Seller, as of the Effective Date.

## SCHEDULE 5.12(c)

**RECEIVABLES**

*None.*

## <u>SCHEDULE 5.14(a)</u>

**PERSONAL PROPERTY LEASES**

1.      Those certain Leases under the Republic Transactions;

2.      Any existing leases from Quality Crushing for ore or rock crushing equipment; and

3.      Any equipment leases for office equipment.

## <u>SCHEDULE 5.14(b)</u>

## OTHER CONTRACTS

1.      Any additional contracts with Gene Henrie or Quality Crushing;

2.      That certain contract with respect to private airplane rentals; and

3.      Any contracts set forth on <u>Schedule 1.1(f)</u> but not set forth above or on <u>Schedule 5.14(a)</u>.

## SCHEDULE 5.14(c)

## CURE COSTS

4.     Approximately $156,750 for the below real property leases, and up to approximately $256,750, unless the SMP DIP Funds are used to pay such Cure Costs:

| | | |
|---|---|---|
| **G. A. McCulley & Grant Wood** | $ | 49,000.00 |
| **Horn Silver Mines, Inc. (Klondyke/King Bird)** | $ | 3,750.00 |
| **Horn Silver Mines, Inc.** | $ | 82,500.00 |
| **Beaverly Bealer** | $ | 5,000.00 |
| **Bogdanich (AJL) SEPA LEASE** | $ | 16,500.00 |
| | | |
| Total Cure | **$** | **156,750.00** |

Plus potential annual payment on McCulley lease in amount of $100,000, if Closing occurs after such payment becomes due.

## SCHEDULE 5.15

**BUSINESS PERMITS**

Those items set forth in Schedule 1.1(h).

## <u>SCHEDULE 5.16(c)</u>

### SELLER'S NON-COMPLIANCE WITH LABOR LAWS

*None.*

## SCHEDULE 5.19

**SELLER'S INSURANCE**

The Seller currently has property and casualty insurance for Mill, buildings and equipment from AIG that lapses as of July 31, 2011.   Such insurance is not transferable to Purchaser and Seller and/or Purchaser will have to obtain replacement insurance as of such date.

**<u>SCHEDULE 5.25</u>**

**TAX NON-COMPLIANCE**

1.      Seller has not filed tax returns for prior years.

2.      Non-payment of certain payroll taxes to the IRS pre-petition.

3.      Non-payment of certain payroll taxes to the State of Utah pre-petition.

4.      Non-payment of certain property taxes to the State of Utah pre-petition.

## <u>SCHEDULE 5.26</u>

**PURCHASED CONTRACT BREACHES**

Seller has failed to make timely payments with respect to the real property leases set forth in Schedule 1.1(f), provided that such real property leases are currently subject to extension or settlement arrangements as of the Effective Date.

## **SCHEDULE 5.27**

## **AFFILIATE TRANSACTIONS**

*None.*

# EXHIBIT "2"

# ASSET PURCHASE TERM SHEET

### *Copper King Mining Corporation*

July 11, 2011

**COMPANY:**   COPPER KING MINING CORPORATION ("**Seller**")

**PURCHASER:**   CS MINING, LLC ("**CS**" or "**Purchaser**"), or SKYE MINERAL PARTNERS, LLC, a Delaware limited liability company ("**SMP**"), or a designee of SMP or CS, the proposed funder of an asset sale of Seller's assets

---

**EFFECTIVENESS:**   This Asset Purchase Term Sheet ("**Term Sheet**") shall become effective upon execution by the parties and approval by the bankruptcy court presiding over the bankruptcy cases of Debtors (as defined below) (the "**Bankruptcy Court**"), and the transactions described herein shall be closed simultaneously with the closing date ("**Closing Date**") of an asset sale of substantially all the assets of Western Utah Copper Company ("**WUCC**", and collectively with Seller, "**Debtors**") pursuant to Section 363 of the Bankruptcy Code pursuant to that certain Asset Purchase Agreement by and between CS and WUCC executed approximately of even date herewith (the "**WUCC APA**"). The terms and transactions described in this Term Sheet shall be adopted as part of the "CK Sale Order" required by the WUCC APA, as defined therein.

**PURCHASE PRICE:**   In exchange for the Purchased Assets and other terms and conditions set forth below in this Term Sheet, Purchaser shall provide the following to a liquidating trust or similar trust for the benefit of the Seller's bankruptcy estate (the "**Trust**") as of the Closing Date (the "**Purchase Price**"):

(a)  The assumption of Assumed Liabilities (as defined below).

(b)  Cash in an amount equal to One Hundred Thousand and No/100 Dollars ($100,000.00) (the "**Cash**").

(c)  A release of all claims of CS, Skye and their affiliates against the Seller and its affiliates in Seller's bankruptcy case.

(d)  One percent (1%) of the voting equity interests in CS in the nature of one percent (1%) of the outstanding voting common LLC or membership interests, as applicable (the "**Equity Interest**"). Thereafter, dilution and distributions with respect to such Equity Interest shall occur pro-rata with the other common equity interests. The Equity Interest shall be issued at the same time, manner and form as such other initially issued voting common equity interests of CS, and the Equity Interest shall have, pro-rata in accordance with ownership, the same rights, benefits and voting privileges as the remaining originally issued common equity interests. Notwithstanding the foregoing, the Equity Interest and the granting thereof must be structured in such a way that CS remains a private entity exempt from registration with the United States Securities and Exchange Commission.

(e)  If the Official Committee of Equity Holders and its members representing Seller's equity holders ("**Equity Committee**") do not object to or oppose this Term Sheet and the WUCC APA or any of the proceedings associated therewith, a warrant with a term of twelve (12) months to purchase an equity interest in CS in an amount equal to two percent (2%) of the outstanding common voting equity interests of CS, and with a strike price equal to two percent (2%) of One Hundred and Twenty Five Million Dollars ($125,000,000), or Two Million Five Hundred Thousand Dollars ($2,500,000), in CS's

standard form satisfactory to CS (the "**Warrant**") will be issued to Seller or its designee (the "Warrant Holder").  Seller has advised CS that, subject to approval of the Official Committee of Unsecured Creditors, Seller intends to transfer the Warrant to the Equity Committee.  The Warrant shall not be transferable by the Warrant Holder.  The Warrant and the granting thereof must be structured in such a way that CS remains a private entity exempt from registration with the United States Securities and Exchange Commission.

**ASSUMED LIABILITIES:**

The following shall constitute "**Assumed Liabilities**" of Seller: (a) Seller's obligations under contracts or business permits that are assigned or otherwise transferred to Purchaser pursuant to this Term Sheet, if any; (b) any cure costs for any contracts assigned or otherwise transferred to Purchaser under this Term Sheet, if any; (c) any and all responsibility for the Loans (as defined below) and any guarantees thereof in the amounts owed thereunder as of the Closing Date; (d) the First Lien Transactions (as defined below) and responsibility for payment of the aggregate amount outstanding and due thereunder as of the Closing Date; (e) the Debtor DIP Loans (as defined below) and responsibility of payment for the aggregate amount outstanding and due thereunder as of the Closing Date; and (f) any debtor-in-possession loans made to Seller and supported by Purchaser following the date hereof and prior to the Closing Date.

The "**Loans**" include: (1) A secured loan to WUCC (the "*WUCC First Lien Loan*") made in 2007 from DDB Utah, LLC; The Raymond W. Schmelzer Marital Trust; Top-Notch Investments, LLC; Rodney Evan Schmelzer; Brent Thomas Bingham; Bridge Loan Capital Fund, LP; DPI College, LC; Milford Copper Investors II, LLC; Reynolds Brothers, Inc.; Milford Investors, LLC; Advanced Strategic Planning, LLC; and Back Country Investments, LLC;  the First Lien Loan was evidenced by a Secured Promissory Note dated January 4, 2007, in the principal amount of $8,944,200.97; and the First Lien Loan was secured by substantially all assets of WUCC, has been guaranteed by Seller, and may be secured by substantially all the assets of Seller; (2) Approximately $4 million borrowed by WUCC in March 2007 from Bridge Loan Capital Fund, LP; DPI College, LC; Milford Copper Investors II, LLC; Reynolds Brothers, Inc.; Milford Investors, LLC; Advanced Strategic Planning, LLC; Back Country Investments, LLC; Bridge Loan Capital, LP; ME Dancy Consulting Services, Inc.; Jonathan B. Wells; Wendell Gile Trust; and Josh Romney; and (3) Approximately $1.2 million borrowed by WUCC in October 2007 from Devin Durrant.

The "**First Lien Transactions**" include various loan and sale/leaseback transactions entered into among Seller, WUCC and Empire Advisors, LLC, Altus Metals, LLC ("**Altus**"), Strategic Capital Partners, LLC, and Winterfox, L.L.C., from September 2009 through April of 2010.  The First Lien Transactions were secured by, or involved the sale and leaseback of, all the assets of Seller and certain assets of WUCC as set forth in the relevant documents.

The "**Debtor DIP Loans**" includes those various debtor-in-possession loans made from March through July of 2011 by First Lien Lenders to Debtors, secured by priming, super-priority liens on all or substantially all the assets of Seller, as set forth in the relevant orders of the Bankruptcy Court and any responsibility of Seller; and any responsibility of Seller with respect to those certain debtor-in-possession loans made from July through September of 2010 by Altus and the First Lien Lenders.

**EXCLUDED LIABILITIES:**

Notwithstanding anything to the contrary contained in this Term Sheet, Purchaser shall not be obligated to pay, assume or to perform or otherwise discharge any liability, debt (as defined by 11 U.S.C. § 101), or obligation ("**Liability**") of Seller or its Affiliates including any Liability constituting an encumbrance upon the Purchased Assets, regardless of whether any such Liability is fixed, absolute, contingent, liquidated, unliquidated, matured, unmatured, asserted, unasserted, known, or unknown, other than the Assumed Liabilities

explicitly assumed by Purchaser (such Liabilities not assumed by Purchaser, the "**Excluded Liabilities**").  Without limiting the foregoing, Purchaser shall not be obligated to pay, assume, perform or discharge, and does not assume, perform or discharge, any of the following liabilities:  (i) any liability of Seller or its Affiliates relating to Seller's execution, delivery or performance of this Agreement or any document contemplated by this Agreement; (ii) any and all liabilities of Seller or its Affiliates of any sort whatsoever (whether now existing or hereafter arising) under environmental laws relating to or arising out of or in connection with the Business (including, without limitation, administrative or civil fines or penalties for violations of environmental laws, or remediation or response costs for contamination); (iii) any brokerage or investment banking fees or similar fees of Seller; (iv) any liability of Seller or its Affiliates with respect to the WARN Act, or any similar federal, state or other law, rule or regulation; (v) any liability of Seller or its Affiliates to employees or under any collective bargaining agreements; (vi) any compensation and reimbursement of expenses of Seller or its Affiliates to Seller's legal counsel, other advisors, or any administrative claimants; (vii) any accrued but unpaid payroll tax as of the Closing Date; (viii) any liability of Seller to any of its Affiliates; (ix) any liabilities relating to penalties, fines, settlements, interest, costs and expenses incurred as a result of any actual or alleged violation by Seller of any requirement of any legal requirement or the litigation related to the legal requirement, including any liabilities with respect to the issuance of securities by Seller or to the United States Securities and Exchange Commission; (x) other than the Assumed Liabilities, any liabilities associated with any and all indebtedness of Seller for borrowed money or services performed; (xi) any liabilities with respect to negligence or other torts committed prior to the Closing Date; and (xii) any liabilities for expenses (a) relating to the negotiation and preparation of this Term Sheet and (b) relating to transactions contemplated hereunder, in each case to the extent incurred by Seller.

**PURCHASED ASSETS:**  On the Closing Date and on the terms and conditions of this Term Sheet, Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire, accept and receive from Seller, free and clear of all encumbrances and interests in property (excluding Assumed Liabilities), all of Seller's right, title and interest as of the Closing Date in and to all of Seller's assets and properties, real, personal, or mixed, tangible and intangible, of every kind, nature and description, wherever located, including: (i) all right, title and interest in, those certain unpatented mining claims held in the name of Seller; and (ii) any rights, claims or interest in, under or to any assets owned by WUCC or conveyed to Purchaser pursuant to the WUCC APA.

**TERMS AND CONDITIONS:**  (a)   Seller shall deliver to Purchaser, as of the Closing Date, all requested transfer documents and agreements necessary to consummate the transactions contemplated hereunder, in the form requested by Purchaser.

(b)   Not later than two (2) business days after execution of this Term Sheet by all parties hereto, Seller shall make a motion for an order selling the Purchased Assets to Purchaser upon the terms hereof.

(c)   Seller acknowledges that the terms and conditions of this paragraph are a condition to Purchaser's obligation to purchase the Purchased Assets pursuant to this Term Sheet and that Purchaser is relying on the release set forth in this paragraph in consummating such purchase.  Effective as of the Closing Date, Seller hereby releases and forever discharges Purchaser, SMP, and its affiliates, and each of their respective individual, joint or mutual, past, present and future directors, officers, members, managers, Affiliates, stockholders, controlling persons, successors and assigns (individually, a "**Releasee**" and collectively, "**Releasees**") from any and all claims, demands, proceedings, causes of action, orders, obligations, contracts, agreements, debts and liabilities

whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which Seller or any of its affiliates now has, has ever had or may hereafter have against the respective Releasees arising contemporaneously with or prior to the Closing Date or on account of or arising out of any matter, cause or event occurring contemporaneously with or prior to the Closing Date, including, but not limited to, any Avoidance Actions, any rights under any of the documents evidencing the Assumed Liabilities or with respect to the Seller's bankruptcy case, whether pursuant to their respective organizational documents, contract, bankruptcy law or otherwise and whether or not relating to claims pending on, or asserted after, the Closing Date; provided, however, that nothing contained herein shall operate to release any obligations of Purchaser arising under this Term Sheet. Seller hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any proceeding of any kind against any Releasee, based upon any matter purported to be released hereby. Further, Seller shall obtain a final order, or include in the sale order, that applies the provisions and releases hereof to any and all third parties that may assert any such claims or actions or any other actions on Seller's behalf or in place of Seller; the foregoing shall be a condition to Seller's obligation to complete the transactions contemplated hereunder. If any provision of this paragraph is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this paragraph will remain in full force and effect. Any provision of this paragraph held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable. If any provision of this paragraph is held invalid or unenforceable by any court of competent jurisdiction, Purchaser may elect, in its sole discretion, to terminate this Term Sheet.

**AUTHORITY:** CS and SMP represent, warrant and acknowledge that the party or parties executing this Term Sheet on behalf of CS and SMP, respectively, have all requisite power and authority to enter into this Term Sheet. Seller represents, warrant and acknowledge that the party or parties executing this Term Sheet on behalf of Seller have all requisite power and authority to enter into this Term Sheet.

**OFFER PERIOD:** This offer is for immediate acceptance by Debtors, in no event later than 5:00 P.M. Eastern Daylight Time, Tuesday, July 12, subject to approval by the Bankruptcy Court.

**CONDITIONS TO TERM SHEET:**

(a) Seller's compliance with the terms hereof.

(b) An order of the Bankruptcy Court embodying or incorporating the terms hereof.

(c) Completion of the WUCC APA.

(d) In approving, executing and agreeing to this Term Sheet, Seller agrees to (1) promptly file with the Bankruptcy Court a motion with respect to this Term Sheet and the WUCC APA in accordance with the terms hereof, and (2) diligently prosecute the approval of this Term Sheet and WUCC APA and pursue the transactions contemplated thereunder.

(e) CS does not object to overbid of the sale contemplated hereunder in accordance with and to the extent required by Section 363 of the Bankruptcy Code.

*[Signature Page Follows]*

ACKNOWLEDGED AND AGREED:

**COPPER KING MINING CORPORATION**

By: _____

A. John A. Bryan, Jr., Chief Executive Officer

**CS MINING, LLC**

By:   SKYE MINERAL INVESTORS, LLC
Title: Member

    By:   EMPIRE ADVISORS, LLC

    Its:   Manager

    By: _____

      David J. Richards, President


By:   CLARITY COPPER, LLC
Title: Member

    By: _____

      Clinton W. Walker, Manager


**SKYE MINERAL PARTNERS, LLC**

By:   SKYE MINERAL INVESTORS, LLC
Title: Member

    By:   EMPIRE ADVISORS, LLC

    Its:   Manager

    By: _____

      David J. Richards, President


By:   CLARITY COPPER, LLC
Title: Member

    By: _____

      Clinton W. Walker, Manager

**EXHIBIT "3"**

**EXHIBIT 3**

**THE DEBTOR DOES NOT BELIEVE THAT ANY CURE AMOUNTS EXIST FOR THE CONTRACTS TO BE ASSIGNED TO CS.  ANY CURE AMOUNTS ASSOCIATED WITH THE REAL PROPERTY LEASES LISTED HEREIN WILL HAVE BEEN PAID PRIOR TO THE HEARING ON THE SALE MOTION AS SUCH LEASES WILL HAVE BEEN ASSUMED BY THE DEBTOR PRIOR TO THE HEARING ON THE SALE MOTION.**

1.1    That certain Mining Lease and Option Agreement between Beverly Prodzinski a.k.a. Beverly Bealer, widow of Alfred W, Bealer, whose address is 201 N. 100 W., Milford, Utah 84751 (hereinafter referred to as the "Lessor")and Cortex Mining & Exploration Co., Inc. dated May 5, 1990, as amended and assigned to Seller, including by that certain Amendment To Mining Lease and Option Agreement between Lessor and Seller entered into and made effective as of April 1, 2004.

1.2    That certain mining lease entered into as of the 28th day of April, 1994 by and between Horn Silver Mines, Inc., a Utah Corporation of Salt Lake City, Utah, and Dotson Exploration Co., of Milford, Beaver County, Utah, as amended and assigned to Seller.

1.3    That certain Mineral Lease and Option to Purchase Agreement by and between Gilbert A. McCulley, D. Carol McCulley, Grant Wood, and Gayle Wood, and Seller as of July 27th, 2004.

1.4    That certain Mineral Lease and Option to Purchase Agreement (the "Agreement"), by and between Horn Silver Mines, Inc., a Utah corporation, whose address is 1005 E. 3900 S., Salt Lake City, Utah 84124 (hereinafter referred to as the "Lessor"), and Western Utah Copper Company, a Utah corporation, whose address is P.O. Box 681659, Park City, Utah 84068-1659 (hereinafter referred to as "WUCC"), is entered into and made effective as of December 19, 2002.

1.5    That certain Mining Lease Agreement made and entered into as of the 30th day of October, 1995, by and between A.J.L. Corporation, a Nevada corporation, and Cortex Mining and Exploration Co., Inc., a Utah corporation.

1.6    All Utah State Trust Lands Administration Leases still in effect.

1.7    The Nevada Star Agreement, and all rights and remedies of Seller of any kind thereunder.

1.8    Any rights under Seller's additional or other mineral leases, if any.

1.9    Any agreements with power companies or suppliers, including that certain Master Electric Service and Facilities Improvements Agreement between Rocky Mountain Power and Western Utah Copper Company dated as of the 28th day of October, 2008.

1.10    All of company's rights under the Republic Transactions, including any equipment leases thereunder.

1.11    The rights of Seller under communications and agreements with the Beaver County Commission with respect to roads, including but not limited to that certain letter to Seller dated as of January 19, 2007, and pursuant to that certain hearing held as of September 6, 2005.

1.12    Any contractual rights related to rights of way, licenses or easements (see real property schedule).